**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LAUTH INVESTMENT PROPERTIES, LLC, | ) Case No. 09-06065-BHL-11 |
| | ) |
| Debtor. | ) Joint Administration Requested |
| | ) |
| In re: | ) Chapter 11 |
| | ) |
| LIP DEVELOPMENT, LLC, | ) Case No. 09-09-06066-BHL-11 |
| | ) |
| Debtor. | ) Joint Administration Requested |
| | ) |
| In re: | ) Chapter 11 |
| | ) |
| LIP INVESTMENT, LLC, | ) Case No. 09-06067-BHL-11 |
| | ) |
| Debtor. | ) Joint Administration Requested |
| | ) |

## MOTION TO ENFORCE THE AUTOMATIC STAY

In support of its Motion to Enforce the Automatic Stay, Debtors Lauth Investment Properties, LLC ("LIP"), LIP Development, LLC ("LIP D"), and LIP Investment, LLC ("LIP I") (collectively, "Lauth" or "Debtors"), state as follows:

## INTRODUCTION

1.      The credit crisis which has engulfed the Nation has claimed its latest victim.  On Friday, May 1, 2009, Indianapolis real estate development company Lauth Investment Properties, LLC, and the affiliated Debtors filed their petitions for relief under Section 11 of Chapter 11 of the United States Code in order to facilitate an orderly restructuring that will preserve value for all stakeholders.

2.      Founded in 1977 and headquartered in Indianapolis, Lauth Group, Inc. and its affiliates ("Lauth") has been one of Indiana's most successful businesses.  As of 2008, Lauth was the 13th largest real estate developer in the United States.  Lauth is not merely a developer, it is a construction business as well — one ranked in the top 100 contractors in the country.  This combination of development and construction expertise allowed Lauth to become, by 2007, one of Indiana's 30 largest private businesses and the employer of over 420 people.

3.      Unfortunately, the ongoing economic crisis that has claimed as victims retailers and developers across the country has devastated Lauth's real estate business.  As Alan Greenspan testified to the United States Congress, even the most sophisticated economists in the country have been stunned by the extent of the ongoing credit crunch:

> We are in the midst of a once-in-a-century credit tsunami.  Central banks and governments are being required to take unprecedented measures… This crisis … has turned out to be much broader than

2

anything I could have imagined.  It has morphed from one gripped by liquidity restraints to one in which fears of insolvency are now paramount … Those of us who have looked to self-interest of lending institutions to protect shareholder's equity (myself especially) are in a state of shocked disbelief … [I]f you go back and ask yourself how in the early years anybody could realistically make a judgment as to what was ultimately going to happen to subprime, I think you're asking more than anybody is capable of judging.

(*The Financial Crisis and the Rate of the Federal Regulators:  Hearing Before the House Comm. on Oversight and Gov't Reform*, 110th Cong. (2008) (Statement of Alan Greenspan).)

4.      The credit crisis has been particularly devastating to the real estate industry.  It has dramatically worsened the leasing environment, resulted in lower loan-to-value requirements by secured lenders which in turn stopped the sale of real estate projects, and caused widespread cash flow shortages.  This combination has left Lauth generally unable to pay its debts as they come due.

5.      Lauth's efforts to restructure its portfolio of projects have been proceeding outside of bankruptcy for the last six months.  That all changed on Monday, April 27, 2009, when Chicago-based REIT Inland American Real Estate Trust, Inc. ("Inland") improperly attempted to assert unilateral control of LIP I and commenced a campaign to seize the remaining gems of the Lauth empire to satisfy its own interests.  Inland's efforts to date have engendered confusion on the part of Lauth's secured lenders and have imperiled the value of Lauth's assets to the detriment of all of Lauth's creditors.

6.      In order to achieve an orderly reorganization that will protect the interests of *all* creditors, Lauth initiated these reorganization proceedings.  It has taken the additional protective

step of filing this motion in order to ensure that Inland abides by the automatic stay that is

imposed by 11 U.S.C. § 362.

**JURISDICTION AND VENUE**

7.      This Court has jurisdiction over this matter, which relates to the above-captioned,

pending cases, pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within

the meaning of  28 U.S.C. § 157(b)(2).

