## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| LAUTH INVESTMENT PROPERTIES, LLC., *et al.*,[1] | ) | Case No. 09-06065-BHL-11 |
|  | ) | Jointly Administered |
| Debtors. | ) |  |

## MOTION TO DISMISS THE DEBTORS' CHAPTER 11 CASES OR, AS AN ALTERNATIVE, TO APPOINT A CHAPTER 11 TRUSTEE

LIP Holdings, LLC ("Holdings"), a creditor and interested party, by its attorneys, von Briesen & Roper, s.c. and Hostetler & Kowalik, P.C., respectfully requests, pursuant to 11 U.S.C. § 1112(b)(1), and the Court's inherent power to prevent the abuse of process and carry out the provisions of title 11, *see* 11 U.S.C. § 105(a), that the Court dismiss the bankruptcy cases of LIP Investment, LLC ("LIP-I"), LIP Development, LLC ("LIP-D") and Lauth Investment Properties, LLC ("LIP") (collectively, the "debtors" and individually, "debtor"), or, alternatively and as an interim relief, to appoint a chapter 11 trustee to manage the bankruptcy estates of the debtors.

The bankruptcy case of debtor LIP-I should be dismissed because it did not have authority to file its case. Holdings has a perfected security interest in LIP-D's ownership interest in LIP-I. After the default of LIP-D (Holdings' borrower), Holdings properly exercised its right to take management and control of LIP-I, including the sole right to file a bankruptcy petition. Despite full knowledge of this change of control, Robert L. Lauth, Jr., on behalf of LIP-I, filed a

---

[1] The debtors include: Lauth Investment Properties, LLC (09-06065); LIP Development, LLC (09-06066); and LIP Investment, LLC (09-06067).

petition in bankruptcy, falsely asserting authority to do so.  Additionally, the circumstances demonstrate that the debtors filed their cases in bad faith.

In the alternative and as an interim relief, if the Court does not dismiss the debtors' bankruptcy cases, Holdings moves the Court to appoint a chapter 11 trustee to manage the debtors' bankruptcy estates because of debtors' malfeasance in managing their assets by engaging in fraudulent transfers for the benefit of the Robert Lauth Insiders (defined below), in permitting the conversion of funds belonging to the LIP-I Subsidiaries (defined below) for the benefit of their affiliates, and defrauding Holdings in connection with their draws under the Mezzanine Loan Agreement (defined below).

## FACTS

1.      **Mezzanine Loan Agreement.**

Holdings and LIP-D entered into a secured loan transaction as of June 8, 2007 to provide LIP-D the benefit of access to a credit facility to allow LIP-D (through LIP-I and its Subsidiaries) to conduct development endeavors ("Mezzanine Loan").  (Affidavit of Lori J. Foust Dated June 1, 2009, Ex. A, ¶ 3).  Holdings and LIP-D executed a Mezzanine Loan Agreement (the "Loan Agreement") and Holdings committed to loan up to $250,000,000 to LIP-D.  (Mezzanine Loan Agreement, Ex. B).   LIP-D's schedules of liabilities lists the debt due and owing to Holdings as $215,925,350.  (LIP-D's Schedule D Creditors Holding Secured Claims, Ex. C Page 2).

2.      **Ownership Pledge, Assignment and Security Agreement.**

At the same time LIP-D executed the Loan Agreement, it also executed an Ownership Pledge, Assignment and Security Agreement (the "Pledge Agreement") in favor of Holdings. (Affidavits of Michael E. Podboy and Lori J. Foust, Ex. A ¶ 5 (collectively, "Ex. A")).  LIP-D pledged its one hundred percent ownership interest in LIP-I (sometimes referred to as the

"Collateral") to Holdings to secure its repayment of the borrowed funds. (Pledge Agreement, Ex. D § 2).

**3.      The Transfer by LIP-D of the Actual Membership Certificate to Holdings.**

Holdings perfected its interest in the Collateral by taking physical possession of the original LIP-D certificate of membership interest in LIP-I (the "Membership Certificate") and by filing a financing statement with the Delaware Secretary of State. (Membership Certificate, Ex. E; Financing Statement, Ex. F). The Membership Certificate was a security under the Uniform Commercial Code. This status greatly enhanced the rights of Holdings over the typical rights accorded to a secured creditor. The right to transfer ownership or any control or management, or in any other way diminish the rights of Holdings in the Membership Certificate, was stripped from LIP-D the minute Holdings received possession of the actual Membership Certificate. LIP-D was only permitted a license to continue voting the LIP-I membership interest prior to a default, but that license did not permit LIP-D to void the rights of control and management that had been passed to Holdings when the Membership Certificate was delivered to Holdings. (Ex. D §§ 4, 8).

**4.      LIP-D Defaults under the Loan Agreement.**

LIP-D was required, but failed, to pay a quarterly interest payment on the borrowed funds that was due on December 31, 2008. (Ex. B § 2.5; Ex. A ¶ 9). As a result of this breach, LIP-D was in default under the Mezzanine Loan Agreement on the third business day after December 31st. (Ex. B. § 6.1(a)). LIP-D has remained in default ever since. (Ex. A ¶ 9).

**5.      The Right to Require Holdings to Take Action Against LIP-D in the Event of Default.**

The only members of Holdings are LIP and Inland American (LIP) Sub, LLC ("Inland Sub"). Holdings did not take immediate action against LIP-D upon its default because of an

agreement between LIP and Inland Sub that was memorialized in the Holdings Limited Liability Company Agreement and its annexes ("Holdings LLC Agreement"). (Holdings LLC Agreement, Ex. G). Before describing this agreement, it is important to understand the different economic interests of LIP and Inland Sub in Holdings.

