UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| LAUTH INVESTMENT PROPERTIES, LLC, et al.,[1] | ) Case No. 09-06065-BHL-11 |
| Debtors. | ) Jointly Administered |

**MOTION OF THE DEBTORS FOR ENTRY OF (A) AN ORDER APPROVING MARKETING PROCESS AND BREAK UP FEE; AND (B) INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING AND (B) GRANTING LIENS AND SUPERPRIORITY CLAIMS**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby file this motion (this "Motion"), for the entry of (a) an order, substantially in the form attached hereto as **Exhibit A** (the "DIP Marketing Process Order"), approving the marketing process to be utilized by the Debtors to obtain postpetition debtor-in-possession financing, (b) an interim order substantially in the form of **Exhibit B** (the "Interim DIP Order") and a final order (the "Final DIP Order," and with the Interim DIP Order, the "DIP Orders"), authorizing the Debtors to obtain postpetition debtor-in-possession financing (the "DIP Facility") on a superpriority administrative claim and first priority lien basis and granting related relief, all as more fully described below and in the proposed DIP Orders. In support of this Motion, the Debtors respectfully state as follows:

---

[1] The Debtors include: Lauth Investment Properties, LLC (09-06065); LIP Development, LLC (09-06066); and LIP Investment, LLC (09-06067).

K&E 15237963.10

**Jurisdiction and Venue**

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested herein are sections 105, 361, 362, 363 and 364 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule B-4001-2 of the Local Rules of the United States District Court for the Southern District of Indiana (the "Local Bankruptcy Rules").

**Background**

4. On May 1, 2009 (the "Petition Date"), each of the Debtors filed a petition with the Court for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Other than the alternative request made as part of the Dismissal Motion (as defined below), no request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases, and no committees have been appointed or designated. On May 15, 2009, the Court entered an order jointly administering the Debtors' Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

5. The Debtors are each affiliates of Lauth Group, Inc. ("Lauth"), a real estate business conglomerate which has developed over $3 billion worth of real estate projects and which has over 100 separate subsidiaries and affiliates.

**The Debtors' Need for Postpetition Financing**

6. The Debtors' business focuses on the development of commercial real estate projects. Cash flow is generated primarily from lease payments paid by tenants at Debtor LIP

2

Investment, LLC's subsidiaries. The profitability of LIP Investment, LLC's development projects at its subsidiaries depends heavily upon the extent to which the projects are leased up and are properly managed.

7. As of the Petition Date, the Debtors' prepetition secured indebtedness consisted of one senior secured financing facility—a $20 million secured financing facility (the "M&I Credit Facility"), secured by certain real property for which the Debtors have granted a first priority security interest (the "Prepetition Collateral") in favor of M&I Marshall & Ilsley Bank ("M&I"), including "cash collateral" as defined in section 361 of the Bankruptcy Code (the "Cash Collateral").[2]

8. Pursuant to the *Interim Order (A) Authorizing the Use of Cash Under 11 U.S.C. § 363, (B) Granting Adequate Protection Under 11 U.S.C. §§ 361 and 363 and (C) Scheduling a Final Hearing Under Bankruptcy Rule 4001(B)* [Docket No. 90], the Debtors were authorized to use up to $2.5 million of the Cash Collateral on an interim basis pending entry of a final order.

9. The Debtors have sought entry of a final order authorizing the full use of the Cash Collateral in an amount up to $3.9 million, but, to date, have been unable to secure entry of such order. Upon entry of such order, the Debtors believe that they will have enough cash to fund operations and chapter 11 expenses through approximately the week ending August 7, 2009.

10. As has been well documented in the various pleadings before the Court, the Debtors filed the Chapter 11 Cases to stave off inappropriate attempts by a junior equity investor (Inland American (LIP) Sub, LLC ("Inland")) to take over the Debtors' business. Since the

---

[2] In addition to the M&I Credit Facility, LIP Holdings, LLC (an entity controlled by Inland (as defined herein)) made a loan to LIP Development, LLC that is secured by LIP Development, LLC's pledge of its equity in LIP Investment, LLC.

