**EXHIBIT C**
**DIP Term Sheet**

K&E 15238346.6

**PERSONAL AND CONFIDENTIAL**

July 21, 2009

LIP Investment, LLC
c/o Lauth Group, Inc.
401 Pennsylvania Parkway
Indianapolis, Indiana 46280
Attention:  President

    Re:    DIP Financing Commitment Letter

Ladies and Gentlemen:

We are pleased to confirm the arrangements under which LIP Lenders, LLC (including its designee(s) and assign(s)) ("**Lender**") is authorized by LIP Investment, LLC (the "**Company**"), a debtor-in-possession under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**"), and certain of its affiliates that are debtors-in-possession under the Bankruptcy Code (collectively, with the Company, the "**Debtors**") in jointly administered cases (the "**Cases**") filed in the United States Bankruptcy Court for the Southern District of Indiana (the "**Bankruptcy Court**"), to commit to provide, a senior secured, super-priority debtor-in-possession credit facility (the "**Financing**") on the terms and subject to the conditions set forth in this letter and the attached Annexes A and B attached hereto (collectively, the "**Commitment Letter**").

You have informed the Lender that the Company is seeking the Financing in order to (a) pay the costs of the Cases, (b) pay fees and expenses associated with the Financing, and (c) provide for working capital for the Debtors and certain of the Company's direct or indirect subsidiaries ("**Subsidiaries**") and other general corporate purposes.  You have also informed us that the Company intends the Financing to include a committed $15 million senior secured term loan facility having the terms set forth on Annex B (the "**Total Commitment**").  As provided on Annex B, in the sole discretion of Lender and on a currently uncommitted basis, Lender may loan up to an additional $10 million to the Company, at the Company's request, as part of the Financing and pursuant to the terms and conditions set forth herein.  The Financing described and provided hereunder is referred to as the "Facility".

Although Lender's commitment is for the full amount of the Total Commitment, in the event the Company elects to utilize the Facility, the Company understands that the Bankruptcy Code and the rules applicable thereto require the approval of such Facility by the Bankruptcy Court pursuant to a final order entered by the Bankruptcy Court (which final order shall be in form and substance satisfactory to Lender) (the "**DIP Order**").  Therefore, Lender is willing to provide the full amount of the Total Commitment, or such lesser amount as the Bankruptcy Court may approve, on an emergency basis, substantially on the terms and conditions to be set forth in an interim order that may be entered by the Bankruptcy Court approving the Facility (with any interim order to be in form and substance satisfactory to Lender) (an "**Interim Order**"), and on the terms and conditions contained in this Commitment Letter (including each of the annexes attached hereto).

Lender's commitment and agreements hereunder with respect to the Facility are subject to (A) Lender's satisfaction with, and entry by the Bankruptcy Court of, an Interim Order and/or DIP Order in form and substance satisfactory to Lender, approving (i) the Facility, (ii) all aspects of the Facility and the

LIP Investment, LLC
July 21, 2009
Page 2

transactions contemplated thereby, including, without limitation, the granting of liens and super-priority administrative claims under Bankruptcy Code section 364(c) in respect of the Facility, and all definitive documentation in connection therewith, (iii) all actions to be taken, undertakings to be made, obligations to be incurred by the Debtors and all liens or other security interests to be granted by the Debtors in connection with the Facility, and (iv) the payment by the Debtors of all of the fees that are provided for herein (all such approvals to be included in, and evidenced by the entry of one or more orders by the Bankruptcy Court, including, without limitation, the Interim Order and the DIP Order, made available to Lender for its advance review and satisfactory in form and substance to Lender), and (B) the Bankruptcy Court entering an order denying the Motion to Dismiss the Debtors' Chapter 11 Cases and, as an Alternative and Interim Relief, to Appoint a Chapter 11 Trustee (the "**Dismissal Denial Order**").  The DIP Order must include provisions satisfactory to Lender that will authorize the Company to authorize each of its direct and indirect subsidiaries (each a "**Subsidiary**") to (1) use revenues of such Subsidiary (a "**Contributing Subsidiary**") to pay obligations of one or more "sister" Subsidiaries (the "**Sisters**") that are subject to mortgage loans from the same mortgage lender who is also a mortgage lender to the Contributing Subsidiary, and (2) grant to a mortgage lender to one or more Sisters who is also a mortgage lender to the Contributing Subsidiary (an "**Affected Mortgage Lender**") cross-collateralization so that obligations of the Sisters to such Affected Mortgage Lender are secured by liens in and against assets of the Contributing Subsidiary.  The use of revenues of certain Contributing Subsidiaries to satisfy obligations of Sisters will be provided for in the Budget.

