**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LAUTH INVESTMENT PROPERTIES, LLC, <u>et al.</u>,[1] | ) Case No. 09-06065-BHL-11 |
| | ) |
| Debtors. | ) Jointly Administered |

**OBJECTION OF WELLS FARGO BANK, NATIONAL ASSOCIATION, TO MOTION OF THE DEBTORS FOR ENTRY OF (A) AN ORDER APPROVING MARKETING PROCESS AND BREAK UP FEE; AND (B) INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING AND (B) GRANTING LIENS AND SUPERPRIORITY CLAIMS**

Wells Fargo Bank, National Association ("<u>Wells Fargo</u>"), pursuant to Federal Rule of Bankruptcy Procedure 4001, and 11 U.S.C. §§ 364 and 1109, hereby submits this Objection to the Motion of the Debtors for Entry of (A) An Order Approving Marketing Process and Break Up Fee; and (B) Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing and (B) Granting Liens and Superpriority Claims (the "<u>DIP Motion</u>").

**Preliminary Statement**

1.　　Wells Fargo objects to the DIP Motion in its capacity as one of the principal mortgage lenders to the non-debtor subsidiaries (the "<u>Subsidiaries</u>") of LIP Investment, LLC ("<u>LIP-I</u>"), one of the Debtors in these proceedings, and to a related affiliate of the Debtors that is an indirect subsidiary of LIP Holdings, LLC ("<u>LIP-H</u>"). Wells Fargo made available to six of the Subsidiaries and one related affiliate a total of seven mortgage loans[2] (and related interest

---

[1] The Debtors include: Lauth Investment Properties, LLC (09-06065); LIP Development, LLC (09-06066); and LIP Investment, LLC (09-06067).

[2] Loans were issued to, among other entities, the following borrowers: Brownsburg Station Partners, LLC ("<u>Brownsburg</u>"); Middleburg Heights Medical Partners, LLC ("<u>Middleburg</u>"); MCP Partners Two, LLC ("<u>MCP Two</u>"); MCP Partners Three, LLC ("<u>MCP Three</u>"); Meridian Medical Partners Two, LLC ("<u>Meridian</u>"); Corporate Plaza Partners, LLC ("<u>Corporate Plaza</u>"); and Virginia Beach Medical Partners, LLC ("<u>Virginia Beach</u>") (collectively, the "<u>Borrowers</u>"). Meridian is wholly owned by Meridian Medical Associates Two, LLC, which is a wholly owned subsidiary of LIP-I. Middleburg is wholly owned by Middleburg Heights Medical Associates, LLC,

rate swap transactions on one of the loans) and letters of credit to finance real estate development projects (the "Projects") in various U.S. markets (each a "Loan" or a "Wells Fargo Loan" and, collectively, the "Loans" or the "Wells Fargo Loans"). The approximate outstanding balance due to Wells Fargo under the Loans (other than the Loan to Corporate Plaza) is $76,963,428.63. The current outstanding balance of the Loan to Corporate Plaza is $$67,920,243.29, and such amount continues to increase as additional loan disbursements are made thereunder. All of the Loans other than the Loan to Corporate Plaza have matured by their terms, are in default and/or have been accelerated. Despite Wells Fargo's demands, the Subsidiaries have failed to repay (or agree to a restructuring of) the Loans.

2.   Wells Fargo is also a creditor to various principals of the Debtors who have executed personal guaranties of the Loans, some of whom are believed to be included within the group of principals and spouses of the Debtors who intend to form a new entity for the purpose of making the proposed DIP Facility.[3] The DIP Motion does not identify these individuals.

3.   This is Wells Fargo's first appearance in these proceedings. While Wells Fargo is not yet recognized as a creditor of any of the Debtors,[4] Wells Fargo has watched with increasing concern as the Debtors have made statements which are inconsistent with the facts as known to

---

which is a wholly owned subsidiary of LIP-I. Virginia Beach is majority owned by Virginia Beach Medical Associates, LLC, which is a wholly owned subsidiary of LIP-I. MCP Two is majority owned by MCP Associates Two, LLC, which is a wholly owned subsidiary of LIP-II. Wells Fargo is the sole lender under each of the Loans other than the Corporate Plaza Loan. Wells Fargo is a 50% co-lender under the Loan to Corporate Plaza, and Wells Fargo acts as the administrative agent for itself and its co-lender under that Loan.

[3]   See List of Equity Security Holders. [Docket No. 3]. The equity holders are also guarantors of certain of the Wells Fargo Loans. Robert L. Lauth, Jr. ("Lauth"), Gregory C. Gurnik ("Gurnik"), Lawrence B. Palmer ("Palmer") and Michael S. Curless ("Curless") executed guaranties in connection with each Loan (Lauth, Gurnik, Palmer and Curless shall be referred to herein collectively as the "Principals"). In addition, W. Todd Jensen ("Jensen") executed guaranties in connection with four of the Loans, Michael J. Jones ("Jones") and John F. McNaughton ("McNaughton") each executed guaranties in connection with three of the Loans, and Thomas K. Peck ("Peck") executed a guaranty in connection with one of the Loans (collectively, the "Guaranties"). The Principals, Jensen, Jones, McNaughton, and Peck shall be referred to herein collectively as the "Guarantors."

