## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LAUTH INVESTMENT PROPERTIES, LLC., *et al.*,[1] | ) | Case No. 09-06065-BHL-11 |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |

### LIP HOLDINGS, LLC'S OBJECTION TO MOTION OF THE DEBTORS FOR ENTRY OF (A) AN ORDER APPROVING MARKETING PROCESS AND BREAK UP FEE; AND (B) INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING AND (B) GRANTING LIENS AND SUPERPRIORITY CLAIMS

LIP Holdings, LLC ("Holdings") hereby objects (the "Objection") to the entry of an Interim DIP Order granting the *Motion of the Debtors for Entry of (A) an Order Approving Marketing Process and Break Up Fee; and (B) Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing and (B) Granting Liens and Superpriority Claims* (the "DIP Motion") [Doc. No. 299]. In support of the Objection, Holdings states as follows:

### INTRODUCTION

1.      The Debtors' proposed postpetition financing is replete with onerous and unfair terms designed to benefit the Debtors' insiders at the expense of Holdings. For example, the term sheet proposes to award the insiders a $750,000 commitment fee even if they never lend a penny under the DIP Credit Facility[2] and to give the insiders warrants for up to 25% of the equity in the reorganized Debtors. But this should come as no surprise to this Court. The "insider" nature of these bankruptcy cases has been a theme from day one, as the Court acknowledged

---

[1] The debtors include: Lauth Investment Properties, LLC (09-06065) ("LIP"); LIP Development, LLC (09-06066) ("LIP-D"); and LIP Investment, LLC (09-06067) ("LIP-I").

when it commented that the testimony on the negotiation of the management fee motion was "like Woody Allen in 'Bananas' when he was cross-examining himself…". (7/23/09 Tr. at 117). The DIP Motion is just one more indicator that the Debtors' bankruptcy cases are being administered by and primarily for the benefit of the Debtors' insiders. And as this Court suggested during the June 30, 2009 hearing, when insiders are involved, transactions should be subjected to closer scrutiny. (6/30/09 Tr. at 54). Here, where the proposed postpetition lender is an entity comprised of certain of the Debtors' principals,[3] and where there are allegations of bad faith and intentional fraudulent transfers by certain of the Debtors' principals,[4] this higher level of scrutiny is particularly warranted. Moreover, given that the Debtors have failed to take any substantial steps in the direction of a restructuring, and that foreclosure proceedings are commencing on LIP-I's underlying properties, this Court should carefully question whether there is a basis for postpetition financing under *any* terms while the Debtors remain under the control of Lauth Group Inc., LLC ("LGI"). LGI clearly lacks resources to do the job and has lost the confidence of a significant number of the underlying lenders.

2.    But even under an unmagnified lens, the DIP Motion is objectionable in several ways, as set forth more fully herein. ***First***, as a procedural matter, the DIP Motion does not comply with Bankruptcy Rules in that it fails to attach the DIP Credit Agreement or to provide all of the information necessary for the parties, including Holdings, to proceed on an informed basis. This is directly contrary to the Court's admonitions to the Debtors at the conclusion of the

---

[2] Capitalized terms used herein and not defined shall have the meanings given to them in the DIP Motion.

[3] As of the filing of this Objection, the Debtors still have not disclosed the identities of the principals or the DIP Credit Agreement, despite requests for this information.

[4] *See generally* Objection of Wells Fargo Bank, National Association, To Motion Of The Debtors For Entry Of (A) An Order Approving Marketing Process And Break Up Fee; And (B) Interim And Final Orders (A) Authorizing The Debtors To Obtain Postpetition Financing And (B) Granting Liens And Superpriority Liens (the "Wells Fargo Objection"). [Doc. No. 332].

July 23, 2009 hearing that the creditors "need to have a much higher degree of comfort as to what's going on" and Holdings "ought to be involved to some degree."  (7/23/09 Tr. at 118). Despite the fact that these cases have been pending for almost four months, the Debtors have failed to articulate to Holdings or to this Court any restructuring strategy.  While the Debtors repeatedly blame Holdings for any lack of progress in the Debtors' restructuring efforts, that excuse rings hollow as time passes.[5]

3.     **Second**, the proposed financing contains numerous unreasonable provisions that cannot have been the product of arms-length, good faith negotiations.  The lack of any real negotiations is illustrated by the fact that when numerous parties, including the United States Trustee, objected to the proposed break-up fee at the hearing held on July 23, 2009, the insiders dropped the request immediately.  Had there been any real negotiations with someone acting independently for the Debtors, that provision never would have seen the light of day.

4.     **Third**, the DIP Motion seeks to prime Holdings' interest in LIP-I in contravention of Holdings' rights under Article 8 of the UCC and without any adequate protection as required by Section 364(d).

5.     **Fourth**, based upon the information known to date, it appears unlikely that the Debtors will be able to satisfy their burden of proving that they actually tested the market to obtain alternative financing.  Holdings has requested information about these marketing efforts and received only a generic lender solicitation package and a list of proposed lenders with virtually no detail about who was contacted, when they were contacted, and what responses were

---

[5] The Debtors' consistent characterization of Holdings of nothing but a nuisance is unwarranted.  In ruling on the authority issue raised in Holdings' Motion to Dismiss, this Court acknowledged that it was a "very close question" and that there were "strong arguments on both sides."  (7/23/09 Tr. at 115).  When Holdings demanded additional discovery in connection with the Debtors' requests for use of cash collateral and to pay the insider asset management fee, this Court agreed that that such discovery was appropriate.

received or what was proposed to the specific contacts. In light of the fact that the Debtors now propose an insider loan with onerous terms, more should be required before any interim or final loan is approved on anything other than a completely unsecured basis and before this Court determines whether the Debtors and the Insider Lender negotiated in good faith.

