IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| In re: <br><br> LAUTH INVESTMENT PROPERTIES, LLC, et al.,[1] <br><br> Debtors. | ) Chapter 11 <br> ) <br> ) Case No. 09-06065-BHL-11 <br> ) <br> ) Jointly Administered <br> ) <br> ) |

**DEBTORS' STATEMENT AND REPLY IN SUPPORT OF DIP MOTION**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby file this statement and reply (the "Reply") to the Objections (as defined herein) to the *Motion of the Debtors for Entry of (A) an Order Approving Marketing Process and Break Up Fee; and (B) Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing and (B) Granting Liens and Superpriority Claims*, filed July 21, 2009 (the "Motion") [Docket No. 299].[2]  In support of this Reply, the Debtors respectfully state as follows:[3]

1. On August 3, 2009, Wells Fargo Bank, National Association, ("Wells"), SunTrust Bank, N.A. ("SunTrust") and Huntington National Bank ("Huntington") each filed objections to the Motion (respectively, the "Wells Objection," the "SunTrust Objection" and the "Huntington Objection" and collectively, the "August 3 Objections") [Docket Nos. 332, 336 and 337].  On August 10, 2009, LIP Holdings, LLC ("Inland") filed an objection to the Motion (the "Inland Objection" and together with the August 3 Objections, the "Objections").

---

[1] The Debtors in the Chapter 11 Cases are: Lauth Investment Properties, LLC (09-06065); LIP Development, LLC (09-06066); and LIP Investment, LLC (09-06067).

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

[3] This Reply is limited to those issues relevant to entry of the Revised Interim DIP Order (as defined herein).  The Debtors reserve their rights with respect to addressing issues raised in the Objections relevant to entry of the Final DIP Order.

**Preliminary Statement**

2.　　Inland has been arguing for months that the Debtors have no viable restructuring options and that the Debtors' principals are somehow trying to use the Chapter 11 Cases to line their own pockets. Inland's arguments fell flat at the recent hearing on the Debtors' proposed asset management agreement. Similarly, Inland's arguments will fall flat with respect to the proposed "stalking horse" DIP Facility (the "Stalking Horse DIP Facility"). Within the last few days, the Debtors have received several expressions of interest from third parties, including a term sheet, attached hereto as **Exhibit A**, (the "Confidential Term Sheet") which the Debtors propose to file under seal for the reasons set forth in the *Debtors' Motion to File Under Seal Confidential DIP Term Sheet* filed contemporaneously herewith. As such, the Debtors submit that the stalking horse process is having the intended result and it is clear that the market believes that there is value worth restructuring, contrary to the assertions made in the Objections. Upon review of the Confidential Term Sheet, this Court will see that the proposed terms are similar to those proposed in the Stalking Horse DIP Facility, and on several points are materially less favorable. Therefore, any notion that there is no merit to the Debtors' restructuring or that certain insiders are trying to fleece the Debtors is flatly contradicted by the market response.

3.　　Given the interest from potential third party lenders, the Debtors and the DIP Lender have agreed to significantly extend the timeframe for approval of the Stalking Horse DIP Facility. Originally, the Debtors proposed a final hearing on the Stalking Horse DIP Facility to be held the week of August 17, 2009, but now, to allow for diligence and negotiations to continue, the Debtors request a final hearing to be held the week of September 21, 2009. While the Debtors are very encouraged by recent expressions of interest and look forward to the opportunity to pursue competing proposals, the Debtors require the use of approximately $4 million in the near term (the "Interim Commitment") (i) to pay the costs of the Chapter 11

Cases, (ii) to pay certain administrative expenses and (iii) to provide for the ongoing working capital requirements of LIP-I and certain of its direct and indirect subsidiaries and for general corporate purposes.  Without such funding, the Debtors believe that they will become administratively insolvent within days.  In addition, the Debtors need access to the Interim Commitment so that they can continue to negotiate with the "stalking horse" DIP Lender, as well as with other interested third parties, to obtain the most favorable DIP Facility.

