**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| LAUTH INVESTMENT PROPERTIES, LLC., *et al.*,[1] | ) | Case No. 09-06065-BHL-11 |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |

**LIP HOLDINGS, LLC'S MOTION TO**
**DIRECT APPOINTMENT OF A CHAPTER 11 TRUSTEE**

LIP Holdings, LLC ("Holdings") respectfully moves this Court (the "Motion") for entry of an Order appointing a chapter 11 trustee under sections 105(a) and 1104 of title 11 of the United States Code (the "Bankruptcy Code"). In support of this Motion, Holdings respectfully represents as follows:

**INTRODUCTION**

1.     It is well established that when the managers of a corporate debtor have "significant, inherent conflicts" that prevent those managers from exercising their duties as a debtor-in-possession, the appointment of a chapter 11 trustee is required "to preserve the integrity of the bankruptcy process and to insure that the interests of creditors are served." *In re SunCruz Casinos*, *LLC,* 298 B.R. 821, 828, 830 (Bankr. S.D. Fla. 2003); *In re Bellevue Place Assoc.*, 171 B.R. 615, 623 (Bankr. N.D. Ill. 1994); *In re Cajun Elec. Power Coop.*, 74 F.3d 599, 600 (5th Cir. 1996); *In re Fiesta Homes of Ga., Inc.*, 125 B.R. 321, 325 (Bankr. S.D. Ga. 1990). "[W]hen the clash of interests between creditors and its current management is … obvious", the Seventh Circuit has made it clear that appointment of a trustee is warranted. *See Wabash Valley*

---

[1] The debtors include: Lauth Investment Properties, LLC (09-06065) ("LIP"); LIP Development, LLC (09-06066) ("LIP-D"); and LIP Investment, LLC (09-06067) ("LIP-I").

*Power Ass'n. v. Rural Electrification Adm.*, 903 F.2d 445, 451 (7th Cir. 1990); *accord In re Marvel Entm't Group, Inc.*, 140 F.3d 463, 472 (3d Cir. 1998); *In re Cajun Elec. Power Coop., Inc.*, 191 B.R. 659, 663 (M.D. La. 1995), *aff'd*, 74 F.3d 599, 600 (5th Cir.), *cert. denied*, 519 U.S. 808 (1996).

2.      Here, there is an "obvious" clash of interests between the Debtors' creditors and Robert Lauth Jr. and the other key members of the Debtors' management team.  As set forth more fully below, Mr. Lauth and the other insiders each have significant disabling conflicts of interest that prevent them from performing their duties in the best interests of creditors as opposed to their own selfish interests.  Mr. Lauth and the other members of management have each guaranteed over $400 million in obligations owed to certain creditors of the underlying entities that are owned by debtor LIP-I.  Each of these underlying entities is a single-purpose entity formed to own one real estate investment and has only one significant creditor, the lender holding a mortgage on the real estate.  Mr. Lauth and the other insiders have guaranteed some of these secured obligations.  Each of these guarantees currently stands alone and the majority of the guarantees are not cross-collateralized by any other real estate owned by any other affiliated entity.  Because the insiders were typically required to guarantee the obligations owed on account of the less healthy properties, it has been clear, since at least late in 2008, that the insiders face significant exposure on account of their guarantees.  This is true even though it was equally clear, both in 2008 and today, that there is equity available for LIP-I to realize from the healthier investments.

3.      In late 2008, the Debtors defaulted on the $228 million mezzanine loan that they owe to Holdings.  Holdings declared a default and began to enforce its rights under its loan agreements with the Debtors.  Holdings is informed and believes that around the same time that

2

Holdings began to exercise its rights, Mr. Lauth and the other insiders caused Debtors LIP-D and LIP-I to execute indemnity agreements (the "LIP-D and LIP-I Indemnity Agreements") that recite they are "entered into *as of* June 1, 2007" and that, if allowed to stand, will cause the other creditors of LIP-D and LIP-I, and significantly Holdings, to receive substantially less on account of their claims. LIP-D and LIP-I received no consideration when they incurred these obligations and the sole purpose for the indemnities appears to have been to hinder, delay and defraud Holdings' efforts to collect on its $228 million loan. Under 11 U.S.C. § 548(a) and 11 U.S.C. §544(b) and state law, the incurrence of these obligations should be avoided for the benefit of the LIP-D and LIP-I estates.

