**<u>Exhibit B</u>**

**Loan Modification Term Sheet**

**Lauth Investment Properties, LLC**

*Modification and Extension of Existing Financing*

# LAUTH INVESTMENT PROPERTIES, LLC
# CONSTRUCTION FINANCING MODIFICATIONS

## CROSS-COLLATERALIZED POOL

## SUMMARY OF TERMS AND CONDITIONS

### FOR SETTLEMENT PURPOSES ONLY
### PURSUANT TO FRE 408 OR ITS EQUIVALENT

### FOR DISCUSSION PURPOSES ONLY –
### NOT A COMMITMENT

*This Summary of Terms and Conditions is an offer to compromise or to settle that is covered by Federal Rule of Evidence 408 or its state law equivalents. This Summary of Terms and Conditions is not intended to be and should not be construed as a commitment to lend, a commitment to amend or modify any existing loan, a commitment to forbear in any respect or as a waiver of any defaults or events of default or of any of Lender's or Borrowers' rights or remedies under any documents executed in connection with the Facilities (as defined below) or any other existing financing or under applicable law. Without limiting the foregoing, this Summary of Terms and Condition is not intended, and shall not be construed, as an attempt to establish all of the terms and conditions relating to any existing financing or any proposed amendment or modification thereof. It is intended only to be indicative of certain terms and conditions around which credit approval may be sought, and once approved, how an amendment and extension of the applicable loan documents might be structured, and shall not preclude negotiations within the general scope of these terms and conditions. All documents containing final terms and conditions are subject to approval by Borrowers and Lenders. No failure by any Lender to exercise any of its rights and remedies previously, at this time or at any time during the course of discussions is intended to constitute, nor shall it be deemed to constitute, a waiver of any default or event of default or any of said rights and remedies, all of which are hereby expressly reserved and may be exercised at any time.*

**Proposal Date:**    February 12, 2010



CONFIDENTIAL

CHI 4510574v.33

**Lauth Investment Properties, LLC**

*Modification and Extension of Existing Financing*

**Borrowers:**       MCP Partners Three, LLC ("MCP Three")
Meridian Medical Partners Two, LLC ("Meridian")
Middleburg Heights Medical Partners, LLC ("Middleburg")
Virginia Beach Medical Partners, LLC ("Virginia Beach")
Brownsburg Station Partners, LLC ("Brownsburg")
Moores Chapel Partners, LLC ("Moores Chapel")
Brier Creek Medical Partners, LLC ("Brier One")
Brier Creek Medical Partners Two, LLC ("Brier Two")

MCP Three, Meridian, Middleburg, Virginia Beach and Brownsburg are sometimes hereinafter referred to each individually, as a "Wells Fargo Borrower" and, collectively, as the "Wells Fargo Borrowers". Moores Chapel, Brier One and Brier Two are sometimes hereinafter referred to each individually, as a "Wachovia Borrower" and, collectively, as the "Wachovia Borrowers". Wells Fargo Borrowers and Wachovia Borrowers are sometimes hereinafter referred to each individually, as a "Borrower" and, collectively, as the "Borrowers". Virginia Beach and Brier One are sometimes hereinafter referred to each, individually, as a "Existing Minority Interest Borrower" and, collectively, as the "Existing Minority Interest Borrowers". Meridian, Middleburg and Brier Two are sometimes hereinafter referred to each, individually, as a "Potential Minority Interest Borrower" and, collectively, as the "Potential Minority Interest Borrowers". The Existing Minority Interest Borrowers and the Potential Minority Interest Borrower are sometimes hereinafter referred to each, individually, as a "Minority Interest Borrower" and, collectively, as the "Minority Interest Borrowers".

Borrowers have provided Lenders with the organizational structure charts for Borrowers attached hereto as Exhibit B. Borrowers represent and warrant to Lenders that such organizational structure charts show the current holders of all direct and indirect equity interests (whether common, preferred, voting, non-voting, controlling, non-controlling, managing, non-managing or otherwise) in each Borrower as of the date of Borrowers' execution of this Summary of Terms and Conditions (but not above the level of Inland American Real Estate Trust, Inc.) and the current holders of any security interests in any such entities and that such charts include the relative percentage interests of each at each such level and, in the case of limited liability companies, identifying all non-member managers of the same. Borrowers further represent and warrant to Lenders that Borrowers have provided Lenders with true, correct and complete copies of the current versions of all operating agreements and other applicable formation and authority documents for each of the entities reflected thereon (other than Inland American (LIP) Sub, LLC and its direct and indirect owners and, in the case of the Existing Minority Interest Borrowers, any minority owners of LLC interests that are



otherwise unaffiliated with, and unrelated to, any of the Lauth Parties (as defined below)), including, without limitation, all documentation pursuant to which any tenant or any other party previously acquired, or has or may have the right to acquire, any interest in any Minority Interest Borrower or any other Borrower), including in each case any and all amendments thereto and, in the case of any equity pledges, copies of all documents evidencing or securing the underlying obligation to which such pledge relates, including in each case any and all amendments thereto.  In connection with any closing of the transactions contemplated hereunder, Borrowers shall represent and warrant that such charts, the information contained thereon and the copies of all such documents so furnished are true, correct and complete as of the date of any such closing.  As used herein, the term "Lauth Parties" shall mean, collectively, Lauth Group, Inc. ("LGI"), Lauth Investment Management, LLC, Lauth Properties, LLC, Lauth Investment Properties, LLC ("LIP"), LIP Development, LLC ("LIP-D"), LIP Investment, LLC ("LIP-I"), Lauth's Principals and their respective members, managers, shareholders, subsidiaries, family members and relatives.  Lenders' approval of the form and substance of such organizational structure charts and such documents shall be a condition precedent to any such closing.  No transfers, pledges or assignments of direct or indirect equity interests in the Borrowers shall be permitted during the term of the Facilities without Lenders' prior written approval, except for (a) the granting by LIP-I of a security interest in all of the equity interests and/or membership interests owned by LIP-I in its direct and indirect subsidiaries in favor of LIP Lender, LLC, as debtor-in-possession lender to LIP-I ("DIP Lender") as security for the DIP loan obligations, pursuant to (and subject to all terms and conditions of) the existing order entered by the United States Bankruptcy Court for the Southern District of Indiana (the "Bankruptcy Court") in the Chapter 11 bankruptcy proceedings with respect to Borrowers, LIP, LIP-D and LIP-I, (b) transfers of the direct or indirect equity interests and/or membership interests in Borrowers to DIP Lender pursuant to a confirmed plan of reorganization or a permitted foreclosure by DIP Lender of the security interests referred to in clause (a) above, in either case pursuant to an order of the Bankruptcy Court and only provided that (i) all membership interests in DIP Lender continue to be held by the persons and in the percentages set forth on Exhibit B attached hereto (except that membership interests in DIP Lender may be transferred or issued to employees and officers of LGI (other than any employee or officer that is also a spouse of any Lauth's Principal) without violating this clause (i) so long as clauses (ii), (iii) and (iv) below are satisfied), (ii) at all times, Robert L. Lauth, Jr. and Gregory C. Gurnik continue to own, collectively, not less than 35% (or such other amount as Lenders shall approve in their sole discretion as set forth in the documentation executed in connection with any closing of the transactions



                                    *CONFIDENTIAL*

## Lauth Investment Properties, LLC

*Modification and Extension of Existing Financing*

contemplated hereunder) of all membership interests in DIP Lender and continue to Control (as defined below) DIP Lender, (iii) at all times, one or more of the Lauth's Principals (as defined below) shall Control each Borrower), and (iv) as a condition precedent to any such transfer, DIP Lender provides full, joint and several, repayment and completion guaranties, without limits on the maximum liability amount of DIP Lender thereuner (in which case DIP Lender shall constitute a Corporate Guarantor (as defined below) hereunder), (c) in the case of the Minority Interest Borrowers, such other transfers of direct interests in such Minority Interest Borrowers as shall be specifically permitted by Lenders up to the minority interest limit in the documentation executed in connection with any closing of the transactions contemplated hereunder, and (d) such other transfers of direct or indirect interests in the Borrowers as may be mutually agreed to by Borrowers and Lenders as set forth in the documentation executed in connection with any closing of the transactions contemplated hereunder. As used in this section, the term "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the applicable Borrower, whether through the ability to exercise voting power, by contract or otherwise.

**Guarantors:** Each of LIP, LIP-D and LIP-I (LIP, LIP-D, LIP-I and (upon any transfer of the direct or indirect equity interests and/or membership interests in Borrowers to DIP Lender as contemplated under the "Borrowers" section above) DIP Lender, each individually, a "Corporate Guarantor" and, collectively, the "Corporate Guarantors") will provide full, joint and several, repayment and completion guaranties, without limits on the maximum liability amount of any Corporate Guarantor thereunder; provided, however, that if (a) on or before the date of any closing of the transactions contemplated hereunder, the direct or indirect equity interests and/or membership interests in every Borrower is transferred to DIP Lender as contemplated by, and in compliance with, clause (b) of the last paragraph in the "Borrowers" section above, (b) Borrowers provide Lenders with evidence acceptable to Lenders in their sole discretion that one or more of LIP, LIP-D and/or LIP-I has (and will, after the effective date of any plan of reorganization confirmed by the Bankruptcy Court, continue to have) no assets of any value or has been (or will, after the effective date of any plan of reorganization confirmed by the Bankruptcy Court, be) legally dissolved with no assets available for distribution to its equity holders, and (c) DIP Lender provides full repayment and completion guaranties, without limits on the maximum liability amount of DIP Lender thereunder, then, in such event LIP, LIP-D and/or LIP-I, as applicable, shall not be required to deliver such guaranties and will not constitute "Corporate Guarantors" hereunder. The guaranties and other agreements of



**CONFIDENTIAL**

**Lauth Investment Properties, LLC**

*Modification and Extension of Existing Financing*

Robert L. Lauth, Jr., Gregory C. Gurnik, Lawrence B. Palmer, Michael S. Curless (each, a "Lauth's Principal" and, collectively, the "Lauth's Principals") and the guaranties and other agreements of all other existing guarantors shall remain in full force and effect as provided in the existing documentation. All such guarantors (other than Thomas K. Peck, W. Todd Jensen, John F. McNaughton and Michael J. Jones) shall, as a condition to any such closing, execute a consent and reaffirmation in form and substance acceptable to Wells Fargo pursuant to which each such guarantor shall consent to the terms and provisions of the closing documentation and the transactions contemplated thereby, reaffirm its obligations under all guaranties or other agreements delivered by such guarantor in connection with any and all of the Loans, reaffirm its waiver of each and every one of the defenses to such obligations as set forth in any such guaranties or other agreements and reaffirm that its obligations under such guaranties and other agreements are separate and distinct from each Borrower's and each other guarantor's obligations and shall continue in full force and effect notwithstanding the execution of such closing documentation or the consummation of the transactions contemplated thereby (and notwithstanding the fact that Thomas K. Peck, W. Todd Jensen, John F. McNaughton and Michael J. Jones shall not have provided such a consent and reaffirmation). Notwithstanding the fact that Thomas K. Peck, W. Todd Jensen, John F. McNaughton and Michael J. Jones shall not be required to provide such a consent and reaffirmation, none of the terms and provisions hereof or of any such closing documentation or the transactions contemplated hereby or thereby is intended to (nor shall it) limit, impair, terminate or revoke any of the obligations of Thomas K. Peck, W. Todd Jensen, John F. McNaughton or Michael J. Jones (or any other guarantor) under any guaranties or other agreements executed by any such person and such obligations shall continue in full force and effect in accordance with the terms and provisions thereof.