8.      Pursuant to 28 U.S.C. § 1409(a), venue is appropriate in this Court because this is

a matter arising in or related to a case under title 11 of the United States Bankruptcy Code that is

pending in this judicial district.

9.      The statutory bases for the relief requested herein are sections 105(a) and 362 of

the Bankruptcy Code.

**BACKGROUND**

**A.      The Debtors Are Integral Parts of One of Indiana's
         Largest Private Businesses.**

10.      The Debtors are each affiliates of Lauth, a real estate business conglomerate

which has developed over $3.0 billion dollars worth of real estate projects and which has over

100 separate subsidiaries and affiliates.  (Affidavit of Robert Lauth, Ex. A, ¶3.)  Prior to 2009,

Lauth was one of Indiana's 30 largest private businesses.  (*Id.* ¶ 4.).  Until the end of 2007, Lauth

directly employed approximately 420 people in the state of Indiana and throughout the country.

(*Id.*)  In addition to its Indianapolis headquarters, Lauth maintained offices in Denver, Charlotte,

Phoenix, Orlando Pittsburgh and Dallas.  (*Id.*)

11.      Lauth was founded in 1977 as a small Indianapolis property manager known as

Ernst – Eaton & Associate, Inc.  (*Id.* ¶ 5.)  In 1982, Robert Lauth joined the firm and began to

4

expand its line of services to include office, industrial and healthcare development and formed

Lauth Construction which is now licensed as a general contractor in forty-nine states. (*Id.*)

12.     By the start of the 1990's, Lauth had its eye on nationwide expansion.  In 1992, Lauth was awarded its first out-of-state development project in Orlando, Florida. (*Id.* ¶ 6.)  In the ensuing fifteen years, Lauth expanded to assume a national footprint — as of the Petition Date, Lauth has developed projects in 35 states and currently owns projects in fifteen states. (*Id.*)

13.     Lauth's revenue growth matched its geographic expansion.  Lauth's gross revenues doubled in 2005 and again in 2006, with gross revenues increasing to $591 million annually by 2006. (*Id.* ¶ 7.)

### B.     The Mezzanine Loan

14.     By 2006, Lauth's size and complexity had grown to a point requiring a more refined corporate structure.  At the same time, equity and debt investors were clamoring for the opportunity to participate in the profits.  As a result, Lauth engaged the law firm of Hogan & Hartson to assist it with a corporate reorganization of its real estate holdings that would allow it to accommodate and put to use new capital infusions. (*Id.* at ¶ 8.)

15.     The structure suggested by Hogan & Hartson was a traditional corporate tree. The Lauth Group, Inc. was formed as a top-level holding company, a number of mid-level holding companies were created to provide platforms to support structured debt, and Lauth's various developments were placed in individual special purpose entities holding debt secured by the entity's development projects. (*Id.* at ¶ 9.)

5

16.     In conjunction with its strategic reorganization, Lauth engaged in extensive negotiations with a wide variety of potential investors.  After analyzing competing offers and extensive negotiations, Lauth entered into a memorandum of understanding with Inland.  (*Id.* at ¶ 10.)  The memorandum set forth the basic terms of a complex lending arrangement that made up to $250 million in capital available for use in developing new projects as part of Lauth's national strategy.  (*Id.*)

### C.     The Financing Arrangement And Mezzanine Loan

#### 1.  *Structure and economics*

17.     LIP's financing arrangement with Inland was formally executed in June 2007. (Mezzanine Loan Agreement, Ex. B.)  The arrangement was structured as a preferred equity investment into LIP Holdings, LLC (a sub-holding company under LIP) with a mezzanine loan to LIP Development, LLC (another sub-holding company under LIP) and, as described below, consists of myriad corporate formation and governance agreements relating to the underlying loan agreement.

18.     First, the parties formed an entity known as LIP Holdings, LLC ("LIP H") with LIP (an affiliate of Lauth Group, Inc.) owning 95% of the common membership interests and Inland American (LIP) Sub, LLC (a wholly owned subsidiary of Inland) ("Inland LIP") owning the remaining 5%.  (LIP H LLC Agreement, Ex. C, Annex D.)

19.     Inland LIP then committed to infuse $250 million in equity into LIP H, receiving preferred interests in exchange.  (*Id.* at §4.2(B).)