On the same date that the Loan Agreement was signed, Inland Sub agreed to contribute cash equity into Holdings. (Contribution Agreement, Ex. H and Ex. A ¶ 7). The cash equity was the source of the funds that Holdings loaned to LIP-D under the Loan Agreement. On or about June 8, 2007, Inland Sub made an initial contribution of $80,391,336 of cash equity. (Ex. A ¶ 8). It made further contributions of cash equity into Holdings between June 8, 2007, and December 31, 2008, resulting in total contributions of $228,544,306.44. (Ex. A ¶ 8).

To induce Inland Sub to make these cash equity investments into Holdings, Inland Sub received, among other things, a five percent ownership of the common membership interests in Holdings and:

        (a)     100% of the Class A Participating Preferred Interests in Holdings, which required Holdings to make quarterly interest payments on the cash equity contributions to Inland Sub (referred to in the Holdings LLC Agreement as the "Class A Preferred Distribution" and required by the Contribution Agreement ) (Ex. G and Ex. H);

        (b)     the special rights and privileges that were afforded to Inland Sub in Annex A to the Holdings LLC Agreement (the Designation, Preferences and Rights of Class A Participating Preferred Interests of LIP Holdings, LLC ("Annex A")) (Ex. G Annex A);

Included in these special rights of Inland Sub as the holder of the Class A Participating Preferred Interests is its right to require Holdings to exercise its rights under the Loan Agreement if Holdings failed to make the quarterly interest payments mentioned above:

"If…(ii) the full amount of the Class A Preferred Distribution has not been paid for any three or more consecutive Distribution Periods, [Inland Sub] shall have the right to cause

(i) a Liquidating Event in accordance with Section 13.1(iv) of the [Holdings LLC Agreement] and (ii) <u>the Company [i.e., Holdings] to exercise all rights of the Company under the Mezzanine Loan Agreement</u>."

(Emphasis and bracketed information added). (The number of Distribution periods was later reduced from "three" to "two" by unanimous consent of LIP and Inland Sub).

(Ex. G Annex A § 6(c); Consent Resolution of Board of Managers of LIP Holdings, LLC, Ex. I).

Holdings funded the Class A Preferred Distribution payments to Inland Sub primarily from the quarterly interest payments made by LIP-D to Holdings. (Ex. A ¶ 6). When LIP-D defaulted in its quarterly payments, Holdings was unable to pay the Class A Preferred Distributions to Inland Sub. (Ex. A ¶ 9). The question that arises is why Holdings agreed to wait two[2] quarters before it could require collection action.

Inland Sub's ultimate right to seek liquidation of the venture and enforcement of the Mezzanine Loan was highly negotiated by the parties. (Ex. A. ¶ 11). While Inland Sub thought it should be able to force Holdings to exercise its control and other rights to the Collateral quickly upon a default, LIP wanted LIP-D to have a sufficient amount of time to correct defaults under the Mezzanine Loan. (*Id.*). Indeed, there are specific provisions in the Holdings LLC Agreement that prevent Inland Sub from requiring Holdings to take action against LIP-D prior to Holdings missing the payment of two consecutive Class A Preferred Distributions (the distributions were made quarterly) and provisions which allow LIP to get back a 3rd seat if Holdings made all the appropriate dividend payments under the agreement. (*Id.*; Ex. G Annex A § 6). Therefore, Holdings (i.e., LIP) could prevent action against LIP-D as long as it paid a Class A Preferred Distribution every quarter. Once that two quarter time period passed (the two consecutive Class A Preferred Distributions), and Holdings (i.e., LIP) could not correct its defaults, then Inland Sub, alone, could require Holdings to exercise its ultimate remedy, the

---

[2] For purposes of the discussion that follows, it will be assumed that the agreement reads as modified, in that two quarters of default triggers Inland Sub's rights, rather than the three quarters provided in the document executed in 2007.

management and control of the Collateral and the ultimate liquidation of Holdings. (Ex. A. ¶ 11). The Board of Managers, including all Robert Lauth Insiders who were members of the Board of Managers, had no discretion whatsoever other than to carry out the direction of Inland Sub. (*Id.*).

Once the two consecutive quarters of default took place, and once Holdings (i.e., LIP) tried, and failed, to correct the defaults, the point of no return was reached. Then, Inland Sub considered that the necessary result of its collection action against LIP-D and the Collateral could be that the Lauth "empire" would cease to exist. (Ex. A. ¶ 12). Inland Sub also knew that it could not provide that the decision to commence a collection action against LIP-D and the Collateral be a Major Decision at the Board of Managers level. (*Id.*). That would permit the Robert Lauth Insiders, who were managers of Holdings, to thwart Holdings from ever exercising its rights under the Loan Agreement. (*Id.*). Under those circumstances, Inland Sub would never be able to realize upon its investment. (*Id.*). The default in payment by Holdings for two consecutive quarters demonstrated, beyond doubt, that LIP-D was a failed venture. (*Id.*). Since action against LIP-D was Inland Sub's only hope of repayment of its equity infusion in Holdings, it had to have unfettered rights to immediately realize upon its collateral upon LIP-D's default. (*Id.*). What nobody understood, however, was the rapidity at which the development market, the credit markets, and the whole real estate industry in general would deteriorate. As such, the Robert Lauth Insiders were, and still are, powerless to correct the deep and numerous problems with their portfolio.

Inland Sub's primary source of repayment of its equity infusion into Holdings rests upon the payment of the borrowings to Holdings under the Loan Agreement. (Ex. A ¶ 10). The sole security for the repayment of the borrowings under the Loan Agreement is the pledge of the

Collateral. (Ex. D § 2). The sole value of the Collateral is in the approximately 50 subsidiaries owned by LIP-I that was contributed by LIP-I in connection with this transaction. (Ex. A ¶ 10).