3

Petition Date, the Debtors have been forced to litigate the issue of which entity has proper authority and control of the Debtors with respect to the pending *Motion to Dismiss the Debtors' Chapter 11 Cases and, as an Alternative and Interim Relief, to Appoint a Chapter 11 Trustee* (the "Dismissal Motion"), as well as almost every other issue before the Court, including the Debtors' requests for full use of the Cash Collateral.

11.    The Debtors' request to use the Cash Collateral was always intended and described as an interim measure. The Debtors knew that they would need additional financing to fund the Chapter 11 Cases. However, because the Debtors filed the Chapter 11 Cases defensively, in response to Inland's aggressive actions, they did not have a postpetition financing facility in place at the time of filing.

12.    Indeed, the Debtors, with the assistance of their advisors, spent the first few months of the Chapter 11 Cases developing detailed cash flow projections for their many project level subsidiaries. In the last several weeks the Debtors and their advisors have actively solicited proposals for postpetition financing. Predictably, however, the pending Dismissal Motion has had a chilling effect on the Debtors' ability to secure such financing commitments. Moreover, it is no secret that the nation's credit markets have seized considerably, making it even more difficult for the Debtors to seek and obtain postpetition financing at this time.

13.    Recognizing the Debtors' need for postpetition financing and recognizing the fact that no third parties appear willing to make a financing commitment while the Dismissal Motion is pending, several principals of the Debtors and their spouses have proposed to establish and fund a new entity, LIP Lenders, LLC, (the "DIP Lender") to provide on a committed basis up to $15 million to be used to finance the Chapter 11 Cases, to fund the operation of Debtor LIP Investment, LLC's project level subsidiaries and to satisfy general corporate obligations.

4

14. The Debtors believe that this offer, negotiated at arms' length and in good faith, represents the only realistic source of financing at this time. Nevertheless, given the insider nature of this proposed transaction, upon entry of the DIP Marketing Process Order, the Debtors will continue to canvass the debt markets in an effort to locate potentially better offers for postpetition financing. In consideration for making a "stalking horse" DIP proposal, the Debtors have agreed to pay the DIP Lender a breakup fee of $500,000 in the event that the Debtors do not utilize the proposed DIP Facility (the "Break Up Fee"). The Debtors have also agreed to reimburse the DIP Lender's reasonable out-of-pocket expenses incurred in connection with the DIP Facility (the "Expense Reimbursement").

15. Accordingly, the Debtors bring the Motion at this time to obtain approval of the Break Up Fee and the Expense Reimbursement, and continue their efforts to obtain postpetition financing which will be necessary to preserve and maintain the Debtors' going-concern values and, ultimately, effectuate a successful reorganization.

**Relief Requested**

16. The Debtors seek authorization to pay the DIP Lender the Break Up Fee in the event the Debtors obtain postpetition financing different than that contemplated herein. In addition, the Debtors seek authorization for Debtor LIP Investment, LLC ("LIP-I") to obtain postpetition financing on a secured and superpriority basis to ensure adequate liquidity to continue the operations of its subsidiaries, prevent anticipated cash flow shortages and bridge to an ultimate reorganization or alternative transaction.

17. By this Motion, the Debtors request that the Court grant the following relief as provided for in the Interim DIP Order and the Final DIP Order:

    (a) authorizing Debtor LIP-I to enter into the DIP Facility in an amount of up to $15 million with the DIP Lender (the "DIP Obligations");

5

(b) authorizing the Debtors to execute and deliver any documents necessary to implement the terms of the Commitment Letter attached hereto as **Exhibit C** (the "DIP Term Sheet") and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(c) subject to the administrative expense obligation granted to M&I as part of the adequate protection for use of the Cash Collateral and the Carve Out (as defined in the DIP Term Sheet) authorizing LIP-I to grant a superpriority allowed administrative claim in favor of the DIP Lender pursuant to section 364(c)(1) of the Bankruptcy Code in respect of the DIP Obligations;

(d) as security for the DIP Obligations, and in addition to the superpriority claim discussed above, the granting of (a) valid, first priority liens on all of the equity interests and/or membership interests owned by LIP-I in its direct and indirect subsidiaries (collectively, the "Collateral");

(e) the scheduling of the final hearing on the Motion to consider entry of the Final DIP Order authorizing the relief requested in the Motion; and

(f) granting such other and further relief as this Court deems just and proper.