Lender's commitment is subject, in its reasonable discretion, to the satisfactory negotiation, execution and delivery of appropriate definitive loan documents relating to the Facility including, without limitation, one or more credit agreements, guarantees, security agreements, intercreditor agreements, pledge agreements, real property security agreements, control agreements, opinions of counsel and other related definitive documents (collectively, the "**Loan Documents**") to be based upon and substantially consistent with the terms set forth in this Commitment Letter.

The Company represents and covenants that (i) all information (other than financial projections, budgets, forward-looking statements and general market data) provided directly or indirectly by the Company or the Company's representatives (on behalf of the Company) to Lender in connection with the transactions contemplated hereunder is and will be, when taken as a whole, complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading and (ii) the financial projections, budgets, forward-looking statements and general market data that have been or will be made available to Lender by or on behalf of the Company have been and will be prepared in good faith based upon assumptions that are believed by the preparer thereof to be reasonable at the time made, it being understood and agreed that financial projections are not a guarantee of financial performance and actual results may differ from financial projections and such differences may be material.  The Company agrees that if at any time prior to the Closing Date (as defined in Annex B), any of the representations in the preceding sentence would be incorrect in any material respect if the information and financial projections were being furnished, and such representations were being made, at such time, then the Company will promptly supplement, or cause to be supplemented, the information and financial projections so that such representations will be correct in all material respects under those circumstances.

The Company agrees to the provisions with respect to Lender's indemnity and other matters set forth in Annex A, which is incorporated by reference into this Commitment Letter.

This Commitment Letter may not be assigned by the Company without the prior written consent of Lender (and any purported assignment without such consent will be null and void), is intended to be

LIP Investment, LLC
July 21, 2009
Page 3

solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the Company and Lender (including Lender's designee(s) and assign(s)). This Commitment Letter may not be amended or any term or provision hereof or thereof waived or modified except by an instrument in writing signed by each of the parties hereto and thereto, and any term or provision hereof or thereof may be amended or waived only by a written agreement executed and delivered by all parties hereto.

Lender hereby notifies the Company that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Patriot Act**") it may be required to obtain, verify and record information that identifies the Company and each of the Guarantors (as defined in Annex B), which information includes the name and address of, the Company and each of the Guarantors and other information that will allow Lender to identify the Company and each of the Guarantors in accordance with the Patriot Act. This notice is given in accordance with the requirements of the Patriot Act and is effective for Lender and each Lender.

Lender and its affiliates may have economic interests that conflict with those of the Company. The Company agrees that Lender will act under this letter as an independent contractor and that nothing in this Commitment Letter or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between Lender and the Company, its stockholders or its affiliates. The Company acknowledges and agrees that (i) the transactions contemplated by this Commitment Letter are arm's-length commercial transactions between Lender, on the one hand, and the Company, on the other, (ii) in connection therewith and with the process leading to such transaction Lender is acting solely as a principal and not the agent or fiduciary of the Company, its management, stockholders, creditors or any other person, (iii) Lender has not assumed an advisory or fiduciary responsibility in favor of the Company with respect to the transactions contemplated hereby or the process leading thereto or any other obligation to the Company except the obligations expressly set forth in this Commitment Letter, and (iv) the Company has consulted its own legal and financial advisors to the extent it deemed appropriate. The Company further acknowledges and agrees that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto. The Company agrees that it will not claim that Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to the Company, in connection with such transaction or the process leading thereto.