[4]   Wells Fargo may be a creditor, for example, if the Debtors are transferees of certain fraudulent conveyances by the Guarantors.

2

Wells Fargo, or which are materially incomplete or which directly threaten the economic interest of Wells Fargo.

    4.    Wells Fargo objects to the DIP Motion for the following reasons:

- The DIP Motion includes a requirement that this Court "authorize" certain modifications to the Wells Fargo Loans of the Subsidiaries, including cross collateralization among the Borrowers, which modifications would constitute covenant violations, and to which Wells Fargo is contractually entitled to consent, and to which it has not and does not consent;[5]

- The DIP Motion may "authorize" various Borrowers to incur new debt, for which repayment may be unlikely, thus impairing the financial interests of Wells Fargo.

- The DIP Motion would permit the entity established by the Debtors' insiders to obtain liens on the direct and indirect equity interests in the Borrowers, which would constitute a violation of the transfer restrictions under some of the Wells Fargo Loans and may constitute an additional event of default under some of the Wells Fargo Loans;

- The DIP Motion fails to disclose that Wells Fargo has sued the Guarantors because the Loans for the Projects (other than the Loan to Corporate Plaza) are matured and are in default; and that the proposed DIP Loan is to be funded by some of the Guarantors of the Wells Fargo Loans who are alleged to have fraudulently transferred substantial sums of cash and real property to family members and to trusts in order to move such assets out of the reach of Wells Fargo[6];

- The DIP Facility is to be used in part to fund the operations of the Subsidiaries; however, the DIP Motion fails to disclose that the Wells Fargo Loans (other than the Loan to Corporate Plaza) are fully matured, in default, and that enforcement proceedings against the Guarantors and the Borrowers have begun or will be commenced as soon as reasonably practicable, hence there will no longer be any significant "operations" in which LIP-I is engaged and no need for the DIP Facility as it relates to the Subsidiaries financed by Wells Fargo;

---

[5] Wells Fargo is concerned that the request for "authority" will lead to an order "directing" the Subsidiaries to take certain actions, although such Subsidiaries are not before this Court. Wells Fargo questions whether this Court has jurisdiction to grant such a request, if made.

[6] The Guarantors have provided financial statements to Wells Fargo, which are subject to certain confidentiality restrictions set forth in the applicable loan documents. In connection with the pending suit in the United States District Court for the Southern District of Indianapolis (Case No. 1:09-cv-746 DFH-JMS), certain information derived from the financial statements was submitted under seal, as an appendix to the Complaint. If needed, Wells Fargo will seek to have such information made available to this Court.

3

- The Debtors may have improperly transferred cash from the Subsidiaries to the Debtors thus improperly converting the proceeds of Wells Fargo's collateral;[7]

- The Debtors have not shown any kind of "irreparable harm" which would remotely justify any interim financing order pending a final hearing (see Bankruptcy Rule 4001(c)(2)); and

- Wells Fargo is entitled to conduct discovery in connection with the DIP Motion or seek a Rule 2004 examination of the Debtors and its principals to determine the sources and uses of the DIP Facility.[8]

5.  For these reasons, and as more fully set forth below, Wells Fargo submits that the Court should deny the DIP Motion or, alternatively, defer ruling on the DIP Motion until Wells Fargo has had an opportunity to obtain full discovery of the Debtors and the Principals.

**Factual Background**

6.  Wells Fargo is a national banking association. Wells Fargo's organization certificate lists South Dakota as the state where Wells Fargo carries on its operations. Wells Fargo's principal place of business is located in California.

7.  On May 1, 2009, LIP, LIP-D and LIP-I each filed chapter 11 petitions (the "Chapter 11 Cases"). The Amended Schedules and Statements of Financial Affairs show that the Debtors are corporate shells with no employees, operating assets or operational expenses, other than the payment of professional and legal fees.

8.  On May 19, 2009, this Court entered an Agreed Order Authorizing the Debtors to Operate their Business Pursuant to 11 U.S.C. Section 1108 (the "1108 Order"). The 1108 Order provided that the Debtors would not enter into any agreement "whereby their direct or indirect

---

[7] It is unclear whether the Budgets that underlie the DIP Motion are premised upon the transfer of cash from Subsidiaries into a central account and then a re-allocation among the various non-debtors. Wells Fargo objects to the extent that the DIP Motion contemplates or requires a continuation of the commingling of cash collateral or cash proceeds derived from those projects on which Wells Fargo has a first lien on the real estate and all proceeds.

[8] A motion to obtain credit or incur debt under Bankruptcy Rule 4001(c) is a contested matter under Bankruptcy Rule 9014. Most of the discovery rules and other selected rules of the Federal Rules of Civil Procedure (as modified by the Bankruptcy Rules) will apply to the motion. Fed. R. Bankr. P. 9014.