6.    ***Finally***, the Debtors have not shown in their DIP Motion that interim relief is necessary to avoid irreparable harm. The Debtors are corporate shells without employees, assets (other than membership interests) or any business activities. In response to Holdings' request for the budget referenced in the Term Sheet, the Debtors produced the same 13-week forecasts they produced for the cash collateral hearings. Like the earlier versions of these cash forecasts, the most recent model shows virtually all of the money going to pay attorneys and the insiders. At this juncture in the case -- almost four months after filing -- the Debtors should be required to provide more explanation about how they are going to use the proceeds of the loan to provide value for creditors before they are allowed to whittle away what value remains.

### BACKGROUND

7.    On May 1, 2009, LIP, LIP-D and LIP-I each filed chapter 11 petitions (the "Bankruptcy Cases"). The petitions for each Debtor were signed by Robert Lauth, Jr. [Doc. No. 1; Case No. 09-6066, Doc. No. 1; Case No. 09-6067, Doc. No. 1]. As the Amended Schedules and Statements of Financial Affairs for each of the Debtors show, the Debtors are corporate shells, with no employees, operating businesses or any ongoing expenses (other than the professional fees of these chapter 11 cases). The only noncontigent debt is held by Holdings. Two days before the bankruptcy filing, the Debtors' insiders caused the Debtors to enter into a management agreement that could only be terminated by the insiders and that imposed additional fees on the Debtors.

8.      On May 8, 2009 the Debtors filed the Motion of the Debtors For Entry of Interim and Final Orders (A) Authorizing the Use of Cash Under 11 U.S.C. § 363, (B) Granting Adequate Protection Under 11 U.S.C. § 361 and 363 and (C) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(B) (the "Cash Collateral Motion"). [Doc. No. 13]. Like the current DIP Motion, the Cash Collateral Motion sought to allow the project entities to engage in cross-collateralization of loans, and to use virtually all of the cash collateral to pay professional and insider management fees. Although the Court approved the use of cash collateral, it refused to approve the cross-collateralization.

9.      On July 21, 2009, the Debtors filed the DIP Motion. The DIP Motion seeks approval of debtor in possession financing from several insiders of the Debtors and their spouses, through a newly-formed entity, LIP Lenders, LLC (the "Insider Lender")  As originally presented, the DIP Motion asked for permission to pay a break-up fee to the Insider Lender if another outside lender was found. Although the DIP Motion was not scheduled for hearing on July 23, 2009, during that hearing Holdings, the United States Trustee, and creditor Bank of America raised concerns about the proposed $500,000 break-up fee to the Insider Lender. Later during that same hearing, the Debtors advised the Court that they would withdraw their request for approval of the break-up fee, but that the Debtors would still seek the approval of expense reimbursement. On July 30, 2009, the Debtors filed a Notice memorializing this statement. [Doc. No. 319].

10.     On August 3, 2009, Wells Fargo Bank, National Association, SunTrust Bank, N.A, and Huntington National Bank each filed objections to the DIP Motion. [Doc. Nos. 332, 336, and 337].

11.     This Court entered the Final Order (A) Authorizing the Use of Cash Under 11 U.S.C. § 363 and (B) Granting Adequate Protection Under 11 U.S.C. §§ 361 and 363 (the "Cash Collateral Order") on August 4, 2009.  [Doc. No. 340].  The Cash Collateral Order authorizes the full use of cash collateral in an amount up to $3.9 million.

12.     On August 7, 2009, the Debtors filed a Summary of Expenditures for Week Ending July 31, 2009 (the "Summary of Expenditures").  [Doc. No. 352].  According to the Summary of Expenditures, as of July 31, 2009, the Debtors had operating cash of $1,817,996.09.

13.     The interim hearing on the DIP Motion was originally scheduled for August 5, 2009.  The Debtors' counsel thereafter sought to continue the interim hearing to August 17, 2009.  In doing so, the Debtors' counsel provided Holdings an extension of time to August 10, 2009 to file Holdings' objection to the DIP Motion.  As of the filing of this Objection, the Debtors have not produced a DIP Credit Agreement or disclosed the identities of the investors.

## ARGUMENT

14.     Section 364 of the Bankruptcy Code "authorizes four increasingly burdensome methods by which a trustee or debtor-in-possession may obtain credit or incur debt on behalf of a bankruptcy estate."  *SunTrust Bank v. Den-Mark Const., Inc. (In re SunTrust)*, 406 B.R. 683, 688 (Bankr. E.D.N.C. 2009).  The provisions relevant to the DIP Motion are the two most "burdensome methods" -- 364(c) and (d).  Under section 364(c), a debtor may obtain postpetition financing on a super-priority claim basis only if, *inter alia*, it cannot obtain "unsecured credit allowable under section 503(b)(1)" of the Bankruptcy Code.  11 U.S.C. § 364(c).  Under section 364(d) -- the "last resort" option -- a debtor may only obtain postpetition financing secured by priming liens if, *inter alia*, it is "unable to obtain such credit otherwise."  11 U.S.C. §364(d)(1)(A); *In re Qualitech Steel Corp.*, 276 F.3d 245, 248 (7th Cir. 2001).  To the extent a

debtor seeks postpetition financing secured by priming liens, it must provide "adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1)(B).