4. Recognizing the Debtors' immediate need for the Interim Commitment, but wanting the marketing process to continue to develop, the DIP Lender has agreed to significantly pare back certain protections requested in connection with the Interim Commitment.  <u>First</u>, the proposed Commitment Fee will be payable only upon entry of the Final DIP Order.  <u>Second</u>, the Debtors only seek access to $4 million on an interim basis, which represents a small fraction of the proposed Total Commitment.  <u>Third</u>, the Debtors have clarified that the Interim Commitment will not contain any repayment restrictions or penalties.  As such, no parties in interest will be prejudiced because in the event the Debtors obtain a better postpetition financing offer from a third party after entry of the Interim DIP Order, such offer will only need to pay off the Interim Commitment plus any accrued interest, which, given the short duration of the Interim Commitment (roughly one month), will be nominal.  <u>Fourth</u>, in addition to eliminating the request for the Break Up Fee, the DIP Lender has agreed to cap the Expense Reimbursement for its reasonable and out-of-pocket expenses (including attorneys' fees) incurred in connection with the Stalking Horse DIP Facility at $150,000.

5. The Debtors also note that many of the proposed terms complained about in the Objections, including the Commitment Fee, the cross-collateralization provision and the back-end equity warrants, are not at issue with respect to the Revised Interim DIP Order (as defined

K&E 15430174.

below) and do not need to be addressed at this time. That said, the Debtors believe that such terms are entirely reasonable, especially considering the non-traditional nature of the collateral package. The Debtors' only real assets are LIP-I's direct and indirect ownership interests in its project subsidiaries (the "Project Interests"). The Project Interests, of course, stand junior in priority to the significant project-level secured debt. Therefore, any potential lender of postpetition financing essentially has to make two bets; first on the Debtors' ability to restructure the loans of the various project-level subsidiaries of LIP-I (most of which are in default and several of which have matured and are now due and payable), and second on the long-term value of the Project Interests (which will largely hinge on the turnaround of the overall real estate market). The Debtors believe that any lender who is willing to provide the funds needed to attempt to restructure the project-level loans will demand an equity upside in return, especially because the lender will not have first priority priming liens on the underlying project-level assets. The DIP Lender, for example, insists on equity upside and the ability to cross-collateralize projects because it believes that the ability to shore up weaker projects with stronger projects will be a vital component in getting project-level lenders to agree to amend the project-level loans and extend maturity dates. Again, these are issues for the final hearing on the Stalking Horse DIP Facility, but given the nature of the Debtors' business and the non-traditional nature of the collateral available to potential lenders, these provisions are logical and reasonable, and certainly not nefarious as the Objections, specifically the Inland Objection, suggest.

6. Under the conditions set forth above, the Debtors believe it is entirely appropriate for the Court to overrule the Objections and enter the revised Interim DIP Order (the "Revised Interim DIP Order") attached hereto as **Exhibit B**.

K&E 15430174.

**Argument**

**A.    Inland Objection**

7.    Inland goes to great lengths to suggest that the Stalking Horse DIP Facility process has been defective in certain respects.  First, Inland states that the Debtors have not provided sufficient information regarding the Stalking Horse DIP Facility.  Contrary to Inland's assertions, the Debtors have provided requested information on a timely basis.  Among other things, Inland was afforded the opportunity to depose the principals and certain advisors of the Debtors, as well as the DIP Lender, regarding the Stalking Horse DIP Facility.  Moreover, attached hereto as **Exhibit C** is the proposed Credit Agreement.  As such, the Debtors believe that Inland and others have more than sufficient information regarding the proposed Stalking Horse DIP Facility.

8.    Second, Inland states that the proposed Stalking Horse DIP Facility contains numerous unreasonable provisions.  The Debtors submit that the Stalking Horse DIP Facility is reasonable and given the limited nature of the Interim Commitment, most of Inland's arguments do not need to be addressed at this time.  Moreover, virtually all of the allegedly unreasonable provisions (i.e., cross-collateralization, commitment fee and warrants) are <u>not</u> part of the Interim DIP Order.  Instead, such provisions will only become effective upon entry of the Final DIP Order.  Thus, Inland and others will have an opportunity to address those issues at the appropriate time.  Moreover, prior to entry of the Final DIP Order, the Debtors will continue to negotiate with other third parties to determine if alternative arrangements may be more favorable, while still obtaining access to the much needed Interim Commitment.