4. Since the filing of the bankruptcy petition, however, the Debtors, controlled by the insiders who will benefit from these fraudulent indemnities, have consistently claimed that these fraudulent obligations entitle them to be paid ahead of Holdings. They have done nothing to avoid these obligations and have blocked Holdings' efforts to obtain information about the dates on which these indemnification obligations actually were incurred. Holdings is informed and believes that, Thomas Peck, a former Debtor insider, has given a deposition in a lawsuit brought by, among others, Inland American (LIP) Sub, LLC, in which he testified about the timing of the execution of the guarantees and other matters related to Mr. Lauth's and the other insiders' conduct that may be relevant to the appointment of a trustee. The Debtors' counsel and counsel for the insiders have claimed in that related litigation that the deposition is confidential and have refused to produce a copy to Holdings' counsel. The Debtors' counsel also has instructed Hogan & Hartson, the law firm that allegedly drafted the indemnification agreements, not to respond to a subpoena requesting documents that would show when the LIP-D and LIP-I Indemnity Agreements were drafted. In the LIP-D and LIP-I Schedules, Debtors failed to state

when the indemnities were incurred despite the fact that the answer to this question is part of Official Form 6.   To avoid answering the question, they list the indemnities under Schedule G, but not Schedule F.

5.       As the managers of a debtor-in-possession, Mr. Lauth and the other insiders have a clear duty to maximize the value of the estate.  *See, e.g., Wabash Valley Power*, 903 F.2d at 451.  By taking no action to avoid the indemnity agreements and blocking the legitimate efforts of creditors to obtain information that might call these agreements into question, the insiders have shown themselves incapable of being able to act as independent fiduciaries and the Court should find that cause exists to appoint a chapter 11 trustee.

## JURISDICTION

6.       This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

7.       The statutory bases for relief are sections 105(a) and 1104(a) of the Bankruptcy Code and Rule 9014 of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND

**A.       The Chapter 11 Cases.**

8.       On May 1, 2009, LIP, LIP-D and LIP-I each filed chapter 11 petitions (the "Bankruptcy Cases").  The petitions for each Debtor were signed by Robert Lauth, Jr. [Doc. No. 1;[2] LIP-D Doc. No. 1; LIP-I Doc. No. 1].

---

[2] "Doc. No. __" refers to docket entries in Case No. 09-6065; "LIP-D Doc No. __" refers to docket entries in Case No. 09-6066; and "LIP-I Doc. No. __" refers to docket entries in Case No. 09-6067.

9.     On June 2, 2009, Holdings filed its Motion to Dismiss the Debtors' Chapter 11 Cases Or, As an Alternative, to Appoint a Chapter 11 Trustee (the "Original Motion") [Doc. No. 130].  Thereafter, on June 10, 2009, this Court granted Holdings leave to amend its Original Motion.  [Doc. No. 179].  On June 19, 2009, Holdings filed a Supplement to the Original Motion [Doc. No. 209] (the Supplement and the Original Motion are referred to collectively as the "Motion to Dismiss").  In the Motion to Dismiss, Holdings argued that the Debtors' bankruptcy cases were filed without proper authority and should be dismissed.  Holdings also argued that dismissal was warranted because the Debtors' bankruptcy cases were filed in bad faith.

10.     On August 28, 2009, this Court entered an Order [Doc. 441] (the "Dismissal Order") denying the Motion to Dismiss on the basis that the Debtors had authority to file their bankruptcy cases.  The Court did not render a decision regarding whether the Debtors' bankruptcy cases were filed in bad faith.  Thereafter, on September 4, 2009, Holdings filed a motion for reconsideration of the Dismissal Order [Doc. No. 461] (the "Reconsideration Motion").  The Reconsideration Motion is set for hearing on January 14, 2010.