**Lenders:**     Wells Fargo Bank, National Association ("Wells Fargo") and Wachovia Bank, National Association ("Wachovia" and, together with Wells Fargo, each a "Lender" and collectively, the "Lenders").

**Facility:**     Extension and modification of (a) the five (5) existing senior secured construction/standing loans made by Wells Fargo to the above-described Wells Fargo Borrowers (each, a "Wells Fargo Facility" or a "Wells Fargo Loan" and, collectively, the "Wells Fargo Facilities" or the "Wells Fargo Loans"), and (b) the three (3) existing senior secured construction/standing loans made by Wachovia to the above-described Wachovia Borrowers (each, a "Wachovia Facility" or a "Wachovia Loan" and, collectively, the "Wachovia Facilities" or the "Wachovia Loans" and, together with the Wells Fargo Loans and



## Lauth Investment Properties, LLC

### *Modification and Extension of Existing Financing*

Wells Fargo Facilities, each, a "<u>Loan</u>" or a "<u>Facility</u>" and, collectively, the "<u>Loans</u>" or the "<u>Facilities</u>"). This Summary of Terms and Conditions and the Loans referred to herein shall not include (1) the existing loan from Wells Fargo and Regions Bank to Corporate Plaza Partners, LLC, an affiliate of Borrowers (loan number 104462) (the "<u>Corporate Plaza Partners Loan</u>"), or (2) the existing loan from Wells Fargo to MCP Partners Two, LLC, an affiliate of Borrowers (the "<u>MCP Two Loan</u>").

**Purpose:**   Extend and modify the eight (8) existing senior secured construction/standing loans made by Lenders to the above-described Borrowers.

**Facility Amount:**   The new aggregate loan commitment will be approximately $99.4 million, with an estimated outstanding balance at Closing of $86.9 million, each to be allocated on a Loan by Loan basis as set forth below or as otherwise determined by Lenders. See Exhibit A for an expected line item breakdown for unfunded commitments, which are subject to change based upon Lender's credit review and approval process in Lender's sole discretion.

| Borrower | Existing Commitment | Existing Outstanding | Proposed Commitment | Proposed Outstanding |
|---|---|---|---|---|
| Virginia Beach | $11,635,488 | $11,514,542 | $11,635,488 | $11,514,542 |
| MCP Three | $16,306,035 | $15,581,113 | $15,959,109 | $15,581,113 |
| Brownsburg | $17,176,719 | $16,753,985 | $17,176,719 | $16,753,985 |
| Middleburg | $12,800,000 | $9,616,106 | $12,800,000 | $9,616,106 |
| Meridian | $13,573,955 | $8,816,475 | $13,573,903 | $8,816,475 |
| Brier One | $10,650,878 | $10,074,623 | $10,400,878 | $10,044,623 |
| Brier Two | $10,264,795 | $7,111,630 | $10,082,599 | $7,087,140 |
| Moores Chapel | $7,833,500 | $7,561,156 | $7,804,400 | $7,532,056 |
| Total | $100,241,370 | $87,029,630 | $99,433,096 | $86,946,040 |

The above amounts and the amounts on Exhibit A assume no additional funds are advanced by the Lenders prior to the date of any closing of the transactions contemplated hereunder. Notwithstanding anything to the contrary set forth herein, if any Lender makes any advance of loan proceeds, any protective advance or any other



**Lauth Investment Properties, LLC**

*Modification and Extension of Existing Financing*

advance to or for the benefit of any Borrower after the date hereof (pursuant to any side letter entered into between any applicable Lender and any applicable Borrower or otherwise), the above amounts and the amounts on Exhibit A shall be adjusted accordingly in a manner acceptable to Lenders in their sole discretion, all as expressly set forth in the final documentation entered into in connection with any closing of the transactions contemplated hereunder. Upon written request of the applicable Borrowers, Lenders would be reasonable in determining whether or not to consent to requested reallocations from one line item (where the applicable Borrower has demonstrated a cost savings) in any particular Loan budget to other line items (including reallocations to the interest line item) in the budget for the same Loan (but not to line items in budgets for other Loans); provided, however, that (subject to the terms of the "Tenant Improvement and Leasing Commission Account" section below) in no event would amounts allocated to (a) the tenant improvement line item, (b) the leasing commission line item, or (c) the interest line item, for any Loan be reallocated to any other line item in the budget for that Loan or to the budget for any other Loan.

**Tenant Improvement and Leasing Commission Account:**

At Closing, Wells Fargo Borrowers to deposit an aggregate amount equal to $4,157,419 in one or more Wells Fargo disbursement accounts for the purpose of funding additional tenant improvement work and leasing commissions at the properties securing the Wells Fargo Loans (each, a "Wells Fargo Project" and, collectively, the "Wells Fargo Projects"), such amount to be allocated on a Wells Fargo Loan by Wells Fargo Loan basis as set forth on Exhibit A. At Closing, Wachovia Borrowers to deposit an aggregate amount equal to $1,244,554 in one or more Wells Fargo disbursement accounts for the purpose of funding additional tenant improvement work and leasing commissions at the properties securing the Wachovia Loans (each, a "Wachovia Project" and, collectively, the "Wachovia Projects" and, together with the Wells Fargo Projects, each, a "Project" and, collectively, the "Projects"), such amount to be allocated on a Wachovia Loan by Wachovia Loan basis as set forth on Exhibit A. The account(s) shall bear interest at a rate established by Wells Fargo, which may not be the highest rate then available. Borrowers shall execute such documentation with respect to such account(s) as Lenders shall reasonably require. The funds so deposited therein (and all interest thereon) shall (a) in the case of the funds deposited by the Wells Fargo Borrowers, constitute additional security first, for the Wells Fargo Borrowers' performance under the loan documents with respect to all of the Wells Fargo Loans until such time as all of the Wells Fargo Loans have been paid in full and, then for the Wachovia Borrowers' performance under the loan documents with



*CONFIDENTIAL*

respect to all of the Wachovia Loans until paid in full, and (b) in the case of the funds deposited by the Wachovia Borrowers, constitute additional security first, for the Wachovia Borrowers' performance under the loan documents with respect to all of the Wachovia Loans until such time as all of the Wachovia Loans have been paid in full and, then for the Wells Fargo Borrowers' performance under the loan documents with respect to all of the Wells Fargo Loans until paid in full. The funds so deposited shall be disbursed (prior to any disbursement of loan proceeds, if any, available for such purpose) to pay the costs of such tenant improvements and leasing commissions at each applicable Project (subject to availability and other limitations set forth below), upon satisfaction of the same conditions as would be applicable to the disbursement of Loan proceeds for payment of such tenant improvement work and leasing commissions, as applicable (in either case to the same extent as if the applicable Borrower were requesting an advance of Loan proceeds for such purpose, any such requests for disbursement to be made concurrently with a monthly draw request for proceeds of the applicable Loan); provided, however, that (a) upon written request of the applicable Borrowers, Lenders will be reasonable in determining whether or not to consent to requested transfers of dollar amounts deposited in a disbursement account with respect to one Loan into a disbursement account with respect to another Loan from the same Lender (i.e. from the account for one Wells Fargo Loan to the account for another Wells Fargo Loan or from the account for one Wachovia Loan to the account for another Wachovia Loan, but not from an account for a Wells Fargo Loan to an account for a Wachovia Loan or vice versa) or, if amounts for different Loans are held in the same account, to reallocate such funds from one such Loan to another such Loan (i.e. reallocate from one Wells Fargo Loan to another Wells Fargo Loan or from one Wachovia Loan to another Wachovia Loan, but not from a Wells Fargo Loan to a Wachovia Loan or vice versa) and, upon any such transfer or reallocation, to be used to pay for costs of tenant improvements and leasing commissions at the Project relating to the Loan to which such amounts have been so transferred or reallocated in the same manner as if such dollar amounts had originally been deposited in such account and allocated to such Loan (provided, however, in no event shall Loan dollars be reallocated from one Loan to another Loan), and (b) in no event shall any Borrower be entitled to a disbursement of such funds to pay for tenant improvements and leasing commissions at its Project in an aggregate amount in excess of the portion of such total as has been allocated to such Borrower's Loan as set forth on Exhibit A (as such amount shall be increased or decreased as a result of any such transfers or reallocations, as contemplated above), and (c) unless the applicable Lender otherwise consents in writing, in no event shall any Borrower be entitled to a disbursement of such amounts for any particular tenant improvements or leasing



## Lauth Investment Properties, LLC

### *Modification and Extension of Existing Financing*

commissions in an amount in excess of the following per square foot maximum amounts for tenant improvements:

| Project | Maximum TI PSF Amount |
|---|---|
| MCP Three | $30 |
| Meridian | $50 |
| Middleburg | $45 |
| Virginia Beach | $60 |
| Brownsburg | $31 |
| Moores Chapel | $25 |
| Brier One | $50 |
| Brier Two | $50 |

or in an amount in excess of the following per square foot maximum amounts for leasing commissions:

| Project | Maximum LC PSF Amount |
|---|---|
| MCP Three | $12 |
| Meridian | $10.25 |
| Middleburg | $13.50 |
| Virginia Beach | $13 |
| Brownsburg | $6 |
| Moores Chapel | $6.25 |
| Brier One | $11 |
| Brier Two | $10.50 |

Notwithstanding the foregoing but subject to the last sentence in this paragraph, any applicable Borrower shall (upon satisfaction of the conditions contemplated above) be permitted to obtain disbursements from funds deposited by Borrowers pursuant hereto (but not Loan proceeds) for tenant improvements or leasing commissions in excess of the foregoing per square foot limitations for any applicable lease if (and only to the extent that) the applicable Lender has previously agreed in writing, pursuant to any consent letter or other side letter or agreement entered into in writing between any applicable Lender and any applicable Borrower, to disburse funds for payment of such amounts in amounts greater than such per square foot limitations for the applicable lease (all as expressly set forth in the final documentation entered into in connection with any closing of the transactions contemplated hereunder). Notwithstanding anything to the contrary contained herein: (A) amounts deposited by Borrowers for tenant improvements and leasing commissions as contemplated above (and Loan funds allocated to tenant improvement or leasing commission line items) shall be used only for tenant improvements on,