20.     Next, two new entities were formed:  (i) LIP Development, LLC ("LIP D"); and (ii) LIP Investment, LLC ("LIP I") with LIP owning 100% of the outstanding membership

interests in LIP D and LIP D, in turn, holding 100% of the outstanding membership interests in LIP I. (LIP D Agreement, Ex. D, Art. IV; LIP I Agreement, Ex. E, §4.01.)

21.     Eighteen of Lauth's pre-existing building projects and thirteen parcels of land, with an estimated cost of $389 Million and an estimated equity value of $64 Million were then contributed beneath LIP I in the corporate tree and eight of Lauth's pre-existing building projects, with an estimated cost of $118 million and an estimated equity value of $30 million were then contributed beneath LIP H in the corporate tree for total contributions of twenty-six projects and thirteen land parcels with an estimated costs of $507 Million and an estimated equity value of $94 Million.  (Lauth Aff., Ex. A, ¶ 11.)  To obtain funding for many of these projects, which pre-dated Lauth's strategic restructuring, certain individual managers of Lauth were required to personally guaranty the financing of the projects contributed LIP I.  (E.g., Sept. 2006 Guaranty A Payment, Ex. G.)

22.     Contemporaneously with the formation of these new entities, LIP H and LIP D entered into a Mezzanine Loan Agreement dated June 8, 2007 (the "Mezzanine Loan") with LIP H as lender and LIP D as borrower.  (Mezzanine Loan Agreement, Ex. B.)  Under its terms, LIP H provided LIP D with a $250 million revolving note, with quarterly interest payments at 12% on the outstanding indebtedness under the revolving facility.  (Mezzanine Loan Agreement Ex. B, § 2.5(a); Revolving Note, Ex. F.)

### 2.  *The Pledge*

23.     As collateral for the Mezzanine Loan, LIP D posted its ownership interests in LIP I.  (Ownership Pledge, Assignment, and Security Agreement (the "Pledge Agreement"), Exhibit D. to Ex. B.)

24.      Notwithstanding the Pledge, LIP D nonetheless retained control of the operating

rights of LIP I under § 4 of the Pledge Agreement:

> Rights of Pledgor in the Collateral.  Until any Event of Default
> occurs under this Agreement, Pledgor shall be entitled to exercise
> all voting rights and to receive all dividends and other distributions
> that may be paid on any Collateral and that are not otherwise
> prohibited by the Loan Documents.

(*Id.* § 4.)

25.      In the event of a default, LIP H had the right — but not the obligation — to

exercise its discretion to assume control of LIP I.  (*Id.* § 8.)  In order to exercise this discretion,

LIP H's Board of Managers needed to approve the assumption of control as a "Major Decision"

under the LIP H Operating Agreement.  (LIP H LLC Operating Agmt., Ex. C, § 7.2(B)(11).)

26.      Significantly, Lauth's principals negotiated for important protections with respect

to "Major Decisions" undertaken by LIP H's Board of Managers.  (*Id.* § 7.2(B).)  Before LIP H

can undertake a Major Decision, it must secure the consent of at least one Inland manager and at

least one Lauth manager.  (*Id.*)  ("Notwithstanding Section 7.2A and any other provisions of this

Agreement to the contrary … the Board of Managers shall not take or approve, and shall not

cause LIP H to take, directly or indirectly, any of the following actions or any action in

furtherance of the following without the approval of at least one Lauth Manager and at least one

Inland Manager… .")

27.      Specifically included as a LIP H "Major Decision" was any attempt to "cause

[LIP H] to exercise **any material discretion** under the Mezzanine Loan Agreement (including

the granting of material provisions, permitting any assignment, or altering any security

interests)…."   (*Id.* at § 7.2(B)(11) (emphasis added).)   Thus, both Lauth and Inland were

protected in the event LIP D defaulted on the Mezzanine Loan because no efforts to exercise LIP H's discretion to assert control of LIP I are permissible without the consent of *both* Lauth and Inland.[1]

### D.    Expansion of Lauth With the Mezzanine Loan

#### 1.   *New development projects and continued success.*

28.    With its new corporate structure and readily available capital, Lauth continued its meteoric rise.  LIP (i) finished eight highly profitable projects that then were placed as wholly-owned subsidiaries under LIP H; (ii) financed and began construction on twenty-six new vertical development projects; and (iii) financed the acquisition of eight additional parcels of land. (Lauth Aff., Ex. A, ¶ 12.)