**6.     The Discovery by Inland Sub of Acts of Malfeasance by the Debtors and Their Affiliates During the Time Between LIP-D's Default and Inland Sub's Enforcement of its Rights to Require Holdings to Take Action Against LIP-D and the Collateral.**

Inland Sub's enforcement of its right to require Holdings to take action against LIP-D under the Loan Agreement did not take place in a vacuum. At the inception of the initial transaction, Robert L. Lauth, Jr. Michael Curless, Gregory Gurnik, Lawrence Palmer, and their affiliates (the "Robert Lauth Insiders") either directly or indirectly controlled all of the functions of Holdings, the debtors and the LIP-I Subsidiaries, including, but not limited to, finance, management, construction and leasing. (Ex. A ¶ 13). Inland Sub relied solely on the integrity of the Robert Lauth Insiders to accurately and completely report all financial and other transactions and to operate these companies in the best interests of those companies and of Holdings' secured interest in the Collateral. (*Id.*). Commencing in November 2008, the Robert Lauth Insiders informed the Inland Sub-appointed managers of financial problems within the "Lauth empire." (*Id.*).

Of critical importance to Holdings and Inland Sub was the preservation of the value of Holdings' security interest in the Collateral. (Ex. A ¶ 10). To maintain that value, LIP-D was required to insure that LIP-I never incurred any indebtedness, including, but not limited to, guaranties and indemnifications. (Ex. B § 5.2(a)). Any LIP-I indebtedness would destroy the value of the Collateral since that indebtedness must be paid before Holdings could reach the LIP-I Subsidiaries. (Ex. A ¶ 10).

Although the Inland Sub-appointed managers initially attempted to work with the Robert Lauth Insiders to address LIP-D's financial problems, these efforts terminated when the Inland

- 7 -

Sub-appointed managers discovered malfeasance on the part of the Robert Lauth Insiders, including, but not limited to the following:

- On February 4, 2009, Holdings was presented with a report from debtors showing sources and uses of cash.  This report was forwarded by Jonathan Goodburn and reviewed by Lawrence Palmer, a Robert Lauth Insider, who is the person generally in charge of the financial reporting to Holdings. Lawrence Palmer is the treasurer and chief financial officer of debtors.  (Ex. A ¶ 15.a).  This cash sources and uses report identified some of the obligations as "constr float deficit."  (*Id*.).  This document confirmed verbal representations regarding the existence of a "float" made by debtors during a January 22, 2009, meeting with Holdings.  (*Id*.). Upon questioning by the Inland Sub-appointed managers, Mr. Palmer explained that "float" was money that had been converted from construction draws made on behalf of some LIP-I Subsidiaries and paid to the Robert Lauth Insider-controlled affiliates.  (*Id*.).  He also stated that he transferred money from LIP, LIP-D, LIP-I and LIP-I Subsidiaries and applied it where needed in the "Lauth empire."  (*Id*.). The "float" was listed as almost $7 million at that time.  (*Id*.) Subsequently, on February 27, 2009, debtors produced a revised cash sources and uses statement renaming the "Constr float deficit" as "Net Constr payments" and showing a larger balance of almost $9 million (*Id*.).

- In March 2009, the Inland Sub-appointed managers discovered that the Robert Lauth Insiders had negotiated settlements in four lawsuits known as the "Select Lawsuits."  (Ex. A ¶ 15.b).  On March 19, 2009, at approximately 7:00 p.m., the Robert Lauth Insiders provided copies of the proposed settlements in the Select Lawsuits and then informed the Inland Sub-appointed managers that Holdings

must contribute $2 million to pay the plaintiffs and that the settlement agreements must be accepted on the very next day, March 20th, without change. (*Id*.). Upon review of the settlement agreements, the Inland Sub-appointed managers discovered that a fifth lawsuit, unrelated to Holdings, was involved in the settlement agreements and demanded that a copy of that settlement agreement be provided to them before they would agree to execute the Select Lawsuit settlements. (*Id*.). Upon review of the settlement of the fifth lawsuit, the Inland Sub-appointed managers discovered that the Robert Lauth Insiders' affiliates would be paid $3.2 million by the same company that owned the plaintiffs in the Select Lawsuits if and only if Holdings would pay $2 million in settlement of the other lawsuits. (*Id*.). To add insult to injury, Holdings had only $1.2 million in cash, and the Robert Lauth Insiders represented that they had no remaining cash to cover the deficit between the settlement amount and Holding's cash position. The remainder, $800,000, was ultimately provided by an affiliate of Inland Sub in exchange for the modification of the Holdings LLC Agreement, reducing Inland Sub's restriction on acting before 3 quarters of Holdings' payments had been missed to two quarters.

- On April 13, 2009, Vernon Back, a Robert Lauth Insider, in response to a position taken by the Inland Sub-appointed managers, disclosed that LIP-I had guaranteed four separate loans to a LIP-I Subsidiary. (Ex. A ¶ 15.c). These guaranties were made without the knowledge or approval of Holdings and totaled more than $100 million. (*Id*.). Mr. Back defended these actions by misrepresenting the intent of the parties in the Loan Agreement with regard to restrictions on LIP-I incurring

additional obligations. (*Id.*). If these guaranties were to be called, they would be paid prior to the payment of the borrowings under the Loan Agreement. (*Id.*).