**Summary of Principal Terms of Postpetition Financing**

18. In accordance with Bankruptcy Rule 4001(b)(1)(B) and Local Bankruptcy Rule B-4001-2(d), the significant terms of the proposed DIP Credit Agreement (as defined below) as currently contained in the DIP Term Sheet are summarized as follows:

| | |
|---|---|
| **Borrower:** | LIP Investment, LLC |
| **Guarantors:** | LIP Development, LLC and Lauth Investment Properties, LLC |
| **Amount of Facility:** | $15 million |
| **Fees:** | • Commitment Fee: 5% of the Total Commitment (as defined in the DIP Term Sheet), payable upon entry of the Interim DIP Order.<br>• Expenses: all of the DIP Lender's actual, out-of-pocket fees and expenses, including reasonable attorney fees and costs, incurred by the DIP Lender in conjunction with the DIP Facility. |
| **DIP Maturity Date:** | The date (the "DIP Maturity Date") that is the earliest to occur of:<br>• Eighteen (18) months after the date on which the Interim DIP |

| | |
|---|---|
| | Order is entered; <br><br> • "effective date" of any plan of reorganization or liquidation confirmed by the Court or the emergence of the Debtors' from bankruptcy; and <br><br> • acceleration of the obligations under the DIP Facility due to the occurrence and continuation of an Event of Default. |
| **Non-Default Interest Rate and Payment Terms:** | • <u>Interest Rate</u>: 15% per annum. <br><br> • <u>Interest Payments</u>: Quarterly and upon repayment, in each case payable in arrears and computed on the basis of a 360-day year <br><br> • <u>Yield Maintenance</u>: In the event, the DIP Facility is repaid through a replacement debtor-in-possession facility prior to the DIP Maturity Date (but not to include repayment pursuant to a plan of reorganization), such repayment will be 107.5% of the amount repaid. |
| **Default Interest Rate:** | During the continuance of an Event of Default, all outstanding obligations shall bear interest at the interest rate of 18%. |
| **Warrants** | The DIP Lender will receive warrants with a strike price of $0.01 to acquire up to 25% of the equity in the reorganized LIP-I. |
| **Voluntary Prepayments:** | The DIP Facility may be prepaid in whole or in part without premium or penalty. <br><br> Certain mandatory prepayments shall be required and negotiated in the definitive credit documents. All mandatory prepayments will be applied without penalty or premium. |
| **Use of Proceeds:** | Proceeds of the DIP Facility shall be used solely in accordance with the Budget (as defined in the DIP Term Sheet) and the DIP Credit Agreement (i) to pay the costs of the Chapter 11 Cases, (ii) to pay fees and expenses associated with the DIP Facility and administrative expenses and (iii) to provide for the ongoing working capital requirements of LIP-I and certain of its direct and indirect subsidiaries and for general corporate purposes. |
| **Priority:** <br> [Fed. R. Bankr. P. 4001(c)(B)(i)] | Except as agreed with respect to the Carve Out and subject to the M&I Superpriority Claim, amounts owed by LIP-I to the DIP Lender pursuant to the DIP Credit Agreement, including all accrued interest, fees, costs and expenses, shall constitute a superpriority, allowed administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code having priority over all administrative expenses of the kind specified in or arising under any sections of the Bankruptcy Code (including, without limitation, sections 105, 326, 328, 330, 331, 364(c)(1), 503(b), 506(c), 507, 546(c), 726, 1113 and 1114 thereof). |
| **Liens:** <br> [Fed. R. Bankr. P. 4001(c)(B)(i) & (vii)] | In addition to the superpriority claim referenced above, the DIP Facility shall be secured by valid, first priority liens on all of the equity interests and/or membership interests owned by LIP-I in its direct and indirect subsidiaries. <br><br> All liens authorized and granted pursuant to the DIP Orders shall be |