In addition, please note that Lender does not provide accounting, tax or legal advice.

The Company acknowledges that Lender has no obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to the Company, confidential information obtained or that may be obtained by them from any other person.

Lender's commitments hereunder will terminate upon the first to occur of (i) a material breach by the Company under this Commitment Letter, (ii) the failure of the Company to file a motion with the Bankruptcy Court for entry of the Interim Order and the DIP Order, in form and substance satisfactory to Lender on or before July 22, 2009, (iii) July 31, 2009, unless an order has been entered by the Bankruptcy Court approving the Break-Up Fee (as defined below) on or before such date, (iv) August 7, 2009, unless the Interim Order has been entered by the Bankruptcy Court on or before such date, (v) August 21, 2009 unless the DIP Order has been entered by the Bankruptcy Court on or before such date (including in such DIP Order protections provided to Lender pursuant to Bankruptcy Code § 364(e) that in the sole discretion of Lender are sufficient to fully protect Lender notwithstanding the pendency of an appeal from the DIP Order and/or the non-exhaustion of the period for taking any such appeal), and (vi) August 31,

LIP Investment, LLC
July 21, 2009
Page 4

2009, unless the funding of the Facility in accordance with the DIP Order, and on the terms and subject to the conditions contained herein, shall have occurred on or before such date.

In the event the Debtors obtain a replacement debtor-in-possession financing facility instead of the Facility, then the Company shall immediately pay to Lender a break-up fee in the amount of $500,000.

**The Company agrees that any suit or proceeding arising in respect to this Commitment Letter or our commitment will be tried exclusively in the Bankruptcy Court.  This Commitment Letter shall be governed by and construed in accordance with the laws of the State of Indiana without regard to principles of conflicts of laws.**

This Commitment Letter may be executed in any number of counterparts, each of which when executed will be an original, and all of which, when taken together, will constitute one agreement.  Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile transmission or electronic transmission (in .pdf format) will be effective as delivery of a manually executed counterpart hereof.  This Commitment Letter is the only agreement that has been entered into among the parties hereto with respect to the Facility and set forth the entire understanding of the parties with respect thereto and supersede any prior written or oral agreements among the parties hereto with respect to the Facility.

[Remainder of page intentionally left blank]

LIP Investment, LLC
July 21, 2009
Page 5

Please confirm that the foregoing is in accordance with your understanding by signing and returning to Lender the enclosed copy of this Commitment Letter on or before 5:00 p.m. (Eastern Time) on July 21, 2009, whereupon this Commitment Letter will become binding agreements between us. If not signed and returned as described in the preceding sentence by such date, this offer will terminate on such date. We look forward to working with you on this assignment.

Very truly yours,

**LIP LENDERS, LLC**

By: _____
Its authorized Manager

**ACCEPTED AS OF JULY __, 2009:**

**LIP INVESTMENT, LLC**

By:_____
Name:_____
Title:_____

LIP Investment, LLC
July 21, 2009
Page 5

Please confirm that the foregoing is in accordance with your understanding by signing and returning to Lender the enclosed copy of this Commitment Letter on or before 5:00 p.m. (Eastern Time) on July 21, 2009, whereupon this Commitment Letter will become binding agreements between us. If not signed and returned as described in the preceding sentence by such date, this offer will terminate on such date. We look forward to working with you on this assignment.