4

subsidiaries cross-collateralize any of their respective assets. . .without further order of this Court. . . ." It also provided that the 1108 Order "does not modify or alter and should not be construed to modify or alter any provisions in the any loan agreements or any related document under which any of the Debtors and/or any of their non-debtor direct or indirect subsidiaries are borrowers or guarantors. . .The lenders to the Debtors' non-debtor direct and indirect subsidiaries and any and all other parties to any loan agreements and/or related loan documents may rely on the terms of this Order."

9. Debtor LIP-I owns (directly or indirectly through other subsidiaries) membership interests in the Subsidiaries, which own the Projects.

10. On June 2, 2009, LIP-H filed a Motion to Dismiss the Debtors' Chapter 11 Cases or, as an Alternative, to Appoint a Chapter 11 Trustee (the "Motion to Dismiss"). [Docket. No. 130].

11. On July 21, 2009, while the Motion to Dismiss was still pending, the Debtors filed the DIP Motion. The DIP Term Sheet provides that the DIP Facility is subject to this Court's denial of the Motion to Dismiss. See Docket No. 299. Accordingly, until this Court rules on the Motion to Dismiss, the DIP Motion should be deferred.

12. On July 23, 2009, this Court heard oral argument on certain legal issues in the Motion to Dismiss, namely whether the Debtors had authority to file their Chapter 11 Cases. The Court denied the Motion to Dismiss on such grounds, but left open for further consideration the issue of whether the cases should be dismissed for "bad faith" or whether a trustee should be appointed.

13. The mandatory terms of the proposed DIP Facility, if approved by this Court, would constitute additional defaults under the Wells Fargo Loans.

5

14. Despite the fact that the Wells Fargo Loans (other than the Loan to Corporate Plaza) are fully matured, in default and that enforcement proceedings against the Guarantors have begun, none of which has been disclosed to the Court by the Debtors, the DIP Motion appears to be premised on the continued existence of such Loans, and contains various provisions which constitute impermissible modifications of the Loans.  Actions against the Borrowers have also begun, or will be commenced as soon as practicable.

15. First, the DIP Term Sheet contains the following requirement that in effect "authorizes" the Debtors to use revenues from one subsidiary to advance/lend/or gift such money to a weaker subsidiary, and then to provide collateral for such advances:

> The DIP Order must include provisions satisfactory to Lender that will authorize the Company to authorize each of its direct and indirect subsidiaries (each a "Subsidiary") to (1) use revenues of such Subsidiary (a "Contributing Subsidiary") to pay obligations of one or more "sister" Subsidiaries (the "Sisters") that are subject to mortgage loans from the same mortgage lender who is also a mortgage lender to the Contributing Subsidiary, and (2) grant to a mortgage lender to one or more Sisters who is also a mortgage lender to the Contributing Subsidiary (an "Affected Mortgage Lender") cross-collateralization so that obligations of the Sister to such Affected Mortgage Lenders are secured by liens in and against assets of the Contributing Subsidiary.  The use of revenues of certain Contributing Subsidiaries to satisfy obligations of Sisters will be provided for in the Budget.

DIP Motion at ¶ 21.

16. While the DIP Motion states that the Court order must "authorize" the non-debtor Subsidiary to take certain action, it further states that the Order must be satisfactory to the DIP Lenders.  Thus, the DIP Lenders may seek a final order stating that the Subsidiaries, whom are not before this Court, are directed or ordered to take certain action, or to grant liens, or otherwise violate existing contractual obligations.

6

17.     Second, the DIP Motion requires that the DIP Facility be secured by a lien on the equity interests in the Subsidiaries. "In addition to the superpriority claim referenced above, the DIP Facility shall be secured by valid, first priority liens on all of the equity interests and/or membership interests owned by LIP-I in its direct and indirect subsidiaries." DIP Motion at 7 (see block labeled, "Liens"). A "transfer" of any interest in the Wells Fargo Borrowers may constitute an event of default. See, e.g., Exhibit A-1 – A7.[9] Wells Fargo does not consent to such transfer and submits that the Court should not authorize any further breaches.[10] Whether the Subsidiaries can grant liens is a matter purely of state law and is governed only by the applicable loan documents. The Wells Fargo Loan documents prohibit the Borrowers from encumbering their assets, and the DIP Loan should not contain any such authorization.

18.     Wells Fargo's concern is that the Debtors are seeking this Court's "authorization" to compel a negotiated result which the Subsidiaries have not achieved thus far through their own intransigence, inability or unwillingness. It is wholly improper for the Debtors to ask this Court to impose conditions or authorize the Subsidiaries to take action, or not to take action.[11]

19.     A summary of some of the violations are set forth below.

---

[9] In certain loans, such as MCP Three, a transfer of any direct or indirect ownership interest in the Borrower is "void," with the term "transfer" being defined as including a sale, pledge or encumbrance. Other loans, such as Brownsburg, have an exception if the transferee is an entity controlled by "Selected Guarantors." Given that the Debtors have not disclosed the owners of the proposed DIP Lender, it is unclear whether any of the exceptions would apply.