15.     Pursuant to Bankruptcy Rule 4001(c)(1)(B), a debtor cannot obtain postpetition credit without providing sufficient information regarding the propose financing, and pursuant to Bankruptcy Rule 4001(c)(2), a debtor cannot obtain interim relief on a motion for postpetition financing without a showing of "immediate and irreparable harm."

16.     A debtor also has the burden of proving that the terms of the proposed postpetition financing are reasonable and beneficial to the debtor's estate and creditor.  *See, e.g., In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (holding that proposed financing should be beneficial and reasonable); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) (court should focus on terms of proposed financing to ascertain whether they are reasonable).

17.     As described below, the Debtors: (a)  have not provided information sufficient to satisfy the requirements of Bankruptcy Rule 4001; (b) have proposed terms of a DIP Credit Agreement that are far from reasonable, fail to provide any real benefit to the Debtors' estates and creditors, and only benefit the Insider Lender and its principals; (c) have not shown that Holdings is adequately protected from the proposed grant of a first priority lien on all of the equity interests and/or membership interests owned by LIP-I in its direct and indirect subsidiaries; (d) have not met their burden of showing that no alternative postpetition financing is available; and (e) have not shown the threat of "irreparable harm" that is required to procure postpetition financing on an interim basis.  Accordingly, the Court should not enter an order -- interim or final -- granting the DIP Motion.

**A.    The Debtors Have Not Provided Sufficient Information Regarding The Proposed Postpetition Financing.**

16.    The  DIP Motion does not contain sufficient information to enable Holdings and the Debtors' other creditors to make an informed decision about the proposed financing. Bankruptcy Rule 4001(c)(1)(A) provides: "A motion for authority to obtain credit shall be made in accordance with Rule 9014 and *shall* be accompanied by a copy of the credit agreement and a proposed form of order."  (emphasis added).  The command "shall" means an act is mandatory. *See Lexecon v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998).[6]  Thus, before the Debtors can obtain any relief they must provide the proposed credit agreement.  The Debtors have not filed with the Court or shared with Holdings, or to Holdings' knowledge any other parties, a credit agreement.  While the terms of the proposed loan are generally described in the term sheet, as that term sheet makes clear it is "not a definitive list of all of the requirements of the Lender in connection with the Facility."  *See* DIP Motion at Ex. C, Annex B-6.  Until this information is provided, with adequate additional time to allow for additional objections, the Court cannot proceed on the DIP Motion.

17.    In addition, Bankruptcy Rule 4001(c)(1)(B) requires the debtor to summarize certain provisions, identify their specific location in the credit agreement and form of order, and identify any provisions that are proposed to remain in effect if interim approval is granted, but final relief is denied.   The Debtors also have not complied with Bankruptcy Rule 4001(c)(1)(B).

---

[6] *Accord In re New Haven Projects Ltd. Liability Co.*, 225 F.3d 283, 287 (2d Cir. 2000) (recognizing that Congress "has chosen the word 'shall' to denote mandatory requirements" throughout the Bankruptcy Code); *In re Barbieri*, 199 F.3d 616 , 619 (2d Cir. 1999) (analyzing 11 U.S.C. § 1307(b):  "[t]he term 'shall,' as the Supreme Court has reminded us, generally is mandatory and leaves no room for the exercise of discretion by the trial court"); *United States v. Szarwark*, 168 F.3d 993, 997 (7th Cir. 1999) (holding that action directed by statute using the word "shall" was "mandatory"); *Robinson Farms Co. v. D'Acquisto*, 962 F.2d 680, 684 (7th Cir. 1992) ("the statute uses 'shall,' a term generally interpreted as mandatory and excluding discretion"); *In re Dow Corning Corp.*, 263 B.R. 544, 547 (Bankr. E.D. Mich.

Although the Debtors have purported to offer a summary of certain of the terms of the proposed DIP Credit Agreement in the DIP Motion, there will undoubtedly be provisions in the actual documents that are not disclosed or summarized in the DIP Motion.

18.     The Debtors also have provided no information regarding the capitalization of the Insider Lender or its sources of funding.  Although such information might not be as critical in cases where the postpetition lender is a known financial institution or regular debtor-in-possession financing provider, where the lender is made up of principals of the Debtors, Holdings submits that the Debtors should be required to provide this information.  The Wells Fargo Objection raises serious questions regarding the good faith of the principals of the Insider Lender and their sources of cash.  As pointed out in the Wells Fargo Objection, the individuals who are believed to be the principals of the Insider Lender have already failed to pay Wells Fargo under certain guarantees and are named as defendants in a lawsuit filed by Wells Fargo that asserts counts for breach of contract, violations of the Indiana Uniform Fraudulent Transfer Act, unjust enrichment, and violations of the Indiana Crime Victim's Relief Act.  The principals are also named as defendants in a lawsuit filed by Inland Sub.