9.    Third, Inland asserts that LIP Holdings, LLC is entitled to adequate protection under section 364(d)(1)(B) of the Bankruptcy Code.  This is an incredible argument on several levels.  First, Inland merely seeks another "bite at the apple" to re-litigate issues related to the

Dismissal Motion. Inland's argument is that it is somehow the real owner of LIP-I and that it has the right to direct LIP-I. These issues, of course, have already been decided against Inland.

10. Furthermore, LIP Holdings, LLC has no lien in the Project Interests and therefore, has no basis whatsoever to request adequate protection. Section 364(d)(1)(b) of the Bankruptcy Code states:

> The court, after notice and hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if — there is adequate protection of the interest of the holder of the **lien** on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1)(B) (emphasis added).

11. Given the literal language of the statute, Inland must prove that LIP Holdings, LLC has a valid lien on the property the Debtors propose to pledge as collateral for the Stalking Horse DIP Facility and the Interim Commitment — namely the Project Interests. LIP Holdings, LLC does not have and does not even assert that it has a lien on the Project Interests.[4] To be sure, as discussed below, LIP Holdings, LLC may have an interest in Debtor LIP Development, LLC's membership interest in LIP-I (the "LIP-I Membership Interest"), but LIP Holdings, LLC has no lien whatsoever on the Project Interests, which are at least two steps down the capital structure from LIP Development, LLC. Absent a lien on the property that LIP-I proposes to pledge as part of the Stalking Horse DIP Facility, Inland has no basis to seek adequate protection.

12. In addition, Inland contends that LIP Holdings, LLC became a "purchaser" (as defined in the Uniform Commercial Code) when LIP Development, LLC pledged its LIP-I Membership Interest to LIP Holdings, LLC. Inland then argues that because LIP Holdings, LLC

---

[4] The Debtors also note that LIP Holdings, LLC is not even a creditor of LIP-I.

K&E 15430174.

is a "purchaser" under the Uniform Commercial Code, it therefore owns the LIP-I Membership Interest. This argument conflates the very precise Uniform Commercial Code definition of "purchaser," which <u>does</u> <u>not</u> equate to ownership, with the everyday use of the word "purchaser," which does equate to ownership. This argument is at best amateur and at worst intentionally misleading and made in bad faith.

13. The underlying documents clearly show that LIP Development, LLC granted a security interest in the LIP Membership Interest, but did not actually convey ownership of such interest to LIP Holdings, LLC. Section 2 of the Pledge Agreement, attached hereto as **Exhibit D**, states:

> 2. <u>Grant of Assignment and Security Interest</u>. As security for all amounts due under the Loan Agreement (the "Obligations"), and to induce Lender to make and maintain the Borrowings, Pledgor pledges, assigns and grants to Lender a **security interest in** the following property of Pledgor (collectively, the "Collateral"), whether now existing or hereafter created or arising:
>
> (a) all certificated and uncertificated shares . . . membership interests . . .

Ex. C at § 2 (emphasis added).

14. Thus, contrary to Inland's assertions, LIP Development, LLC did not convey <u>ownership</u> of the LIP-I Membership Interest, but only granted a <u>security</u> <u>interest</u> in the LIP-I Membership Interest. Inland conveniently fails to describe this crucial distinction despite the clear terms of the Pledge Agreement, which states unequivocally that LIP Development, LLC granted only a security interest in the LIP-I Membership Interest.

15. Inland attempts to further muddy the issue by contending that LIP Holdings, LLC became a "purchaser" when LIP Development, LLC pledged the LIP-I Membership Interest to LIP Holdings, LLC and that, pursuant to section 8-302 of the Uniform Commercial Code, as a "purchaser" of a certificated security, LIP Holdings, LLC acquired all rights in such security. Though Inland provides the correct statutory reference, Inland fails to provide the Court with the

7

entire statute, which would reveal significant qualifying language to the rights a "purchaser" can acquire.

16. Section 8-302 of the Uniform Commercial Code states:

> (a) **Except as otherwise provided in subsection (b) and (c)**, a purchaser of a certificated or uncertificated acquires all rights in the security that the transferor had or had power to transfer.
>
> **(b) A purchaser of a limited interest acquires rights only to the extent of the interest purchased.**

6 Del. C. § 8-302 (emphasis added (text in bold not cited by Inland)).

17. The importance of clause (b) of section 8-302 of the Uniform Commercial Code with respect to Inland's argument cannot be overstated. LIP Holdings, LLC, as a "purchaser," did not actually acquire the LIP-I Membership Interest. Rather, Inland, as a "purchaser," acquired a limited interest in the form of a security interest in the LIP-I Membership Interest, as the parties clearly intended in the Pledge Agreement. Any argument to the contrary is simply untrue and misleading.