**B.     Holdings' Claims Against The Debtors.[3]**

11.     The Debtors in this case are shell companies with no employees, tangible assets or business operations.  LIP exists solely to hold ownership interests in LIP-D and Holdings.  LIP-D exists solely to hold a membership interest in LIP-I. LIP-I exists solely to hold membership interests in the entities that hold the underlying real estate.

12.     On or about June 8, 2007, LIP and Inland American (LIP) Sub, LLC ("Inland Sub") entered into a Limited Liability Company Agreement to create Holdings.  LIP is the sole

---

[3] Holdings incorporates by reference herein the facts set forth in the Original Motion and the Supplement.

member and owner of LIP-D, and LIP-D is the sole member and owner of LIP-I.  (*See* Adv. Pro. Case No. 09-50304, Adv. Pro. Doc. No. 1, the "Complaint" at ¶¶ 5-7).

13.     Holdings was formed for the purpose of, among other things, making a mezzanine loan to LIP-D (the "Mezzanine Loan").  Holdings primarily used cash contributed by Inland Sub to make loans to LIP-D.  Holdings and LIP-D executed a Mezzanine Loan Agreement dated June 8, 2007 (the "Mezzanine Loan Agreement"), pursuant to which Holdings committed to loan up to $250,000,000 to LIP-D.  To secure its obligations to Holdings under the Mezzanine Loan Agreement, LIP-D executed an Ownership Pledge, Assignment and Security Agreement (the "Pledge Agreement") in favor of Holdings.  Pursuant to the Pledge Agreement, LIP-D pledged its 100 percent ownership interest in LIP-I to Holdings to secure its repayment of the funds borrowed under the Mezzanine Loan Agreement.  LIP-I is the entity that actually held value -- the real estate holdings -- and thus, Holdings' decision to enter into the Mezzanine Loan Agreement was based on LIP-D's pledge of LIP-I.[4]

14.     In July of 2007, certain individuals, including Mr. Lauth, Michael S. Curless, Gregory Gurnik, Lawrence Palmer, and Thomas Peck (collectively, the "Indemnified Insiders")[5] executed indemnity agreements with LIP (collectively, the "LIP Indemnity Agreements") in connection with the Holdings transaction.  Copies of the LIP Indemnity Agreements are attached hereto as <u>Exhibit A</u>.  The LIP Indemnity Agreements, *inter alia*, purport to indemnify the

---

[4] All of these agreements are attached as Exhibits to the Motion to Dismiss. [Doc. No. 209].

[5] The Indemnified Insiders were each "insiders" as that term is defined in 11 U.S.C. § 10131) of the Bankruptcy Code as of the Petition Date.  Mr. Lauth currently serves as chairman and chief executive officer of Lauth Group, Inc. ("LGI"), the parent company of the Debtors, and Mssrs. Curless and Gurnik are current executives of LGI and the Debtors and, along with Mr. Lauth, are responsible for operating the Debtors.  (August 10, 2009 deposition of Robert L. Lauth, Jr. (hereinafter, "Lauth Dep.") at pp. 14-15).  Mssrs. Lauth, Curless, Gurnik, and Palmer and each of their wives are also principals of LIP Lenders, LLC, the debtor-in-possession lender in this case ("LIP Lenders").

Indemnified Insiders against any claims made against the Indemnified Insiders on account of certain personal guarantees executed by the Indemnified Insiders guaranteeing obligations owed to certain creditors of the underlying entities that are owned by debtor LIP-I (the "Personal Guarantees"). The Indemnified Insiders have personally guaranteed approximately $400 million in debt to various lenders as set forth in Exhibit B hereto.

15.     The LIP Indemnity Agreements are separate and distinct from the LIP-D and LIP-I Indemnity Agreements. The LIP Indemnity Agreements do not impair Holdings' rights to collect the Mezzanine Loan because any interest LIP has in the value of the underlying real estate entities is junior to the interests of Holdings to collect under the Mezzanine Loan. Put more simply, LIP-D would have to repay the Mezzanine Loan in full before LIP-D would have any value to distribute to LIP that could be used to make payments under the LIP Indemnification Agreements.