*CONFIDENTIAL*

## Lauth Investment Properties, LLC

### *Modification and Extension of Existing Financing*

and leasing commissions under leases with respect to, so-called "first generation" space (i.e. space that has not previously been leased or had tenant improvements constructed therein); (B) nothing contained herein shall permit any Borrower to enter into any lease except as permitted by, and in accordance with, the terms of the existing loan documentation; and (C) in the event of a release of any Project as contemplated in the "Release Prices" section below, Borrowers shall not be entitled to a return of any portion of any remaining amounts deposited by Borrowers for tenant improvements and leasing commissions with respect to such Project as contemplated above and the applicable Lender shall have the right to transfer any such remaining amounts into one or more disbursement accounts for other Loans from the same Lender in such order and amounts as the applicable Lender shall elect in its sole discretion, such amounts to continue to constitute additional security and to be retained or disbursed for such other Loans in accordance herewith (or if all Loans of such Lender have been repaid in full, to one or more disbursement accounts for other Loans from the other Lender in such order and amounts as the applicable Lender shall elect in its sole discretion and, in such case, to continue to constitute additional security for such Loans and to be retained or disbursed for such other Loans in accordance herewith) or to reallocate such funds from such Loan to one or more other Loans from the same Lender in such order and amounts as the applicable Lender shall elect in its sole discretion, such amounts to continue to constitute additional security and to be retained or disbursed for such other Loans in accordance herewith (or if all Loans of such Lender have been repaid in full, to one or more Loans from the other Lender in such order and amounts as the applicable Lender shall elect in its sole discretion and, in such case, to continue to constitute additional security for such Loans and to be retained or disbursed for such other Loans in accordance herewith).  In addition, notwithstanding anything to the contrary contained herein or in any of the existing loan documentation: (X) to the extent that any Lender may have previously agreed, pursuant to any consent letter, any side letter entered into between any applicable Lender and any applicable Borrower or otherwise, to fund the costs of any tenant improvements or leasing commissions at any applicable Project, as a protective advance, disbursement of Loan proceeds or otherwise, in amounts that would exceed the available Loan dollars otherwise available under the applicable loan documents for such items (in the absence of such agreement), the parties hereby agree that such prior agreement shall be superseded by the terms hereof and that such Lender shall have no obligation to advance or pay any such amounts except out of funds deposited with the applicable Lender by Borrowers as contemplated above and then, only in the event such funds are then available for such purposes, and the applicable Borrower is entitled to disbursement of such amounts for such purposes, as contemplated above; and (Y) subject to the



**Lauth Investment Properties, LLC**

*Modification and Extension of Existing Financing*

provisions of clause (X) above, the terms of any consent letter, any other side letter and any other agreement relating to any lease or lease letter of intent previously executed by either Lender shall be incorporated into and superseded by the final documentation entered into in connection with any closing of the transactions contemplated hereunder.

**Funding of Prior Draw Requests:**

In connection with any closing of the transactions contemplated hereunder, Wells Fargo will fund portions of certain draw requests previously requested by certain Wells Fargo Borrowers but not funded by Wells Fargo because Wells Fargo was not required to fund such draws at such time (to reimburse the applicable Wells Fargo Borrowers to the extent they have previously paid the costs to which the requested draws related out of such Wells Fargo Borrowers' own funds), provided such Wells Fargo Borrowers shall provide Wells Fargo with evidence reasonably acceptable to Wells Fargo of payment of such costs and shall satisfy all of the terms and conditions with respect to such draws set forth in the applicable loan documents as the same shall be amended in connection with such closing. Amounts to be funded by Wells Fargo shall not include reimbursement for any interest or principal payments made by any applicable Borrower and shall, in all cases, be (a) subject to final Wells Fargo credit approval and satisfaction of the conditions set forth above, (b) limited to those specific items listed on Exhibit C attached hereto and incorporated herein (and any other amounts approved by Lenders in their sole discretion), and (c) shall be specifically itemized in the documentation executed in connection with any such closing.

**Income Cross-Collateralization:**

To the extent that the unfunded commitment amounts contemplated above do not include an interest reserve for any particular Loan (as set forth on Exhibit A) and to the extent interest on any Loan that does include an interest line item may exceed the available interest line item for such Loan, the applicable Borrowers will not be able to draw on any other Loan proceeds to pay interest on any of the Loans unless (and then only to the extent that) the applicable Lender otherwise agrees to permit a reallocation of budget dollars from a different line item (where the applicable Borrower has demonstrated a cost savings) to the interest line item, in its reasonable discretion as contemplated above. Wells Fargo Borrowers will first use available net cash flow from all of the Wells Fargo Projects (and then use all available net cash flow from all of the Wachovia Projects, if any such net cash flow remains after paying interest on all Wachovia Loans) for paying interest on all Wells



## Lauth Investment Properties, LLC

*Modification and Extension of Existing Financing*

Fargo Loans before being entitled to use any available interest line item for any applicable Wells Fargo Loan for paying such interest. Wachovia Borrowers will first use available net cash flow from all of the Wachovia Projects (and then use all available net cash flow from all of the Wells Fargo Projects, if any such net cash flow remains after paying interest on all Wells Fargo Loans) for paying interest on all Wachovia Loans before being entitled to use any available interest line item for any applicable Wachovia Loan for paying such interest.

**Security:** All five (5) Wells Fargo Loans shall be cross-collateralized and cross-defaulted with each other in a manner acceptable to Lenders. All three (3) Wachovia Loans shall be cross-collateralized and cross-defaulted with each other in a manner acceptable to Lenders. In addition, the five (5) Wells Fargo Loans and the three (3) Wachovia Loans shall be further cross-collateralized and cross-defaulted with each other such that: (a) the Wells Fargo Projects shall also secure the three (3) Wachovia Loans, all in a manner acceptable to Lenders, subject to such intercreditor arrangements as Lenders shall agree upon and which shall, unless otherwise agreed by Lenders in their sole discretion, provide, in any event, that Wachovia shall not be entitled to receive any proceeds of the Wells Fargo Projects to satisfy any obligations under the Wachovia Loans until such time as the five (5) Wells Fargo Loans and all related obligations have been paid in full; and (b) the Wachovia Projects shall also secure the five (5) Wells Fargo Loans, all in a manner acceptable to Lenders, subject to such intercreditor arrangements as Lenders shall agree upon and which shall, unless otherwise agreed by Lenders in their sole discretion, provide, in any event, that Wells Fargo shall not be entitled to receive any proceeds of the Wachovia Projects to satisfy any obligations under the Wells Fargo Loans until such time as the three (3) Wachovia Loans and all related obligations have been paid in full.

Lenders' obligation to close any transaction contemplated hereunder is expressly conditioned upon Lenders' approval, in their sole discretion, of the manner and method of the cross-collateralization contemplated herein.

The Facilities and all related obligations (including, without limitation, all obligations of Borrowers under any swap or other interest rate protection transactions between Wells Fargo and any Borrower) shall be (or continue to be) secured by: (i) individual first mortgages, or in the case of Virginia Beach a first leasehold mortgage, on the Projects; (ii) a collateral assignment of all present and future leases and rents; (iii) a collateral assignment of all reciprocal easement agreements, architectural and construction related contracts, permits, and licenses; (iv) other customary security documentation as required by Lenders



**Lauth Investment Properties, LLC**

*Modification and Extension of Existing Financing*

and their counsel; and (v) in each case, such additional mortgages or deeds of trust and other security documents as Lenders shall require to accomplish the cross-collateralization and cross-defaulting contemplated above, all in form and substance and in such order of priority, as Lenders shall require. Subordinate financing or third party guarantee obligations secured by any Project shall not be permitted. No transfer of any equity interest in any Project shall be permitted without prior written consent by Lenders, subject to the "Release Prices" section below and without limiting such permitted transfers of direct or indirect interests in the Borrowers as may be set forth in the documentation executed in connection with any closing of the transactions contemplated hereunder (as contemplated in the "Borrowers" section above).

The Lenders' first lien positions and the liens granted in connection with any cross-collateralization contemplated above shall be insured by ALTA Lender's policies of title insurance (and date-down, modification, tie-in and such other endorsements to Lender's existing mortgagee's title insurance policies as Lenders shall require), subject only to such permitted exceptions as Lenders may approve, from a title company and in an amount acceptable to Lenders. The Borrowers and Guarantors shall execute such modifications to existing loan documents and such new documents as Lenders shall require (including, without limitation, second and third mortgages, if required by Lenders) in order to accomplish the modifications and extensions contemplated hereunder including, without limitation, the cross-collateralization and cross-defaulting contemplated above.

**Loan Term:**  The term of each of the Loans shall be extended to June 29, 2012, with one (1) one-year extension option to be exercised, if at all, by written notice to Lenders not more than ninety (90) and not less than thirty (30) days prior to June 29, 2012 and provided that (a) no Event of Default (or event or condition which, with the giving of notice or passage of time or both, would constitute an Event of Default) with respect to any Loan shall have occurred and be continuing as of the date of such notice or as of June 29, 2012, (b) Lenders have received Appraisals (obtained by Lenders at Borrowers' expense and dated not less than 30 days prior to June 29, 2012) of each Project in form and substance reasonably acceptable to Lenders, (c) to the extent the aggregate Loan-to-As-Is-Value Percentage (as such term shall be defined in the final documentation entered into in connection with any closing of the transactions contemplated hereunder) of the Wells Fargo Loans is greater than ninety-six percent (96%), based upon such Appraisals, Borrowers shall, on or before June 29, 2012, repay the principal of the Wells Fargo Loans by the aggregate amount necessary for the Wells Fargo Loans, in the aggregate, to satisfy a