29.    Around the same time, LIP I entered into a number of agreements with individual managers to provide indemnification on any liability that the individuals might incur as a result of their personal guaranties on the pre-existing projects that had been transferred to LIP I and LIP H as part of the collateral package under the Mezzanine Loan.  (*Id.* at ¶ 13.)  Because the guarantors were also officers of LIP, these indemnification agreements simply supplemented the already existing indemnification provisions included in the LIP D and LIP I LLC Agreements. (LIP D LLC Agreement, Ex. D, Art. VI; LIP I LLC Agreement, Ex. E, Art. VI.)

---

[1]    A "Lauth Manager" is defined as a manager of LIP H's Board of Managers appointed by LIP.  (LIP H LLC Operating Agreement, Ex. C, § 7.1)

### E.   The Global "Credit Tsunami" Hits Lauth

#### 1.  *An unprecedented contraction of the credit markets occurs*

30.   Lauth finds itself in its current circumstances as a result of a series of unprecedented events arising in the real estate financial market.  (Lauth Aff., Ex. A, ¶ 14.) Beginning in 2007, the U.S. capital market deteriorated significantly due to rising subprime residential mortgage defaults and the deterioration in value of certain residential mortgage-backed securities.  The failures of Fannie Mae and Freddie Mac last summer, followed by the government rescue of AIG and the bankruptcy of Lehman Brothers on September 15, 2008, brought the commercial real estate finance markets to a virtual shutdown.

31.   As evidenced by the October 23, 2008 Congressional testimony of former Federal Reserve chairman Alan Greenspan, the credit crisis was not anticipated by even the most senior economists:

> We are in the midst of a once-in-a-century credit tsunami.  Central banks and governments are being required to take unprecedented measures… This crisis … has turned out to be much broader that anything I could have imagined.  It has morphed from one gripped by liquidity restraints to one in which fears of insolvency are now paramount … Those of us who have looked to self-interest of lending institutions to protect shareholder's equity (myself especially) are in a state of shocked disbelief … [I]f you go back and ask yourself how in the early years anybody could realistically make a judgment as to what was ultimately going to happen to subprime, I think you're asking more than anybody is capable of judging.

(*The Financial Crisis and the Rate of the Federal Regulators:  Hearing Before the House Comm. on Oversight and Gov't Reform*, 110th Cong. (2008) (Statement  Alan Greenspan).)

**2.   LIP-D misses its 2008 4th Quarter Mezzanine Loan interest payment.**

32.     Despite its well-established portfolio and sound management, Lauth was not immune to this "credit tsunami."  Its project-level secured lenders began demanding lower debt-to-equity ratios on many of LIP's outstanding credit facilities.  (Lauth Aff., Ex. A, ¶ 15.)  This forced LIP to borrow more heavily against the Mezzanine Loan to lower project level balances, which, in turn, increased LIP D's interest obligations under the Mezzanine Loan.  (*Id.*)  Lauth then saw its accounts receivable grow as other ailing businesses began to slow pay or, worse, discharged their debts in bankruptcy.  (*Id.* at ¶ 16.)  Finally, as happens in any severe recession, the sales of developed real estate stopped and  businesses cut back their expansion plans, leading to a reduction in demand for Lauth's new developments.  (*Id.*)

33.     Lauth could likely have withstood any one of these headwinds.  When all of them hit at once, something had to give.  In this case, it was LIP D's ability to make its interest payment on the Mezzanine Loan.  (*Id.* at ¶ 17.)

34.     As a result, on December 31, 2008, rather than paying the entire interest payment to LIP H on the Mezzanine Loan, LIP D was only able to pay a potion of the interest expense, triggering an Event of Default under the Mezzanine Loan.  (*Id.*)

**F.     LIP H chooses not to declare a default or attempt to assume control of LIP I.**

35.     At the time of the Event of Default, LIP H took no action under the Mezzanine Loan.  Indeed, LIP H did not even declare a default.  Nor did it convene a meeting of its Board of Managers to discuss any Major Decisions to be taken in connection with the default.