- Gary Axelrod of Kirkland & Ellis, LLP, an attorney representing the LIP-appointed managers, disclosed on April 15, 2009, that LIP, LIP-D and LIP-I had executed indemnification agreements with some of the Robert Lauth Insiders on July 1, 2007, three weeks after Inland Sub contributed the first $80,391,335. (Ex. A ¶ 15.d). The Inland Sub-appointed managers were stunned by this disclosure, as they had not been aware of the indemnification agreements, which exposed LIP-D and LIP-I to hundreds of millions of dollars of potential liability. (*Id.*). The payment of these indemnifications would be made prior to any repayment of the borrowings under the Loan Agreement. (*Id.*).

- Inland Sub, after extensively analyzing, making reconciliations and tracing funds from the accounting documents requested from LIP-D and its affiliates, determined that funds drawn by LIP-D pursuant to a loan application delivered to Holdings were not used for the purposes stated in the loan application, contrary to the terms of the Mezzanine Loan Agreement. (*Id.*).

**7.    Inland Requires Holdings to Act and Holdings Enforces its Rights pursuant to a Default.**

Holdings failed to make two consecutive Class A Preferred Distributions to Inland Sub, which triggered Inland Sub's rights under Section 6(c) of Annex A. (Ex. A. ¶ 9; Ex. G Annex A § 6(c)). On April 24, 2009, at 12:29 p.m. CDT, pursuant to Section 7.1E of the Holdings LLC Agreement, the Inland Sub-appointed managers faxed a written notice of a meeting to be held on 1:45 p.m. CDT on April 27, 2009, pursuant to the provisions of the Holdings LLC Agreement.

(Ex. A ¶ 16).  All managers, including the LIP-appointed managers, Robert L. Lauth, Jr. and Michael Curless, attended the meeting.  (Ex. A ¶ 16).

A letter dated that same date from Inland Sub was provided to the Board of Managers. (Ex. A ¶16; Letter dated April 27, 2009, from Inland Sub to Board of Managers for LIP Holdings, LLC, Ex. J).  In that letter, Inland Sub exercised its rights to require Holdings to take immediate action against LIP-D pursuant to its rights under Section 6(c) of Annex A of the Holdings LLC Agreement.  (*Id*.).

Upon default of LIP-D, Holdings had the right to enforce the Loan Agreement and the Pledge Agreement without notice.  The material provision of the Pledge Agreement states:

> Upon the occurrence of an Event of Default and so long as the same shall be continuing (and in addition to all of its other rights, powers and remedies under this Agreement or under applicable law), [Holdings] may, **at its option, without notice** to [LIP-D] or any other party, do any one or more of the following:  . . . (d) Exercise all voting and management rights of [LIP-D] as to [LIP-I] or otherwise pertaining to the [Collateral], and [LIP-D], forthwith upon the request of [Holdings], shall use its best efforts to secure, and cooperate with the efforts of [Holdings] to secure (if not already secured by [Holdings]), all the benefits of such voting and management rights;

(Ex. D § 8(d)) (emphasis added).

Pursuant to the Inland Sub demand and pursuant to Holdings' rights under the Pledge Agreement, the Inland Sub-appointed managers of Holdings presented the Board of Managers with a resolution that exercised Holdings' right to control and manage LIP-I.  (Ex. A ¶ 16). Holdings also directed LIP-I and LIP-D to take no further action.  (Ex. J).  The resolution passed on a 3-2 vote.  (Ex. A ¶ 16 and Telephonic Meeting Minutes of LIP Holdings, LLC Board of Managers April 27, 2009, Ex. A-5).

### 8**.**    **The Debtors Ignore the Resolution of Holdings**.

Despite the resolution, debtors LIP-D and LIP-I, pursuant to the direction of Robert L. Lauth, Jr., Michael Curless, and other affiliated individuals, including the Robert Lauth Insiders, violated the terms of the Holdings LLC Agreement, Loan Agreement and Pledge Agreement by

- 11 -

continuing to conduct business outside of Holdings' direction and, moreover, by continuing to contact the lenders of the LIP-I Subsidiaries. (Ex. A ¶ 17). While debtors claim that Mr. Podboy and Holdings' actions caused confusion in the marketplace, debtors LIP-D and LIP-I's further discussions with the LIP-I Subsidiary lenders, when they had no authority to do so, actually created any confusion among such lenders. (Ex. A ¶ 17).

The Robert Lauth Insiders further violated the Loan Agreement by amending the LIP-I LLC Agreement without Holdings' knowledge, allegedly on the morning of the Board of Managers' afternoon meeting on April 27th. (Ex. A ¶ 18; Ex. B § 5.2(e)). The amendment to LIP-I's LLC Agreement was not discussed during the Board of Managers meeting, and neither Robert L. Lauth, Jr. nor Michael Curless disclosed the amendment to the other managers on April 27th, or at any time prior to the filing of LIP-I's bankruptcy on May 1st. (Ex. A ¶ 18). The amendment deleted the provisions for removing LIP-I's managers, and gave Robert L. Lauth, Jr. sole authority to act on behalf of LIP-I. (Amended and Restated Limited Liability Company Agreement for LIP Investment, LLC, Ex. K). Under Section 6(f) of the Pledge Agreement, no action was to be taken that would be inconsistent with any of the documents executed in connection with the Loan Agreement or which would materially impair Holdings' position or interest in the Collateral. (Ex. D § 6(f)). Further, under Section 5.2(e) of the Loan Agreement, LIP-D could only amend LIP-I's operating agreement for non-material reasons. (Ex. B § 5.2(e)).

Although Inland Sub made certain that its actions were proper in accordance with the Holdings LLC Agreement, Loan Agreement and Pledge Agreement, Robert L. Lauth, Jr., in his affidavit to the bankruptcy court, admits that his eleventh-hour boardroom maneuvers were motivated out of concern that "Inland [Sub]'s actions might threaten the entire business[.]" Affidavit of Robert L. Lauth, Jr. ¶ 26 [Docket No. 12-1]. Robert L. Lauth, Jr. under penalties of

perjury and while knowing that Holdings had taken action to control and manage the Collateral, falsely stated to the Court that he had authority to file the LIP-I bankruptcy.