7

| | |
|---|---|
| | deemed effective and perfected as of the effective date of the DIP Facility, and no further notice or act will be required to effect such perfection. |
| | The Debtors and the DIP Lender shall execute and file all such documents as may be required by the DIP Lender to create and perfect such liens and security interests in the Collateral. |
| | The DIP Facility shall be subject to negotiation, execution and delivery of a definitive credit agreement (the "DIP Credit Agreement") and related loan documents, embodying the terms set forth in the DIP Term Sheet reasonably satisfactory to the Debtors and the DIP Lender. |
| **Conditions Precedent to Availability:** | The obligations of the DIP Lender to provide the DIP Facility will be subject to such closing conditions as are usual and customary for financings of this kind. |
| **Representations and Warranties:** | The DIP Credit Agreement will contain such customary and appropriate representations and warranties by the Debtors as are usual and customary for financings of this kind. |
| **Conditions to All Borrowings Under the DIP Facility:** | The conditions to all borrowings will include requirements relating to prior written notice of borrowing, the accuracy of representations and warranties, the absence of any default or potential event of default, and will otherwise be customary and appropriate for financings of this type. Such conditions shall include, without limitation, the following: <br><br>• As a result of such extension of credit, usage of the Total Commitment shall not exceed the lesser of (i) the Total Commitment then in effect and (ii) the aggregate amount authorized by the Interim Order or the DIP Order, as the case may be; <br><br>• The Interim DIP Order or the Final DIP Order, as the case may be, shall be in full force and effect, and shall not have been reversed, modified, amended, stayed, vacated or subject to any pending appeal; and <br><br>The Debtors shall have paid the balance of all fees then payable as referenced in the DIP Term Sheet. |
| **Events of Default:** | Events that customarily constitute a default in debtor in possession financing agreements, subject to any applicable cure periods (collectively, "Events of Default"), including, without limitation: <br><br>• **Interim Order.** The Interim DIP Order in form and substance satisfactory to the DIP Lender, on a motion by the Debtors that is in form and substance reasonably satisfactory to the DIP Lender, and on such prior notice to such parties as may be satisfactory to the Lender, shall not have been entered by the Bankruptcy Court on or before August 7, 2009. <br><br>• **Final Order.** The Final DIP Order in form and substance satisfactory to the DIP Lender, on a motion by the Debtors that is in form and substance reasonably satisfactory to the DIP Lender, and on such prior notice to such parties as may |

8

|  | |
|---|---|
| | be satisfactory to the Lender, shall not have been entered by the Bankruptcy Court on or before August 21, 2009.<br><br>• **Dismissal or Conversion.** The Dismissal Denial Order (as defined in the DIP Term Sheet) being reversed on appeal or any of the Chapter 11 Cases shall be dismissed or converted to a Chapter 7 Case; a Chapter 11 Trustee.<br><br>• **Trustee/Examiner.** A responsible officer or an examiner with enlarged powers shall be appointed in any of the Cases (having powers beyond those set forth in section 1106(a)(3) of the Bankruptcy Code).<br><br>• **Superpriority Administrative Expense Claims.** Any other superpriority administrative expense claim (other than the Carve-Out) which is pari passu with or senior to the claims of the DIP Lender shall be granted in any of the Chapter 11 Cases.<br><br>• **Stay Relief.** The Court shall enter an order granting relief from the automatic stay to any creditor or party in interest (to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Debtors or to permit other actions that would have a material adverse affect on the Debtors, their business operations or their estates.<br><br>• **DIP Orders.** An order shall be entered reversing, amending, supplementing, staying, vacating or otherwise modifying the Interim DIP Order or the Final DIP Order; or the Debtors shall fail to comply with the Interim DIP Order or the Final DIP Order.<br><br>• **Plan.** A Plan shall be confirmed in any of the Chapter 11 Cases that does not provide for termination of the Total Commitment (as defined in the DIP Term Sheet) under the DIP Facility and payment in full in cash of the Debtors' obligations under the Loan Documents (as defined in the DIP Term Sheet) on the effective date of such Plan or any order shall be entered which dismisses any of the Cases and which order does not provide for termination of the Total Commitment under the DIP Facility and payment in full in cash of the Debtors' obligations under the Loan Documents, or any of the Debtors shall seek, support, or fail to contest in good faith the filing or confirmation of such a Plan or the entry of such an order. |
| **Indemnification:**<br>[Fed. R. Bankr. P. 4001(c)(1)(B)(ix)] | The DIP Credit Agreement will provide customary and appropriate provisions relating to indemnity and related matters in a form reasonably satisfactory to the DIP Lender. |