Very truly yours,

**LIP LENDERS, LLC**

By: _____
     Its authorized Manager

ACCEPTED AS OF JULY __, 2009:

**LIP INVESTMENT, LLC**

By: _____[signature]_____
Name: GREGORY GURNIK
Title: PRESIDENT

## *Annex A*

*In the event that Lender becomes involved in any capacity in any action, proceeding or investigation brought by or against any person, including stockholders, partners or other equity holders of the Company in connection with or as a result of either this arrangement or any matter referred to in this Commitment Letter, the Company agrees to periodically reimburse Lender for its reasonable legal and other out-of-pocket expenses (including the cost of any investigation and preparation) incurred in connection therewith. The Company also agrees to indemnify and hold Lender harmless against any and all actual losses, claims, damages or liabilities to any such person in connection with or as a result of either this arrangement or any matter referred to in this Commitment Letter (whether or not such investigation, litigation, claim or proceeding is brought by you, your equity holders or creditors or an indemnified person and whether or not any such indemnified person is otherwise a party thereto), except to the extent that such loss, claim, damage or liability has been found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from (i) the gross negligence, willful misconduct or bad faith of Lender (or any of its officers, directors, employees or agents) in performing the services that are the subject of this Commitment Letter or (ii) a material breach of this Commitment Letter by Lender (or any of its officers, directors, employees or agents). If for any reason the foregoing indemnification is unavailable to Lender or insufficient to hold it harmless, then the Company shall contribute to the amount paid or payable by Lender as a result of such loss, claim, damage or liability in such proportion as is appropriate to reflect the relative economic interests of (i) the Company and its affiliates, stockholders, members or other equity holders on the one hand and (ii) Lender on the other hand in the matters contemplated by this Commitment Letter as well as the relative fault of (i) the Company and its affiliates, stockholders, members or other equity holders and (ii) Lender with respect to such loss, claim, damage or liability and any other relevant equitable considerations. The reimbursement, indemnity and contribution obligations of the Company under this paragraph shall be in addition to any liability which the Company may otherwise have, shall extend upon the same terms and conditions to any affiliate of Lender and the partners, directors, agents, employees and controlling persons (if any), as the case may be, of Lender and any such affiliate, and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company, Lender, any such affiliate and any such person. The Company also agrees that neither any indemnified party nor any of such affiliates, partners, directors, agents, employees or controlling persons shall have any liability to the Company or any person asserting claims on behalf of or in right of the Company or any other person in connection with or as a result of either this arrangement or any matter referred to in this Commitment Letter, except in the case of the Company to the extent that any losses, claims, damages, liabilities or expenses incurred by the Company or its affiliates, stockholders, members or other equity holders have been found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from (i) the gross negligence, bad faith or willful misconduct of such indemnified party (or any of its officers, directors, employees or agents) in performing the services that are the subject of this Commitment Letter or (ii) a material breach of this Commitment Letter by Lender (or any of its officers, directors, employees or agents); <u>provided</u>, <u>however</u>, that in no event shall such indemnified party or such other parties have any liability for any indirect, consequential or punitive damages in connection with or as a result of such indemnified party's or such other parties' activities related to this Commitment Letter.* **The provisions of this Annex A shall survive any termination or completion of the arrangement provided by this Commitment Letter.**

Annex B

LIP Investment, LLC

**Summary of Terms and Conditions of the Facility**

*This Summary of Terms and Conditions outlines certain terms of the Facility referred to in the Commitment Letter, of which this Annex B is a part. Certain capitalized terms used herein are defined in the Commitment Letter.*