[10] To avoid confusion, Wells Fargo does not believe this Court should make any determination as to the rights of the Subsidiaries concerning their relationship with Wells Fargo other than a determination that such rights are private contract matters, controlled by state law, and involving two non-debtor parties.

[11] The Seventh Circuit interprets "related to" jurisdiction more narrowly than other circuits. In re Mission Bay Ski & Bike, Inc., 398 B.R. 250 (Bankr. N.D. Ill. 2008). The court does so "to prevent the expansion of federal jurisdiction over disputes that are best resolved by the state courts." In re FedPak Sys., Inc., 80 F.3d 207, 214 (7th Cir. 1996). The court has also expressed concern about the seemingly unlimited breadth of the phrase "related to" "in a universe where everything is related to everything else." FedPak, 80 F.3d at 214 (internal quotation omitted). Not surprisingly, one non-debtor's action for damages against another non-debtor is typically not a matter over which a bankruptcy court can exercise jurisdiction. See, e.g., In re Federalpha Steel LLC, 341 B.R. 872, 880 (Bankr. N.D. Ill. 2006); Wayne Film Sys. Corp. v. Film Recovery Sys. Corp., 64 B.R. 45, 52-53 (N.D. Ill. 1986); In re O'Malley, 252 B.R. 451, 458-59 (Bankr. N.D. Ill. 1999); In re Mulder, 307 B.R. 637 (Bankr. N.D. Ill. 2004).

| DIP Provisions | Loan Violation | Affected Properties |
|---|---|---|
| Lien on equity interests | Violates change in control provision | Corp. Plaza: Section 9.15: Va. Beach: Section 9.16 Middleburg: Section 9.16 Meridian: Section 9.15 MCP Three: Section 9.16 Brownsburg: Section 9.15 |
| Requires borrower to advance funds to affiliate | Violates covenants which prohibit Borrower from entering into any financing arrangement or loan transaction. | Same as above. |
| Permits borrower to obtain other debt and to grant additional liens | Same as above. | Same as above. |
| Subsidiary Borrowers have previously been upstreaming cash to LIP-I or LIP-D despite an event of default. | Wrongful and unauthorized use of cash proceeds from collateral. | |

**The Wells Fargo Loans Are In Default: Foreclosures
Have Been Or Shortly Will Be Commenced**

20.    The Debtors assert that the DIP Facility is to provide financial support for the operations of its Subsidiaries, that is, to fund operations at various non-debtor Subsidiaries. Directly tied to this request is a request for "authorization" to permit some of the Subsidiaries to make loans and grant liens on their assets in order to prevent foreclosure on the various loans to the Subsidiaries. "Without such cross-collateralization, LIP-I subsidiaries will be unable to convince Affected Mortgages Lenders to forbear from foreclosing their mortgages. . . As such the DIP Term Sheet requires that the Final DIP Order contain the provision quoted above to

8

allow LIP-I to take action needed to preserve the equity it holds in such Subsidiaries." DIP Motion at ¶ 22.

21. The Debtors, however, fail to disclose that (i) all but one of the Loans are in default, (ii) a collection proceeding has commenced on the applicable Guaranties, and (iii) LIP-I has repeatedly failed to establish any rationale for forbearance by Wells Fargo and, despite extensive negotiations, has been unwilling or unable to enter into a restructuring. In addition, Wells Fargo has commenced, or will soon commence, foreclosure proceedings with respect to these Loans. Thus, the Debtors' statement that the proposed DIP Facility will prevent foreclosures of the Wells Fargo Loans is not accurate.

22. The defaults under the Wells Fargo Loans are many:

- As of October 10, 2008, Middleburg failed to repay in full all sums due and owing under its Loan, and related documents, on or before that date, which was that Loan's maturity date. On or about November 25, 2008, Wells Fargo served upon the Principals and Jensen a final demand to pay and to perform in accordance with their obligations owing under the Guaranty with respect to that Loan. A civil suit has been filed against the applicable Guarantors with respect to the Guaranties of this Loan and foreclosure proceedings on the collateral for this Loan have been commenced, or will shortly be commenced.

- As of November 8, 2008, Brownsburg failed to repay in full all sums due and owing under its Loan, and related documents, on or before that date, which was that Loan's maturity date. On or about November 13, 2008, Wells Fargo served upon the Principals a demand to pay and to perform in accordance with their obligations owing under the Guaranty with respect to that Loan. A civil suit has been filed against the applicable Guarantors with respect to the Guaranties of this Loan and foreclosure proceedings on the collateral for this Loan have been commenced, or will shortly be commenced.

- As of November 18, 2008, MCP Two, which is not a Subsidiary of the Debtors, but is a subsidiary of LIP-H, failed to repay in full all sums due and owing under its Loan, and related documents, on or before that date, which was that Loan's maturity date. On or about November 24, 2008, Wells Fargo served upon the Principals and Jones a final demand to pay and to perform in accordance with their obligations owing under the Guaranty with respect to that Loan. A civil suit has been filed against the applicable Guarantors with respect to the Guaranties of this Loan and foreclosure proceedings on the collateral for this Loan have been commenced, or will shortly be commenced.