19.     Further, the substantial protections to be afforded the Insider Lender upon approval of the interim loan make it critical that the Court explore the ability of the Insider Lender to honor its commitment if the Court finds the loan is necessary.  For example, if interim approval is given, the Insider Lender will receive a $750,000 commitment fee and reimbursement of its attorneys fees and expenses even if it never lends a penny to the Debtors or is unable to honor its full commitment.

---

2001) (stating that "shall" is "generally understood to connote that which is mandatory, rather than permissive").

20.     The Debtors also do not provide information regarding the value of the interest they purport to pledge to the Insider Lender, and the Debtors have failed to advise the Court that most of the project entities are in default under their loans and that foreclosure proceedings have been or are about to be commenced.  (*See* Wells Fargo Objection, ¶¶ 20-25).  In addition to the Wells Fargo foreclosure proceedings, Holdings recently learned that Huntington National Bank commenced a foreclosure proceeding on one of the project level entities on July 14, 2009.  Holdings only learned about this foreclosure proceeding through its own due diligence.  The Debtors never advised Holdings or the Court of the Huntington foreclosure proceeding.

21.     The DIP Motion also provides no explanation as to how the $15 million the Debtors seek to borrow will be used, opting instead to merely assert that the funds are necessary to avoid "immense harm" and "maximize [the] estates for the benefit of all parties in interest." At Holdings request, the Debtors provided Holdings with a 13-week forecast that is nearly identical to the "13-weekers" the Debtors have previously provided and sets forth no substantive detail regarding how the postpetition financing will be utilized to restructure the Debtors.  The only items noted with any specificity on the 13-week forecast are the payments to professionals and to insiders.  Moreover given this Court's admonitions at the July 23, 2009 hearing to involve Holdings and allow it some oversight, it is hard to understand how the Debtors can continue to be so obstinate and persist in their refusal to provide budgets to Holdings and the Court as to how the "management fees" will be used by Lauth Management Group ("LMG").[7]

22.     Holdings reserves its right to supplement this Objection after further discovery and after the Debtors provide the information that is required by the Bankruptcy Code.

---

[7] On August 7, 2009, the Debtors filed a Notice of Submission of Amended Asset Management Agreement.  [Doc. No. 357].  Notwithstanding this Court's direction, the Debtors did not consult with Holdings regarding the revisions to the asset management agreement, nor did they include any provisions in the asset management agreement that would provide for any oversight by Holdings.

**B.     The Terms Of The Proposed DIP Credit Agreement With The Insider Lender Are Not Reasonable.**

23.     Although the Debtors have provided no real information regarding the postpetition financing, they ask this Court to approve terms of a yet undisclosed credit agreement that are unreasonable and clearly are intended to benefit the Insider Lender.  As the bankruptcy court noted in *Ames*, this Court should pay particular attention to "proposed terms that would tilt the conduct of the bankruptcy case; prejudice, at an early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors; or leverage the Chapter 11 process by preventing motions by parties-in-interest from being decided on their merits."  *In re Ames*, 115 B.R. at 37.   In this case, as this Court has recognized, the terms deserve even additional scrutiny because they are terms of an agreement between the Debtors and their principal insiders.

**1.     The DIP Term Sheet Contains Unreasonable And Onerous Terms.**

24.     Without the benefit of the full DIP Credit Agreement, Holdings is not able to identify all of the unreasonable terms of the postpetition financing, but based on the Debtors' disclosures in the DIP Motion, Holdings identifies the following provisions as unreasonable and not beneficial to the Debtors' estate and creditors:[8]

(a)     <u>Cross-Collateralization</u>:   The DIP Term Sheet contains the following requirement that in effect "authorizes" the Debtors to use revenues from one subsidiary to, as Wells Fargo states, "advance/lend/or gift" such money to a weaker subsidiary, and then to provide collateral for such advances:

---

[8] Although Holdings does not believe interim relief is appropriate, if this Court grants interim relief it should not approve the cross-collateralization or actions that would prime Holdings' lien on an interim basis.  Local Rule B-4001-2(b), "Absent extraordinary circumstances, the Court may not enter interim orders that include any of the provisions identified in [Local Rule 4001(c)]."   The DIP Term Sheet includes at least two of the provisions identified in Local Rule 4001(c): (a) the cross-collateralization of prepetition debt; and (b) the priming of existing liens.  The  Debtors have not shown that "extraordinary circumstances" exist to warrant their inclusion.

The DIP Order must include provisions satisfactory to Lender that will authorize the Company to authorize each of its direct and indirect subsidiaries (each a "Subsidiary") to (1) use revenues of such Subsidiary (a "Contributing Subsidiary") to pay obligations of one or more "sister" Subsidiaries (the "Sisters") that are subject to mortgage loans from the same mortgage lender who is also a mortgage lender to the Contributing Subsidiary, and (2) grant to a lender to the Contributing Subsidiary (an "Affected Mortgage Lender") cross-collateralization so that obligations of the Sister to such Affected Mortgage Lenders are secured by liens in and against assets of the Contributing Subsidiary. The use of revenues of certain Contributing Subsidiaries to satisfy obligations of Sisters will be provided for in the Budget.