18. Notwithstanding the fact that LIP Holdings, LLC never acquired all of the rights in the LIP-I Membership Interest, Inland nevertheless wants the Court to believe that its status as a "purchaser" means that it is the owner of the LIP-I Membership Interest. Again, such an argument lacks any merit and is plainly refuted by the plain terms of the Pledge Agreement and the Uniform Commercial Code.

19. Section 8 of the Pledge Agreement clearly sets forth the rights of LIP Holdings, LLC following an event of default under the Pledge Agreement. There is no express provision overriding the Uniform Commercial Code that would permit LIP Holdings, LLC to automatically assume ownership of the LIP-I Membership Interest. In fact, the Pledge Agreement specifically states that upon an event of default, LIP Holdings, LLC, among other

8

things, may "sell the Collateral in any manner permitted by the UCC, and upon any such sale of the Collateral, Lender may (i) bid for and purchase the Collateral and apply the expenses of such sale . . . as a credit against the purchase price." Ex. C at § 8(e). Given this provision, Inland's argument appears to become even more of an absurdity. Why would a party bargain for the right to bid for and purchase collateral if it were already the owner of collateral?

20.     In addition, the Pledge Agreement expressly states that LIP Holdings, LLC "shall have all of the rights and remedies of a secured party under the Uniform Commercial Code . . .". Thus, the parties clearly intended that for any change in ownership of the LIP-I Membership Interest to occur, LIP Holdings, LLC would have to foreclose on the collateral pursuant to the Uniform Commercial Code. See In the Matter of Copeland, 391 F.Supp. 134, 143 (D. Del. 1975) ("For, under the law of pledge, a pledgor retains title even without possession prior to default. Indeed, title remains in the pledgor after default as well. The pledgee at that point only has the right to proceed by the terms of the contract and in concert with such rights and remedies as are provided by the Uniform Commercial Code."); see also Nat'l Bank of Commerce of Dallas v. All Am. Assurance Co., 583 F.2d 1295, 1300 (5th Cir. 1978) ("The pledgee . . . has 'no general property right in the thing pledged, but only a right, upon default, to sell in satisfaction of the pledgor's obligation.'") (quoting Pauly v. State Loan & Trust Co., 165 U.S. 606, 622 (1897)); 6 Del. C. § 8-302 cmt. n.2 ("the grant of a security interest is transfer of a property interest, but the formal steps necessary to effectuate such a transfer are governed by Article 9, not by Article 8"). To be clear, LIP Holdings, LLC has not foreclosed on the LIP-I Membership Interest. Such a foreclosure would be a "Major Decision" that would require the consent of a Lauth manager and no such consent has been given.

21. As stated, Inland's lengthy discussion regarding LIP Holdings, LLC's efforts to perfect its interest in the LIP-I Membership Interest may prove that it possesses an interest of the LIP-I Membership Interest, but it does not prove that LIP Holdings, LLC now owns the membership interest of LIP-I or for that matter the Project Interests. Moreover, as stated above, LIP Holdings, LLC does not possess any liens on the Project Interests, the collateral being pledged pursuant to the Stalking Horse DIP Facility, and thus is not entitled to adequate protection.

22. Fourth, Inland believes that the Debtors have not met their burden with respect to demonstrating that alternative financing is not available. The Debtors believe that such claims are entirely moot given the recent interest expressed by third parties in providing such alternative financing. Indeed, as represented in the Motion and on the record, the Debtors purposefully filed the Motion to market test the Stalking Horse DIP Facility, as such facility merely represented a "stalking horse" proposal. It was always the goal of the Debtors to seek other favorable offers for postpetition financing, and in the event no other offers were forthcoming, the Debtors would know that they necessarily received the most favorable offer. Notwithstanding these aims, Inland wants to derail the entire market-testing process instead of providing the Debtors with additional time to solicit higher and better offers for postpetition financing.