## C.     The Indemnified Insiders' Misconduct In Causing LIP-I And LIP-D To Execute Indemnification Agreements.

16.     By November, 2008, the Debtors had defaulted under the Mezzanine Loan Agreement. (*See* Debtor's Response and Objection to LIP H's Motion to Dismiss [Doc. No. 259] ("The financial crisis that has engulfed the United States has not spared the LIP I properties. By the last quarter of 2008, LIP I's subsidiaries were struggling with the worst leasing environment in recent history … As a result, LIP I was unable to upstream sufficient cash to LIP D to allow it to service its quarterly interest payments on the Mezzanine Loan. Thus, on December 31, 2008, LIP D failed to make its quarterly interest payment under the Mezzanine Loan.")). The underlying entities owned by LIP-I also were in default on many of the loans that the Indemnified Insiders had personally guaranteed. As it was entitled to do, Holdings began to enforce its rights in the Event of Default.

17.    Holdings is informed and believes that the Indemnified Insiders also began to secretly take actions designed to hinder and delay Holdings' efforts to collect on the Mezzanine Loan.  Holdings is informed and believes that, in December, 2008, the Indemnified Insiders caused LIP-D and LIP-I to execute the LIP-D and LIP-I Indemnity Agreements.   Copies of the LIP-D and LIP-I Indemnity Agreements are attached hereto as <u>Exhibit C</u>.  The LIP-D and LIP-I Indemnity Agreements are similar to the LIP Agreements and purport to indemnify the Indemnified Insiders against any claims made against the Indemnified Insiders on account of the Personal Guarantees.  Like the LIP Indemnity Agreements, the LIP-D and LIP-I Indemnity Agreements state that they were entered into "as of July 1, 2007."

18.    The Court will note, however, that there is a substantial difference between the document identification number on the LIP Indemnity Agreements and the document indemnification numbers on the LIP-D and LIP-I Indemnity Agreements.  If these agreements were all executed at the same time, as the Debtors purport to represent that they were, there would not be such a significant difference between the document identification numbers, which appear to be generally sequential within their respective sets (3761-3818 for the LIP Indemnity Agreements and 18034-18048 for the LIP-D and LIP-I Indemnity Agreements).

19.    Unlike the LIP Indemnification Agreement, the effect of the LIP-I and LIP-D Indemnification Agreements is to place the Indemnified Insiders' purported claims ahead of those of Holdings.  LIP-D and LIP-I received no consideration for making these agreements. The sole purpose of these agreements appears to be to protect the Debtors' insiders at the expense of Holdings and other creditors and Holdings believes, as described above, that these Indemnification Agreements were executed in late 2008.

**D.    The Debtors' Ongoing Concealment Of Their Misconduct.**

20.    The Debtors have concealed the date of the execution of the LIP-I and LIP-D Indemnification Agreements from the Court and Holdings.  Although a debtor is required to file a schedule of all unsecured claims, including those that are contingent or unliquidated, and to list the date on which each claim was incurred (11 U.S.C. §521(b); Fed. R. Bankr. P. 1007(b); Official Form 6), the Debtors did not schedule the LIP-I and LIP-D Indemnification Agreements as unsecured claims under Schedule F and instead listed them only under Schedule G as executory contracts.  *See* LIP-D Schedules F and G [LIP-D Doc. No. 62]; LIP-I Schedules F and G [LIP-I Doc. No. 60].  The LIP-I and LIP-D Indemnification Agreements are not executory contracts and, even if they were, any obligation owed to the Indemnified Insiders should have been listed in Schedule F.  *See, e.g.*, *In the Matter of Chicago, Rock Island & Pacific RR Co.*, 604 F.2d 1002, 1003-04 (7th Cir. 1979); *In re Chateaugay Corp.*, 102 B.R. 335, 345 (Bankr. S.D.N.Y. 1989).  But by scheduling these agreements only in Schedule G, the Debtors avoided stating the date on which the obligations were incurred as required by Official Form 6 and Fed. R. Bankr. P. 1007(b).