*CONFIDENTIAL*

## Lauth Investment Properties, LLC

*Modification and Extension of Existing Financing*

Loan-to-As-Is-Value Percentage requirement of not more than ninety-six percent (96%) (with such principal repayment to be applied to the Wells Fargo Loans on a pro rata basis in accordance with their respective then outstanding principal amounts), (d) to the extent the aggregate Loan-to-As-Is-Value Percentage of the Wachovia Loans is greater than ninety-six percent (96%), based upon such Appraisals, Borrowers shall, on or before June 29, 2012, repay the principal of the Wachovia Loans by the aggregate amount necessary for the Wachovia Loans, in the aggregate, to satisfy a Loan-to-As-Is-Value Percentage requirement of not more than ninety-six percent (96%) (with such principal repayment to be applied to the Wachovia Loans on a pro rata basis in accordance with their respective then outstanding principal amounts), and (e) Borrowers shall execute or cause the execution of all documents reasonably required by Lenders to effectuate the extension option and shall deliver to Lenders, at Borrower's sole cost and expense, such title insurance endorsements as may be reasonably required by Lenders.   All other extension options for any of the Loans shall become null and void and Borrowers shall have no further rights with respect to the same.

| | |
|---|---|
| **Interest Rate:** | The interest rate for the Facilities shall be 0.50% higher than the interest rate otherwise applicable under existing documentation (e.g. if the current documentation would provide for in interest rate of LIBOR plus 1.75%, the interest rate will be LIBOR plus 2.25%) except that (a) Borrowers shall not be entitled to elect (and, unless the applicable Lender so elects, no Loan will bear interest at) an interest rate based upon the base rate, prime rate or any other rate other than LIBOR (provided, however, that the foregoing shall not entitle Lenders to elect an interest rate based upon the base rate, prime rate or any other rate other than LIBOR unless the loan documents would otherwise permit or require an interest rate based upon same in the absence of the modification transaction contemplated hereunder), and (b) the Borrowers shall not be entitled to any future reduction in the interest rate otherwise contemplated under the current loan documentation (e.g. a reduction of the applicable margin upon the occurrence of the "Reduction Date" (as defined in any applicable existing documentation)).   Borrowers under any Loans that (a) have matured prior to the date of the loan modification, or (b) are otherwise in default prior to the date of the loan modification, shall pay interest for the period from the maturity date or the date of such default, as applicable, to the date of the loan modification, at the rate calculated herein and not at the default interest rate; provided, however, that the foregoing shall in no event operate to relieve any such Borrower of any obligation to pay the default rate thereafter if and when otherwise required by the loan documents, as the same may be modified pursuant hereto.   It shall be a condition precedent to the closing of any |



***CONFIDENTIAL***

**Lauth Investment Properties, LLC**

*Modification and Extension of Existing Financing*

of the transactions contemplated hereby that all unpaid interest (calculated as provided above, where applicable) and other amounts due and owing under any of the Loans on or before the closing date, be paid by Borrowers on the closing date.

**Modification Fee:** 0.1875% of the aggregate loan commitment, whether funded or unfunded, payable at Closing.

**Prepayment:** The Facilities may be repaid in full or in part at any time without payment of any penalty or premium, but subject to payment of any breakage, termination or other fees or expenses provided for under the current loan documentation with respect to repayment of loans bearing interest at a rate based upon LIBOR and payment of any termination fees or other payments required under existing documentation evidencing any swap agreements.

**Tax Service Contracts:** Lenders may obtain tax service contracts for each of the Projects at closing at Borrowers' expense. The estimated cost of such contracts is currently expected to be a one-time cost of approximately $240 per Project.

**Management Agreements:** Borrowers shall provide Lenders with true and correct copies of all property or asset management agreements or similar agreements relating to the management or operation of any of the Projects. Lenders' approval of such agreements, and any manager(s) thereunder, shall be a condition to any closing of any of the transactions contemplated hereunder. In connection with any closing hereunder, any such property managers will subordinate all of their rights under their management agreements to Lenders' liens on the Projects and all of Lenders' rights with respect to the Projects. The documents executed in connection with the transactions contemplated hereunder shall provide that Lenders may (or may cause the Borrowers to) terminate and replace any manager with an independent third-party property manager if (1) an event of default occurs under the Loan, (2) the manager is in default of its obligations under the management agreement(s), or (3) the manager becomes insolvent or the subject of any bankruptcy proceeding. Borrowers shall execute a collateral assignment of all management agreements in form and substance reasonably acceptable to Lenders which shall, among other terms, limit management fees for any Project to the lesser of (a) actual management fees, and (b) five percent (5%) of collected gross rental income for the applicable Project.

*CONFIDENTIAL*



**Lauth Investment Properties, LLC**

*Modification and Extension of Existing Financing*

**Release Prices:** Except as otherwise set forth herein below, Borrowers shall have no right to a release of any Project until such time as all of the Facilities and all related obligations (including any swap termination or other similar fees) have been repaid in full. Notwithstanding the foregoing, Borrowers may obtain a release of any Project upon: (a) payment of a release price for the Project equal the greater of (1) 100% of the net proceeds of the sale of the applicable Project (i.e. gross sales price less (i) reasonable and customary costs of sale, (ii) federal, state and local individual income taxes on the sale gain, and (iii) in the case of a sale of a Project owned by a Minority Interest Borrower which, at the applicable time, is owned in part by minority owners of LLC interests that are otherwise unaffiliated with, and unrelated to, any of the Lauth Parties, distribution of net sales proceeds to such minority LLC members, all as shall be specifically set forth in the documentation executed in connection with any closing of the transactions contemplated hereunder), and (2) the release price set forth below for the applicable Project (subject to change based upon Lender's credit review and approval process in Lender's sole discretion):

| Project | Minimum Release Price |
|---|---|
| MCP Three | $22,425,000 |
| Meridian | $20,125,000 |
| Middleburg | $13,800,000 |
| Virginia Beach | $20,010,000 |
| Brownsburg | $17,800,000 |
| Moores Chapel | $9,150,000 |
| Brier One | $13,800,000 |
| Brier Two | $11,760,000; |

and (b) satisfaction of all other conditions to such partial release as shall be set forth in the documents executed in connection with the transactions contemplated herein. Notwithstanding the foregoing, in the case of Brownsburg and Moores Chapel, if, after the date hereof and prior to the date of a release of either such Project in its entirety, the applicable Borrower shall have obtained a partial release of any Outlot at such Project, as hereinafter contemplated, the Minimum Release Price for the remainder of the applicable Project set forth in the table above shall be reduced by the actual amount of any release price paid to the applicable Lender in connection with any such prior release of any such Outlot.

Lenders shall apply all amounts paid by a Borrower in respect of any such release first, to pay amounts outstanding with respect to the applicable Loan to which the sold Project relates until the same are paid in full, second, to pay amounts outstanding with respect to any or



## Lauth Investment Properties, LLC

*Modification and Extension of Existing Financing*

all other Loans from the same Lender to other Borrowers (in such order and amounts as the applicable Lender shall elect in its sole discretion) until all other Loans from the same Lender to other Borrowers are paid in full, and third, to pay amounts outstanding with respect to all other Loans from the other Lender to other Borrowers (in such order and amounts as the applicable Lender shall elect in its sole discretion) until all other Loans from the other Lender to other Borrowers are paid in full.

In addition, Brownsburg may obtain partial releases of Outlots (as defined in the loan documents relating to such Loan) at the Project owned by such Borrower upon: (a) payment of a release price for the applicable Outlot equal the greater of (1) 100% of the net proceeds of the sale of the applicable Outlot (i.e. gross sales price less (i) reasonable and customary costs of sale, and (ii) federal, state and local individual income taxes on the sale gain, all as shall be specifically set forth in the documentation executed in connection with any closing of the transactions contemplated hereunder), and (2) the release price set forth below for the applicable Outlot (subject to change based upon Lender's credit review and approval process in Lender's sole discretion):

| Outlot | Minimum Release Price |
|--------|----------------------|
| Outlot 1 | N/A (sold previously) |
| Outlot 2 | $681,500 |
| Outlot 3 | N/A (sold previously) |
| Outlot 4 | $658,000 |
| Outlot 5 | $802,760; |

and (b) satisfaction of all other conditions to such partial release set forth in the applicable loan documents.

In addition, Moores Chapel may obtain a partial release of the one remaining outlot at the Project owned by such Borrower (which consists of approximately 35,719 square feet) ("Outlot A") upon: (a) payment of a release price for such Outlot A equal the greater of (1) 100% of the net proceeds of the sale of such Outlot A (i.e. gross sales price less (i) reasonable and customary costs of sale, and (ii) federal, state and local individual income taxes on the sale gain, all as shall be specifically set forth in the documentation executed in connection with any closing of the transactions contemplated hereunder), and (2) an amount equal to $500,000 (subject to change based upon Lender's credit review and approval process in Lender's sole discretion); and (b) satisfaction of all other conditions to such partial release as shall



## Lauth Investment Properties, LLC

*Modification and Extension of Existing Financing*

be set forth in the documentation executed in connection with any closing of the transactions contemplated hereunder, which shall be similar to the conditions for releases of Outlots at the Project owned by Brownsburg as set forth in the loan documents relating to the Loan to Brownsburg.

**Amortization:**    None.

**Completion Guarantee:**    The Corporate Guarantors will provide full, joint and several, completion guaranties, without limits on the maximum liability amount of any Corporate Guarantor thereunder. The guaranties and other agreements of the Lauth's Principals and the guaranties and other agreements of all other existing guarantors shall remain in full force and effect as provided in the existing documentation. All such guarantors (other than Thomas K. Peck, W. Todd Jensen, John F. McNaughton and Michael J. Jones) shall, as a condition to any such closing, execute a consent and reaffirmation as contemplated in the "Guarantors" section above.

**Repayment Guarantee:**    The Corporate Guarantors shall unconditionally guarantee, on a joint and several basis, payment and performance in full as and when due of all obligations of Borrowers including, without limitation: (i) repayment of the principal balance of the Facilities, (ii) repayment of all accrued but unpaid interest; (iii) performance by Borrowers of all collateral related maintenance obligations such as the payment of real estate taxes and insurance; (iv) payment of all obligations of Borrowers under any swap or other interest rate protection transactions between any Lender and any Borrower, and (v) payment of all expenses, fees and costs of loan origination, maintenance and collection, if any, without limits on the maximum liability amount of any Corporate Guarantor thereunder. The guaranties and other agreements of the Lauth's Principals and the guaranties and other agreements of all other existing guarantors shall remain in full force and effect as provided in the existing documentation. All such guarantors (other than Thomas K. Peck, W. Todd Jensen, John F. McNaughton and Michael J. Jones) shall, as a condition to any such closing, execute a consent and reaffirmation as contemplated in the "Guarantors" section above.

**Environmental Indemnity:**    As provided in the existing loan documents.



*CONFIDENTIAL*

## Lauth Investment Properties, LLC

### *Modification and Extension of Existing Financing*

**Insurance Requirement:** Borrowers shall at all times maintain insurance policies with respect to the Projects as required under the existing Loan documents.

**Lauth's Principals Financial Covenant:** Lauth's Principals shall maintain compliance, at all times, with the Financial Covenant listed below. Evidence of compliance with the following financial covenant shall be delivered as set forth in the "Reporting Requirements" section below.