36.    Understanding that the Debtors' development and construction expertise were critical to weathering the economic storm, Inland asked to keep LIP I's management in place and requested that Robert L. Lauth, Jr. remain as Chairman of LIP H.  (*Id.* at ¶ 19.)

37.    Inland told Lauth executives to use all of the cash in the system to keep the real estate portfolio and operating company healthy.  (*Id.* at ¶ 20.)  As a result, LIP D loaned Lauth $1.5 million to maintain the health of Lauth's operating company and keep key executives.  (*Id.*) In addition, the Lauth principals loaned Lauth $7 million from their personal accounts to cover operating expenses and construction invoices.  (*Id.*)

38.    As demonstrated by the foregoing, initial negotiations between Inland and the Debtors were amicable.  Indeed, Inland requested that the Debtors leverage their relationships with project-level lenders in order to obtain financial accommodations on the project debt that would aid its ability to upstream assets to LIP I.  (*Id.* at ¶ 21.)  In connection with that request, Inland assured the Debtors that it had earmarked approximately $200 million to support any such restructuring with project lenders.  (*Id.*)

39.    LIP's negotiations with its project-level lenders were initially successful.  After lengthy negotiations, the Debtors' principals persuaded LIP I's largest secured lender, Wells-Fargo, to restructure certain of its loans and contacted Inland to discuss the proposed terms for a refinancing of the obligations on 10 projects.  (*Id.* at ¶ 22.)  In their own words, Inland President Tom McGuinnis was "giddy" with the negotiated results and promised to quickly get back to the Debtors about moving forward on the refinancing.  (*Id.*)

G.      **Negotiations Between the Debtors and Inland Breakdown**

40.     As negotiations dragged on without an agreement by Inland to inject additional funds, the Debtors began to suspect that Inland sought something other than a comprehensive work-out aimed at maintaining Lauth as a going concern.  (*Id.* at ¶ 23.)

41.     In a call on April 15, 2009 between Robert Lauth and Inland President Tom McGuinnis, Inland claimed that it was unwilling to proceed with the Wells Fargo refinancing because it did not want to cross-collateralize the Wells Fargo project-level obligations.  (*Id.* at ¶ 24.)

42.     It was at this moment that Inland revealed its true intent — cherry-pick the prime assets of LIP I to satisfy LIP H's Mezzanine Loan and leave the remaining portfolio to collapse to the detriment of all other creditors.  (*Id.* at ¶ 25.)

43.     Concerned that Inland's actions might threaten the entire business, at 9:00 a.m. on April 27, 2009, LIP D amended LIP I's LLC Agreement to divest LIP D of control over LIP I's management.  (*Id.* at ¶ 26.)  Management control was transferred to a Board of Managers, the structure used at most of the LIP I subsidiaries.  Robert Lauth, Gregory C. Gurnik and Michael S. Curless were elected as the initial managers.  (*Id.*)

H.      **Inland Wrongly Asserts Unilateral Control of LIP I.**

44.     LIP's concerns were warranted.  Inland scheduled a LIP H meeting on the afternoon of April 27 ostensibly to discuss "general business matters."  (*Id.* at ¶ 27.)  However, just moments before the meeting began, the Lauth Managers were blindsided with an email agenda from Inland indicating that the LIP H Board would vote on exercising its various rights under the Mezzanine Loan.  (April 27, 2009 Email from M. Podboy to B. Lauth, Ex. H.)

13

45.     At the meeting, the Inland Managers (as defined in the Mezzanine Loan Agreement ) voted their 3 votes in favor of various LIP H resolutions which they proposed and read very quickly and orally (without providing written copies to Lauth ) exercising material discretion under the Mezzanine Loan (the "Material Discretion Resolutions"), which included purporting to divest LIP D from operating the business.  (Lauth Aff. at ¶ 28.)   Both Lauth Members voted against the proposed resolutions.  (*Id.*)   Because the resolutions were Major Decisions under the LIP H Operating Agreement, the failure to obtain a Lauth Member consent defeated the motions.  (LIP H LLC Operating Agreement, Ex. C 7.2(B).)   However, in minutes of the meeting circulated later that day, Inland falsely represented that the Material Discretion Resolutions had *passed*.   (Minutes of Telephonic Meeting of LIP Holding LLC Board of Managers April 27, 2009, Ex. I.)   Obviously, the minutes were not approved by Lauth.