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, 28 U.S.C. §§ 157(1) and (b)(1).  This is a core proceeding under 28 U.S.C. §§ 157(b)(2).  Venue of the debtors' chapter 11 cases and the objection in this district is proper pursuant to 28 U.S.C. § 1408.

## ARGUMENT

LIP-I's bankruptcy case should be dismissed because LIP-I did not have authority to file a bankruptcy petition.  Furthermore, the circumstances surrounding LIP-I's bankruptcy filing demonstrate that it filed its case to impede Holdings' enforcement of the Loan Agreement and the Pledge Agreement, and not for the purpose of engaging in a legitimate reorganization.

### A.      LIP-I Lacked Authority to File for Bankruptcy

LIP-I is required to have authority to file a bankruptcy petition.  11 U.S.C. § 301.  When a debtor lacks authority to file a bankruptcy petition, its creditors may move to dismiss the resulting, unauthorized, bankruptcy case.  *See, e.g., In re Eastern Bancorporation*, 23 B.R. 474, 476 (Bankr. E.D. Pa 1982).

In *Eastern Bancorporation*, the court upheld a lender's exercise of voting and corporate rights under a pledge agreement.  The creditor in *Eastern Bancorporation* voted to file bankruptcy.  The court found that the creditor was authorized, under the rights granted by the pledge agreement, to exercise stockholders' rights.  In the case at hand, Holdings, the creditor is similarly authorized to prevent LIP-I from filing for bankruptcy.  As of the afternoon of April 27, 2009, LIP-I no longer had the authority necessary to commence a bankruptcy. Despite the actions of April 27th, LIP-I's bankruptcy petition was signed by Robert L. Lauth, Jr., as manager, on May 1, 2009.

In clear violation of the agreements and the Uniform Commercial Code as adopted by the State of Delaware ("UCC"), LIP-I, by an Amended and Restated Limited Liability Company Agreement of LIP Investment, LLC ("Amended LIP-I LLC Agreement") amended the Limited Liability Company Agreement of LIP Investment, LLC.  This was allegedly done on the morning of April 27, 2009, to expressly include an enumeration of powers, including the power to file for bankruptcy, and to authorize Robert L. Lauth, Jr. to take actions on behalf of LIP-I.

Not only did these acts of Robert L. Lauth, Jr. violate Section 6(f) of the Pledge Agreement, but also, more importantly, they did not affect Inland Sub's rights under Annex A to the Holdings LLC Agreement, and did not affect the right of Holdings to vote and control LIP-D's membership interests in LIP-I since, on the afternoon of April 27, 2009, Holdings exercised its rights under the Pledge Agreement to vote and control LIP-D's membership interest in LIP-I. Holdings' exercise of power was lawful and appropriate because a default had occurred and two consecutive quarterly interest payments were not made to Inland Sub and Holdings (i.e., LIP) failed to correct the default prior to the time that the second consecutive quarterly interest payment was due.   The Holdings LLC Agreement expressly provides that, under such circumstances, Inland Sub, alone, has the unfettered right to cause Holdings to enforce the Loan Agreement.  (Ex. G Annex A § 6(c)).  Pursuant to this directive, Holdings ordered all officers and agents of LIP-I to take no further action.  Robert L. Lauth, Jr.'s subsequent act of signing the bankruptcy petition for LIP-I on May 1, 2009, violated this directive and was without authority.

Even assuming that the action allegedly undertaken at 9:00 a.m. actually took place at that time, what the debtors fail to realize is that, given the Pledge Agreement and the rights of Holdings under the UCC, it doesn't really matter what any party did at this juncture.  Inland Sub was granted these rights and the original Membership Certificate in LIP-I was delivered to Holdings on the date of the closing of the transaction back in 2007.  Holdings possesses that

original Membership Certificate today.  The rights granted in the Pledge Agreement and possession of that Membership Certificate, and the rights conferred upon Holdings, are the ultimate rights in any entity; that of control of all of the outstanding interests in LIP-I.  As everyone understands, controlling all of the outstanding interest in an entity gives the power to affect any right demanded.  It allows removal of all officers, liquidation of the company; or, basically, whatever it wants.  Holdings, upon asserting its rights against LIP-D and the Collateral on April 27 pursuant to the demand of Inland Sub, could not only exercise its rights to ultimately manage and control the Collateral and liquidate LIP-I, but also remove whoever was in charge at the time.  The resolutions passed by the Board of Managers of Holdings clearly state "all of the officers and agents of LIP-I shall be immediately required to (i) take no further action as officers or agents of LIP-I (emphasis added)."  As such, it didn't matter whether Robert L. Lauth, Jr. or President Obama, for that matter, was supposedly elected a couple of hours before the April 27th meeting took place.  These resolutions voided any election whenever it may have occurred.

Interestingly, the debtors have never cited Section 6(c) of Annex A to this Court.  That is not a surprise since the debtors have, thus far, engaged in a far ranging practice of what can only be called a "conspiracy" of absurd readings of documents that would give them "cover" to perform bad acts that violate clear provisions of agreements so that they could engage in prohibited actions.  What the debtors want this Court to believe is that the enforcement of Holdings' rights under the Mezzanine Loan was an exercise of "material discretion" by Holdings under Section 7.2.B(11) of the Holdings LLC Agreement.  The plain language of Section 6(c) of Annex A disposes of this argument.  Under Section 6(c), a default by Holdings triggers *Inland Sub's* right *to cause Holdings to exercise* its rights under the Loan Agreement.  The provision defines Inland Sub's rights, not Holdings' rights.  By placing the power of direction entirely with Inland Sub, the provision sweeps aside any question that Holdings might have some choice in the

matter.  Section 6(c) employs imperative language—"shall"—concerning Inland Sub's right to control Holdings.  Finally, the provision activates the rights under the Loan Agreement directly, without reference to the Holdings LLC Agreement.