9

**Provisions To Be Highlighted Pursuant to Local Bankruptcy Rule B-4001-2**

19.     Local Bankruptcy Rule B-4001-2(c)(4) requires a movant to identify provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve out.  See S.D. Ind. Bankr. L.R. B-4001-2(c)(4).

20.     With respect to this provision, there has not been a creditors' committee appointed in the Chapter 11 Cases.  Moreover, given the Debtors' schedules and statements, the Debtors believe that appointment of a creditors' committee in the Chapter 11 Cases is unwarranted and likely will not occur.  As such, the Debtors believe that there no disparate treatment will arise as a result of approval of the DIP Orders.

21.     In addition, the Debtors call to the attention of the Court and parties-in-interest a requirement of the DIP Term Sheet regarding the Final DIP Order.  The DIP Term Sheet contains the following requirement:

> The DIP Order must include provisions satisfactory to Lender that will authorize the Company to authorize each of its direct and indirect subsidiaries (each a "Subsidiary") to (1) use revenues of such Subsidiary (a "Contributing Subsidiary") to pay obligations of one or more "sister" Subsidiaries (the "Sisters") that are subject to mortgage loans from the same mortgage lender who is also a mortgage lender to the Contributing Subsidiary, and (2) grant to a mortgage lender to one or more Sisters who is also a mortgage lender to the Contributing Subsidiary (an "Affected Mortgage Lender") cross-collateralization so that obligations of the Sisters to such Affected Mortgage Lender are secured by liens in and against assets of the Contributing Subsidiary.  The use of revenues of certain Contributing Subsidiaries to satisfy obligations of Sisters will be provided for in the Budget.

22.     The DIP Lender and the Debtors believe that (a) LIP-I's subsidiaries will have sufficient funds to operate only if certain of the "better" commercial properties owned by LIP-I subsidiaries are allowed to contribute revenue to pay the expenses of other subsidiaries whose

10

properties do not currently create adequate cash flow to cover obligations ("Cross Use of Funds"); and (b) in those circumstances in which a single mortgage lender (an "Affected Mortgage Lender") holds liens in and against properties held by multiple LIP-I subsidiaries, some of those subsidiaries will need to grant "cross-collateralizing" mortgages to secure obligations that its "Sister" subsidiaries owe to such an Affected Mortgage Lender. The Cross Use of Funds is reflected in the 13 week cash flow projections currently before the parties with regard to use of the Cash Collateral and will be reflected in the Budget created in connection with the proposed DIP financing. Without such cross-collateralization, LIP-I subsidiaries will be unable to convince Affected Mortgage Lenders to forebear from foreclosing their mortgages. Such foreclosures would threaten the equity that Debtors (and the Lender) believe exists in many of the Subsidiaries' projects. As such the DIP Term Sheet requires that the Final DIP Order contain the provision quoted above to allow LIP-I to take action needed to preserve the equity it holds in such Subsidiaries.

## Basis for Relief

**I.    Payment of the Break Up Fee and Expense Reimbursement Is Reasonable and Appropriate**

23.    The Break Up Fee and the Expense Reimbursement were negotiated at arms' length and in good faith and is necessary to secure the DIP Lender's commitment to provide the DIP Facility. In essence, the DIP Lender is serving as a "stalking horse" with respect to postpetition financing in an effort to obtain better offers from third parties regarding such financing. Moreover, the Break Up Fee will become payable only in the event the Debtors are able to obtain a replacement debtor-in-possession financing facility.