| | |
|---|---|
| **Borrower:** | LIP Investment, LLC (the "**Borrower**") as a debtor-in-possession under Chapter 11 of the United States Bankruptcy Code in jointly administered cases (collectively, the "**Cases**") in the United States Bankruptcy Court for the Southern District of Indiana (the "**Bankruptcy Court**"). |
| **Guarantors:** | Each of LIP Development, LLC and Lauth Investment Properties, LLC, which are debtors-in-possession in the Cases (collectively, the "**Guarantors**") shall guarantee all obligations under the Facility. (The Borrower and the Guarantors collectively, the "**Debtors**".) |
| **Purpose/Use of Proceeds:** | The proceeds of the Facility will be used (i) to pay the costs of the Cases (ii) to pay fees and expenses associated with the Financing and administrative expenses and (iii) to provide for the ongoing working capital requirements of the Borrower, certain of its Subsidiaries, and Guarantors and for general corporate purposes. |
| **Lender:** | **LIP Lenders, LLC or its designee(s) or assign(s)** |
| **Total Commitment and Amount of Facility:** | After the date of entry (the "**Interim Order Entry Date**") of the Interim Order (as defined in the Commitment Letter) and subject to the satisfaction of each of the conditions precedent to the Facility, $15 million of senior secured financing (the "**Total Commitment**"). In addition, in Lender's sole discretion, Lender may (on a currently uncommitted basis) loan to Borrower as part of the Facility up to an additional $10 million upon Borrower's request. |
| **Commitment Fee and Lender's Expenses:** | 5% of the Total Commitment, payable upon the Interim Order Entry Date (in the sole discretion of Lender payment of the Commitment Fee may be deferred). Reimbursement of all of Lender's actual out-of-pocket fees and expenses, including reasonable attorney fees and coats, incurred by Lender in conjunction with the Facility. These fees and expenses will be payable by Borrower on the Closing Date and with respect to Lender's fees and expenses accruing thereafter promptly upon presentation of Lender's statement of fees and expenses to Borrower. |

| | |
|---|---|
| **Availability:** | After the Interim Order Entry Date, the Total Commitment shall be available to the Borrower, subject to (i) delivery by the Borrower of a Budget (as defined below) and (ii) compliance with the terms, conditions and covenants described in this Term Sheet and the appropriate loan documents relating to the Facility (such documents, including, without limitation, credit agreements, guarantees, security agreements, pledge agreements, real property security agreements, opinions of counsel and other related definitive documents, collectively, the "**Loan Documents**"). |
| **Budget:** | As used in this Term Sheet, "**Budget**" means the business plan and projected operating budget (which shall include income statements, balance sheets, cash flow statements, a line item for total available liquidity for the period through the Maturity Date on a monthly and quarterly basis setting forth the anticipated uses of the Facility, which shall provide for the payment of the fees and expenses relating to the Facility, ordinary course administrative expenses, and working capital and other general corporate needs, and which shall be in form and substance satisfactory to the Lender. |
| **Maturity:** | The maturity date of the Facility will be (and all loans and obligations under the Facility shall be repaid in full in cash on) the earliest of: (i) **eighteen (18) months** after the Interim Order Entry Date, (ii) the effective date of the Debtors' plan of reorganization or liquidation (a "**Plan**") or the emergence of the Debtors from bankruptcy and (iii) the acceleration of the loans and termination of the commitments under the Facility, including, without limitation, as a result of the occurrence of certain events in bankruptcy to be determined (any such occurrence, the "**DIP Maturity Date**"). |
| | Any confirmation order entered in the Cases shall not discharge or otherwise affect in any way any of the obligations of the Borrower to the Lender under the Facility and the Loan Documents, other than after the payment in full and in cash to the Lender of all obligations under the Facility and the Loan Documents on or before the effective date of a Plan. |
| **Closing Date:** | The date on or before August 31, 2009, on which borrowings under the Facility are made (the "**Closing Date**"). |
| **Amortization:** | None. |
| **Interest Rate:** | All amounts outstanding under the Facility will bear interest at the rate of 15% per annum. |
| **Interest Payments:** | Quarterly and upon prepayment, in each case payable in arrears and computed on the basis of a 360-day year. |
| **Voluntary Prepayments:** | The Facility may be prepaid in whole or in part without premium or penalty. |

Annex B-2

**Mandatory Prepayments:**  Certain mandatory prepayments shall be required and negotiated in the definitive Loan Documents.  All mandatory prepayments will be applied without penalty or premium

**Yield Maintenance Provision:**  In the event all of the Facility is repaid through a replacement debtor-in-possession financing facility prior to the DIP Maturity Date (but not to include repayment pursuant to a Plan), such repayment will be made at 107.5% of all amounts otherwise payable.