9

- As of January 22, 2009, MCP Three failed to pay the January interest payment due under its Loan and related documents, on or before that date, which is the date such payment was due. Wells Fargo then accelerated that Loan pursuant to the Loan Agreement and demanded payment in full, which MCP Three failed to provide. On or about January 29, 2009, Wells Fargo served upon the Principals, Jones, and Peck a final demand to pay and to perform in accordance with their obligations owing under the Guaranty with respect to that Loan. A civil suit has been filed against the applicable Guarantors with respect to the Guaranties of this Loan and foreclosure proceedings on the collateral for this Loan have been commenced, or will shortly be commenced.

- As of January 24, 2009, Meridian failed to repay in full all sums due and owing under its Loan, and related documents, on or before that date, which was that Loan's maturity date. Meridian is thus in default under that Loan. On or about January 26, 2009, Wells Fargo served upon the Principals and Jensen a final demand to pay and to perform in accordance with their obligations owing under the Guaranty with respect to that Loan. A civil suit has been filed against the applicable Guarantors with respect to the Guaranties of this Loan and foreclosure proceedings on the collateral for this Loan have been commenced, or will shortly be commenced.

- As of February 2, 2009, Virginia Beach failed to perform in accordance with certain monetary and other obligations under one of the Loans that the Principals, Jensen, and McNaughton guarantied. Specifically, Virginia Beach failed to repay in full all sums due and owing under the Loan, and related documents, on or before that date, which was that Loan's maturity date. Virginia Beach is thus in default under that Loan. On or about February 3, 2009, Wells Fargo served upon the Principals, Jensen, and McNaughton a final demand to pay and to perform in accordance with their obligations owing under the Guaranty with respect to that Loan. A civil suit has been filed against the applicable Guarantors with respect to the Guaranties of this Loan and foreclosure proceedings on the collateral for this Loan have been commenced, or will shortly be commenced.

23. Beginning in October 2008 and continuing into April 2009, Wells Fargo and the Borrowers engaged in discussions regarding these defaulted Loans. At the Borrowers' request, Wachovia Bank, National Association ("<u>Wachovia</u>"), joined these discussions for the purpose of attempting to reach a global restructuring of certain Wells Fargo Loans and certain Wachovia mortgage loans (the "<u>Wachovia Loans</u>") to other Subsidiaries[12] secured by Projects. These

---

[12] The Wachovia Loans were made to the following Subsidiaries: Moores Chapel Partners, LLC, Brier Creek Medical Partners, LLC, and Brier Creek Medical Partners Two, LLC.

10

discussions resulted in a draft term sheet that provided for, among other things, the Borrowers' principals contributing additional cash equity to the Borrowers, the cross-collateralization of certain of the Loans with other Loans and with the Wachovia Loans, and the extension of the maturity dates of the Loans and the Wachovia Loans. In April 2009, the Debtors informed Wells Fargo that they were unwilling or unable to proceed with the potential restructuring as contemplated. During the course of these negotiations, Wells Fargo repeatedly requested from the Principals additional information as to the extent and timing of certain of the asset transfers by the Principals discussed above and below, but the Principals repeatedly refused such requests.

24.     As a result of, among other things, (1) the maturities and defaults of the Wells Fargo Loans, (2) the Borrowers' inability or unwillingness to enter into a restructuring acceptable to Wells Fargo, and (3) Wells Fargo's receipt, after the conclusion of negotiations on the potential restructuring, of additional information concerning asset transfers by the Principals, Wells Fargo filed civil proceedings against the Guarantors in the United States District Court for the Southern District of Indianapolis (Case No. 1:09-cv-0746 DFH-JMS). A true copy of the Complaint is attached hereto as <u>Exhibit C</u>.[13]

25.     The DIP Facility should not be predicated on any statements by these Debtors that they are able, or even willing, to effectuate a restructuring of the Wells Fargo Loans. Any restructuring would require the consent of Wells Fargo and would be a private contract between nondebtor parties. And, as noted above, the requested modifications to the Wells Fargo documents would violate the Wells Fargo Loan documents and constitute an additional breach of the Wells Fargo Loans.

---

[13] As noted above, *supra* n. 6, the Appendix to the Complaint in Case No. 1:09-cv-0746 DFH-JMS contains information derived from financial statements that are subject to certain confidentiality restrictions set forth in the applicable loan documents, and therefore was filed under seal. Though that Appendix is not attached hereto, if needed, Wells Fargo will provide a copy of it to this Court.