DIP Motion at ¶ 21. The proposed cross-collateralization, which is not permitted under most, if not all, of the loans of the project level entities, will effect covenant violations under those loans. Because those entities are not in bankruptcy, the underlying lenders will assert that they be able to act on these defaults which will only create further litigation. In addition, the proposed cross-collateralization is also a violation of section 5.2(h) the Mezzanine Loan Agreement (attached as Exhibit A), which requires Holdings' consent to any modification or amendment, including the cross-collateralization of loans to the subsidiaries of LIP-I. Further, this provision can only be for the benefit of the insiders, The Debtors' principals have guaranteed the debt at the project level entities, and the cross-collateralization is a transparent attempt to limit the exposure of these insiders by shoring up the weaker properties (on which there are personal guarantees by the insiders) by using the equity in stronger properties. No reasonable lender would require this cross-collateralization as it does nothing to ensure repayment of the postpetition financing and in fact, would most likely make payment less likely to occur. This Court properly rejected the Debtors attempts to cross-collateralize the loans of the project entities in connection with the Cash Collateral Motion, and it should not allow the Debtors to now include this provision in its postpetition financing agreement.

(b)      $750,000 commitment fee/15 percent annual rate of interest/repayment

penalty: The Debtors have articulated no basis for the $750,000 commitment fee to be provided

to the Insider Lender or the interest rate of 15 percent (and 18 percent default interest rate). The

13-week forecast the Debtors provided to Holdings shows a very lean budget with cash being

used mostly for the purposes of paying the insider LMG and professional fees. Under these

circumstances, the 5 percent commitment fee and 15 percent interest rates are particularly

unreasonable. Further, if the Insider Lender is replaced with a different lender at any time during

the case -- the stated goal of the DIP Motion -- the Insider Lender will receive a 7.5 percent fee

termed a "yield maintenance provision." Assuming the full $15 million is lent, this is an

additional $1,125,000. Put another way, without accounting for interest payments, 12.5 percent

of the loan will be used to pay fees to the Insider Lender. In addition, the Insider Lender earns

an additional 10% fee if it is repaid following a default, in addition to default interest.[9]

(c)      Warrant rights as to 25 percent of the equity in reorganized LIP-I: The

DIP Term Sheet gives the Insider Lender warrant rights to acquire 25 percent of the equity

interest in reorganized LIP-I. This provision will fundamentally affect the terms of any plan of

reorganization, violates the absolute priority rule, and it is inappropriate for the Debtors to seek

approval of this sort of restructuring term outside of the context of plan negotiations. *See Pension*

*Benefit Guaranty Corporation vs. Braniff Airways, Inc. (In re Braniff Airways, Inc.),* 700 F. 2d

935 (5th Cir. 1983) ("the debtor and the Bankruptcy Court should not be able to short circuit the

---

[9] The Debtors will undoubtedly claim that these provisions are "market." This bald assertion -- particularly given that these provisions are for the benefit of the Debtors' insiders -- is not enough to carry the Debtors' burden under section 364. This Court should require real evidence of "market", such as other lenders who demanded these terms and examples of other "insider" loans where courts allowed such onerous terms. The Debtors should also be required to offer a credible explanation for why a loan that is being made to protect the insider's management company and to keep the insiders in control of the Debtors should also allow those same insiders to take back 12.5% of the loan proceeds plus charge 15 percent interest at a time when the prime rate is only 3.5 percent. *See* http://www.wsjprimerate.us/.

requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets." ).

             (d)    <u>Improper conditions</u>:  The Insider Lender's commitment is replete with improper conditions designed to entrench the insiders control over the Debtors and impact Holdings' rights.  For example, the postpetition financing is conditioned upon the denial of Holdings' motion to dismiss.  Holdings objects to the Debtors' attempt to preordain the result of the Motion to Dismiss by seeking this Court's approval of a DIP Term Sheet that is expressly conditioned upon this Court ruling a certain way on the Motion to Dismiss.  Terms that are an attempt to "leverage the Chapter 11 process by preventing motions by parties-in-interest from being decided on their merits" warrant extra scrutiny.  *See Ames*, 115 B.R. at 37.  Similarly, without the insider's consent, there can be no change in management of the Debtors and the very individuals who are believed to back the Insider Lender -- Robert L. Lauth, Jr., Gregory C. Gurnik, Lawrence B. Palmer, and Michael S. Curless must be "the individuals in control of the Debtors."   This provision like the warrants for 25 percent of the reorganized Debtors are designed solely with the idea of allowing the Debtor's insiders a leg up  in any restructuring negotiations and are improper.

      **2.**      **The DIP Term Sheet And The Negotiations Between The Debtors And The Insider Lender Should Be Subject To A High Degree Of Scrutiny.**

      25.      The Debtors transactions with its insiders -- including the Insider Lender -- should be subjected to a high degree of scrutiny.  *See e.g. In re RJC Indus., Inc.*, 369 B.R. 845, 851 (Bankr. M.D. Penn. 2006) (extension of credit from insider must be "carefully scrutinized"); *In re Drexel Burnham Lambert Group*, 134 B.R. 493, 498 (Bankr. S.D.N.Y. 1991) (review of agreement warranted "closer scrutiny because it was negotiated with an insider"); *In re Regensteiner Printing Co.*, 122 B.R. 323, 236 (Bankr. N.D. Ill. 1990) ("Courts must scrutinize

transactions between insiders and the debtor-in-possession to ensure the transactions are fair to the estate and creditors."); *In re Lifeguard Indus., Inc.*, 37 B.R. 3 (Bankr. S.D. Ohio 1983) (noting an "obligation to scrutinizes" transactions with insiders). Thus, the Court must review the terms of the proposed DIP Credit Agreement and make a determination of whether those terms are "fair to the estate and creditors" or whether they are intended to primarily benefit the Debtors' insiders.