23. Last, Inland asserts that the Debtors have not demonstrated that they will be immediately and irreparably harmed if the Revised Interim DIP Order is not entered. Contrary to such assertions, the Debtors have previously filed a 13-week cash forecast detailing the need for the Interim Commitment, which is attached hereto as **Exhibit E**. Moreover, as stated above and reflected in such forecast, the Debtors will be in danger of becoming administratively insolvent within days. Absent evidence to the contrary, the Debtors believe that such evidence clearly

establishes that the Debtors will suffer immediate and irreparable harm if the Revised Interim DIP Order is not entered in the near term.

**B.     Wells Objection**

24.     Wells opposes the Motion on numerous grounds; however, many of these arguments, similar to those asserted by Inland, are not timely as they relate to the Final DIP Order rather than the Revised Interim DIP Order (i.e., cross-collateralization).  Moreover, with respect to those issues that are relevant to the Revised Interim DIP Order, the Debtors believe that such arguments lack any merit and should be overruled.

25.     Wells's main argument centers around the granting of liens on the equity interests in the subsidiaries of LIP-I.  Wells contends that such grant with respect to certain subsidiaries of LIP-I may constitute a default under applicable Wells loan documents and, as such, this Court should not authorize such a breach.  Moreover, Wells asserts that the applicable Wells loan documents expressly prohibit the borrower-subsidiaries from encumbering their assets.  As explained below, such contentions are wholly without merit because such contractual restrictions are inconsistent with the Debtors' rights to obtain postpetition credit under section 364 of the Bankruptcy Code.

26.     As an initial matter, the Debtors note that the project-level borrower-subsidiaries under the applicable Wells loan documents are not granting any liens with respect to such subsidiaries' own assets.  Instead, the Debtors are proposing to pledge the Project Interests, which are owned by LIP-I.  As a result, any argument regarding whether the project-level subsidiaries' grant of liens violates the applicable Wells loan documents is misplaced because, as stated, the project-level subsidiaries are <u>not</u> granting any such liens.

27.     In addition, section 364 of the Bankruptcy Code specifically authorizes the Debtors to seek postpetition financing.  This includes the right under section 364(c)(2) to obtain

11

credit or incur debt that is "secured by a lien on property of the estate that is not otherwise subject to a lien". As stated, there currently are no liens that exist with respect to the Project Interests.

28. Moreover, even if provisions in the applicable project-level loan documents restrict the granting of liens, it is well established that provisions in prepetition contracts that interfere with a debtor's rights under the Bankruptcy Code are not enforceable. In re Weitzen, 3 F. Supp. 698, 698 (D.C.N.Y. 1933) ("The agreement to waive the benefit of bankruptcy is unenforceable. To sustain a contractual obligation of this character would frustrate the object of the Bankruptcy Act…"). This is because a prepetition waiver of bankruptcy rights "violates public policy in that it purports to bind the debtor-in-possession to a course of action without regard to the impact on the bankruptcy estate, other parties with a legitimate interest in the process or the debtor-in-possession's fiduciary duty to the estate." In re Trans World Airlines, Inc., 261 B.R. 103, 114 (Bankr. D. Del. 2001) [hereinafter "Trans World I"]; see also In re Detrano, 222 B.R. 685, 689 (Bankr. E.D.N.Y. 1998) (rev'd on other grounds) ("It has long been the settled law in this Circuit that waivers of bankruptcy remedies are generally against public policy and not enforceable."); In re Tru Block Concrete Prods., Inc., 27 B.R. 486, 492 (Bankr. S.D. Cal., 1983) ("It is a well settled principal that an advance agreement to waive the benefits conferred by the bankruptcy laws is wholly void as against public policy.").