21.    Moreover, contrary to this Court's direction that it wanted "complete transparency" in these cases and that the Debtors should provide Holdings with access to information (7/23/09 Tr. at 116), the Debtors have continued to be anything but transparent.  In connection with the pending Motion to Dismiss based upon the Debtors' bad faith, Holdings served discovery on the Debtors and other third parties to obtain information about when the LIP-I and LIP-D Indemnification Agreements were executed.  The Debtors have refused to answer the discovery and have directed third parties not to answer the discovery as well, asserting that Holdings is not entitled to this information.

22.     Among the discovery Holdings has requested is a copy of the deposition testimony given by Thomas Peck, one of the Indemnified Insiders, in connection with a lawsuit filed by Inland Sub against the Indemnified Insiders in the United States District Court for the Southern District of Indiana.  Debtors' counsel and the Indemnified Insiders' counsel contend that the deposition is confidential and have refused to allow Holdings' counsel access to the deposition.  Inland Sub is currently contesting that designation as it is improper under controlling Seventh Circuit case law.  *See, e.g., Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 945-46 (7th Cir. 1999).[6]  But by taking this unreasonable position, the Debtors (and their insiders) have substantially hindered Holdings' access to relevant information.

23.     In addition, Holdings served a subpoena on the law firm that it believes prepared the LIP-I and LIP-D Indemnification Agreements, Hogan & Hartson, seeking information about the dates on which they were prepared.  Debtors' counsel has instructed Hogan & Hartson not to respond to the subpoena.

24.     Holdings also has served the Debtors with interrogatories asking the Debtors the actual date of the execution of the LIP-D and LIP-I Indemnity Agreements.  The Debtors' responses to the interrogatories are due on December 23, 2009.  As of the filing of this Motion, the Debtors have not answered the interrogatories.

---

[6] To the extent it contains personal financial information about the Debtors' insiders, a protective order already exists in this case that was expressly crafted to protect that information [Doc. No. 237].  Thus, there is no legitimate basis to continue to hide behind a claim of confidentiality.  As the Seventh Circuit noted in *Citizens First Nat'l*, the public is entitled to access to court records and confidentiality designations must be made in good faith and may only protect trade secrets. 178 F.3d at 945-46. The date on which the Debtors' insiders and the Debtors executed indemnification agreements is plainly not a trade secret. *See IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002) (explaining that a trade secret is "valuable, not known to others who might profit by its use, and has been handled by means reasonably designed to maintain secrecy.").

25.     In short, the Debtors have actively blocked Holdings from obtaining any information regarding the actual date of execution of the LIP-D and LIP-I Indemnity Agreements.

26.     Assuming the LIP-D and LIP-I Indemnity agreements were executed in December of 2008 (and surely the Debtors' management who executed the LIP-D and LIP-I Indemnity Agreements knows when they executed them), the Debtors' obligations under the LIP-D and LIP-I Indemnity Agreements are likely fraudulent obligations that can be avoided for the benefit of the Debtors' estates.  Not surprisingly, however, the Debtors have not taken any steps to avoid the Debtors' these obligations.  Nor have the Debtors attempted to reject the burdensome one-sided LIP-D and LIP-I Indemnity Agreements, which the Debtors claim are "executory contracts."  As the Indemnified Insiders who control the Debtors know, if the Debtors were to avoid those obligations, the Indemnified Insiders would face substantial personal exposure under the Personal Guarantees.

**E.     Other Conflicts Of Interest And Misconduct.**

27.     The Indemnified Insiders have engaged in other questionable transactions that place their interests in direct conflict with those of creditors.  On April 29, 2009, two days before they filed these chapter 11 cases, LIP-I entered into a one-sided management agreement with Mr. Lauth's company, Lauth Management Group, LLC, that can effectively never be terminated by the Debtors and which substantially increased the management fees this entity received.  This agreement, like the LIP-I and LIP-D Indemnification Agreements, benefits insiders at the expense of creditors and Holdings believes should not only be rejected but also should be set aside as fraudulent obligation to avoid any claims being asserted against LIP-I on account of this eve-of-bankruptcy insider transaction.  The Debtors have done nothing to avoid this obligation;

instead they have supported the insiders' assertion that they should continue to be paid under this agreement.