- **Lauth's Principals' Minimum Net Liquidity**

  At all times until the payment in full of all of the Loans, Lauth's Principals, in the aggregate, shall maintain (on a consolidated basis), a Net Liquidity (as defined below) of at least One Million Seven Hundred Fifty Thousand Dollars ($1,750,000); provided, however, that upon Borrowers' written request to Lenders from time to time, Lenders shall agree to reduce such required minimum amount by an amount equal to any amount that the Lauth's Principals demonstrate (to Lenders' reasonable satisfaction) has actually been contributed by Lauth's Principals to LIP (or to DIP Lender if the direct or indirect equity interests and/or membership interests in every Borrower are transferred to DIP Lender as contemplated by, and in compliance with, clause (b) of the last paragraph in the "Borrowers" section above) after the date of the closing of the transactions contemplated hereby, which has in turn actually been contributed through any intervening subsidiaries of LIP (or of DIP Lender, if applicable) to any Borrower and has actually been used by such Borrower to pay to, or deposit with, any Lender any amount required to be paid to, or deposited with, such Lender under the loan documents for any applicable Loan, it being acknowledged, however, that (a) in no event shall the amount of any such reduction be more than the actual amount paid to, or deposited with, the applicable Lender by the applicable Borrower, (b) if any amount so deposited with a Lender shall thereafter be returned to the applicable Borrower, then the minimum amount shall be re-increased by the amount so returned, and (c) such minimum required amount shall not be reduced by any amount so contributed to the Borrowers to deposit the amounts required to be deposited under the "Tenant Improvement and Leasing



*CONFIDENTIAL*

**Lauth Investment Properties, LLC**

*Modification and Extension of Existing Financing*

Commission Account" section above. For purposes of this financial covenant, the term "Net Liquidity" shall mean (on a consolidated basis) an amount equal to (a) Liquid Assets (as defined below), less (b) all unsecured debt. For purposes of this financial covenant, the term "Liquid Assets" shall mean (on a consolidated basis) the sum of (i) unrestricted cash and Cash Equivalents (as defined below), (ii) market value of stocks, bonds and all other securities, and (iii) interest-bearing time or demand deposits, certificates of deposit, or other similar banking arrangements with any government securities dealer, bank, trust company, national banking association or other savings institution; provided, however, that (1) in no event shall any assets that are owned jointly, or are held in accounts owned jointly, by the applicable Lauth's Principal and his wife (or any other person) be included as Liquid Assets, (2) in no event shall any assets held in 401(k), IRA or Section 529 College savings accounts be included as Liquid Assets, (3) in no event shall any assets that have been pledged or otherwise encumbered as security for any debt or other obligation be included as Liquid Assets, (4) in no event shall any direct or indirect interest in LIP (or any of its direct or indirect assets) be included as a Liquid Asset, (5) in no event shall any direct or indirect interest in LGI (or any of its direct or indirect assets) be included as a Liquid Asset, and (6) in no event shall any direct or indirect interest in DIP Lender (or any of its direct or indirect assets) be included as a Liquid Asset.

Borrowers and Lauth's Principals shall provide Lenders with evidence of compliance with the foregoing minimum net liquidity covenant on a quarterly basis as contemplated in the "Reporting Requirements" section below.

- **Cash Equivalents**

As used above, the term "Cash Equivalents" means, as at any date, (a) securities issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than twelve months from the date of acquisition, (b) Dollar denominated time deposits and certificates of deposit of (i) any Lender, or (ii) any domestic commercial bank of recognized standing having capital and surplus in excess of $500,000,000, and (c) Investments, classified in accordance with GAAP as current assets, in money market investment programs registered under the



**Lauth Investment Properties, LLC**

*Modification and Extension of Existing Financing*

Investment Company Act of 1940 which are administered by reputable financial institutions having capital of at least $500,000,000 and the portfolios of which are limited to investments of the character described in the foregoing clauses (a) and (b).

Borrowers and each of the Lauth's Principals hereby represent and warrant that (A) Borrowers, Lauth's Principals and Corporate Guarantors have delivered to Lenders current financial statements for each of such Lauth's Principals and Corporate Guarantors (including calculations of Lauth's Principals' current Liquid Assets and Net Liquidity and Corporate Guarantors" current Liquid Assets and Net Liquidity) and that such financial statements are true, correct and complete and fairly present the financial condition of the Lauth's Principals and Corporate Guarantors as of the date thereof, and (B) no material adverse change has occurred in the financial condition of any Lauth's Principal or Corporate Guarantor since the date thereof. Borrowers, Lauth's Principals and Corporate Guarantors shall remake such representation and warranty in the closing documentation.

**Other Covenants:**

The Borrowers and Guarantors (as applicable) shall comply with the following other covenants:

a) No Borrower will make changes to its LLC agreement that would have an adverse affect on its ability to own and operate its properties or to perform under any Loan, without prior written consent of Lenders.

b) The Borrowers or their affiliates must remain as developer of the Projects and as asset manager following completion.

c) Transfer of assets owned by any of the Lauth's Principals is prohibited to the extent any such transfer:

   (1) is for less than reasonably equivalent value; or

   (2) would result in a violation of the financial covenant set forth in the "Lauth's Principals Financial Covenant" section above; or

   (3) is a Non-Arms-Length Transfer (as defined below) of an asset with a value in excess of $500,000, individually; or

   (4) is a Non-Arm's-Length Transfer of an asset the value of which, together with all other assets transferred by the



*CONFIDENTIAL*

## Lauth Investment Properties, LLC

### *Modification and Extension of Existing Financing*

Lauth's Principals after the date of this Summary of Terms and Conditions and all other assets then simultaneously being transferred, is in excess of $1,000,000 in the aggregate.

As used herein, the term "**Non-Arm's-Length Transfer**" means any transfer that is not a transfer made pursuant to a good faith, arm's-length transaction with a person or entity that is unrelated to, and unaffiliated with, any of Lauth's Principals, any Corporate Guarantor, any Borrower or any of their respective subsidiaries or affiliates. Without limiting the foregoing in any respect, the term "**Non-Arm's-Length Transfer**" shall in any event include any transfer, regardless of the value received, to a family member or relative of any of Lauth's Principals, their spouses, parents, siblings, spouses of parents, spouses of siblings, children, spouses of children, grandchildren, or spouses of grandchildren or to a trust or other entity of which any such person is a direct or indirect, current or contingent beneficiary.

Notwithstanding the foregoing, upon Borrowers' written request to Lenders from time to time, Lenders shall agree to permit Non-Arms-Length Transfers in excess of those otherwise permitted by the foregoing clauses (c)(3) and (c)(4) above to the extent (and only to the extent) the Lauth's Principals demonstrate (to Lenders' reasonable satisfaction) that any such Non-Arms-Length Transfer is a contribution of cash by Lauth's Principals to LIP (or to DIP Lender if the direct or indirect equity interests and/or membership interests in every Borrower are transferred to DIP Lender as contemplated by, and in compliance with, clause (b) of the last paragraph in the "Borrowers" section above) after the date of the closing of the transactions contemplated hereby, which has in turn actually been contributed through any intervening subsidiaries of LIP (or of DIP Lender, if applicable) to any Borrower and has actually been used by such Borrower to pay to, or deposit with, any Lender any amount required to be paid to, or deposited with, such Lender under the loan documents for any applicable Loan, it being acknowledged, however, that (A) in no event shall the amount of any such Non-Arms-Length Transfer be more than the actual amount paid to, or deposited with, the applicable Lender by the applicable Borrower, and (B) if any amount so deposited with a Lender shall thereafter be returned to the applicable Borrower, then such amount



*CONFIDENTIAL*

**Lauth Investment Properties, LLC**

*Modification and Extension of Existing Financing*

shall be returned to the applicable Lauth's Principal(s) and the limitations set forth in the foregoing clauses (c)(3) and (c)(4) above shall apply to the same extent as if no consent to such additional Non-Arms-Length Transfer had been given.

d) Any and all debt payable to affiliates shall be fully subordinated to these Facilities.

e) Title shall be free and clear of any liens not acceptable to Lenders, as evidenced by a date-down endorsement to each applicable title insurance policy in connection with each construction draw.

**Reporting Requirements:**     Borrowers and Guarantors (as applicable) shall provide to Lenders the following periodic information:

a) Within 120 days of the end of each party's fiscal year (or calendar year in the case of individuals), financial statements acceptable in form to Lenders, including a balance sheet, an income statement, and a statement of cash flow, together with supporting property and mortgage debt schedules, for LGI, LIP, DIP Lender, each Borrower and each Guarantor. In the case of LIP, such financial statements shall be prepared in accordance with GAAP on a consolidated basis for itself and its subsidiaries and shall be accompanied by (i) an audit report, unqualified as to scope, of a nationally recognized firm of independent public accountants or other independent public accountants reasonably acceptable to Lenders, and (ii) any management letter prepared by said accountants.

b) Within 45 days of the end of each fiscal quarter (or calendar quarter in the case of individuals), including, without limitation, the last fiscal quarter (or calendar quarter) of each such year, Borrowers and Guarantors shall provide a financial covenant compliance certificate (including a calculation of the Liquid Assets and Net Liquidity of Lauth's Principals, together with back-up documentation supporting such calculations acceptable to Lenders which shall in any event include bank statements, broker statements and other independent third-party documentation acceptable to Lenders evidencing the existence of any such Liquid Assets and the applicable party's ownership thereof), all in form and substance acceptable to Lenders.

c) Borrowers shall provide leasing status reports, monthly operating statements and rent rolls shall be provided no later than 10 days after each month end.



*CONFIDENTIAL*

## Lauth Investment Properties, LLC

*Modification and Extension of Existing Financing*

    d) Within 30 days of quarter end, Borrowers shall provide 12-month forward looking cash flow projections in a form acceptable to Wells Fargo.

    e) Such other information (including but not limited to more frequent leasing status updates) as Lenders may require.

**Documentation:** The extension and modification of the Facilities is subject to the preparation, execution, and delivery of documents satisfactory to all parties. Such documents shall contain requirements for disbursements, representations and warranties, covenants, events of default, indemnification, payment of expenses, and such other provisions, terms and conditions normal and customary for loans of this type.