46.     Immediately thereafter, Inland began corresponding with project-level lenders, falsely claiming that LIP H was now in control of LIP I and its subsidiaries, that existing management had been divested of all authority, and that all future communications should be with LIP H's purported designee.  (*E.g.*, April 27, 2009 Letter from M. Podboy to N. Hamond, Ex. J.)

**I.      The Chapter 11 Cases**

47.     Inland's unlawful attempt to usurp LIP D's right to operate LIP I threatens the Debtor's ability to successfully reorganize for the benefit of all creditors.

48.     Indeed, Inland's improper interference with LIP I's lender relationships has created a state of confusion regarding the control of LIP I and its subsidiaries to the detriment of the Debtors' creditors as a whole.

14

49.    Moreover, if left unabated (and if Inland were successful in its plan to divest LIP I of its most valuable assets), it would transform an otherwise well-managed, interconnected development business that might successfully reorganize into a collection of distressed assets that are incapable of obtaining their true value in today's deflated real estate market.

50.    The Debtors have filed this bankruptcy to put a stop to the confusion and to prevent Inland's actions from thwarting a potentially successful reorganization of the Debtors' business.

**ARGUMENT**

**I.    Legal Standard**

51.    Two basic goals of bankruptcy law are to provide an orderly process for the resolution of a debtor's obligations and to preserve going concerns.  *See U.S. v. Frontone*, 383 F.3d 656, 659 (7th Cir. 2004) ("Bankruptcy maximizes the repayment of an insolvent debtor's debts by overcoming the collective-action (or musical-chairs) problem that arises when each of the debtor's unsecured creditors races to seize the debtor's assets, when a more orderly liquidation, or a reorganization, would yield a larger total recovery."); *In re Castleton Assoc. L.P.*, 109 B.R. 347, 350 (Bankr. S.D. Ind. 1989) ("Central to the aims and objectives of bankruptcy philosophy is whether the debtor has an ongoing business which it intends to reorganize.")

52.    Key among the tools available to bankruptcy courts to accomplish these ends is the automatic stay provision of § 362.  The United States Supreme Court has recognized "[t]he automatic stay provision of the Bankruptcy Code, § 362(a) … as one of the *fundamental debtor protections provided by the bankruptcy laws*."  *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*,

15

474 U.S. 494, 503 (1986) (emphasis added).  The automatic stay is sufficiently important that its

violation is sanctionable and enforced through the court's contempt power.  *See In re Worldcom,*

*Inc.*, 361 B.R. 697, 721 (Bankr. S.D.N.Y. 2007) ("contempt proceedings are the proper means of

compensation and punishment for willful violations of the [automatic] stay").

53.     Importantly, section 362 does not limit the reach of the automatic stay to actual

litigation.  By its terms, section 362(a)(2), stays "any act" and should be construed broadly.

*Delpit v. Comm'r*, 18 F.3d 768, 771 (9th Cir. 1994) ("Section 362 is *extremely broad* in scope

and should apply to *almost any type* of formal or informal action against the debtor or the

property of the estate") (internal quotations and citations omitted) (emphasis in original).

54.     Section 105 of the Bankruptcy Code provides additional — and even broader —

power for this Court to issue an order enforcing the automatic stay.  Section 105 permits courts

to "issue any order, process, or judgment that is necessary to carry out the provisions of [the

Bankrutpcy Code]."  11 U.S.C. § 105(a).  Accordingly, "[t]he Bankruptcy Court has authority

under section 105 broader than the automatic stay provisions of section 362 and may use its

equitable powers to assure the orderly conduct of the reorganization proceedings."  *In re*

*Chateaugay Corp.*, 93 B.R. 26, 29 (S.D.N.Y. 1988); *accord In re Keene Corp.*, 162 B.R. 935,

944 (Bankr. S.D.N.Y. 1994); *In re AP Indus., Inc.*, 117 B.R. 789, 801 (Bankr. S.D.N.Y. 1990).