Holdings' loss of discretion under such circumstances makes sense.  Section 6(c) triggers loan enforcement upon a default by Holdings.  It makes no sense whatsoever for Holdings to be the gatekeeper of an enforcement action against Holdings arising from Holdings' own default.  In order to sustain the debtors' position, the Court would have to find that:

- o  the parties intended the LIP-appointed managers of Holdings to have a never-ending right to prevent any action against their affiliate regardless of defaults by LIP-D or Holdings and regardless of the language of Annex A of the Holdings LLC Agreement; and

- o  the parties intended that the pledge of the Collateral was meaningless and the parties never intended the Pledge Agreement to act as anything more than a sham document.

Such a conclusion would subvert the purpose of both Section 6(c) of Annex A of the Holdings LLC Agreement and the Loan Agreement.  Furthermore, if the debtors' interpretation were adopted, Holdings would be unable to enforce its loan against LIP-D, which is a wholly-owned subsidiary of LIP, without the consent of a LIP-manager.  Giving the borrower's corporate parent the power to hamstring loan enforcement upon the borrower's default would undermine the entire financing arrangement, and lead to a completely absurd result.

**B.     The Debtors Filed Their Cases In Bad Faith**

LIP-I's unauthorized filing was, in and of itself, a bad faith act.  The circumstances surrounding the filing also show that the Robert Lauth Insiders who exercised control over LIP-I and the other debtors prior to April 27, 2009, caused the debtors to file bankruptcy for the sole purpose of frustrating Holdings' enforcement of its rights under the Loan Agreement.

Section 1112(b) provides for the involuntary dismissal or conversion of a chapter 11 case for cause:

> [O]n request of a party in interest and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

11 U.S.C. § 1112(b)(1).  Section 105(a) states that "[n]o provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to . . . prevent an abuse of process." 11 U.S.C. § 105(a).

Courts have recognized that good faith is a prerequisite for chapter 11 relief and that cause for dismissal exists when a chapter 11 petition is filed in bad faith: "Courts have sensibly considered bad faith to be an acceptable basis for conversion or dismissal." *In re Jartan, Inc.*, 886 F.2d 859, 867 (7th Cir. 1989); *In re Madison Hotel Associates*, 749 F.2d 410, 426 (7th Cir. 1984); *In re 4 C Solutions, Inc.*, 289 B.R. 354, 366 (Bankr. C.D. Ill. 2003) (recognizing that "it is well established that a Chapter 11 petition is subject to dismissal for cause if not filed in good faith"). *See also Duratech Industries, Inc.*, 241 B.R. 283, 287 (E.D. N.Y. 1999) (the court has the inherent power to *sua sponte* dismiss a debtor's chapter 11 case).

To find bad faith, fraudulent or malicious intent is not required; "malfeasance is not a prerequisite to bad faith." *In re Leavitt*, 209 B.R. 935, 940-41 (9th Cir. BAP 1997).  Some courts have observed that the terms "good faith" and "bad faith" concerning a bankruptcy filing are inaccurate. *In re Huckfeldt*, 39 F.3d 829, 832 (8th Cir. 1994).  The issue is whether the debtor has filed bankruptcy with a legitimate reorganizational objective under the Bankruptcy Code, or has instead filed for "tactical reasons unrelated to reorganization." *In re Marsch*, 36 F.3d 825,

929 (9th Cir. 1994). *See In re Integrated Telecom Express*, 384 F.3d 108, 118 (3d Cir. 2004); *In re N.R. Guaranteed Ret.*, 112 B.R. 263, 271 (Bankr. N.D. Ill. 1990). The debtor's motivation may simply be to preserve assets that are in jeopardy of being taken by secured creditors, but "to the extent that the legitimate ends of bankruptcy law are frustrated by the debtor's actions," abuse sufficient to warrant dismissal exists. *In re Greishop*, 63 B.R. 657, 663 (N.D. Ind. 1986).

An inference that the debtor filed bankruptcy for tactical reasons unrelated to bankruptcy can be drawn from the circumstances surrounding the bankruptcy filing:

> [C]ourts may consider any factors which evidence "an intent to abuse the judicial process and the purpose of the reorganization provisions" or, in particular, factors which evidence that the petition was filed "to delay or frustrate the legitimate efforts of secured creditors to enforce their rights."

*In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394 (11th Cir. 1988) (citations omitted). *See also In re Syed*, 238 B.R. 133, 141 (Bankr. N.D. Ill 1991 (bad faith inferred from impossibility of confirming plan); *In re McCormick Road Assoc.*, 127 B.R. 410, 415 (N.D. Ill. 1991).

The debtors filed these cases on May 1, 2009, just days after the Holdings' Board of Managers meeting on April 27th to enforce Holdings' rights under the Loan Agreement. On the morning of April 27th, the Robert Lauth Insiders, who control the debtors, amended LIP-I's LLC Agreement in violation of the Pledge Agreement. But the actions taken on April 27th were done with the power and authority to strip any officer or agent of LIP-I of authority to take any action. By Robert L. Lauth, Jr.'s admission, the actions on the morning of April 27th were undertaken to impede Holdings' ability to take control of LIP-I. (Affidavit of Robert L. Lauth, Jr. ¶ 26 [Docket No. 12-1]). Similarly, the debtors' papers acknowledge that they filed bankruptcy to prevent Holdings from acting against LIP-I. (Debtors' Motion to Enforce the Automatic Stay ¶¶ 47-50 at p.15). The debtors' numerous filings directed at Holdings and Inland Sub in the opening days of these cases—two motions and an adversary proceeding—show that the purpose of these bankruptcies is to stymie Holdings.