24.    Bankruptcy courts have approved traditional breakup fees in other contexts under the business judgment rule, which proscribes judicial second-guessing of the actions of a

11

corporation's board of directors taken in good faith and in the exercise of honest judgment. See, e.g., In re Integrated Res., 147 B.R. at 662 (approving termination fee plus reimbursement of expenses); In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may be "legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking"). The Debtors submit that the Break Up Fee is reasonable and legitimately necessary to convince the DIP Lender to go forward, and that granting the Break Up Fee represents a valid exercise of the Debtors' business judgment.

## II. LIP-I Should Be Permitted to Obtain Postpetition Financing Pursuant to Section 364(c) of the Bankruptcy Code

25. As set forth above, the Debtors will have a need for additional liquidity in the near term to pay for the costs of the Chapter 11 Cases and to provide for the ongoing working capital requirements of the Debtors and for general corporate purposes. The DIP Facility enhances the Debtors' flexibility in maximizing the enterprise value of its businesses, avoids the risk of significant and unforeseen future cash outlays restraining liquidity and gives comfort to the Debtors' significant business partners that further business with the Debtors does not constitute an unjustifiable credit risk.

### A. LIP-I Was Unable to Obtain Postpetition Credit on an Unsecured Basis and Could Not Obtain More Favorable Postpetition Credit from Any Other Lender

26. Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit outside the ordinary course of business and (c) obtaining credit with specialized priority or on a secured basis. For the reasons discussed below, LIP-I must be able to access postpetition financing on a secured basis pursuant to sections 364(c) and (d) of the Bankruptcy Code.

12

27. Pursuant to section 364(c), if a debtor cannot obtain postpetition credit on an unsecured basis, a court may authorize such debtor to obtain credit or incur debt that is entitled to superpriority administrative expense status, secured by a senior lien on unencumbered property, or secured by a junior lien on encumbered property. See 11 U.S.C. § 364(c); see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp., 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).

28. A debtor seeking financing under section 364(c) of the Bankruptcy Code must make a reasonable effort to seek other sources of unsecured credit, but is granted deference in acting in accordance with its business judgment and, indeed, is not required to seek credit from every possible source. See, e.g., Ames, 115 B.R. at 40 (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders); see also Bray v. Shenandoah Fed. Sav. & Loan Assoc. (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) ("The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable.").

29. Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); see also In re Garland Corp., 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured

credit unobtainable); In re Stanley Hotel, Inc., 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); Ames, 115 B.R. at 37-39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

30. Over the course of the Chapter 11 Cases, the Debtors and their advisors have repeatedly attempted to locate consolidated postpetition credit for the Debtors to fund ongoing operational costs. The Debtors have not been able to secure a commitment and many parties have cited the uncertainty with respect to the Dismissal Motion. Nevertheless, the Debtors intend to continue searching for potentially better offers for postpetition financing.

31. LIP-I itself owns little in the way of "borrowing base" or other traditional hard assets, it is unable to grant any potential lender a more traditional lien in hard assets that are customary in the debtor in possession financing context. LIP-I's sole avenue of granting collateral consists of providing a lender with pledges in the equity interests in LIP-I's direct and indirect operating subsidiaries. Most potential lenders contacted by the Debtors, unaccustomed to receiving anything but hard assets to secure their loans, and given the current economic climate, expressed reluctance to enter into financing arrangements under these circumstances.

32. In the same vein, given the non-traditional nature of the DIP Facility, the DIP Lender is demanding warrants with a strike price of $0.01 to acquire up to 25% of the equity in the reorganized LIP-I. Without this arrangement, the Debtors believe that the DIP Lender (or any other party) would be unwilling to extend postpetition financing.

33. Lastly, no parties were willing to provide unsecured financing. Thus the DIP Lender was the only party to date willing to extend credit on terms feasible in light of existing contractual arrangements.

14

34. Given the inability to obtain postpetition financing from other lenders, the Debtors and their advisors continued discussions with the DIP Lender. The individuals who will create and finance the DIP Lender are intimately familiar with the Debtors' situation and, as of today, are the only parties willing to provide LIP-I with a financing commitment. The DIP Lender is willing to provide the DIP Facility only on the terms discussed herein. The terms of the DIP Facility are fair and reasonable. Further, the potential benefits here are substantial and access to the DIP Facility will enable the Debtors to maximize their estates for the benefit of all the parties in interest.