**Priority/Security and Carve-Out:**  All obligations of the Borrower to the Lender, subject to the Carve-Out (as defined below), shall at all times:

(i)   pursuant to Bankruptcy Code section 364(c)(1), be entitled to joint and several super-priority administrative expense claim status in the Cases (subject only to the super-priority administrative expense claim previously granted to M&I Bank with respect to a use of cash collateral order);

(ii)   pursuant to Bankruptcy Code section 364(c)(2), be secured by a perfected first-priority lien on all of the Borrower's equity interests in its direct and indirect subsidiaries;

subject in each case only to, in the event of the occurrence and during the continuance of an Event of Default, or an event that would constitute an Event of Default with the giving of notice or lapse of time or both (a "**Default**"), provided that any right to charge the collateral under Section 506(c) of the Bankruptcy Code shall have been waived, the payment of (i) fees pursuant to 28 U.S.C. § 1930(a)(6); (ii) fees payable to the clerk of the Bankruptcy Court and any agent thereof; (iii) in the event of a conversion of the Chapter 11 cases to cases under Chapter 7 of the Bankruptcy Code, fees and expenses incurred by a trustee and any professionals retained by such trustee, in an aggregate amount not exceeding $50,000; (iv) to the extent allowed at any time, whether by interim order, procedural order or otherwise, all unpaid fees and expenses (the "**Professional Fees**") incurred or accrued by professionals or professional firms retained by the Debtors pursuant to section 327, 363 or 1103 of the Bankruptcy Code (the "**Professional Persons**") at any time before or on the first business day following delivery by the Lender of a Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice; and (v) after the first business day following delivery by the Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise, the payment of Professional Fees of Professional Persons in an aggregate amount not to exceed $2,000,000 (clauses (i) through (v) collectively, the "**Carve-Out**").  Notwithstanding the foregoing, so long as no Default or Event of Default shall have occurred and be continuing, the Debtors shall be permitted to pay compensation and reimbursement of fees and

Annex B-3

|  |  |
|---|---|
|  | expenses allowed and payable under Bankruptcy Code sections 328, 330 and 331, as the same may be due and payable, and the same shall not reduce the Carve-Out. No portion of the Carve-Out or proceeds of the Facility may be used for the payment of the fees and expenses of any Professional Person incurred in challenging, or in relation to the challenge of, any of the Lender's liens or claims, or the initiation or prosecution of any claim or action against the Lender. The Carve-Out Trigger Notice is a written notice delivered by Lender to counsel for Borrower following the occurrence of an Event of Default expressly stating that the Carve-Out has been invoked. Lender will waive all of its right to object to or otherwise challenge the Professional Fees. |
| **Warrants:** | Lender will receive warrants with a strike price of $0.01 to acquire 25% of the equity in the reorganized Borrower pursuant to the Plan. |
| **Representations and Warranties:** | The Facility will contain such customary and appropriate representations and warranties by the Borrower (with respect to the Borrower and its subsidiaries) as are usual and customary for financings of this kind. |
| **Management of the Debtors:** | The Facility will require that there be no substantial change in the management and control of the Debtors, including that, except for death or mental or physical disability or with Lender's consent (in its sole discretion), Robert L. Lauth, Jr., Gregory C. Gurnik, Lawrence B. Palmer, and Michael S. Curless shall be the individuals in control of the Debtors. |
| **Events of Default:** | The Facility will include such events of default (and, as appropriate, grace periods) as are usual and customary for financings of this kind, including, without limitation, failure to make payments when due, defaults under other agreements or instruments of indebtedness, noncompliance with covenants, breaches of representations and warranties, judgments in excess of specified amounts, ERISA, impairment of security interests in collateral, invalidity of guarantees, intercreditor provisions, the occurrence of a change of control (to be defined in a manner acceptable to the Lender). |
|  | The Facility will include, in addition to the above, the following events of default: |
|  | (a) A final order (the "**DIP Order**"), in form and substance satisfactory to the Lender, on a motion by the Debtors that is in form and substance reasonably satisfactory to the Lender, and on such prior notice to such parties as may be satisfactory to the Lender, shall not have been entered by the Bankruptcy Court on or before August 21, 2009; |
|  | (b) The Dismissal Denial Order being reversed on appeal or any of the Cases shall be dismissed or converted to a Chapter 7 Case; a Chapter 11 Trustee, a responsible officer or an examiner with enlarged |