11

**Fraudulent Transfers by the Guarantors Who Are the Potential DIP Lenders**

26. According to the DIP Motion, the DIP Facility will come from a newly formed entity, which in turn will be funded solely by certain of the Debtors' principals and their spouses, who are believed to be either Guarantors of the Wells Fargo Loans or transferees of highly questionable transfers made by the Principals of the Debtors, and for the purpose of hindering, delaying or defrauding their creditors. See Exhibit C. Accordingly, the Debtors' source of funding is highly questionable, and Wells Fargo is concerned that the loan proceeds will either be Wells Fargo's own cash collateral at the Subsidiary level, or the proceeds, in part or in full, of wrongful transfers by the Principals. Despite any argument over the "fungibility" of money, the Guarantors and Principals should not be permitted to engage in inequitable and wrongful conduct, and then come before this Court seeking to invest all or some of that money in these Chapter 11 Cases, while seeking a high interest rate, and asking this Court for various protections (such as administrative priority).

27. Wells Fargo is entitled to discovery to corroborate that these improper transfers form the basis of its fraudulent transfer Complaint, and will be prepared to present such evidence to this Court at the final hearing on the DIP Motion. Wells Fargo's allegations are based in part on the financial statements provided by the Guarantors to Wells Fargo and the limited additional information provided, after much protest, by the Principals. Out of an abundance of caution, Wells Fargo included information derived from the Principals' financial statements into a separate appendix to the Complaint, which was filed under seal in the Civil Suit. The pertinent parts of those allegations are set forth below for the convenience of the Court.

28. The Loans to the Borrowers were scheduled to mature between October 10, 2008 and June 27, 2009. At the beginning of 2007, as required by the Guaranties, the Principals

12

submitted to Wells Fargo personal financial statements for the fiscal year ended on or about December 31, 2006 (the "2006 Financial Statements").

29.     By early or mid-2007, with the first of the Loans set to mature in 2008, it should have been readily apparent to the Principals that a number of the Projects for which the Loans were made were underperforming and likely would not generate sufficient funds for the Borrowers to pay or to perform the Loans' obligations when they became due. The 2006 Financial Statements reflect that at this critical juncture, the Guarantors, and prospective DIP Lenders here, began to make the alleged fraudulent conveyances. The timing of these transfers, when coupled with the impending maturities on the Wells Fargo Loans creates more than a reasonable inference that the intent of the transfers was to hinder, delay or defraud creditors.

30.     Just as the Loans were about to become due and to go into default, triggering the Principals' obligations to pay or perform under the Guaranties, the Principals, upon information and belief, transferred a significant portion of their assets (the "Transfers") to their wives (Robin S. Lauth, Julie Gurnik, Pamela J. Palmer, and Nancy G. Curless) and to various trusts, foundations, and other entities (the recipients of the transfers, collectively, the "Transferees") benefiting, among others, their wives and other family members. The Transferees include Robert Lauth Family Foundation, Inc., Nancy G. Curless Trust, and other as yet unidentified Defendants.

31.     The Principals' personal financial statements for the fiscal year ended on or about December 31, 2007 (the "2007 Financial Statements") were due April 30, 2008. The Principals, however, did not submit those statements until May 21, 2008 (when Lauth and Gurnik each submitted his 2007 Financial Statement) and May 23, 2008 (when Palmer and Curless each submitted his 2007 Financial Statement).

13

32. The 2007 Financial Statements revealed that the Principals had disposed of a significant portion of their assets since the effective date of their 2006 Financial Statements.

33. Wells Fargo immediately began a review of the 2007 Financial Statements and the startling reduction in assets. On or about September 29, 2008, after reviewing the 2007 Financial Statements, Wells Fargo determined that the Principals had transferred a substantial portion of the assets that had been available in 2007 to satisfy the Principals' obligations under the Guaranties.

34. Between submitting his 2006 and 2007 Financial Statements to Wells Fargo, Lauth made Transfers of a significant portion of his total assets. These Transfers were made to Robin S. Lauth, Robert Lauth Family Foundation, Inc., unidentified defendant family partnerships, and an unidentified defendant trust, of which, upon information and belief, Robin S. Lauth, is a trustee and/or beneficiary.

35. Upon information and belief, the Transfers made by Lauth included: (a) on May 19, 2008 (two days before Lauth submitted his 2007 Financial Statements to Wells Fargo), the Transfer to Robin S. Lauth of his primary residence in Carmel, Indiana; (b) on May 14, 2008 (one week before Lauth submitted his 2007 Financial Statements to Wells Fargo) the Transfer to Robin S. Lauth of real property in Naples, Florida; and (c) also on May 14, 2008, the Transfer to Robin S. Lauth of additional real property in Naples, Florida.

36. Upon information and belief, between the time that he submitted his 2006 Financial Statement and the time that he submitted his 2007 Financial Statement to Wells Fargo, Gurnik made Transfers of a significant portion of his total assets. Upon information and belief, these Transfers were made to Julie Gurnik, or to an irrevocable trust (which is an unidentified Defendant), of which, upon information and belief, Julie Gurnik is a trustee and/or beneficiary.

37. Upon information and belief, between the time that he submitted his 2006 Financial Statement and the time that he submitted his 2007 Financial Statement to Wells Fargo, Palmer made Transfers of a significant portion of his assets to Pamela J. Palmer or a trust (which is an unidentified Defendant) of which, upon information and belief, Pamela J. Palmer is a trustee and/or beneficiary.