26.     The Debtors claim that the postpetition financing was "negotiated at arms' length and in good faith", but extending this Court's "Bananas" analogy, Holdings submits that it is pretty difficult to negotiate at arms' length when both sides have the same arm. Here, the terms of the proposed postpetition financing indicate that the Debtors' principals were better advocates for the Insider Lender than they were for the Debtors and their creditors. Because Holdings believes it is clear that the intent of this postpetition financing is to benefit insiders of the Debtors to the detriment of their creditors, this Court should not make a finding of good faith. As the Seventh Circuit stated: "Where it is evident from the loan agreement itself that the transaction has an intended effect that is improper under the Bankruptcy Code, the lender is not in good faith, and it is irrelevant what the improper purpose is." *In re EDC Holding Co.*, 676 F.2d 945,948 (7th Cir. 1982).

**C.     The Debtors Have Not Carried Their Burden Of Proving That Holdings Is Adequately Protected.**

27.     The DIP Motion also fails to satisfy the requirements of section 364(d). The proposed DIP Term Sheet provides that "The DIP Facility shall be secured by valid, first priority liens on all of the equity interest and/or membership interests owned by LIP-I in its direct and indirect subsidiaries." (DIP Motion, p. 7). Contrary to the Debtors' representations in the DIP Motion that the proposed financing does not involve the priming of any liens, the first priority

liens that the Debtors seek to grant to the Insider Lender would prime Holdings' equity interest in LIP-I (and LIP-I's direct and indirect subsidiaries).

### 1.    Holdings' Equity Interest In LIP-I

28.    Holdings has an equity interest in the direct and indirect subsidiaries of LIP-I.   As this Court is aware, prepetition, to secure its obligations to Holdings under the Mezzanine Loan Agreement, LIP-D executed an Ownership Pledge, Assignment and Security Agreement (the "Pledge Agreement") in favor of Holdings.  (*See* Pledge Agreement, attached hereto as <u>Exhibit B</u>).  Pursuant to the Pledge Agreement, LIP-D pledged its 100 percent ownership interest in Debtor LIP-I (the "Collateral") to Holdings to secure its repayment of the funds borrowed under the Mezzanine Loan Agreement.  (*Id.* at Ex. A).  The Pledge Agreement provided, *inter alia*, that upon an event of default under the Mezzanine Loan Agreement: (a) LIP-D was no longer entitled to exercise voting rights or to receive dividends and other distributions that may be paid on the Collateral (*Id.* at §4); and (b) Holdings, with or without notice, could exercise all voting and management rights of LIP-D as to LIP-I.  (*Id.* at  §§ 4, 8(d)).[10]

29.    Holdings perfected its interest in the LIP-I  membership interest in two ways: (i) by taking physical possession and control of the original LIP-D certificate of membership interest in LIP-I (the "Membership Certificate") with the accompanying endorsement of transfer; and (ii) by filing a financing statement with the Delaware Secretary of

---

[10] In addition, LIP-D covenanted in the Pledge Agreement to "cooperate fully with [Holding's] efforts to preserve the Collateral and to take such actions to preserve the Collateral as [Holdings] may in good faith direct."  (*Id.* at § 6(b)).  LIP-D covenanted that it would not, after an Event of Default, "receive any dividend or distribution or other benefit with respect to a Pledged Company, and not to consent, waive or ratify any action taken that would violate or be inconsistent with any of the terms and provisions of this Agreement, or any of the Loan Documents or that would materially impair the position or interest of Lender in the Collateral or dilute the Ownership Interests pledged to Lender."  (*Id.* at § 6(f)).  LIP-D has clearly breached these covenants.

State covering the Membership Interest.  (*See* Membership Certificate, <u>Exhibit C</u>; Financing Statement, <u>Exhibit D</u>).  The Membership Certificate provides: "This Certificate represents 100% of the membership interests in the Limited Liability Company, which membership interests constitute 'certificated securities' under Article 8 of the Uniform Commercial Code of Delaware."  *See* <u>Ex. C</u>. Thus, the Membership Certificate is a "certificated security" under the Uniform Commercial Code.  *See* Ex. B at §§ 2, 5(g).  Pursuant to the Delaware Uniform Commercial Code (the "UCC"), delivery of a certificated security to a purchaser occurs when the "purchaser"[11] acquires possession of the security certificate.   6 Del. C. § 8-301.  Thus, delivery occurred when Holdings took possession of the Membership Certificate, and Holdings took control of the security by taking possession of the Membership Certificate and its accompanying endorsement of transfer, thereby perfecting its interest in the LIP-I membership interest.  6 Del. C. § 8-106; § 9-313.