29. Recognizing the supervening nature of federal bankruptcy policy and the inalienable nature of rights accorded to debtors under the Bankruptcy Code, courts have invalidated a wide range of provisions in prepetition contracts that restricted a debtor's rights upon filing for bankruptcy protection. Furthermore, courts have held that provisions in prepetition agreements requiring a debtor to maintain ownership of certain assets are not

12

enforceable because such agreements run contrary to a debtor's right to sell assets under section 363 of the Bankruptcy Code. See In re Trans World Airlines, Inc., 275 B.R. 712, 722 (Bankr. D. Del. 2002) ("[P]re-petition agreements purporting to interfere with a debtor's rights under the Bankruptcy Code are not enforceable.") [hereinafter "Trans World II"].  Similarly, courts have found that provisions in a prepetition contract prohibiting the debtor from rejecting the contract and/or requiring the debtor to assume the contract are void. See Trans World I, 261 B.R. at 114. Courts have also invalidated prepetition agreements to waive the benefits of a bankruptcy discharge. See In re Morris, 1998 WL 355510 at *7 (Bankr. N.D. Ill. June 30, 1998) ("As a matter of law, a party cannot contract away his right to the dischargeability of a debt prior to the actual bankruptcy filing.  An agreement to waive the dischargeability of a debt is not enforceable as a matter of public policy.") (internal citations omitted).  Much like these other invalid restrictions, contractual restrictions on incurring indebtedness are overridden in virtually every bankruptcy case in which a debtor seeks debtor-in-possession financing and has existing bank or bond debt, as such instruments almost always contain restrictions on the incurrence of new indebtedness.

30.    The same rationale applies in this case to invalidate any prepetition contractual restrictions on granting new liens.  First, the project-level subsidiaries are not granting any liens, but rather LIP-I is pledging its own equity interests in the project-level subsidiaries. Furthermore, by arguing that the project-level loans should bar the Debtors' pledge of their own assets, Wells again ignores the overwhelming body of case law holding that prepetition waivers of bankruptcy rights are not enforceable.  Public policy requires the Debtors be free to utilize all tools given to them by the Bankruptcy Code in order to maximize and preserve the value of their

13

estates. The right to seek postpetition credit under section 364 of the Bankruptcy Code is a fundamental right that cannot be waived or restricted by the terms of prepetition agreements.

31. Therefore, for the foregoing reasons, to the extent that Wells argues that prepetition contractual restrictions prohibit the Debtors from seeking the relief requested in the Motion, all such objections must be overruled.

C.    **SunTrust Objection and Huntington Objection**

32. The Debtors submit that the arguments set forth in the SunTrust Objection and the Huntington Objection are without merit for the reasons stated above. The Debtors have and will satisfy their burden with respect their inability to obtain alternative financing on more favorable terms than the Stalking Horse DIP Facility through continuation of their efforts to market the proposed financing. Moreover, notwithstanding SunTrust and Huntington's desire that its contractual rights not be impaired, as stated above, the Debtors have the ability to grant liens in the equity interests of the subsidiaries of LIP-I pursuant to section 364 of the Bankruptcy Code. In any event, such grant of liens to the DIP Lender will not prejudice in any way SunTrust or Huntington's right to exercise remedies under the applicable loan documents. As such, the SunTrust Objection and the Huntington Objection should be overruled.

## Conclusion

33. The Debtors, in their sound business judgment, believe that entry of the Revised Interim DIP Order is necessary to avoid immediate and irreparable harm. Moreover, recognizing such harm, the Debtors negotiated certain revisions to the Interim DIP Order such that they could obtain the Interim Commitment on an expedited basis and to allow additional time to obtain other potentially higher and better third party offers for postpetition financing than the proposed Stalking Horse DIP Facility.

K&E 15430174.

WHEREFORE, the Debtors respectfully request that this Court (i) deny the Objections in their entirety as they relate to the Revised Interim DIP Order, (ii) enter an order substantially in the form of the Revised Interim DIP Order and (iii) grant such other relief as may be just and proper. and (iv) grant such additional relief as the Court deems just and proper.

Dated: August 13, 2009
Indianapolis, Indiana

**TAFT STETTINIUS & HOLLISTER LLP**

*/s/ Jeffrey J. Graham*
Jerald I. Ancel
Jeffrey J. Graham
One Indiana Square, Suite 3500
Indianapolis, Indiana  46204
Telephone:   (317) 713-3500
Facsimile:   (317) 713-3699

- and -

**KIRKLAND & ELLIS LLP**
Reed S. Oslan, P.C.
James A. Stempel (admitted *pro hac vice*)
Steven C. Hackney (admitted *pro hac vice*)
Ross M. Kwasteniet (admitted *pro hac vice*)
Arun K. Kurichety (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois  60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

Co-Counsel for the Debtors and Debtors in Possession

K&E 15430174.