28.    On July 21, 2009, the Indemnified Insiders filed a motion to act as lenders to the Debtors that sought approval of an onerous and unfair agreement.  But for creditor objections and this Court's refusal to approve their request as originally filed, the Debtors would have been saddled with substantial fees and expenses.  By filing such a motion, the Debtors underscored that their managers can not be independent and will cause the Debtors to act in the Indemnified Insiders' best interests as opposed to those of creditors.

29.    As set forth in Wells Fargo Bank's complaint against the Indemnified Insiders (District Court Case No. 09-cv-746) the Indemnified Insiders have engaged in numerous transactions that appear to be fraudulent transfers designed to prevent creditors from collecting their claims.  These allegations create an appearance of impropriety if the Indemnified Insiders are allowed to continue to manage the Debtors.

30.    Finally, because the Debtors have blocked Holdings' legitimate discovery, other instances of insider misconduct may exist and Holdings expressly reserves the right to rely upon any such misconduct as an additional factual basis for the appointment of a chapter 11 trustee.

**ARGUMENT**

31.    Section 1104(a) of the Bankruptcy Code allows the Court to order the appointment of a chapter 11 trustee: (1) "for cause, including fraud, dishonesty, incompetence or gross mismanagement of the affairs of the debtor by current management," or (2) "if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate."  11 U.S.C. § 1104(a)(1) and (2).  If cause exists to order the appointment of a trustee under section 1104(a)(1) of the Bankruptcy Code, the Court has no discretion and must order the

appointment of a chapter 11 trustee. *See In re Bellevue Place Assoc.*, 171 B.R. 615, 622 - 23 (Bankr. N.D. Ill. 1994); *In re Madison Mgmt. Group, Inc*., 137 B.R. 275, 281 (Bankr. N.D. Ill. 1992). The list of incidents of "cause" for which a chapter 11 trustee must be appointed under section 1104(a)(1) of the Bankruptcy Code is not exhaustive. *See In re Marvel Entm't. Group, Inc.*, 140 F.3d 463, 472 (3d Cir. 1998); *In re Bellevue Place*, 171 B.R. at 622-23; *In re Madison Mgmt.*, 137 B.R. at 281. Even if cause does not exist to order the appointment of a trustee under section 1104(a)(1) of the Bankruptcy Code, a court may exercise its discretion and order the appointment of a chapter 11 trustee under section 1104(a)(2) of the Bankruptcy Code. *See In re Bellevue Place*, 171 B.R. at 623 ("The Court has particularly wide discretion under subsection (a)(2).").

32. In the present case, Holdings respectfully submits that "cause" exists under section 1104(a)(1) for the appointment of a chapter 11 trustee. The existence of the LIP-D and LIP-I Indemnity Agreements creates an irreconcilable conflict between the interests of the Indemnified Insiders who control the Debtors and the interests of the Debtors' creditors. This conflict is particularly troubling here, where it appears the Indemnified Insiders back-dated the LIP-D and LIP-I Indemnity Agreements and misled this Court and the Debtors' creditors regarding the timing of those obligations. The Debtors' continuing refusal to contest its avoidable indemnification obligations is in direct conflict with the Debtors' duty to maximize the value of their estates for the benefit of creditors. *See Wabash Valley*, 903 F.2d at 451. The Debtors' ongoing misrepresentations and breach of their fiduciary duties to creditors constitute gross mismanagement of the Debtors' affairs under section 1104(a)(1) of the Bankruptcy Code and compel the appointment of a chapter 11 trustee. Even if "cause" did not exist under section 1104(a)(1), however, the appointment of a chapter 11 trustee would still be warranted under

section 1104(a)(2) because it is in the best interests of the Debtors' creditors and estates for the Debtors to be managed by a chapter 11 trustee who will not be motivated to prefer his self-interest over the interests of the Debtors' creditors and estates.