**Events of Default:** Customary, including without limitation, failure to make payments when due, breach of covenants, breach of representations and warranties or guarantees, bankruptcy/insolvency, judgments and attachments with customary limits and grace periods. Without limiting the foregoing, it shall also be an Event of Default under the loan documents if (a) any Lauth's Principal shall transfer any assets owned by such Lauth's Principal in violation of the restrictions set forth in clause (c) of the "Other Covenants" section above, or (b) if any of the obligations of any of the Corporate Guarantors are not fully reinstated, or any of Lenders' contractual rights with respect thereto are altered in any way, in connection with the bankruptcy of the Corporate Guarantors; provided, however, that if (1) the direct or indirect equity interests and/or membership interests in every Borrower is transferred to DIP Lender as contemplated by, and in compliance with, clause (b) of the last paragraph in the "Borrowers" section above, (2) Borrowers provide Lenders with evidence acceptable to Lenders in their sole discretion that one or more of LIP, LIP-D and/or LIP-I has (and will, after the effective date of any plan of reorganization confirmed by the Bankruptcy Court, continue to have) no assets of any value or has been (or will, after the effective date of any plan of reorganization confirmed by the Bankruptcy Court, be) legally dissolved with no assets available for distribution to its equity holders, and (3) DIP Lender provides full, joint and several, repayment and completion guaranties, without limits on the maximum liability amount of DIP Lender thereunder as contemplated above, then, in such event it shall thereafter not constitute an Event of Default under the loan documents if any of the obligations of LIP, LIP-D and/or LIP-I, as applicable, are not fully reinstated, or any of Lenders' contractual rights with respect to the obligations of LIP, LIP-D and/or LIP-I, as applicable, are altered in any way, in connection with the bankruptcy of LIP, LIP-D or LIP-I.



**Lauth Investment Properties, LLC**

*Modification and Extension of Existing Financing*

Any Event of Default under the existing loan documentation resulting solely from the filing of the existing Chapter 11 bankruptcy proceedings with respect to Borrowers, LIP, LIP-D and LIP-I in the United States Bankruptcy Court for the Southern District of Indiana will be waived; provided, however, such waiver shall not apply to any future bankruptcy event with respect to any such entity or any bankruptcy event with respect to any other person or entity.

**General Release of Lender:**

The documentation executed in connection with the extension and modification of the Facilities contemplated hereunder shall contain a full and complete general release from each Borrower and each Guarantor, jointly and severally, and on behalf of itself and each person or other entity (including, without limitation, any former, current, or future employee, officer, agent, attorney, board member, member, manager, shareholder, parent, subsidiary, partnerships, joint venture, other affiliate, spouse, relative, heir, beneficiary, legal representative, creditor, successor or assign) who or that may assert or may attempt to assert any Claim (as defined below) by or otherwise belonging to such party, through such party, or otherwise on behalf of such party (including, without limitation, on any derivative basis) (collectively, the "Borrower Related Parties"), releasing Lenders and each of their former, current, and/or future subsidiaries, parents, partnerships, joint ventures, other affiliates, officers, directors, employees, attorneys, agents (including consultants), assigns, heirs, executors, administrators, legal representatives, predecessors, successors and assigns (collectively, the "Lender Related Parties"), from any and all Claims relating in any manner whatsoever arising from or otherwise relating to: (a) the Loans; (b) the documents executed in connection with any of the Loans or in connection herewith; (c) any transactions contemplated or undertaken thereunder or hereunder; (d) the Projects; (e) any Borrower's or any Guarantor's credit relationship with the Lender; and (f) any related matters; which, in the case of any of the foregoing, has existed at any time on or prior to the Closing Date, including any such Claim which relates or may relate in any manner whatsoever to any facts in existence on or prior to the Closing Date, all as more specifically set forth in the documentation executed in connection with the extension and modification of the Facilities contemplated hereunder.

As used herein, the term "Claims" shall mean, with respect to any party, any and all claims, counterclaims, action or actions, cause or causes of action (including, without limitation, any relating in any manner to any existing litigation or investigation), suits, obligations, controversies, defenses, debts, liens, contracts, agreements,



*CONFIDENTIAL*

**Lauth Investment Properties, LLC**

*Modification and Extension of Existing Financing*

covenants, promises, liabilities, damages, penalties, demands, threats, compensation, losses, costs, judgments, orders, interest, fee or expense (including, without limitation, attorneys' fees and expenses) or similar items of any kind, type, nature, character or description, including, whether in law, equity, or otherwise, whether now known or unknown, whether in contract or in tort, whether choate or inchoate, whether contingent or vested, whether liquidated or unliquidated, whether fixed or unfixed, whether matured or unmatured, whether suspected or unsuspected, and whether or not concealed, sealed, or hidden, of such party or which may be asserted by such party directly or through any other party or otherwise on behalf of itself or any other party (including, without limitation, those which may be asserted on any derivative basis).

**Personal Guarantor Lawsuit:**

Promptly after the closing of the extension and modification of the Facilities contemplated hereunder, the existing lawsuit filed in the United States District Court for the Southern District of Indiana by Lenders against Lauth's Principals, the other individual guarantors and certain transferees and all counterclaims relating thereto (the "Existing Guarantor Lawsuit") shall be amended, without prejudice, to delete any claims thereunder arising out of guaranties delivered in connection with the Facilities being extended and modified and any related counterclaims; provided, however, that the Existing Guarantor Lawsuit may continue with respect to the MCP Two Loan and nothing herein shall prevent Wells Fargo or any other lender thereunder from adding the Corporate Plaza Partners Loan to the Existing Guarantor Lawsuit and/or filing such other actions with respect thereto as they shall deem necessary or appropriate.

In addition, as a condition to the closing of any such extension or modification transaction, either (1) or (2) below would be required:

(1) The guarantors and all transferees shall execute an agreement acceptable to Lenders tolling the running of any statute of limitations or other limitations period with respect to any claims either Lender may have against the guarantors for a period from the date of the filing of the Existing Guarantor Lawsuit until 180 days after the latest outside maturity date of the 8 Loans, as the same may be extended. Such tolling would apply to any and all claims in connection with the guaranties and the Loans, including any fraudulent transfer or other claims of the nature included in the Existing Guarantor Lawsuit. Prior to execution of same, Lenders shall be permitted to engage in depositions and other discovery to the extent necessary to confirm



**Lauth Investment Properties, LLC**

*Modification and Extension of Existing Financing*

that all transferees have been identified and required to execute the tolling agreement; or

(2) In lieu of the tolling agreement and discovery contemplated in item #1 above and in exchange for a release of the repayment guaranties as to those 8 Loans, the guarantors may elect to repay those loans in an aggregate amount equal to $7 million, to be applied as principal repayments on such loans in such order and amounts as the Lenders shall elect. The Borrowers shall remain fully liable with respect to such loans. The aforementioned payment shall be in addition to, and not in lieu of, any other funds otherwise being deposited hereunder by the Borrowers for tenant improvement and leasing commission reserves. The foregoing release of the guarantors shall be effective one day after the expiration of any applicable preference period under the bankruptcy code. In addition, in the event any transfer to any of the Lenders contemplated hereunder is avoided under the bankruptcy code for any reason, all such releases shall be null and void.

**Bankruptcy/ Relief from Automatic Stay:**  The documentation executed in connection with any closing of the transactions contemplated hereunder shall include provisions whereby the Borrowers and guarantors agree that, in the event of any subsequent bankruptcy proceedings after the consummation of any such extension and modification transaction, the Borrowers and guarantors shall consent to any motion seeking relief by either or both Lenders from the automatic stay which shall permit the applicable Lenders to exercise any and all remedies, including foreclosure.

Borrowers acknowledge that the bankruptcy case of each Borrower is a "single asset real estate" case as such term is defined in 11 U.S.C. section 101(51B). Borrowers further acknowledge that the amounts shown in the "Existing Outstanding" column in the chart in the "Facility Amount" section above with respect to Borrowers, plus the amount of any advance of loan proceeds, any protective advance or any other advance to or for the benefit of the applicable Borrower after the date hereof as contemplated in the "Facility Amount" section above, plus all other amounts which may be allowed under applicable law, including but not limited to accrued or unpaid interest (pre-petition and post-petition and including any default interest), fees, expenses, attorney fees and costs, shall be deemed to be Allowed Claims (as defined in the Bankruptcy Code) against each of the respective Borrowers by each applicable Lender in the Borrowers' existing Chapter 11 bankruptcy proceedings, and that there are no offsets, recoupment, defenses, counterclaims, or avoidance claims against such allowed claims, and that Borrowers do not intend to (and shall not) file any objection to such allowed claims nor to seek any form of recharacterization or subordination



## Lauth Investment Properties, LLC

*Modification and Extension of Existing Financing*

of such claims under any theory at law or in equity. Borrowers further acknowledge and agree that, in the event of any sale of the Wells Fargo Projects and/or the Wachovia Projects under section 363, the lien of the applicable Lenders shall attach to all proceeds, and the applicable Lenders shall have the absolute right to credit bid the full amount of its Allowed Claims (or any lesser amount at Lenders' sole discretion) and, if applicable, such sale shall be free from recordation or transfer tax under 11 USC §1146 to the fullest extent permitted by law.

**Conditions to Closing:**

In addition to the conditions listed above, additional conditions to closing shall be those which are usual and customary for transactions of this nature, including but not limited to the following:

a) Receipt, review and approval by Lenders of insurance policies evidencing all insurance required under the existing loan documents, including terrorism insurance (to the extent required under the existing loan documents).

b) Final internal approval of the extension/modification contemplated hereunder by Lenders.

c) Receipt, review and approval by Lenders of estoppels, subordination, non-disturbance and attornment agreements from such tenants at each Project as Lenders shall require, all in form and substance acceptable to Lenders.

d) Bankruptcy Court approval.

e) Other customary closing conditions including due authorization, execution, delivery and enforceability opinions from Borrowers' counsel and applicable entity organizational formation, authority and incumbency documentation.

**Milestone Requirements:**

Borrowers shall comply with the following milestone requirements:

a) On or before February 12, 2010, the Borrowers shall deliver to the Lenders a draft plan of reorganization and disclosure statement for all of the Borrowers that contains plan provisions that are not inconsistent with this Summary of Terms and Conditions and that will permit the execution and consummation of each of the material terms of this Summary of Terms and Conditions, and that in the judgment of the Lenders is



**Lauth Investment Properties, LLC**

*Modification and Extension of Existing Financing*

reasonably likely to be confirmable by the Bankruptcy Court and is in conformity with applicable bankruptcy law.

b) On or before February 22, 2010, the Borrowers shall have filed a plan of reorganization and disclosure statement with the Bankruptcy Court that shall have been previously approved in writing by the Lenders, which consent may be given or withheld in their sole discretion (a "Conforming Plan of Reorganization"), together with a motion (1) seeking to expedite the applicable time periods for approval of a disclosure statement and confirmation of the plan, and (2) requesting provisional authority to solicit conditional acceptances of the plan prior to approval of the disclosure statement.

c) On or before March 31, 2010, the Bankruptcy Court (1) shall have approved the disclosure statement as containing adequate information, and which shall not contain any material financial or operational information which has not been previously disclosed to Lenders, or which does not reflect that the financial condition of the Borrowers and their ability to perform their obligations under this Summary of Terms and Conditions cannot be fulfilled, carried out, or accomplished, and (2) shall have confirmed the Conforming Plan of Reorganization, which shall contain provisions that are not inconsistent with this Summary of Terms and Conditions and will permit the execution and consummation of each of the material terms of this Summary of Terms and Conditions.

d) The Conforming Plan of Reorganization shall have a scheduled effective date not more than 15 days after the date of confirmation.