**II.     An Order Pursuant to § 362(a) and § 105 Is Warranted Because Inland's Conduct
Jeopardizes the Orderly Reorganization of the Debtors and Minimizes Their Value
as Going Concerns.**

55.     The Debtors' purpose in filing their Chapter 11 petition is to obtain a fresh start

by using the orderly process of the Bankruptcy Code to maximize the value of LIP, LIP D, and

LIP I as going concerns.

16

56.     Inland's recent conduct, however, will hinder the Debtors' reorganization. Inland believes that it is entitled to run LIP I for its own benefit, ignoring the interests of the Debtor's other creditors. Inland's goal was to use LIP I as a platform to cherry-pick the Debtors' best assets for itself, leaving the underperforming assets to the Debtors' other creditors. To this end, Inland has already contacted lenders to various LIP I subsidiaries to inform them, incorrectly, that Inland now has the sole authority regarding the loans. (See *e.g.*, April 27, 2009 Letter from M. Podboy to N. Hamond, Ex. J.) The Debtors only expect these efforts to intensify in the coming days.

57.     In addition to directly harming the Debtors' other creditors by attempting to remove valuable assets from the estate, Inland's conduct is greatly diminishing the Debtors' going concern value. The Debtors' operate a portfolio of properties that are a part of the larger Lauth Group network. Aside from obvious economies of scale, the Debtors are able to provide tenants with access to a nationwide network of properties and tap into the Lauth Group's knowledge and experience. Thus, keeping the Debtors intact allows them to continue to reap these benefits and maximizes their value. Dividing up the Debtors piecemeal, as Inland is attempting, does just the opposite.

58.     Inland is also undoing the benefits of the Debtors' relationship with their secured lenders. The Debtors and their connection to the Lauth Group are the reason that the secured lenders agreed to lend in the first instance. Indeed, many of the secured lenders have done repeated business with the Debtors and the Lauth Group for many years. There is no better evidence of the strength of the Debtors' relationships with the secured lenders than the fact that Lauth's managers successfully negotiated a refinancing with Wells Fargo, their largest secured lender. That Inland ultimately thwarted this refinancing demonstrates conclusively that the

17

Debtors, and not Inland, need to be at the helm. Inland's interference could lead to unneeded foreclosures at the property level entities that are not part of this filing at the current time.

59.     Inland's conduct and the harms flowing from it are precisely what section 362's automatic stay was meant to avoid. Inland is attempting to put itself ahead of the Debtors' remaining creditors and maximize its own recovery at their expense. By doing so, Inland also undermines the value of the going concern, and harms the value of the remaining assets. Thus, the Debtors' creditors lose twice: once when Inland takes the prime assets for itself and again because what remains has diminished in value.

60.     The Debtors believe that Inland will not immediately cease its activities as required by the automatic stay. In order to avoid potentially significant harm to the Debtors' restructuring goals, they ask this Court to issue an order extending the automatic stay to prohibit Inland's improper efforts to break-up the Debtors.

**CONCLUSION**

WHEREFORE, the Debtors respectfully requests entry of an order an entry of an order,

substantially in the form attached hereto as Exhibit K, and granting such other and further relief

as the Court may deem just and proper.

Dated:  May 4, 2009                          LAUTH INVESTMENT PROPERTIES, LLC,
                                             LIP DEVELOPMENT, LLC, and
                                             LIP INVESTMENT, LLC,


                              By:      /s/ Jerald I. Ancel
                                     Jerald I. Ancel, one of their proposed counsel
                                     Attorney No. 2390-49


Jerald I. Ancel
Jeffrey J. Graham
TAFT, STETTINIUS & HOLLISTER LLP
One Indianapolis Square
Suite 3500
Indianapolis, Indiana 46204
Telephone:  317-713-3500
Facsimile:  317-713-3699

James Stempel
Ross Kwasteniet
Stephen C. Hackney
Micah E. Marcus
KIRKLAND & ELLIS, LLP
300 N. LaSalle
Chicago, Illinois 60654
Telephone:  312-862-2000
Facsimile:  312-862-2200

   *Proposed Attorneys for the Debtors and Debtors-in-Possession*