The debtors describe Holdings' enforcement of its loan to LIP-D as "improper interference with [LIP-I's] lender relationships." (Debtors' May 4, 2009 Motion to Enforce the Automatic Stay, ¶ 49 at p. 15). This argument disregards the parties' commercial relationship. Upon default by Holdings of payment of the Class A Preferred Distribution for two consecutive quarters, Inland Sub could cause Holdings to exercise its right to, among other things, take over voting and management control of LIP-I. There was no improper interference by Holdings— only a lender's actions to enforce the rights it has if a borrower defaults in a lending relationship. The debtors' self-serving and absurd interpretations of the Loan Agreement and the Holdings LLC Agreement are not sufficient blocks of Holdings' enforcement of its rights, or to cure a bad faith filing..

## II.   APPOINTMENT OF A CHAPTER 11 TRUSTEE TO MANAGE THE DEBTORS' BANKRUPTCY ESTATES

As interim and alternative relief, Holdings asks the Court to immediately appoint a trustee under Bankruptcy Code § 1104. Section 1104(a) of the Bankruptcy Code provides:

> (a)    At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee –
>
> > (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor;
> >
> > (2) if such appointment is in the interest of creditors, any equity security holders, and other interests of the estate without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
> >
> > (3) if grounds exist to convert or dismiss the case under section 1112, but the court determines that the appointment of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1104.

Subsection (a)(1) requires the bankruptcy court, upon motion, to appoint a trustee when the movant has proved "cause," including incompetence and gross mismanagement. "Factors relevant to the appointment of a trustee pursuant to Section 1104(a)(1) include: conflicts of interest, including inappropriate relations between corporate parents and their subsidiaries; misuse of assets and funds; inadequate record keeping and reporting; various instances of conduct found to establish fraud or dishonesty; and lack of credibility and creditor confidence." *See In re Altman*, 230 B.R. 6, 16 (Bankr. D. Conn. 1999) (citing *In re Clinton Centrifuge, Inc.*, 85 B.R. 980, 985 (Bankr. E.D. Pa. 1988)).

Subsection (a)(2) emphasizes the court's discretion, allowing the court to appoint a trustee when doing so would serve the interests of the estate and interested parties. *In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3rd Cir. 1989).

Cause exists in this case under section 1104(a)(1) for many of the reasons outlined above. The Robert Lauth Insiders' direction of LIP-I to enter into guaranties and indemnity agreements served to protect the Robert Lauth Insiders to the detriment of LIP-I and its creditors involved both gross mismanagement and a conflict of interest. The $7 million "float" of funds from the LIP-I Subsidiaries up to the debtors, and perhaps further up the corporate chain, involves an inappropriate relationship between a parent company and its subsidiaries, the misuse of assets and funds and probably inaccurate record keeping. The transfer of funds out of LIP-D during the two months prior to bankruptcy also appears to be a misuse of funds. Debtors' schedules fail to show assets to be reorganized.

The willingness of courts to leave debtors-in-possession is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee. *In re Nugelt, Inc.*, 142 B.R. 661, 666 (Bankr. D. Del. 1992), *citing*

- 20 -

*Commodity Futures Trading Com. v. Weintraub*, 471 U.S. 343, 355 (1985).  In this case, the numerous instances of pre-petition self-dealing and mismanagement indicate that debtors' management cannot be trusted with the oversight of the debtors' financial affairs for their creditors.  The debtors' omission of facts and documents in their filings to this Court, and indeed the multiplicity of the debtors' filings and the inordinate resources directed against Inland Sub and Holdings are further demonstration that the debtors are continuing the pattern of dishonesty that they established prepetition and are not capable of exercising the level-headed, independent business judgment necessary to manage a chapter 11 bankruptcy estate.

The debtors' stated hope that they somehow "might successfully reorganize," Motion to Enforce Automatic Stay ¶ 49 at p.15, stands in sharp contrast to their desperate measures to raise cash and forestall foreclosures on the LIP-I Subsidiaries earlier this year.  No matter how often repeated, the debtors' rhetoric cannot gloss over the unhappy truth confronting them and their creditors: the debtors' and their subsidiaries' commercial real estate development business is collapsing.  Numerous development projects owned by the LIP-I Subsidiaries are failing. Indeed, the steps taken by the debtors' to placate undersecured project lenders of the LIP-I Subsidiaries turned isolated, project-specific defaults into a systemic crisis shared by LIP-D, LIP-I and their subsidiaries.

Since commencing these cases, the debtors have devoted significant resources to resisting Holdings' enforcement of the Loan Agreement and realization of the Collateral securing the Mezzanine Loan.  Continuing the pre-bankruptcy pattern of behavior identified above, they have omitted key facts and documents concerning the parties' respective actions and rights in these cases.  Even more disturbingly, the debtors urge the Court to ratify their bad faith interpretation of documents and to induce the Court to permit them to continue their authority to convert funds from the LIP-I Subsidiaries and even the debtors themselves.

## <u>RESERVATION OF SANCTIONS MOTION AND RIGHT TO SUPPLEMENT</u>

Holdings reserves its right to file any appropriate sanction motion for bad faith filing and/or to supplement this motion based upon the discovery of additional evidence.

**WHEREFORE, LIP Holdings, LLC** respectfully requests that the Court dismiss the debtors' bankruptcy case, or, alternatively, and as an interim relief, appoint a chapter 11 trustee to manage the bankruptcy estates of the debtors, and award such further relief as the court deems just and proper.