35. Moreover, as noted above, LIP-I has no appreciable secured debt obligations of its own. The DIP Lender's superpriority liens will not prime any existing liens. Therefore, the DIP Facility satisfies the requirements of section 364(d) of the Bankruptcy Code. Additionally, the foregoing reasons satisfy the first prong of section 364(d)(1) of the Bankruptcy Code—the nonavailability of credit except on the terms offered by the DIP Lender. Accordingly, the Debtors respectfully submits that its efforts to obtain postpetition financing satisfies and will continue to satisfy the standard required under sections 364(c) and (d) of the Bankruptcy Code and that they should be granted authority to enter into the DIP Facility and obtain funds on the secured and administrative superpriority basis described herein.

**B.    The DIP Facility is Necessary to Preserve Estate Assets**

36. Without access to funding under the DIP Facility, LIP-I and the other Debtors' estates will suffer immense harm, likely will be administratively insolvent and thus will not be able to fund an orderly process whereby the Debtors can attempt to renegotiate and restructure their project level debt..

37. Furthermore, as debtors in possession, the Debtors have a fiduciary duty to protect and maximize their estates' assets. See In re Mushroom Transp. Co., Inc., 382 F.3d 325, 339 (3d

15

Cir. 2004); Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 573 (3d Cir. 2003). Authority to obtain postpetition financing pursuant to the DIP Facility allows the Debtors to do precisely that. Absent new funding, the Debtors will be unable to meet certain obligations and their businesses will be substantially and irreparably harmed. Failure to approve the DIP Facility at this critical juncture in the Chapter 11 Cases could cause the Debtors to plummet into a Chapter 7 liquidation, destroying value for all creditor constituencies.

### III. The DIP Facility Will Be Market Tested

38. Recognizing the insider nature of the DIP Facility, the Debtors will continue to solicit completing proposals and the DIP Facility will serve as a "stalking horse." The DIP Lender is not an incumbent lender and is not seeking priming liens. If any party believes the terms of the DIP Facility are not favorable or are not market-based, they may substantiate their views by presenting the Debtors with a better proposal than the DIP Facility.

### Request for Interim and Final Hearing

39. Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set (a) a hearing on the Break Up Fee and Expense Reimbursement during the week of July 27, 2009; (b) an interim hearing during the week of August 10, 2009 and (c) a final hearing during the week of August 17, 2009, all subject to the Court's availability. The Debtors will send appropriate notice regarding the various deadlines for parties to file objections to the Motion.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

40. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**Notice**

41.　　The Debtors have provided notice of this Motion to: (a) the Office of the United States Trustee for the Southern District of Indiana; (b) the entities listed on the Lists of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the agent for the Debtors' prepetition secured lenders; (d) those parties who have requested service of papers pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

**No Prior Request**

42.　　No prior motion for the relief requested herein has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

K&E 15237963.10

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court enter (a) the DIP Marketing Process Order, substantially in the form attached hereto as **Exhibit A**, approving the marketing process to be utilized by the Debtors to obtain postpetition debtor-in-possession financing, (b) the Interim DIP Order, substantially in the form of **Exhibit B** and the Final DIP Order, authorizing the Debtors to obtain postpetition debtor-in-possession financing on a superpriority administrative claim and first priority lien basis and (c) granting such other and further relief as the Court deems appropriate.

Dated: July 21, 2009
Indianapolis, Indiana

**TAFT STETTINIUS & HOLLISTER LLP**

/s/ Jeffrey J. Graham
Jerald I. Ancel
Jeffrey J. Graham
One Indiana Square, Suite 3500
Indianapolis, Indiana  46204
Telephone:   (317) 713-3500
Facsimile:    (317) 713-3699

- and -

**KIRKLAND & ELLIS LLP**
Reed S. Oslan, P.C.
James A. Stempel (admitted *pro hac vice*)
Steven C. Hackney (admitted *pro hac vice*)
Ross M. Kwasteniet (admitted *pro hac vice*)
Arun K. Kurichety (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois  60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

Co-Counsel for the Debtors and Debtors in Possession

1068901-1

K&E 15237963.10