powers shall be appointed in any of the Cases (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3)); or any other super-priority administrative expense claim (other than the Carve-Out) which is pari passu with or senior to the claims of the Lender shall be granted in any of the Cases;

(c) The Bankruptcy Court shall enter an order granting relief from the automatic stay to any creditor or party in interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any asset of the Debtors or to permit other actions that would have a material adverse affect on the Debtors, their business operations, or their estates;

(d) An order shall be entered reversing, amending, supplementing, staying, vacating or otherwise modifying the Interim Order or the DIP Order; or the Debtors shall fail to comply with the Interim Order or the DIP Order;

(e) A Plan shall be confirmed in any of the Cases that does not provide for termination of the Total Commitment under the Facility and payment in full in cash of the Debtors' obligations under the Loan Documents on the effective date of such Plan or any order shall be entered which dismisses any of the Cases and which order does not provide for termination of the Total Commitment under the Facility and payment in full in cash of the Debtors' obligations under the Loan Documents, or any of the Debtors shall seek, support, or fail to contest in good faith the filing or confirmation of such a Plan or the entry of such an order; and

(f) The Debtors shall take any action in support of any of the foregoing or any person other than the Debtors shall do so and such application is not contested in good faith by the Debtors and the relief requested is granted in an order that is not stayed pending appeal.

**Default Interest Rate:** During the continuance of an Event of Default, all outstanding obligations shall bear interest at the interest rate of 18%.

**Default Exit Fee:** Borrower shall pay an exit fee equal to an amount equal to 10% of the outstanding balance of the Facility payable upon acceleration of the Facility as a result of any Default.

**Conditions Precedent to Availability:** The obligations of the Lender to provide the Facility will be subject to such closing conditions as are usual and customary for financings of this kind.

**Conditions to All Borrowings:** The conditions to all borrowings will include requirements relating to prior written notice of borrowing, the accuracy of representations and warranties, the absence of any default or potential event of default, and will otherwise be customary and appropriate for financings of this type. Such conditions shall include, without limitation, the following:

      (a)  As a result of such extension of credit, usage of the Total Commitment shall not exceed the lesser of (i) the Total Commitment then in effect and (ii) the aggregate amount authorized by the Interim Order or the DIP Order, as the case may be;

      (b)  The Interim Order or DIP Order, as the case may be, shall be in full force and effect, and shall not have been reversed, modified, amended, stayed, vacated or subject to any pending appeal; and

      (c)  The Debtors shall have paid the balance of all fees then payable as referenced herein.

**Taxes:** The Facility will provide that all payments are to be made free and clear of any taxes (other than franchise taxes and taxes on overall net income), imposts, assessments, withholdings or other deductions whatsoever.

**Indemnity:** The Facility will provide customary and appropriate provisions relating to indemnity and related matters in a form reasonably satisfactory to the Lender.

**Governing Law and Jurisdiction:** The Facility will provide that the Borrower will submit to the non-exclusive jurisdiction and venue of the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in Marion County, Indiana; and shall waive any right to trial by jury. Indiana law shall govern the Loan Documents.

**Counsel to Lender:** Baker & Daniels LLP.

*The foregoing is intended to summarize certain basic terms of the Facility. It is not intended to be a definitive list of all of the requirements of the Lender in connection with the Facility.*