38. Upon information and belief, between the time that he submitted his 2006 Financial Statement and the time that he submitted his 2007 Financial Statement to Wells Fargo, Curless made Transfers of a significant portion of his assets to Nancy G. Curless or to a trust called the Nancy G. Curless Trust.

39. With all seven Loans (other than the Loan to Corporate Plaza), the Principals have failed to pay or to perform in accordance with their obligations under the Guaranties. Jensen, Jones, McNaughton, and Peck also have failed to pay or to perform in accordance with their obligations under the Guaranties that they respectively executed.

### **Improper Upstreaming of Subsidiaries' Cash**

40. Wells Fargo is also concerned that the Debtors have permitted the upstreaming of cash proceeds from the Subsidiaries despite the fact that the Wells Fargo Loans (other than the Loan to Corporate Plaza) are in default, and that all such cash is subject to the mortgage liens of Wells Fargo.

41. Under the Wells Fargo Loan documents, the Borrower has granted a security interest in "rents, issues, profits, proceeds, revenues, awards and other benefits of the Mortgaged Property" and "[a]ll monies relating to the Mortgage Property held in any cash collateral or operating account maintained with Mortgagee or any Affiliate of Mortgagee now or at any time hereafter." See MCP Three Mortgage, Granting Clauses E and L, attached as Exhibit B.1; MCP Two Mortgage, Granting Clauses E and L, attached as Exhibit B.2; Brownsburg Mortgage,

15

Granting Clauses E and L, attached as <u>Exhibit B.3</u>; Meridian Mortgage, Granting Clauses E and L, attached as <u>Exhibit B.4</u>; Middleburg Mortgage, Granting Clauses E and L, attached as <u>Exhibit B.5</u>; Virginia Beach Deed of Trust, Granting Clauses E and L, attached as <u>Exhibit B.6</u>; Corporate Plaza Deed of Trust, Granting Clauses E and L, attached as <u>Exhibit B.7</u>.

42. Further, each of the personal Guaranties provides that any limitations on the liability of the Guarantors thereunder shall not apply to, among other items, any failure by the Borrowers, following an Event of Default, to apply all revenues and rents to the normal operating expenses of the Project and any payments due under the Loan Documents.

43. The Debtors' estates should not be funded with monies which were either converted from the collateral of Wells Fargo or are the proceeds of fraudulent transfers.

**The Debtors Cannot Demonstrate Irreparable Harm**

44. The Debtors should not be permitted any interim financing pending a final hearing, pursuant to Bankruptcy Rule 4001(c)(2). Certainly, as to the Projects funded by Wells Fargo, there is no immediate need for the kind of financing sought in the present DIP Motion. Moreover, it is unclear for what purpose the Debtors need a substantial infusion of capital, nor how the Debtors have been acquiring cash and using cash during the course of this case.

45. The Debtors' bankruptcy cases have been consuming excessive amounts of cash, mostly for legal and professional fees, although without any apparent ability to reorganize.

46. On May 18, 2009, the Debtors were authorized to use up to $2.5 million in certain Cash Collateral of M&I Marshall & Ilsley Bank ("<u>M&I</u>"). [Docket No. 90]. The Debtors state that they have sought entry of a final order authorizing the full use of the cash collateral in an amount up to $3.9 million, but have been unable to obtain entry of such order. The Debtors further claim that upon entry of such order, they would only have sufficient cash to fund operations and the Chapter 11 Cases through August 7, 2009. DIP Motion, ¶ 9. This is a

16

<u>staggering amount</u> of money to run a bankruptcy case with no employees and no business operations.

47. Through only May 30, 2009, the Debtors incurred over $734,845 in legal expenses during the first two and one half months of the Chapter 11 Cases; much of this money has been spent on business activities for the Subsidiaries and not for the Debtors themselves. [Docket No. 301]. A statement filed by Alix Partners on July 17, 2009, shows that Alix Partners has billed the Debtors $634,145.72. [Docket No. 291]. Much of this work is not related to the Debtors, but rather to the preparation of 13-week cash flow projections for the Subsidiaries. <u>Id.</u>[14]

48. According to the Summary of Expenditures for the Week Ending July 17, 2009, LIP I still had over $1.5 million in cash. [Docket No. 309].

## Points And Authorities

49. As with any DIP financing arrangement, good faith is mandated. Before the Court may grant a superpriority claim pursuant to section 364(c)(1) or a lien on the Debtors' assets pursuant to sections 364(c)(2) and (c)(3) or (d), the Debtors must show that a good faith effort first was made to obtain credit by granting only administrative expense priority under section 364(a) or (c). 11 U.S.C. § 364(c); <u>In re Ames Dept. Stores. Inc.</u>, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990).[15] That burden has been held to be at least equal to, if not greater than, the burden of proof required of a petitioner seeking a temporary restraining order. <u>In re Adamson</u>

---

[14] Despite the fact that the Debtors' estates have paid for this work, the Debtors obtained a protective order making disclosure of such budgets improper without a court order. <u>See</u> Agreed Protective Order, Docket No. 253.