30.     As a purchaser of a certificated security, Holdings acquired all of LIP-D's rights in the security.  *Id.* at § 8-302 ("a purchaser of a certificated or uncertificated security acquires all rights in the security that the transferor had or had power to transfer").   Thus, under the UCC, the right to transfer ownership, control or management, or in any other way diminish the rights of Holdings in the Membership Certificate, was transferred from LIP-D to Holdings when Holdings received possession of the actual Membership Certificate.

31.     As a result of the Pledge Agreement and LIP-D's default (which the Debtors have never disputed), Holdings is the holder of LIP-D's membership interest in LIP-I, and therefore

---

[11] A "Purchaser" under the UCC is a person that takes by "purchase."  6 Del. C. § 1-201(29).  A purchase is defined to include a taking by pledge.  *Id.* at § 1-201(30).  Thus, Holdings became a "Purchaser" when LIP-D pledged its membership interest in LIP-I to Holdings to secure LIP-D's obligations to Holdings.

has an equity interest in the direct and indirect subsidiaries of LIP-I.  Consequently, the Debtors'

proposed grant to the Insider Lender of a first priority lien on all of LIP-I's equity interest and/or

membership interests is a priming lien and the Debtors must satisfy the requirements of section

364(d).

       **2.**        **The Debtors Have Not Satisfied The Requirements Of Section 364(d).**

32.     Under Section 364(d)(1)(B), postpetition financing secured by a senior or equal

lien on property of the estate that is subject to a lien may be authorized only if "there is adequate

protection of the interest of the holder of the lien on the property of the estate on which such

senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d).  As the Seventh Circuit has

noted, section 364(d) is not favored by courts and is "supposed to be a last resort."  *In re*

*Qualitech*, 276 F.3d at 248; *see also In re Mosello*, 195 B.R. 277, 287 (Bankr. S.D.N.Y. 1996)

("As a general principal, the Bankruptcy Code recognizes the primacy of prepetition contractual

liens and seeks to preserve the financial interest created thereby."); *In re Seth Co.*, 281 B.R. 150,

153 (Bankr. D. Conn. 2002) ("ability to prime is extraordinary.").

33.     A debtor has the burden to establish that the holder of the lien to be subordinated

has adequate protection. 11 U.S.C. § 364(d)(2); *The Resolution Trust Corp. v. Swedeland*

*Development Group, Inc. (In re Swedeland Development Group, Inc.)*, 16 F.3d 552, 564 (3d. Cir.

1994).   The Code does not expressly define adequate protection, but section 361 states that it

may be provided by: (a) periodic cash payments; (b) additional or replacement liens; or (c) other

relief resulting in the "indubitable equivalent" of the secured creditor's interest in such property.

11 U.S.C. §361.  "Given the consequences to the existing creditor of a priming lien, the court

must be 'particularly cautious' when evaluating whether the subordinated creditor is adequately

protected." *In re Stoney Creek Techs., LLC*, 364 B.R. 882 (Bankr. E.D. Penn. 2007) (*quoting Mosello*, 195 B.R. at 289).

34.    Here, the DIP Motion fails to even acknowledge Holdings' lien, much less set forth any form of adequate protection for Holdings' interest.  The practical effect of the proposed postpetition financing is that it will add a $15 million senior lien on the already distressed direct and indirect subsidiaries of LIP-I, and will therefore significantly impair Holdings' interests in these properties.  Although Holdings believes the DIP Motion is objectionable on multiple bases, the fact that the Debtors seek to prime Holdings' position without providing adequate protection is basis alone for this Court to deny the DIP Motion.  *See In re Reading Tube Indus.*, 72 B.R. 329,331 (Bankr. E.D. Penn. 1987) (denying financing motion "in light of the debtor's utter failure to comply with the requirements of Section 364(d)(1) of the Bankruptcy Code.").

35.    In addition, under the Pledge Agreement, the Debtors do not have the authority to prime Holding's interests.  Pursuant to Article 8 of the Delaware UCC and the Pledge Agreement, the right to transfer ownership, control or management of LIP's membership interest is held by Holdings.  Section 6(f) of the Pledge Agreement further provides that LIP-D cannot take any action that would "materially impair the position or interest" of Holdings in the LIP-I membership.  By diluting the value of LIP-I through the post-petition loan, LIP-D is acting contrary to this provision and Delaware law, which places the authority to take actions for LIP-I in the hands of Holdings.

**D.    The Debtors Have Failed To Meet Their Burden That Alternative Financing Is Not Available.**

36.    The Debtors have also failed to meet their burden of showing that alternative financing is not available.  *See* 11 U.S.C. § 364(d)(1)(A).  Courts routinely deny approval of proposed postpetition financing where the debtor fails to meet its burden to demonstrate that it

could not obtain alternative financing. *See, e.g., Den-Mark Const.*, 406 B.R. 683; *In re Phase-I Molecular Toxicology, Inc.*, 285 B.R. 494, 496 (Bankr. D.N.M. 2002); *In re Stacy Farms*, 78 B.R. 494, 498 (Bankr. S.D. Ohio 1987) (court denied motion to approve postpetition financing because "the Debtor failed to establish its inability to obtain other, more favorable credit").