33.    The Seventh Circuit has made it clear that "when the clash of interests between creditors and its current management is … obvious", the appointment of a trustee is warranted. *See Wabash Valley*, 903 F.2d at 451.  Following the Seventh Circuit's reasoning in *Wabash Valley*, the bankruptcy court in *Cajun Electric* held that the appointment of a chapter 11 trustee was mandatory under section 1104(a)(1) as a result of the "many conflicts of interest that [the debtor's] management, directors and members have with each other and with their creditors …" 191 B.R. at 662.  The bankruptcy court also concluded that the potential for gridlock between the debtor's management and its creditors supported the appointment of a chapter 11 trustee under section 1104(a)(2).  *Id.* at 663 (finding it "absolutely necessary … that a neutral trustee be appointed to preside in an objective and impartial manner").  The Fifth Circuit affirmed the bankruptcy court, finding that the "conflicts present in [the] case provid[ed] sufficient 'cause'" for the appointment of a chapter 11 trustee under section 1104(a)(1).  74 F.3d 599 (adopting the reasoning of the dissent in 69 F.3d 746).

34.    Under factual circumstances similar to those before this court, the bankruptcy court in *In re Tel-Net Haw., Inc.*, 105 B.R. 594 (Bankr. D. Haw. 1989) granted a motion for the appointment of a chapter 11 trustee where the debtor was controlled by its principal shareholder, potentially preferential transfers had been made to pay liabilities guaranteed by that shareholder, and the debtor had "not made any effort to recover the[] preferential transfers" from the shareholder.  *Id.* at 595.  The court noted the conflict between the debtor's obligations to creditors and the shareholder's own interests, explaining "[a]n entity cannot adequately serve

14

two masters." *Id.* at 595.    Accordingly, the court concluded that the debtor's "conflicting interests preclude the proper and effective operations of [the debtor] and dictate the appointment of an impartial trustee." *Id.; see also In re Sharon Steel Corp.*, 871 F.2d 1217, 1221 (3rd Cir. 1989) (affirming the appointment of a chapter 11 trustee where, *inter alia*, "the bankruptcy court questioned the current management's ability to fulfill its fiduciary duty to pursue [] claims since [the debtor] shares common management with the recipients of the transfers."); *In re Coram Healthcare Corp.*, 271 B.R. 228, 236 (Bankr. D. Del. 2001) ("Actual conflicts of interest of debtor's officers in bankruptcy are usually found in the context of prosecution of avoidance actions which the debtor may have against the officers themselves or against creditors whose debt was guaranteed by the officers.  Such a conflict of interest may warrant appointment of an impartial trustee.")

35.    As set forth above, there are numerous bases on which this Court should find that the appointment of a chapter 11 trustee is either mandated under section 1102(a)(1) or warranted under section 1102(a)(2).    The Debtors should not be allowed to continue to run these bankruptcy cases for the primary benefit of the Indemnified Insiders.  Any prudent debtor-in-possession acting in the best interests of its creditors and its estates would have taken steps to avoid the burdensome obligations imposed on the Debtors by the LIP-D and LIP-I Indemnity Agreements.  The Debtors' motivation to not take such action is transparent and is consistent with their attempts throughout these bankruptcy cases to favor insiders.  The appointment of a neutral chapter 11 trustee is necessary and is in the best interests of the Debtors' creditors and their estates.

WHEREFORE, for all of the reasons set forth above and all of the reasons set forth herein, Holdings respectfully requests that the Court enter an Order directing the appointment of a chapter 11 trustee and for such other and further relief as is just and proper.

Dated: December 23, 2009                     Respectfully Submitted,

                                                   JENNER & BLOCK LLP

                                                   */s/ Catherine L. Steege*

                                                   Catherine L. Steege (admitted *pro hac vice*)
                                                   Joel T. Pelz (admitted *pro hac vice*)
                                                   Melissa M. Hinds (Atty. No. 24230-49)
                                                   353 North Clark Street
                                                   Chicago, Illinois 60654
                                                   Telephone:  (312) 222-9350
                                                   Facsimile:  (312) 527-0484

                                                   -and-

                                                   HOSTETLER & KOWALIK, P.C.
                                                   Jeffrey A. Hokanson
                                                   Courtney E. Chilcote
                                                   101 W. Ohio Street, Suite 2100
                                                   Indianapolis, Indiana 46204
                                                   Telephone:  (317) 222-7486
                                                   Facsimile:  (317) 262-1010

                                                   Attorneys for LIP Holdings, LLP