Borrowers acknowledge that the foregoing milestone requirements are a material inducement to Lenders' willingness to provide this Summary of Terms and Conditions to Borrowers and that, in the absence of Borrowers' agreement to such milestone requirements, Lenders would likely immediately seek to exercise such other rights and remedies available to Lenders as Lenders deem appropriate (including but not limited to the right to seek relief from the automatic stay or to dismiss the pending bankruptcy cases). In the event any of the foregoing milestone requirements are not met, with time being of the essence, or if a trustee is appointed under 11 U.S.C. section 1104, Lenders, in their sole discretion and in addition to any other remedies or rights which Lenders may have, may: (1) elect not to proceed with any of the transactions contemplated hereunder; and/or (2) move to terminate, annul or condition the automatic stay



## Lauth Investment Properties, LLC

### *Modification and Extension of Existing Financing*

and/or to terminate the Borrowers' exclusivity, and Borrowers hereby agree that either or both of such motions can be heard on five calendar days notice and that Borrowers will otherwise cooperate for the purpose of having a highly expedited hearing on either or both of such motions. The Lenders, in their sole discretion, may waive or extend in writing any or all of these milestone requirements.

**Other Plan Terms:**

Among other provisions, the Conforming Plan of Reorganization shall include the following terms acceptable to Lenders in their sole discretion:

a) Exculpation of Lenders for all acts post petition.

b) Deemed allowed claim for all purposes, including credit bidding, without offset, deduction, defense, counterclaim or avoidance.

c) Waiver of any right to surcharge the assets under 506(c).

d) Release by the Borrowers and Guarantors of all claims against Lenders.

e) Terms that reflect the agreement reached on the Existing Guarantor Lawsuit.

**Assignments & Participations:**

Any Lender may assign, pledge, transfer or grant participations in all or any portion of one or more of the Facilities as set forth in the existing documentation; provided, however, that (1) the applicable Lender shall notify Borrowers in advance of the identity of any proposed Assignee Lender (as defined in the existing loan documents), and (2) in no event shall any consent or approval of any Borrower or any Guarantor be required as a condition to any such assignment, pledge, transfer or grant of any participation.

**Expenses:**

Borrowers will reimburse each Lender for all of its reasonable out-of-pocket expenses including, but not limited to, all underwriting costs, legal costs, syndication costs, appraisal report and review, project cost analysis and environmental reports (except that Borrowers shall not be required to reimburse Lenders for legal fees in an amount in excess of $25,000 per Loan, except that the foregoing limitation shall not apply to any legal fees incurred after the closing of the transactions contemplated hereunder to the extent Borrowers are otherwise obligated to reimburse Lenders for same under the loan documents). To the extent any Lender provides any of these services internally, Borrowers will reimburse such Lender for these costs at



**Lauth Investment Properties, LLC**

*Modification and Extension of Existing Financing*

market rates.   Payment by Borrowers of such expenses shall be made regardless of whether the proposed extension and modification of the Facilities closes.   Without limiting the foregoing and notwithstanding anything to the contrary set forth in the loan documents, Borrowers acknowledge and agree that Lenders shall have no obligation to provide Borrowers or Guarantors with copies of any appraisals, analyses, reports or other such information obtained by Lenders in connection with the Loans, whether or not Borrowers are required to reimburse Lenders for the cost thereof.

**Expiration:**    If Wells Fargo does not receive a fully-executed counterpart of this Summary of Terms and Conditions (via electronic mail to steven.r.lowery@wellsfargo.com), duly executed by each Borrower and each Lauth's Principal, by 5:00 p.m. Chicago time on February 19, 2010, this Summary of Terms and Conditions shall expire without further notice.

**Outside Closing Date:**    April 30, 2010.  If the execution of documents extending and modifying the Loans as contemplated hereunder and the closing of the transactions contemplated thereunder (the "Closing") does not occur on or before such date for any reason whatsoever, this Summary of Terms and Conditions shall expire without further notice.

**Confidentiality:**    The terms contained herein are <u>Confidential</u>, and except for disclosure as necessary to your executives, officers and employees, to professional advisors retained by you in connection with this transaction, and/or as may be required by law, the terms hereof should not be disclosed in whole or in part to any other person or entity without the prior written consent of Lenders.  Notwithstanding the foregoing or anything to the contrary contained in any existing documentation, each Lender may: (a) share the terms contained herein and other information in such Lender's possession regarding the Loans, the Borrowers and the Guarantors with the other Lender and the Lenders may have discussions with each other regarding the same in order to facilitate each Lender's consideration, analysis and evaluation of the terms contained herein, and (b) share financial statements and other information in such Lender's possession regarding any Lauth's Principal with any other Lauth's Principal (including, without limitation, any calculations of Liquid Assets and Net Liquidity with respect to any such Lauth's Principal) and the Lenders may have discussions with any such Lauth's Principal regarding the same.   The terms of this section shall survive any expiration or termination of this Summary of Terms and Conditions and any Closing



**CONFIDENTIAL**

## Lauth Investment Properties, LLC

### *Modification and Extension of Existing Financing*

hereunder and, in the event of any such Closing, shall be incorporated into the documentation executed in connection with such Closing.

**Non-binding:**      Notwithstanding anything to the contrary set forth herein, this Summary of Terms and Conditions is non-binding and Lenders and Borrower shall have no obligation to enter into any modification or extension contemplated hereunder unless and until Lenders shall have received internal credit approval of all terms and conditions of same and the parties shall have entered into documentation with respect thereto acceptable to Lenders in their sole discretion.

Without limiting the foregoing, if Borrowers and Lauth's Principals would like Lenders to begin their credit approval process and begin preparation of documentation relating to the proposed modification and extension of the Facilities based upon the terms and conditions set forth in this Summary of Terms and Conditions, Borrowers and Lauth's Principals must execute the enclosed copy of this Summary of Terms and Conditions and return it to Wells Fargo (via electronic mail to steven.r.lowery@wellsfargo.com) no later than 5:00 p.m. Chicago time on February 19, 2010. This Summary of Terms and Conditions and the proposal set forth herein shall terminate at such time unless prior thereto Wells Fargo shall have received a signed copy of this Summary of Terms and Conditions as aforesaid.

*[Signatures begin on next page]*



**CONFIDENTIAL**

**Lauth Investment Properties, LLC**

*Modification and Extension of Existing Financing*

**WELLS FARGO BORROWERS:**

BROWNSBURG STATION PARTNERS, LLC,
an Indiana limited liability company

By: _____
Name: _____Michael S. Curless_____
Title: _____Executive Vice President___

MERIDIAN MEDICAL PARTNERS TWO, LLC
an Indiana limited liability company

By: _____
Name: _____Michael S. Curless_____
Title: _____a Manager_____

MIDDLEBURG HEIGHTS MEDICAL PARTNERS, LLC,
an Indiana limited liability company

By: _____
Name: _____Michael S. Curless_____
Title: _____a Manager_____

VIRGINIA BEACH MEDICAL PARTNERS, LLC,
an Indiana limited liability company

By: _____
Name: _____Michael S. Curless_____
Title: _____a Manager_____

MCP PARTNERS THREE LLC,
an Indiana limited liability company

By: _____
Name: _____Michael S. Curless_____
Title: _____Executive Vice President___

*[Signatures continue on next page]*



## Lauth Investment Properties, LLC

*Modification and Extension of Existing Financing*

**WACHOVIA BORROWERS:**

MOORES CHAPEL PARTNERS, LLC,
an Indiana limited liability company

By: _____
Name: ___Michael S. Curless___
Title: ___Executive Vice President___


BRIER CREEK MEDICAL PARTNERS, LLC,
an Indiana limited liability company

By: _____
Name: ___Michael S. Curless___
Title: ___a Manager___


BRIER CREEK MEDICAL PARTNERS TWO, LLC
an Indiana limited liability company

By: _____
Name: ___Michael S. Curless___
Title: ___a Manager___


*[Signatures continue on next page]*

 WELLS FARGO

*CONFIDENTIAL*

## Lauth Investment Properties, LLC

*Modification and Extension of Existing Financing*

**LAUTH'S PRINCIPALS:**

_____
Robert L. Lauth, Jr.

_____
Gregory C. Gurnik

_____
Lawrence B. Palmer

_____
Michael S. Curless



Page 35 of 38                    **CONFIDENTIAL**

**Lauth Investment Properties, LLC**

*Modification and Extension of Existing Financing*

LAUTH'S PRINCIPALS:

Robert L. Lauth, Jr.

Gregory C. Gurnik

Lawrence B. Palmer

Michael S. Curless

CONFIDENTIAL

## Lauth Investment Properties, LLC

*Modification and Extension of Existing Financing*

**LAUTH'S PRINCIPALS:**

_____
Robert L. Lauth, Jr.

_____
Gregory C. Gurnik

_____
Lawrence B. Palmer

_____
Michael S. Curless

CONFIDENTIAL

WELLS FARGO

**Lauth Investment Properties, LLC**

*Modification and Extension of Existing Financing*

**LAUTH'S PRINCIPALS:**

_____
Robert L. Lauth, Jr.


_____
Gregory C. Gurnik


_____
Lawrence B. Palmer


_____
Michael S. Curless

*CONFIDENTIAL*



CONFIDENTIAL

**EXHIBIT A**

See Attached.