Dated: June 1, 2009.                     HOSTETLER & KOWALIK, P.C.


_____/s/  Jeffrey A. Hokanson_____
Jeffrey A. Hokanson
Courtney E. Chilcote
101 W. Ohio Street, Suite 2100
Indianapolis, IN 46204
Telephone:  (317) 222-7486
Facsimile:  (317) 262-1010

-and-

VON BRIESEN & ROPER, S.C.
Claire Ann Resop (WI Bar No. 1020342)
Christopher J. Stroebel (WI Bar No. 1035182)
3 South Pinckney Street, Suite 1000
Madison, WI 53703
Telephone (608) 441-0300
Facsimile: (608) 441-0301

Attorneys for LIP Holdings, LLC

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been furnished via the United States Bankruptcy Court's electronic transmission service or via first class U.S. mail, postage-paid, to all persons listed in the Service List, which is attached hereto as *Exhibit A*, this _____ day of June, 2009.


　　　　　　　　　　　　　　/s/ Jeffrey A. Hokanson
　　　　　　　　　　　　　Jeffrey A. Hokanson

## Exhibit A

*U.S. Bankruptcy Court Electronic Service:*

| | | |
|---|---|---|
| Alwin, Janice A. | Creditor, Bank of America, N.A. | janice.alwin@bfkn.com |
| Jerald L. Ancel | Debtors | jancel@taftlaw.com<br>ecfclerk@taftlaw.com<br>cmiller@taftlaw.com<br>docket@taftlaw.com |
| William J. Barrett | Creditor, Bank of America, N.A. | william.barrett@bfkn.com |
| Jason R. Burke | Creditor, M&I Marshall & Ilsley Bank f/k/a First Indiana Bank, N.A. | jburke@hopperblackwell.com<br>kellis@hopperblackwell.com |
| Deborah Caruso | Creditor, First Financial Bank | dcaruso@daleeke.com<br>lharves@daleeke.com |
| Courtney E. Chilcote | Creditor, LIP Holdings, LLC | cec@hostetler-kowalik.com<br>sdw@hostetler-kowalik.com |
| Fred L. Cline | Creditor, Regions Bank | fcline@dannpecar.com<br>dlingenfelter@dannpecar.com<br>ccanny@dannpecar.com<br>ecf@dannpecar.com |
| Howard Russell Cohen | Creditor, The Huntington National Bank | hcohen@fbtlaw.com<br>decree@fbtlaw.com |
| Linda Vojik Donhauser | Creditor, Bank of America, N.A. | ldonhauser@milesstockbridge.com |
| Mark Allen Drummond | U.S. Trustee | mark.drummond@usdoj.gov<br>theresa.m.deever@usdoj.gov |
| Jeffrey J. Graham | Debtors | jjgraham@taftlaw.com<br>ecfclerk@taftlaw.com<br>cmiller@taftlaw.com<br>docket@taftlaw.com |
| Jeffrey A. Hokanson | Creditor, LIP Holdings, LLC | jeff.hokanson@hostetler-kowalik.com<br>hkecfbackup@yahoo.com<br>dwp@hostetler-kowalik.com |
| George W. Hopper | Creditor, M&I Marshall & Ilsley Bank f/k/a First Indiana Bank, N.A. | ghopper@hopperblackwell.com<br>mroth@hopperblackwell.com |
| Christine K. Jacobson | Party-in-Interest, Charter One Bank | cjacobson@katzkorin.com |

| Brian Francis Kenney | Creditor, Bank of America, N.A. | bkenney@milesstockbridge.com |
| James Michael Matthews | Creditor, Irwin Union Bank and Trust | jmathews@fbtlaw.com<br>decree@fbtlaw.com |
| Alan K. Mills | Creditor, Salen Bank and Trust Company | alan.mills@btlaw.com<br>bragle@btlaw.com<br>bankruptcyindy@btlaw.com |
| James P. Molloy | Creditor, Regions Bank | jmoloy@dannpecar.com<br>dlingenfelter@dannpecar.com<br>ccanny@dannpecar.com<br>ecf@dannpecar.com |
| Claire Ann Resop<br>Christopher J.K. Stroebel<br>Eliza Marie Reyes<br>U.S. Trustee | Creditor, LIP Holdings, LLC<br>Creditor, LIP Holdings, LLC<br>Creditor, LIP Holdings, LLC | cresop@vonbriesen.com<br>cstroebel@vonbriesen.com<br>ereyes@vonbriesen.com<br>Ustpregion10.in.ecf@usdoj.gov |

***Debtor's Attorney's U.S. Mail Service:***

Stephen C. Hackney
Arun Kurichety
James A. Stempel
Micah E. Marcus
Ross M. Kwasteniet
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois  60654

Sun Trust Bank
c/o Stephen P. Drobnyl
Peter H. Levitt
Shutts & Bowen LLP
1500 Miami Center
201 South Biscayne Boulevard
Miami, Florida  33131

Michael Shockey
Charter One
10333 N. Meridian Street, Suite 350
Indianapolis, Indiana  46290

Walter Allen
Ernst & Young
111 Monument Circle, Suite 2600
Indianapolis, Indiana  46204

J. C. Nelson
Allen & Hoshall
713 S Pear Orchard Road
Ridgeland, Mississippi  39157

Vickie Ross
Soiltech Consultants
PO Box 12466
Jackson, Mississippi  39236

ST CDE IV LLC
clo Lee Harrington
Nixon Peabody LLP
100 Summer Street
Boston, Massachusetts  02110-2131

Dawn Saw
Baker Barrios Architects, Inc.
189 South Orange Avenue, Suite 1700
Orlando, Florida  32801

21287020.DOC

(H&K: 142585)