[15] The court in <u>Ames</u> noted that the discretion of bankruptcy courts in approving financing on a secured basis is not unbridled. Recognizing that debtors-in-possession have little bargaining leverage, it is up to the court to protect the parties in interest by focusing "attention on proposed terms that would tilt the conduct of the bankruptcy case; prejudice, at an early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors; or leverage the Chapter 11 process by preventing motions by parties-in-interest from being decided on their merits." 115 B.R. at 37.

Co., Inc., 29 B.R. 937 (Bankr. E. D. Va. 1983). For the reasons set forth above, the Debtors have failed to meet this burden.

50. In addition, on an interim basis, "the Court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Bankruptcy Rule 4001(c)(2). The Debtors have failed to meet their burden here, as the Debtors are believed to have more than sufficient cash available to continue their "operations" pending a final order.

51. Finally, a DIP financing order which is not shown to be in good faith is not entitled to the appeal protections of section 364(e).[16] See N.Y. Life Ins. Co. v. Revco D.S., Inc. (In re Revco D.S., Inc.), 901 F.2d 1359 (6th Cir. 1990) (good faith cannot be presumed); General Elec. Capital Corp. v. Hoerner (In re Grand Valley Sport & Marine, Inc.), 143 B.R. 840, 848 (Bankr. W.D. Mich. 1992) ("A bankruptcy court must make an explicit good faith finding at the time of the postpetition financing hearing to afford a postpetition lender protection under § 364(e)"). The Debtors and the proposed DIP Lender need to do more than include a simple conclusory allegation of good faith in the DIP Motion to warrant a good faith finding in the financing order, especially where the lending transaction will be among insiders. Insider transactions are to be vigorously scrutinized. In re Marquam Inv. Corp., 942 F.2d 1462 (9th Cir. 1991); Westship, Inc. v. Trident Shipworks, Inc., 247 B.R. 856 (M.D. Fla. 2000). Strictly scrutinized, an insider's actions may subject him or her to equitable subordination on the basis of

---

[16] Good faith is not defined in the Bankruptcy Code, but courts have looked to standards employed in other contexts for guidance. See In re Ellingsen MacLean Oil Co., 834 F.2d 599, 605 (6th Cir. 1987) (court looked to definition of good faith contained in Uniform Commercial Code); In re Adams Apple, Inc., 829 F.2d 1484, 1489 (9th Cir. 1987) (dismissing appeal as moot, court looked to good faith standard applied to foreclosure sales). Good faith is generally a question of fact. See Ellingsen, 834 F.2d at 605; Adams Apple, 829 F.2d at 1490 ("creditor fails to act in good faith if it acts for an improper purpose"); In re EDC Holding Co., 676 F.2d 945, 947-9 (7th Cir. 1987) (held, stated purpose of portion of loan was to pay creditors' attorneys; because of improper purpose, lender did not act in "good faith"; improper to extend credit with ulterior purpose of reducing cost of settlement by putting legal expenses of union, a creditor, ahead of general creditors' claims).

inherent unfairness alone.  <u>In re Kreisler</u>, 331 B.R. 364 (Bankr. N.D. Ill. 2005), <u>aff'd</u>, 352 B.R. 671 (N.D. Ill. 2006).

52. Because of the substantial allegations of inequitable conduct by the insiders, and the potential that the proceeds of fraudulent conveyances may be used, in whole or in part, the Court should defer any ruling pending an evidentiary hearing on the sources and uses of such funds.

## **Conclusion**

For the foregoing reasons, Wells Fargo respectfully requests that the Court (a) deny the DIP Motion or, alternatively, not approve any provision in the Interim DIP Order which "authorizes" any modifications to the Wells Fargo Loans, otherwise interferes with the Wells Fargo Loans or which permits a lien on the equity interests of the Subsidiaries held by LIP-I; (b) continue the hearing on the DIP Motion until the Court resolves the pending Motion to Dismiss and Motion for Appointment of a Trustee; (c) allow Wells Fargo sufficient time to conduct discovery to determine whether the DIP Facility funds are the proceeds of a fraudulent conveyance; (d) not permit the use of Subsidiary cash flow for the operations of the Debtor to the extent that such cash flow comes from defaulted mortgages; (e) strike the "good faith" finding from the proposed Interim DIP Order; and (f) grant such other relief as this Court may deem just and appropriate.

/s/Guy S. Neal
David R. Kuney (SBN 228734)
*Pro hac motion pending*
Guy S. Neal (SBN 36007)
*Pro hac motion pending*
SIDLEY AUSTIN LLP
1501 K. St. N.W.
Washington, D.C. 20005
Telephone: 202-736-8650
Facsimile: 202-736-8711
Email: dkuney@sidley.com

/s/Kurtis A. Marshall
James A. Knauer
Kurtis Marshall
KROGER GARDIS & REGAS, LLP
111 Monument Circle
Indianapolis, IN 46204-5125
317-692-9000
jak@kgrlaw.com
kam@kgrlaw.com

Attorneys for Wells Fargo Bank, National Association