37.     Although the Code does not require that a debtor seek credit from every possible source, debtors are required show that they made a "reasonable effort" to obtain postpetition financing from other sources on less onerous terms and that such financing was unavailable. *See In re Ames*, 115 B.R. at 40. "A court must make its decision as to '[h]ow extensive the debtor's efforts to obtain credit must be' on a case-by-case basis." *Den-Mark Const.*, 406 B.R. at 691 (internal citations omitted). In this case, because the terms of the financing are so favorable to the Insider Lender (and to the Debtors' principals), the Debtors should be required to prove that their search was extensive and to provide real evidence that alternative lenders rejected the Debtors' request for financing on terms that were as favorable as the terms the Debtors seek to provide the Insider Lenders.

38.     The Debtors have not met this burden in the DIP Motion. The DIP Motion includes no facts regarding parties contacted or terms negotiated in an effort to secure financing on more favorable terms. Instead, the Debtors simply assert that they "have not been able to secure a commitment and many parties have cited the uncertainty with respect to the Dismissal Motion." DIP Motion, ¶ 14. In response to Holdings' request for information, the Debtors provided Holdings with a very generic lender solicitation package and "check sheet" showing various hedge fund and private equity entities to which the package was sent to and whether those parties responded. The Debtors have provided no substantive detail regarding any communications with the parties solicited or the proposed financing terms discussed with those

parties.    Finally, although the Debtors call the DIP Facility a "stalking horse", the Debtors have

not provided the information that would be necessary to attract a serious bidder and Holdings has

seen no indication that subsequent to filing the DIP Motion the Debtors have made any effort to

attract interested lenders.

**E.      The Debtors Have Not Shown That They Will Be Immediately And Irreparably Harmed If Interim Relief Is Not Granted.**

39.      The Debtors should not be permitted any interim financing pending a final

hearing, pursuant to Bankruptcy Rule 4001(c)(2) because the Debtors have not proven that

interim relief is necessary to avoid immediate and irreparable harm to the Debtors' estates.    In

the DIP Motion, the Debtors stated that they believed the Cash Collateral Order would provide

the Debtors with enough cash to fund operations through the week ending August 7, 2009, but

the Debtors' voluntary adjournment of the hearing on the DIP Motion to August 17, 2009 is an

indicator that the Debtors' projections are not as dire as the Debtors would suggest to this Court.

40.      In response to Holdings' request for a DIP budget, the Debtors provided Holdings

with a 13-week cash forecast (the "DIP forecast").    The DIP forecast is attached hereto as

Exhibit E.    The DIP forecast shows the payment of one month's worth of asset management fees

during the week ending August 7, 2009 (presumably May fees), and the payment of two month's

worth of asset management fees during the week ending August 21, 2009 (presumably June and

August fees).[12]    The DIP forecast also shows the payment of $1,000,000 in professionals' fees

during the week ending August 21, 2009.    The DIP forecast shows the beginning cash balance of

LIP-I on July 31, 2009 as $1,489,029.    According to the DIP forecast, the Debtors will run out of

cash on August 21, 2009 if the DIP financing is not approved.

---

[12] The Debtors have already paid July, 2009 asset management fees.

41.     The Debtors' need for cash is not, however, as dire as the DIP forecast makes it out to be.  First, according to the Summary of Expenditures as of July 31, 2009 the Debtors had an aggregate of $1,817,996.09 cash on hand, and LIP-I had $1,621,391.39 in cash on hand.  Thus, LIP-I actually has $132,362.39 more than is projected in the DIP forecast, and the Debtors also have access to another $196,604.70 in cash held primarily by LIP-D.   Second, the budgeted payments that would purportedly send LIP-I into the red are three asset management fee payments (presumably for May, June, and August of 2009) and a payment of $1,000,000 in professional fees.  As to the asset management fees, the Debtors have not yet received authority to pay the August asset management fee, and even if the payment of these fees were authorized, there is no reason to believe that insider controlled LMG would stop providing services to the irreparable harm of the Debtors if it was not paid for August services until September.  With respect to the professionals' fees, those fees can be paid from the $1,500,000 reserve instead of from the Debtors' cash on hand.  Thus, the Debtors can pay May and June asset management fees and can pay the professionals fees and will still have sufficient cash on hand to operate through at least August 28, 2009.

42.     Because Debtors have not shown that they will be immediately and irreparably harmed if this Court does not grant interim relief on the DIP Motion, interim relief cannot be granted under Bankruptcy Rule 4001(c)(2).

## CONCLUSION

For the foregoing reasons, Holdings respectfully requests that the Court deny the DIP Motion and grant such other relief as this Court may deem just and appropriate.

Dated: August 10, 2009                    JENNER & BLOCK LLP

*/s/ Catherine L. Steege*
Catherine L. Steege (admitted *pro hac vice*)
Joel T. Pelz (admitted *pro hac vice*)
Melissa M. Hinds (Atty. No. 24230-49)
330 North Wabash Avenue
Chicago, Illinois 60611
Telephone:  (312) 222-9350
Facsimile:  (312) 527-0484

-and-

HOSTETLER & KOWALIK, P.C.
Jeffrey A. Hokanson
Courtney E. Chilcote
101 W. Ohio Street, Suite 2100
Indianapolis, Indiana 46204
Telephone:  (317) 222-7486
Facsimile:  (317) 262-1010

Attorneys for LIP Holdings, LLC