**Lauth Investment Properties, LLC**
*Modification and Extension of Existing Financing*

Exhibit A

## Wells Fargo Loans

| | MCP Partners Three, LLC | Meridian Medical Partners Two, LLC | Middleburg Heights Medical Partners, LLC | Virginia Beach Medical Partners, LLC | Brownsburg Station Partners, LLC | Total |
|---|---|---|---|---|---|---|
| Current Outstanding Loan Balance | $15,581,113 | $8,616,475 | $9,616,106 | $11,514,542 | $16,753,985 | $62,082,221 |
| Proposed Relocation of Interest Payments | | | | | | |
| Proposed New Outstanding Loan Balance | $15,581,113 | $8,616,475 | $9,616,106 | $11,514,542 | $16,753,985 | $62,082,221 |
| Proposed Remaining Commitment Breakdown: | | | | | | |
| Tenant Improvements | $106,872 | $3,634,658 | $2,557,553 | $14,207 | $3,369,148 | $9,382,318 |
| Leasing Commissions | $271,125 | $565,569 | $525,000 | $82,003 | $53,086 | $1,525,314 |
| Engineering | | $525,000 | | $7,205 | | $7,205 |
| Architectural | | $60,848 | $10,466 | $7,500 | | $78,814 |
| Operating Expense | | $17,864 | | | | $17,664 |
| Legal | | | $34,050 | | | $34,050 |
| Development Travel & Misc. | | $23,350 | $2,505 | | | $2,505 |
| Financing Exp. | | $20,350 | $20,350 | | | $43,700 |
| Marketing | | $18,594 | $18,594 | | | $16,594 |
| Appraisal Fee | | $480 | $480 | | | $3,480 |
| Impact Fees | | $1,260 | | | | $1,260 |
| Space Planning | | $21,020 | | | | $21,020 |
| Soft Cost Contingency | | | | | | $0 |
| Earn Out | | | | | | $0 |
| Interest Reserve | | $414,979 | $314,897 | | | $729,876 |
| Operating Reserves | | | | | | $0 |
| Land Acquisition | | | | | | $0 |
| Total Proposed Remaining Commitment | $377,997 | $4,757,429 | $3,183,894 | $120,946 | $422,734 | $8,862,999 |
| Total Proposed Commitment | $15,959,109 | $13,573,903 | $12,800,000 | $11,635,488 | $17,176,719 | $71,145,219 |
| Proforma TI/LC Requirements (1) | | | | | | |
| Tenant Improvements | $670,904 | $4,066,271 | $3,252,128 | $1,359,613 | $269,148 | $9,226,664 |
| Leasing Commissions | $168,016 | $834,298 | $972,550 | $205,638 | $53,586 | $2,233,877 |
| Total | $838,920 | $4,900,569 | $4,224,478 | $1,575,251 | $422,734 | $11,461,947 |
| Required Borrower Equity (TIs / LCs) | | | | | | |
| Tenant Improvement | $564,032 | $431,733 | $994,675 | $1,355,406 | $0 | $3,345,746 |
| Leasing Commissions | $0 | $250,718 | $447,350 | $113,605 | $0 | $811,929 |
| Total | $564,032 | $682,451 | $1,441,925 | $1,469,011 | $0 | $4,157,413 |

## Wachovia Loans

| | Brier Creek I (2) | Brier Creek II | Moores Chapel (3) | Total |
|---|---|---|---|---|
| Current Outstanding Loan Balance | $10,074,623 | $7,111,630 | $7,561,156 | $24,747,409 |
| Proposed Relocation of Interest Payments | $30,000 | $24,490 | $29,100 | $83,590 |
| Proposed New Outstanding Loan Balance | $10,044,623 | $7,087,140 | $7,532,056 | $24,663,819 |
| Proposed Remaining Commitment Breakdown: | | | | |
| Tenant Improvements | $2,250,000 | | $153,564 | $2,403,564 |
| Leasing Commissions | $80,792 | $527,015 | $89,144 | $696,951 |
| Engineering | | | | |
| Architectural | | | $5,048 | $11,582 |
| Operating Expense | | | | |
| Legal | | $12,139 | $7,860 | $19,999 |
| Development Travel & Misc. | | | | |
| Financing Exp. | | | | |
| Marketing | | | | |
| Appraisal Fee | $3,000 | | | $3,000 |
| Impact Fees | | $50,269 | | $50,269 |
| Space Planning | | $5,922 | | $38,808 |
| Soft Cost Contingency | $113,565 | $102,883 | $110,488 | $326,946 |
| Earn Out | | $28,096 | | $28,096 |
| Interest Reserve | | $69,804 | | $69,804 |
| Operating Reserves | | | | |
| Land Acquisition | | | | $0 |
| Total Proposed Remaining Commitment | $356,255 | $2,995,459 | $272,343 | $3,624,057 |
| Total Proposed Commitment | $10,400,878 | $10,082,599 | $7,804,399 | $28,287,876 |
| Proforma TI/LC Requirements (1) | | | | |
| Tenant Improvements | $650,469 | $2,528,063 | $359,425 | $3,537,947 |
| Leasing Commissions | $146,077 | $569,393 | $91,653 | $807,122 |
| Total | $796,546 | $3,097,446 | $451,078 | $4,345,069 |
| Required Borrower Equity (TIs / LCs) | | | | |
| Tenant Improvement | $498,905 | $278,053 | $359,425 | $1,134,383 |
| Leasing Commissions | $65,285 | $42,378 | $2,509 | $110,171 |
| Total | $592,190 | $320,431 | $361,934 | $1,244,554 |

**Lauth Investment Properties, LLC**

*Modification and Extension of Existing*

*Financing*

Exhibit B

Organizational Structure Charts

See attached.

**Lauth Corporate Structure**
Wells Fargo Bank

See Exhibit A – Owners

**Lauth Group, Inc.**

Managing Member

**Lauth Investment Management, LLC**

2.84%

Sole Member

**Lauth Properties, LLC**

See Exhibit B – Owners

0.70%

**Lauth Investment Properties, LLC**

100%

96.46%

DIP Loan Guarantor

See Exhibit C – Non-Managing Members

**Non-Managing Members**

MCP Associates Two, LLC

Sole Manager 85%

**MCP Partners Two, LLC**

15%

**WI Properties, LLC**

$250 Million Preferred Units

**Inland American Real Estate Trust, Inc.**

**Inland American (LIP) Sub, LLC**

100%

5%

$3 Million Common Units

**LIP Holdings, LLC**

**Board of Managers:**
1. Robert L. Lauth, Jr.
2. Michael S. Curless
3. Tom McGuiness
4. Lori J. Foist
5. Michael E. Podboy

MCP Partners Three, LLC

Inland American Charlotte Lender, LLC

Pledge of Equity

Mezz Loan

Brownsburg Station Partners, LLC

Mezz Loan

Corporate Plaza Partners, LLC

95%

Pledge of Membership Interests in LIP Investment, LLC

100%

**LIP Development, LLC**

Sole Member

DIP Loan Guarantor

**LIP Investment, LLC**

100%

Meridian Medical Partners Two, LLC

Managing Member 100%

**Meridian Medical Associates Two, LLC**

Middleburg Heights Medical Partners, LLC

Managing Member 100%

**Middleburg Heights Medical Associates, LLC**

**Managers:**
1. Robert L. Lauth, Jr.
2. Gregory C. Gurnik
3. Michael S. Curless
4. Lawrence B. Palmer
**General Manager:**
Robert L. Lauth, Jr.

Virginia Beach Medical Partners, LLC

Managing Member 84.14%

**Virginia Beach Medical Associates, LLC**

**Managers:**
1. Robert L. Lauth, Jr.
2. Gregory C. Gurnik
3. Michael S. Curless
4. Lawrence B. Palmer
**General Manager:**
Robert L. Lauth, Jr.

DIP Loan Borrower

DIP Loan Guarantor

DIP Loan

Pledge of Equity

**LIP Lender, LLC**

**Members:**
Robert L. Lauth – 22.42%
Robin Lauth – 22.42%
Gregory G. Gurnik – 22.41%
Julie Gurnik – 22.42%
Lawrence B. Palmer – 8.00%
Pam Palmer – 2.00%
Michael S. Curless – 0.27%
Nancy Curless –0.07%

**Managers:**
1. Robert L. Lauth, Jr.
2. Gregory C. Gurnik
3. Michael S. Curless
4. Lawrence B. Palmer
**General Manager:**
Robert L. Lauth, Jr.

13.03%

Pain Stream – Deposit Medical Center, Inc.

1.28%

Mid-Atlantic Dermatology Center P.C.

0.72%

Atlantic Urology, LLC

0.89%

Virginia Beach Medical Center for Right, LLC



# Lauth Corporate Structure
## Wachovia Bank

## EXHIBIT A
## Lauth Group, Inc. Ownership

| | |
|---|---|
| Robert L. Lauth | 57.00% |
| Gregory C. Gurnik | 23.75% |
| Lawrence B. Palmer | 14.25% |
| Michael S. Curless | 5.00% |

### EXHIBIT B
### Lauth Properties, LLC Ownership

| | |
|---|---|
| Robert L. Lauth | 42.225% |
| Gregory C. Gurnik | 42.225% |
| Lawrence B. Palmer | 15.550% |

EXHIBIT C
LIP Ownership (1/1/10)

| Unitholder/Member | Series A Preferred Units | % Interest | Class A Common Units | % Interest | Total Performance Common Units | % Interest | Total Common and Performance Common Units | % Interest |
|---|---|---|---|---|---|---|---|---|
| Lauth Investment Management, LLC | 720,744 | 29.27% | 158,889 | 1.50% | 377,222 | 4.54% | 536,111 | 2.84% |
| Lauth Properties, LLC | 0 | 0.00% | 132,841 | 1.25% | 0 | 0.00% | 132,841 | 0.70% |
| Robert L. Lauth | 675,047 | 27.42% | 4,053,383 | 38.26% | 3,185,424 | 38.29% | 7,238,807 | 38.27% |
| Gregory C. Gurnik | 662,919 | 26.92% | 4,035,890 | 38.09% | 3,153,257 | 37.91% | 7,189,147 | 38.01% |
| Lawrence B. Palmer | 267,214 | 10.85% | 927,897 | 8.76% | 377,221 | 4.54% | 1,305,118 | 6.90% |
| Michael S. Curless | 136,289 | 5.54% | 1,285,826 | 12.14% | 1,225,238 | 14.73% | 2,511,064 | 13.28% |
| **Total** | 2,462,213 | 100.00% | 10,594,726 | 100.00% | 8,318,362 | 100.00% | 18,913,088 | 100.00% |

**Lauth Investment Properties, LLC**

*Modification and Extension of Existing*

*Financing*

Exhibit C

List of Prior Draw Requests to be Funded at Closing

Leasing commissions paid by the following Borrowers with respect to leases with the following tenants and in the following amounts*:

**Virginia Beach (Norfolk Eye Physicians and Surgeons, Ltd. lease)**
Leasing Commissions        -        $23,861.52

**Brier One (Shanahan Rheumatology and Immunotherapy lease)**
Leasing Commissions        -        $20,119.40

**Moores Chapel (Tri Duc Nguyen dba M Nails lease)**:
Leasing Commissions        -        $6,555.60


**TOTAL:**                        **$50,536.52**


*Nothing contained herein shall constitute a consent to any lease unless and until any such consent shall have been delivered in accordance with the applicable loan documents.