**SO ORDERED: September 03, 2010.**



**Basil H. Lorch III**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LAUTH INVESTMENT PROPERTIES, LLC, et al.,[1] | ) 09-06065-BHL-11 |
| | ) |
| Debtors. | ) (Jointly Administered) |

**FINAL ORDER UNDER 11 U.S.C. §§ 105, 361, 362, 363 AND 364 AND FED. R. BANKR. P. 2002, 4001 AND 9014 AUTHORIZING DEBTORS TO OBTAIN INCREASED POSTPETITION FINANCING BY APPROVAL OF PROPOSED MODIFICATION TO FIRST DIP FACILITY AND APPROVAL OF SECOND DIP FACILITY**

THIS MATTER came before the Court for final hearing on the "Motion Of The

Debtors For Entry Of An Order Authorizing The Debtors To Obtain Increased Postpetition

---

[1] The Debtors in these chapter 11 cases include:  Lauth Investment Properties, LLC (09-06065); LIP Development, LLC (09-06066); LIP Investment, LLC (09-06067); Brier Creek Medical Associates Two, LLC (09-12760); Brier Creek Medical Associates, LLC (09-12761); Brier Creek Medical Partners Two, LLC (09-12762); Brier Creek Medical Partners, LLC (09-12763); Brownsburg Station Partners, LLC (09-12764); MCP Partners Three, LLC (09-12765); Meridian Medical Associates Two, LLC (09-12766); Meridian Medical Partners Two, LLC (09-12767); Middleburg Heights Medical Associates, LLC (09-12768); Middleburg Heights Medical Partners, LLC (09-12769); Moores Chapel Partners, LLC (09-12656); Virginia Beach Medical Associates, LLC (09-12770); Virginia Beach Medical Partners, LLC (09-12771); North Pointe Partners One, LLC (10-06921); and North Pointe Park Partners, LLC (10-06923).

Financing Commitment" [Docket No. 958] (the "Motion")[2] of the above-captioned debtors and

debtors in possession (collectively, the "Debtors") for the entry of interim and final orders under

sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11

of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and Rules 2002,

4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the

Notice of Submission Of Commitment Letter Related To Motion Of The Debtors For Entry Of

An Order Authorizing The Debtors To Obtain Increased Postpetition Financing [Docket No.

1090] (the "Notice of Submission of Commitment Letter"), and the Notice of Submission of

Second DIP Credit and Security Agreement Related to Motion of the Debtors for Entry of an

Order Authorizing the Debtors to Obtain Increased Postpetition Financing [Docket No. 1117]

(the "Notice of Submission of Second DIP Credit Agreement") together seeking:

      1.    approval of a certain Proposed Modification to the First DIP Facility by

which (i) the Interest Reserve provided for in the Court's "Final Order Under 11 U.S.C. §§ 105,

361, 362, 363 and 364 and Fed. R. Bankr. P. 2002, 4001 and 9014 Authorizing Debtors To

Obtain Postpetition Financing" (the "Original DIP Order") is deleted, and (ii) the Original DIP

Credit Agreement is modified to (x) change the definition of the Interest Payment Date (as

defined in the Original DIP Credit Agreement) to become the same as the definition of the

Maturity Date (as defined in the Original DIP Credit Agreement) and (y) provide that previously

accrued and unpaid interest and all further accruing interest under the First DIP Facility be

changed from a current cash payment obligation to a paid-in-kind or "PIK" obligation payable in

cash on the Maturity Date (as amended);

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion, the Notice
of Submission of Commitment Letter, the Notice of Submission of Second DIP Credit Agreement and the Second
DIP Credit Agreement, as applicable.

2.      authorization for the Debtors to enter into and comply with a credit agreement for a Second DIP Facility (the "Second DIP Credit Agreement") and all other Second DIP Loan Documents (as defined below) and approving for the purposes of this Final Second DIP Order (as defined below) the borrowing of up to $5,000,000 under that Second DIP Facility on a committed basis pursuant to the Second Term Note and up to an additional $3,000,000 under that Second DIP Facility;

3.      the grant in favor of the DIP Lender of super priority administrative claim status pursuant § 364(c)(1) of the Bankruptcy Code in the cases pending for Borrower and Guarantors respect of the obligations under the Second DIP Facility (the "Second DIP Obligations") with such super priority administrative claim being inferior to the super priority administrative claim granted with respect to the First DIP Facility (and any and all obligations of Debtors that are senior in priority of payment to the First DIP Facility obligations);

4.      as security for the Second DIP Obligations and as contemplated by the Second DIP Loan Documents, the grant in favor of the DIP Lender of perfected second priority valid, enforceable and non-avoidable liens upon and security interests in all the Collateral (as defined below) upon the entry of this Final Second DIP Order (as defined below), having the priorities described in the § 364(c)(2) and 364(c)(3) of the Bankruptcy Code, subject only to the liens granted to secure the First DIP Facility and valid prior perfected liens existing as of the Original Petition Date or perfected after the Original Petition Date pursuant to 546(b) of the Bankruptcy Code;

5.      the scheduling of the Final Hearing on the Motion, the Notice of Submission of Commitment Letter, and the Notice of Submission of Second DIP Agreement to

consider entry of a final order (the "<u>Final Second DIP Order</u>") authorizing and granting relief requested in the Motion; and

      6.    the grant of certain related relief.

      Due and appropriate notice of the Motion, the relief requested therein, the Notice of Submission of Commitment Letter, the Notice of Submission of Second DIP Credit Agreement, the material terms of this Final Second DIP Order and the Final Hearing has been served by the Debtors, whether by telecopy, e-mail, overnight courier or hand delivery, on the following parties:  (a) the Office of the United States Trustee for the Southern District of Indiana (the "<u>U.S. Trustee</u>"); (b) the entities listed on the Lists of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); and (c) those parties appearing in the Service List (as that term is defined in the case management procedures approved in the Debtors' Chapter 11 Cases) (collectively, the "<u>Interim Notice Parties</u>").

      Upon the record made by the Debtors at the Final Hearing, including the Motion, the Notice of Submission of Commitment Letter, the Notice of Second DIP Credit Agreement, and other filings and pleadings in the Debtors' Chapter 11 Cases, and good and sufficient cause appearing therefor;

      THE COURT MAKES THE FOLLOWING FINDINGS OF FACTS AND CONCLUSIONS OF LAW:

      A.    <u>Petition</u>.  On May 1, 2009 (the "<u>Original Petition Date</u>"), Lauth Investment Properties, LLC, LIP Development, LLC and LIP Investment, LLC (the "<u>Original Debtors</u>" and together with the Wells Fargo Debtors (as defined below) and the North Pointe Debtors (as defined below), the "<u>Debtors</u>") filed voluntary petitions for relief under

chapter 11 of the Bankruptcy Code (the "Original Chapter 11 Cases").  On August 27, 2009,

Moores Chapel Partners, LLC filed a voluntary petition for relief under chapter 11 of the

Bankruptcy Code.  On August 29, 2009, Brier Creek Medical Associates Two, LLC; Brier Creek

Medical Associates, LLC; Brier Creek Medical Partners Two, LLC; Brier Creek Medical

Partners, LLC; Brownsburg Station Partners, LLC; MCP Partners Three, LLC; Meridian Medical

Associates Two, LLC; Meridian Medical Partners Two, LLC; Middleburg Heights Medical

Associates, LLC; Middleburg Heights Medical Partners, LLC; Virginia Beach Medical

Associates, LLC; Virginia Beach Medical Partners, LLC (collectively, together with Moores

Chapel Partners, LLC, the "Wells Fargo Debtors") each filed voluntary petitions for relief under

chapter 11 of the Bankruptcy Code (the "Wells Fargo Debtors Chapter 11 Cases").  On May 10,

2010, North Pointe Partners One, LLC and North Pointe Park Partners, LLC each filed voluntary

petitions for relief under chapter 11 of the Bankruptcy Code (the "North Pointe Debtors Chapter

11 Cases" and together with the Original Chapter 11 Cases and the Wells Fargo Debtors Chapter

11 Cases, collectively, the "Chapter 11 Cases").

        B.     Debtor-in-Possession Status.  Each Debtor is continuing in the

management and possession of its business and properties as a debtor-in-possession pursuant to

sections 1107 and 1108 of the Bankruptcy Code.

        C.     Jurisdiction and Venue.  Consideration of this Motion constitutes a "core

proceeding" as defined in 28 U.S.C. §§ 157(b)(2)(A), (D), (G), (K), (M) and (O).  This Court has

jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28

U.S.C. §§ 157 and 1334.

        D.     Notice.  Sufficient and adequate notice of this Final Second DIP Order has

been provided based upon (i) the notice sent to the Interim Notice Parties and (ii) the consent to

the relief sought in the Motion and approved by this Final Second DIP Order by the DIP Lender; and no further notice of, or hearing on, the Motion or this Final Second DIP Order is necessary or required.

E.    Acknowledgments and Agreements as to Cash Collateral

(i)    Pursuant to that certain *Final Order Under 11 U.S.C. §§ 105, 361, 362, 363 and 364 and Fed.R.Bankr.P. 2002, 4001 and 9014 Authorizing the Debtors To Obtain Post Petition Financing Entered November 6, 2009* (the "Original DIP Order"), the DIP Lender has provided Debtors a first priority superpriority, first lien secured debtor-in-possession term loan facility in an aggregate principal amount not to exceed Fifteen Million Dollars ($15,000,000).

(ii)    Pursuant to that certain *Interim Order Under 11 U.S.C. §§ 105, 361, 362, 363 and 364 and Fed.R.Bankr.P. 2002, 4001 and 9014 (I) Authorizing the Debtors To Obtain Postpetition Financing By Approval of Proposed Modification to First DIP Facility and Interim Approval of Second DIP Facility and (B) Prescribing Form and Manner of Notice and Setting Time for Final Hearing Entered June 3, 2010* (the "First Interim Order"), the Court approved the Proposed Modification, that certain Second Amendment to Secured Credit Agreement, the Commitment Letter (as modified) and the Debtors' request for interim approval of the Motion and the Second DIP Credit Agreement and approving for the purposes of the First Interim Order the borrowing of up to Two Million Dollars ($2,000,000) under the Second DIP Facility.

(iii)    Pursuant to that certain *Second Interim Order Under 11 U.S.C. §§ 105, 361, 362, 363 and 364 and Fed.R.Bankr.P. 2002, 4001 and 9014 (I) Authorizing the Debtors To Obtain Postpetition Financing By Approval of Proposed*

*Modification to First DIP Facility and Interim Approval of Second DIP Facility and*

*(B) Prescribing Form and Manner of Notice and Setting Time for Final Hearing Entered July 9,*

*2010* (the "<u>Second Interim Order</u>"), the Court approved the Commitment Letter (as modified)

and the Debtors' request for interim approval of the Motion and the Second DIP Credit

Agreement and approving for the purposes of the Second Interim Order the borrowing of up to

Four Million Dollars ($4,000,000) under the Second DIP Facility.

F.      <u>Findings Regarding Post-Petition Financing</u>.

(i)      *Need for Post-Petition Financing*.  The Debtors represent

that without the financing proposed by the Motion and the Commitment Letter (as modified by

the First Interim Order, the Second Interim Order and herein) (including the Proposed

Modification), the Debtors will not have the funds necessary to pay postpetition expenses

necessary for the continued operation of the Debtors' businesses and the management and

preservation of Debtors' assets and properties.  The Debtors have requested that, pursuant to the

Commitment Letter, the Second DIP Credit Agreement, the First Interim Order, the Second

Interim Order and this Final Second DIP Order, the DIP Lender make loans to or for the benefit

of the Debtors to be used by the Debtors to:  (A) pay the costs of the Chapter 11 Cases, (B) pay

the fees and expenses associated with the Second DIP Facility permitted to be made by the

Bankruptcy Code, the First Interim Order, the Second Interim Order, this Final Second DIP

Order, or any other order of the Bankruptcy Court to the extent permitted under the Commitment

Letter and/or the Second DIP Credit Agreement or consented to by the DIP Lender as provided

for in the Commitment Letter and/or the Second DIP Credit Agreement and (C) provide for

ongoing working capital requirements of the Borrower, certain of its Subsidiaries (as will be

defined in the Second DIP Credit Agreement) and the Guarantors (as defined in the Second DIP

- 7 -

Credit Agreement), including the funding of arrangements made with mortgage lenders to Subsidiaries and obligations under confirmed Chapter 11 plans of such Subsidiaries.  The Debtors represent that the ability of the Debtors to continue their businesses and remain viable entities and thereafter reorganize under Chapter 11 of the Bankruptcy Code depends upon the Debtors' obtaining such financing from the DIP Lender.  The DIP Lender is willing to make such loans on a secured basis as more particularly described herein pursuant to the terms and conditions of the Commitment Letter, as modified, the Second DIP Credit Agreement, the other Second DIP Loan Documents, and in accordance with the First Interim Order, the Second Interim Order and this Final Second DIP Order.

(ii)     *No Credit Available on More Favorable Terms*.  The Debtors represent that they are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code or pursuant to sections 364(a), (b) or (c)(1) of the Bankruptcy Code or secured credit pursuant to sections 364(c)(2) and (c)(3) on more favorable terms. Additionally, the Debtors represent that they were unable to procure the necessary financing on more favorable terms than those offered by the DIP Lender pursuant to the Commitment Letter, the Second DIP Credit Agreement, the other Second DIP Loan Documents, the First Interim Order, the Second Interim Order and this Final Second DIP Order.

(iii)     *Business Judgment and Good Faith Pursuant to Section 364(e)*.  The Debtors represent that the terms of the Commitment Letter (as modified by the First Interim Order, the Second Interim Order and herein) and the Second DIP Credit Agreement (as approved by the Court) among the Debtors and the DIP Lender, pursuant to which the additional postpetition loans contemplated herein will be made or provided to or for the benefit of the Debtors by the DIP Lender have been negotiated at arms' length and in good faith, as that term is

- 8 -

used in section 364(e) of the Bankruptcy Code, and are in the best interests of the Debtors, their

estates and creditors.  The Debtors further represent that the DIP Lender is extending financing

to the Debtors in good faith and the DIP Lender is entitled to the benefits of the provisions of

section 364(e) of the Bankruptcy Code.

(iv)    *Good Cause, Immediate Entry.*  The Debtors represent that

the relief requested by the Motion pursuant to the terms of the Commitment Letter (as modified

by the First Interim Order, the Second Interim Order and herein), the Second DIP Credit

Agreement, the First Interim Order, the Second Interim Order and this Final Second DIP Order is

necessary to avoid immediate and irreparable harm to the Debtors' estates.  All objections filed

with respect to the Motion and entry of this Final Second DIP Order, if not previously

withdrawn, are overruled.

G.    Committee.  As of the date hereof, the Office of the U.S. Trustee has not

appointed an official committee of unsecured creditors (the "Committee") in accordance with

section 1102 of the Bankruptcy Code.

Based upon the foregoing, and after due consideration and good cause appearing

therefore, and based upon the Court's statements at the hearing, which are incorporated herein by

reference:

IT IS ORDERED, ADJUDGED AND DECREED, that:

1.    Motion Granted.  The Motion is granted and approved to the extent

provided below.

2.    Objections Overruled.  All objections to the entry of this Final Second DIP

Order are resolved by the terms hereof or, to the extent not resolved or granted by the Court as

set forth herein, are overruled.

3.      <u>Borrowing Authorization</u>.  The terms of the First Interim Order, the Second Interim Order empowering and authorizing the Debtors to enter into the Second DIP Credit Agreement and the other Second DIP Loan Documents and to perform their obligations thereunder are hereby ratified and approved.  The Debtors are authorized and empowered to continue borrowing and obtaining, and guaranteeing as applicable, the financial and credit accommodations from the DIP Lender pursuant to the terms and conditions of the Commitment Letter, with the modification set forth in paragraph 4 below (the "<u>Modified Commitment Letter</u>"), and the Second DIP Credit Agreement, that are applicable to borrowings made under the First Interim Order, the Second Interim Order and this Final Second DIP Order in such amount or amounts as may be made available to the Debtors by the DIP Lender, in accordance with the terms and conditions set forth in the Modified Commitment Letter, the Second DIP Credit Agreement, the other Second DIP Loan Documents, the First Interim Order, the Second Interim Order and this Final Second DIP Order.

4.      <u>Modification to the Commitment Letter</u>.  The DIP Lender has agreed to modify the terms of the Commitment Letter, with such modifications incorporated into and replacing inconsistent provisions of the Commitment Letter as part of the Modified Commitment Letter, as follows:

(a)     <u>Interest</u>.  Prior to an Event of Default (as defined below), Borrowing under the Second DIP Facility will bear interest based upon a Base Rate of Fifteen Percent (15%) per annum calculated on the basis of the actual number of days elapsed in a year of 360 days and payable monthly in arrears.

(b)     <u>Default Interest Rate</u>.  Default Interest Rate means an interest rate equal to a rate of two percent (2%) in excess of the Base Rate.

(c)    Exit Fee and Warrant Proposal.  The provision of the Commitment Letter regarding "Exit Fee and Warrant Proposal" will not become effective unless and until the Bankruptcy Court approves such provision as part of the Final Second DIP Order.

(d)    Commitment Fee.  A "Commitment Fee" of Five Percent (5%) of the Total Commitment will not be payable to Lender until the DIP Maturity Date.

5.    Execution and Compliance with Credit Documents.  The Debtors are authorized and directed to execute, deliver, perform and comply with all of the terms and covenants of the Modified Commitment Letter and the Second DIP Credit Agreement and the other Second DIP Loan Documents (as approved by the Court) which are applicable to borrowings made under the First Interim Order, the Second Interim Order and this Final Second DIP Order.  Borrowings thereunder will constitute valid, binding, enforceable and non-avoidable obligations of the Debtors for all purposes during Debtors' Chapter 11 Cases, any subsequently converted case of any Debtor under Chapter 7 of the Bankruptcy Code or after the dismissal or reorganization of any Debtor's Chapter 11 Case.  The Debtors are authorized and directed to perform all acts, and execute and comply with the terms of such other documents, instruments, and agreements, as the DIP Lender may reasonably require but only to the extent consistent with the First Interim Order, the Second Interim Order and this Final Second DIP Order as evidence of and for the protection of the Second DIP Obligations and the Collateral or which may be otherwise deemed necessary by the DIP Lender to effectuate the terms and conditions of the Modified Commitment Letter, the Second DIP Credit Agreement, the First Interim Order, the Second Interim Order and this Final Second DIP Order, each of such additional documents, instruments and agreements being included in the definition of "Second DIP Loan Documents" as used herein.

6.      <u>Use of Loan Proceeds</u>.  Subject to the limitations applicable in the Modified Commitment Letter, the Debtors shall use the proceeds made or arranged for by the DIP Lender pursuant to the Modified Commitment Letter, the Second DIP Credit Agreement, the First Interim Order, the Second Interim Order, this Final Second DIP Order and the Budget (as defined in the Modified Commitment Letter) (a) to pay the costs of these Chapter 11 Cases, (b) to pay fees and expenses associated with the Second DIP Facility and administrative expenses, (c) to provide for the ongoing working capital requirements of the Borrower, certain of its Subsidiaries, and Guarantors and for general corporate purposes, including the funding of arrangements made with mortgage lenders to Subsidiaries and DIP obligations under confirmed Chapter 11 plans of such Subsidiaries, all of which shall be added to, shall be added to, and are included as part of, the principal amount of the Second DIP Obligations, secured by the Collateral and afforded all of the rights, priorities and protections afforded to the DIP Lender in respect of the Second DIP Obligations under the First Interim Order, the Second Interim Order and this Final Second DIP Order; provided however, DIP Lender agrees the aggregate sum of fees and expenses of DIP Lender charged to Borrower in connection with negotiating, documenting and obtaining approval of the Second DIP Facility up to and through the date of entry of the Final Second DIP Order shall not exceed $25,000.  The DIP Lender shall provide Borrower and all counsel of record in the Chapter 11 Cases with reasonable detail of the expenses (including attorneys' fees) charged to Borrower and shall file periodic reports with the Court detailing such expenses.  Parties in interest shall have ten calendar days to object to any such expenses and if an objection is raised, the Court shall determine the reasonableness of the expense and the Borrower shall only be obligated to pay the amount as determined by the Court. Notwithstanding anything to the contrary contained in the First Interim Order, this Second

Interim Order, the Final Second DIP Order, or the Second DIP Loan Documents, the Debtors are

not hereby authorized to cross-collateralize the loans made to any of their project level affiliates

with the loans made to any other project affiliate without the affected project level lenders'

specific written consent or without order of the Court after notice and hearing. Nothing herein

shall constitute a consent by any project level lender to the granting of any liens in favor of the

DIP Lender contemplated hereunder or to any future change in ownership of the Debtors' project

level affiliates.

       7.    <u>Exit Fee and Warrant Proposal</u>. The provision of the Commitment Letter

regarding "Exit Fee and Warrant Proposal" is approved.

       8.    <u>Conclusive Evidence of DIP Obligations</u>. The terms, conditions and

covenants of the Modified Commitment Letter and any Second DIP Loan Document shall be

sufficient and conclusive evidence of the borrowing and financing arrangements among the

Debtors and the DIP Lender for all purposes, including, without limitation, Debtors' obligation

to pay all principal, interest, fees and other costs and expenses (including, without limitation, all

reasonable fees and expenses of consultants, advisors and attorneys), as more fully set forth and

to the extent provided in the Second DIP Credit Agreement and the other Second DIP Loan

Documents.

       9.    <u>Superpriority Claim</u>. For all Second DIP Obligations now existing or

hereafter arising pursuant to Modified Commitment Letter, the Second DIP Credit Agreement,

the First Interim Order, the Second Interim Order and/or this Final Second DIP Order, the DIP

Lender is granted an allowed superpriority administrative claim pursuant to section 364(c)(1) of

the Bankruptcy Code in the pending chapter 11 cases for the Borrower and Guarantors, which

claim shall have priority in right of payment over any and all other obligations, liabilities and

indebtedness of those Debtors, now in existence or hereafter incurred by any of the Borrower and Guarantors and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, inter alia, sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), and/or 364(c)(1) of the Bankruptcy Code (the "Superpriority Claim"), provided, however, that the Superpriority Claim shall be inferior in priority to the superpriority administrative expense status previously granted to the DIP Lender with respect to the First DIP Facility and the M&I Bank.

10.    DIP Lender Lien Grant.  To secure the prompt payment and performance of any and all Second DIP Obligations under the Modified Commitment Letter, the Second DIP Credit Agreement, any other Second DIP Loan Document, the First Interim Order, the Second Interim Order and/or this Final Second DIP Order, the DIP Lender shall have, and is granted in accordance with the terms and conditions of the Second DIP Credit Documents, effective on and after the date of entry of the First Interim Order a continuing second priority Lien and security interest in and to the Collateral, subject in all cases only to (i) first priority liens of DIP Lender under the First DIP Facility, (ii) valid and perfected liens in existence on the Original Petition Date and junior to such valid and perfected liens, and (iii) valid, enforceable and non-avoidable Liens existing as of the Original Petition Date, pursuant to section 364(c)(2) of the Bankruptcy Code, all of the equity interests and/or membership interests owned by Borrower in its direct and indirect subsidiaries.

11.    Collateral.  The assets and property subject to the liens and security interests granted in this Final Second DIP Order shall be all of the equity interests and/or membership interests owned by Debtor LIP Investment, LLC, Borrower, in its direct and indirect subsidiaries (collectively, the "Collateral").  In no event shall:  (a) any lien or security interest

- 14 -

granted pursuant to the Second DIP Loan Documents, the First Interim Order, the Second

Interim Order or this Final Second DIP Order be subject to any lien or security interest that is

avoided and preserved for the benefit of Debtors' estates under section 551 of the Bankruptcy

Code; (b) any person or entity who pays (or through the extension of credit to any Debtor, causes

to be paid) any of the Second DIP Obligations be subrogated, in whole or in part, to any rights,

remedies, claims, privileges, liens or security interests granted in favor of, or conferred upon, the

DIP Lender by the terms of the Second DIP Loan Documents, the First Interim Order, the

Second Interim Order or this Final Second DIP Order, until such time as all of the Second DIP

Obligations are indefeasibly paid in full in cash in accordance with the Second DIP Loan

Documents , the First Interim Order, the Second Interim Order and this Final Second DIP Order;

or (c) the DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine

with respect to the Collateral.

        12.    <u>Lien Perfection</u>.  The First Interim Order, the Second Interim Order and

this Final Second DIP Order shall be sufficient and conclusive evidence of the priority,

perfection and validity of all of the liens and security interests in and upon the Collateral granted

pursuant to the First Interim Order, this Second Interim Order, this Final Second DIP Order

and/or the Second DIP Loan Documents, without the necessity of (a) filing, recording or serving

any financing statements, mortgages, deeds of trust or other agreements, documents or

instruments which may otherwise be required under federal or state law in any jurisdiction

(collectively, the "<u>Lien Recording Documents</u>"), (b) taking possession of the Collateral or

evidence thereof (provided, that, without limiting the foregoing, any third party in possession of

any Collateral, including, without limitation, the Prepetition Lender, is hereby deemed a bailee

for the benefit of and on behalf of the DIP Lender) or (c) taking any other action to validate or

perfect the liens and security interests granted in the First Interim Order, the Second Interim

Order, this Final Second DIP Order and/or the Second DIP Loan Documents.  If the DIP Lender

shall, in its discretion, elect for any reason to file any such Lien Recording Documents with

respect to such liens and security interests, the Debtors are authorized and directed to execute, or

cause to be executed, all such Lien Recording Documents upon the DIP Lender's request and the

filing, recording or service thereof (as the case may be) of such Lien Recording Documents shall

be deemed to have been made at the time of and on the Original Petition Date.  The DIP Lender

may, in its discretion, file a certified copy of the First Interim Order, the Second Interim Order

and/or this Final Second DIP Order in any filing or recording office in any county or other

jurisdiction in which the Debtors have an interest in real or personal property and, in such event,

the subject filing or recording officer is authorized and directed to file or record such certified

copy of the First Interim Order, the Second Interim Order and/or this Final Second DIP Order.

To the extent that any applicable non-bankruptcy law would otherwise restrict the grant, scope,

enforceability, attachment or perfection of the liens and security interests authorized or created

hereby, or otherwise would impose filing or registration requirements with respect thereto, such

law is preempted to the maximum extent permitted by the Bankruptcy Code, applicable federal

law, and the judicial power of this Court (provided that if the DIP Lender takes steps to perfect

its liens and security interests under otherwise applicable state law, it does so without waiving

the benefits of this provision of this Final Second DIP Order).  In the event that any Lien

Recording Document which the DIP Lender elects to file in accordance with this paragraph

contains any limitations, defects, deficiencies or other information which might otherwise limit

or adversely affect the DIP Lender's liens upon and security interests in the Collateral or any of

the DIP Lender's claims, rights, priorities and/or protections afforded under the First Interim

Order, this Second Interim Order, this Final Second DIP Order and/or the Second DIP Loan

Documents, such limitations, defects, deficiencies or other information shall not impair, limit,

restrict or adversely affect in any way any of the DIP Lender's liens and security interests in the

Collateral or its claims, rights, priorities and/or protections granted under the First Interim Order,

the Second Interim Order, this Final Second DIP Order and/or the Second DIP Loan Credit

Documents.

13.    <u>Nullifying Prepetition Restrictions on Postpetition Lien Grants</u>.

Notwithstanding anything to the contrary contained in any prepetition agreement, contract, lease,

document, note or instrument to which any Debtor is a party or under which any Debtor is

obligated, any provision that restricts, limits or impairs in any way any Debtor's ability or right

to grant liens or security interests upon any of the Collateral (including, among other things, any

anti-lien granting or anti-assignment clauses in any leases or other contractual arrangements to

which any Debtor is a party) under the Second DIP Loan Documents, the First Interim Order, the

Second Interim Order and this Final Second DIP Order or otherwise enter into and comply with

all of the terms, conditions and provisions thereof (all such provisions being collectively referred

to as the "<u>Restrictive Clauses</u>") shall not be effective and shall be unenforceable against any such

Debtor and the DIP Lender to the maximum extent permitted under the Bankruptcy Code and

other applicable law, but only with respect to the entry of the First Interim Order , the Second

Interim Order and this Final Second DIP Order granting such postpetition financing, and,

therefore, shall not adversely affect the validity, priority or enforceability (subject to paragraphs

15 and 16) of this Final Second DIP Order) of the liens, security interests, claims, rights,

priorities and/or protections granted to the DIP Lender pursuant to the First Interim Order, the

Second Interim Order, this Final Second DIP Order, the Second DIP Credit Agreement and/or

- 17 -

the other Second DIP Loan Documents or any of the rights of the DIP Lender hereunder or thereunder to the maximum extent permitted under the Bankruptcy Code and other applicable law. Subject to paragraphs 1 and 16 of this Final Second DIP Order, such Restrictive Clauses shall not, to the maximum extent permitted under the Bankruptcy Code and applicable law, render any contract or lease unable to be assumed and/or assigned by any Debtor (or by the DIP Lender pursuant to the provisions contained in the First Interim Order, the Second Interim Order or this Final Second DIP Order), or in any way impair or limit the ability or right of any Debtor (or by the DIP Lender, on behalf of any Debtor, pursuant to the provisions contained in the First Interim Order, the Second Interim Order or this Final Second DIP Order) to assume and/or assign any contract or lease, or any lessor's right to object to such relief on any other grounds, under sections 365 or 1123 of the Bankruptcy Code.

Nothing contained in the First Interim Order, the Second Interim Order, this Final Second DIP Order, the Modified Commitment Letter or the Second DIP Credit Agreement shall be construed to modify, amend or waive any loan agreements, security agreements or related documents (including, without limitation, any default provisions), or any organizational documents, entered into by or governing or concerning the Debtors' project level affiliates or the projects owned by such affiliates, or to amend any loan, project or construction budgets in respect of such projects. Notwithstanding anything to the contrary contained in the First Interim Order, the Second Interim Order, this Final Second DIP Order, the Modified Commitment Letter or any Second DIP Loan Document, the Debtors shall not use any loan or equity funds of any of the Debtors' project level affiliates which are subject to project level loan agreements without such project level lenders' consent.

14.     <u>Maintenance of Collateral</u>.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral, except as otherwise provided for in the Modified Commitment Letter, any Second DIP Loan Document, the First Interim Order, the Second Interim Order and/or this Final Second DIP Order.

15.     <u>Remedies upon Occurrence of Event of Default</u>.  In the event of any of the following:  (a) the failure of the Debtors to perform in any material respect any of their respective obligations pursuant to the First Interim Order, the Second Interim Order and this Final Second DIP Order or (b) the occurrence and continuation of any "Event of Default" as defined under the Modified Commitment Letter, or any Second DIP Loan Document (each of the foregoing being referred to in this Final Second DIP Order, individually, as an "<u>Event of Default</u>" and collectively, as the "<u>Events of Default</u>"); the DIP Lender shall be permitted to exercise any remedies contained in the Second DIP Credit Agreement only after obtaining an order from the Court allowing such exercise of remedies.  Nothing contained in the First Interim Order, the Second Interim Order, or this Final Second DIP Order or otherwise shall be construed to obligate the DIP Lender in any way to lend or advance any additional funds to Borrower, or provide other financial accommodations to Debtors upon or after the occurrence of an Event of Default.  The DIP Lender may not exercise any remedies against any Collateral without further order of the Court.  Any declaration of an Event of Default by the DIP Lender must be in good faith and the DIP Lender shall have the burden to establish to the satisfaction of the Court the DIP Lender's good faith.  The DIP Lender must also demonstrate that the exercise of any requested remedy would be appropriate in light of such Event of Default.  If the DIP Lender will not waive the Event of Default, the Debtors shall be required to enter into replacement financing provided such replacement financing is on the same or better terms.

- 19 -

16.   <u>Collateral Rights</u>.  Until all of the DIP Obligations shall have been indefeasibly paid and satisfied in full in immediately available funds and without further order of the Court, the liens and other rights granted herein shall remain in full force and effect.  In the event that any party who holds a lien or security interest in any of the Collateral that is junior and/or subordinate to the liens and claims of the DIP Lender in such Collateral receives or is paid proceeds of the Collateral prior to the indefeasible payment and satisfaction in full of all Second DIP Obligations, such junior or subordinate lienholder shall be deemed to have received, and shall hold, such Collateral proceeds in trust for the DIP Lender and shall immediately turnover to the DIP Lender such proceeds for application to the Second DIP Obligations in accordance with the Second DIP Loan Documents, the First Interim Order, the Second Interim Order and/or this Final Second DIP Order.

17.   <u>Reservation of Rights</u>.  Entry of the First Interim Order, the Second Interim Order and this Final Second DIP Order shall not be deemed to prejudice any and all rights, remedies, claims and causes of action of the DIP Lender may have against third parties, and shall not prejudice the rights of the DIP Lenders from and after the entry of the First Interim Order to seek any other relief in Debtors' Chapter 11 Cases.  Entry of the First Interim Order, the Second Interim Order and this Final Second DIP Order shall not in any way constitute:  (a) a preclusion or a waiver of any right of the DIP Lender to file, or to prosecute if already filed, a motion for relief from stay, a motion or request for other relief, including but not limited to any adversary proceeding; (b) agreement, consent, or acquiescence to the terms of any plan of reorganization by virtue of any term or provision of this Final Second Order; (c) a preclusion or waiver to assert any other rights, remedies or defenses available to the DIP Lender, or to respond to any motion, application, proposal, or other action, all such rights, remedies, defenses and

opportunities to respond being specifically reserved by the DIP Lender; or (d) a preclusion,

waiver or modification of any rights or remedies that the DIP Lender has against any other

person or entity.

18.    Release Upon Repayment of DIP Obligations  Upon the indefeasible

payment in full of all Second DIP Obligations owed to the DIP Lender and termination of the

Second DIP Credit Agreement and the other Second DIP Loan Documents, the DIP Lender shall

be released by each Debtor and its bankruptcy estate from any and all obligations, liabilities or

responsibilities arising in connection with or related to the First Interim Order, the Second

Interim Order, this Final Second DIP Order, the Second DIP Credit Agreement and/or the other

Second DIP Loan Documents in accordance with the terms and conditions contained in the

Second DIP Loan Documents.  Upon repayment in full of all Second DIP Obligations owed to

the DIP Lender, the releases granted in favor of the DIP Lender, and the termination of the

Second DIP Credit Agreement and the other Second DIP Loan Documents, all in accordance

with this paragraph, the Debtors shall file with this Court a notice evidencing the termination and

release of all liens, security interests and claims of the DIP Lender against the Debtors and all

assets and properties of their estates.

19.    Restrictions on Additional Use of Cash Collateral, Additional Financing.

All postpetition loans under the Modified Commitment Letter, the Second DIP Credit Agreement

and the other Second DIP Loan Documents are made in reliance on the First Interim Order, the

Second Interim Order and this Final Second DIP Order, and in the event that an order is entered

at any time in Debtors' Chapter 11 Cases or in any subsequently converted case under Chapter 7

of the Bankruptcy Code (other than the Final Second DIP Order) which (a) authorizes the sale,

lease, or other disposition of property of the Debtors' estates in which the DIP Lender has a lien

or security interest, except as expressly permitted hereunder or in the Second DIP Loan

Documents, or (b) authorizes under section 364 of the Bankruptcy Code the obtaining of credit

or the incurring of indebtedness secured by a lien or security interest which is equal or senior to a

lien or security interest in property in which the DIP Lender holds a lien or security interest, or

which is entitled to priority administrative claim status which is equal or superior to that granted

to the DIP Lender herein; then, in each instance described in clauses (a) and (b) of this

paragraph, (i) the DIP Lender shall first have given its express prior written consent thereto, no

such consent being implied from any other action, inaction or acquiescence by the DIP Lender,

or (ii) such other order shall require that all DIP Obligations first shall be indefeasibly paid in

full in immediately available funds.  The liens and security interests granted to or for the benefit

of the DIP Lender hereunder and the rights of the DIP Lender pursuant to the First Interim Order,

the Second Interim Order, this Final Second DIP Order and the Second DIP Loan Documents

with respect to the Second DIP Obligations and the Collateral are cumulative and shall not be

altered, modified, extended, impaired, or affected by any plan of reorganization of the Debtors

and, if the DIP Lender shall expressly consent in writing that the Second DIP Obligations shall

not be repaid in full upon confirmation and effectiveness thereof, shall continue after

confirmation and effectiveness of any such plan.

        20.     <u>Binding Effect of Final Second DIP Order and Credit Documents</u>.

        (a)     The Debtors irrevocably waive any right to seek any modifications

or extensions of this Final Second DIP Order without the prior written consent of the DIP

Lender, and no such consent shall be implied by any other action, inaction or acquiescence by

any of the DIP Lender.

(b)      The provisions of the First Interim Order, the Second Interim

Order and this Second Final DIP Order and any actions taken pursuant hereto shall survive entry

of any order which may be entered converting the Debtors' Chapter 11 Cases to a Chapter 7

case, dismissing any of the Debtors' bankruptcy cases (in the case of any such dismissal, to the

maximum extent permitted under the Bankruptcy Code and other applicable law) or any order

which may be entered confirming or consummating any plan of reorganization of the Debtors;

and the terms and provisions of the First Interim Order, the Second Interim Order and this Final

Second DIP Order, as well as the priorities in payment, liens, and security interests granted

pursuant to the First Interim Order, the Second Interim Order, this Final Second DIP Order the

Modified Commitment Letter, and the Second DIP Loan Documents shall continue in this or any

superseding case under the Bankruptcy Code, and such priorities in payment, liens and security

interests shall maintain their priority as provided by this Final Second DIP Order until all Second

DIP Obligations are indefeasibly paid and satisfied in full; provided that all obligations and

duties of the DIP Lender hereunder, under the Modified Commitment Letter, Second DIP Loan

Documents or otherwise with respect to any future loans, shall terminate immediately upon the

earlier of the date of any Event of Default or the date that a plan of reorganization of the Debtors

becomes effective unless the DIP Lender consistent with provisions of the Second DIP Credit

Agreement has given its express prior written consent thereto, no such consent being implied

from any other action, inaction or acquiescence by the DIP Lender.

(c)      The provisions of the First Interim Order, the Second Interim

Order, this Final Second DIP Order, the Modified Commitment Letter and the Second DIP Loan

Documents shall be binding upon all parties-in-interest in these cases, including, without

limitation, the Debtors, the DIP Lender and the Committee (if appointed), and their respective

successors and assigns (including, to the fullest extent permitted by applicable law, any Chapter

7 or Chapter 11 trustee hereinafter appointed or elected for any Debtor's estate, an examiner

appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary hereafter

appointed as a legal representative of the Debtors or with respect to the property of Debtors'

estates), and shall inure to the benefit of the Debtors, the DIP Lender and the Committee (if

appointed), and their respective successors and assigns; provided, however, that the DIP Lender

shall have no obligation to extend any financing to any Chapter 7 trustee or similar responsible

person appointed for the Debtors' estates.

      21.    Good Faith.  The terms of the financing arrangements among the Debtors

and the DIP Lender have been negotiated in good faith among the Debtors and the DIP Lender

and any loans which are made or caused to be made to the Debtors by the DIP Lender pursuant

to the Modified Commitment Letter under the First Interim Order, the Second Interim Order and

the Final Second DIP Order are deemed to have been made and provided in good faith, as the

term "good faith" is used in section 364(e) of the Bankruptcy Code, and shall be entitled to the

full protection of section 364(e) of the Bankruptcy Code in the event that the First Interim Order,

the Second Interim Order, this Final Second DIP Order or any provision hereof is vacated,

reversed or modified, on appeal or otherwise.

      22.    Carve-Out.

      (a)    Subject to the terms and conditions contained in this paragraph 22,

all liens on and security interests in the Collateral granted pursuant to the First Interim Order, the

Second Interim Order and this Final Second DIP Order, including to the DIP Lender to secure

the DIP Obligations, and all superpriority administrative claims granted pursuant to the First

Interim Order, the Second Interim Order and this Final Second DIP Order, including to the DIP

- 24 -

Lender with respect to the DIP Obligations, shall be subordinate to the following (collectively, the "Carve-Out"):  (i) fees pursuant to 28 U.S.C. § 1930(a)(6); (ii) fees payable to the clerk of the Bankruptcy Court and any agent thereof; (iii) in the event of a conversion of the Debtors' Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code, fees and expenses incurred by a trustee and any professionals retained by such trustee, in an aggregate amount not exceeding $50,000; (iv) to the extent allowed at any time, whether by interim order, procedural order or otherwise, all unpaid fees and expenses (the "Professional Fees") incurred or accrued by professionals or professional firms retained by the Debtors pursuant to section 327, 363 or 1103 of the Bankruptcy Code and/or by the Special Mediator (or his counsel) appointed pursuant to the order of the Bankruptcy Court dated April 8, 2010 (the "Professional Persons") at any time before or on the first business day following delivery by the DIP Lender of a Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice; and (v) Professional Fees accruing after the first business day following delivery by the Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise, in an aggregate amount not to exceed $2,000,000.

(b)     As used herein, "Carve-Out Trigger Notice" means a written notice delivered by the DIP Lender to counsel for the Debtors following the occurrence of an Event of Default expressly stating that the Carve Out has been invoked.  Upon receipt of the Carve-Out Trigger Notice, the Debtors shall provide immediate notice by facsimile to all professionals and counsel of record in the Chapter 11 Cases informing them that a Carve-Out Trigger Notice has been received and further advising them that the Debtors' ability to pay the Professional Fees is subject to the Professional Fee Carve-Out.

(c)     Any payment or reimbursement made on or after delivery of the Carve-Out Trigger Notice in respect of any allowed Professional Fees shall permanently reduce the Professional Fee Carve-Out on a dollar-for-dollar basis.  Any payments or reimbursements made in respect of allowed Professional Fees at any time prior to delivery of the Carve-Out Trigger Notice shall not reduce the Professional Fee Carve-Out.  Any payments or reimbursements made at any time in respect of any Carve-Out other than the Professional Fee Carve-Out shall not reduce the Professional Fee Carve-Out.

(d)     Payment of any obligations within the Carve-Out shall not and shall not be deemed to reduce the Second DIP Obligations and shall not and shall not be deemed to subordinate the DIP Lender's liens and security interests in the Collateral or its Superpriority Claim to any junior prepetition or postpetition lien, interest, or claim in favor of any other party. Except as otherwise provided herein, the DIP Lender shall not be responsible for the direct payment or reimbursement of any fees or expenses within the Carve-Out, and nothing in the First Interim Order, the Second Interim Order, this Final Second DIP Order or otherwise shall be construed to obligate the DIP Lender in any way to pay or reimburse any such fees or expenses, or to guarantee that the Debtors have sufficient funds to pay such fees or reimburse such expenses.

(e)     Notwithstanding anything to the contrary in the First Interim Order, the Second Interim Order or this Final Second DIP Order, neither Professional Fees within the Professional Fee Carve-Out nor the proceeds of any Loans or Cash Collateral shall be used to pay Professional Fees to the extent incurred in connection with any of the following:  (i) an assertion or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or

similar relief: (A) challenging the legality, validity, priority, perfection, or enforceability of the

Second DIP Obligations, the DIP Lender's liens on and security interests in the Collateral,

(B) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the DIP

Obligations, the DIP Lender's liens on and security interests in the Collateral, or (C) preventing,

hindering or delaying the DIP Lender's assertion or enforcement of any lien, claim, right or

security interest or realization upon any Collateral; (ii) the commencement or prosecution of any

action or proceeding of any claims, causes of action, or defenses against the DIP Lender or any

of its respective officers, directors, employees, agents, attorneys, affiliates, assigns, or

successors; or (iii) any act which has or could have the effect of materially and adversely

modifying or compromising the rights and remedies of the DIP Lender, or which is contrary, in a

manner that is material and adverse to the DIP Lender, to any term or condition set forth in or

acknowledged by the Second DIP Loan Documents, the First Interim Order, the Second Interim

Order or this Final Second DIP Order

       23.    <u>No Modification or Stay of Final Second DIP Order</u>.  If any or all of the

provisions of this Final Second DIP Order are hereafter modified, vacated or stayed, such

modification, vacation or stay shall not affect (a) the validity of any obligation, indebtedness or

liability incurred by the Debtors to the DIP Lender prior to the effective date of such

modification, vacation or stay or (b) the validity or enforceability of any security interest, lien, or

priority authorized or created hereunder or pursuant to the Second DIP Loan Documents, as

applicable.  Notwithstanding any such modification, vacation or stay, any indebtedness,

obligations or liabilities incurred by the Debtors to the DIP Lender prior to the effective date of

such modification, vacation or stay shall be governed in all respects by the original provisions of

the First Interim Order, the Second Interim Order and this Final Second DIP Order; and the DIP

Lender shall be entitled to all the rights, remedies, privileges and benefits granted herein with respect to all such indebtedness, obligations and/or liabilities.  The indebtedness, obligations and/or liabilities of the Debtors to the DIP Lender under the First Interim Order, the Second Interim Order, this Final Second DIP Order the Modified Commitment Letter, and/or the Second DIP Loan Documents shall not be discharged by the entry of an order confirming a plan of reorganization in Debtors' Chapter 11 Cases pursuant to section 1141(d)(4) of the Bankruptcy Code or otherwise, unless and until all indebtedness, obligations and liabilities of the Debtors to the DIP Lender are indefeasibly paid in full in accordance with the terms and conditions of the Second DIP Loan Documents prior to or concurrently with the entry of such order.  No indebtedness, obligation or liability owed by the Debtors to the DIP Lender under the First Interim Order, the Second Interim Order, this Final Second DIP Order the Modified Commitment Letter or the Second DIP Loan Documents, in each case, prior to the effective date of any modification, vacation or stay of this Final Second DIP Order can, as a result of any subsequent order in these Chapter 11 Cases, or in any superseding case, be subordinated, lose its lien priority or superpriority administrative claim status, or be deprived of the benefit of the status of the liens and claims granted to the DIP Lender under the First Interim Order, the Second Interim Order, this Final Second DIP Order the Modified Commitment Letter and/or the Second DIP Loan Documents.

24.    <u>Conflicting Provisions</u>.  Unless otherwise provided in the First Interim Order, the Second Interim Order and this Final Second DIP Order, to the extent the terms and conditions of the Second DIP Loan Documents are in conflict with the terms and conditions of the First Interim Order, the Second Interim Order and this Final Second DIP Order, the terms and conditions of this Final Second DIP Order shall control.

- 28 -

25.    <u>Effectiveness</u>.  Notwithstanding any Bankruptcy Rule to the contrary, the terms and conditions of this Final Second DIP Order shall (a) be immediately enforceable, and (b) not be stayed absent the grant of such stay under Bankruptcy Rule 8005 after a hearing upon notice to Debtors and DIP Lender.

###

SECOND SECURED
DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT

Dated as of June 3, 2010

LIP INVESTMENT, LLC,
a Debtor and Debtor-in-Possession
under Chapter 11 of the Bankruptcy Code, as the Borrower,

LIP DEVELOPMENT, LLC
and
LAUTH INVESTMENT PROPERTIES, LLC, as Guarantors

and

LIP LENDERS, LLC, as the Lender

SECOND SECURED
DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT

This SECOND SECURED DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT (this "Second Credit Agreement") is entered into as of June 3, 2010, by and among LIP INVESTMENT, LLC, a Delaware limited liability company and a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code (as hereinafter defined) (the "Borrower"), LIP DEVELOPMENT, LLC, a Delaware limited liability company ("Development"), and LAUTH INVESTMENT PROPERTIES, LLC, an Indiana limited liability company ("Lauth Investment"; Development and Lauth Investment are referred to collectively as "Guarantors" and individually as "Guarantor"), and LIP LENDERS, LLC, an Indiana limited liability company (the "Lender").

PRELIMINARY STATEMENTS

1.      On May 1, 2009 (the "Petition Date"), the Borrower and Guarantors respectively filed voluntary petitions for relief in the United States Bankruptcy Court for the Southern District of Indiana (such court, together with any other court having jurisdiction over the Cases from time to time, the "Bankruptcy Court"), and commenced their bankruptcy cases, now jointly administered, (the "Cases"), under Chapter 11 of the Bankruptcy Code (as hereinafter defined) and since such filing, the Borrower has continued in the possession of its assets and in the management of its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.      Borrower, Guarantors and Lender are parties to that "Secured Debtor-In-Possession Credit And Security Agreement dated as of August 25, 2009" (the "First DIP Credit Agreement"). The Credit Agreement was amended by the First Amendment to Secured Debtor-in-Possession Credit and Security Agreement dated as of October 30, 2009 and as amended is referred to hereafter as the "Amended First DIP Credit Agreement". The Amended First DIP Credit Agreement was approved by the Bankruptcy Court on an interim basis pursuant to the *Interim Order Under 11 U.S.C. §§ 105, 361, 362, 363 and 364 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Prescribing Form and Manner of Notice and Setting Time for Final Hearing*, dated August 25, 2009, as such order was amended and supplemented by orders increasing the authorized amount of borrowings on an interim basis (the "Interim First DIP Order"), and finally approved pursuant to *Final Order Under 11 U.S.C. §§ 105, 361, 362, 363 And 364 And Fed. R. Bankr. P. 2002, 4001 And 9014 Authorizing Debtors To Obtain Postpetition Financing* entered by the Bankruptcy Court on November 6, 2009 (the "Final First DIP Order").

3.      Pursuant to the Amended First DIP Credit Agreement, certain Loan Documents (as defined in the Amended First DIP Credit Agreement) provided for therein, and the Final First DIP Order, the Lender has provided to Borrower a $15 million first priority superpriority, first lien secured debtor-in-possession term loan facility in an aggregate principal amount not to exceed Fifteen Million Dollars ($15,000,000) (the "First DIP Facility").

4.      The Borrower has requested that the Lender extend to Borrower additional credit by way of a second priority superpriority, second lien secured debtor-in-possession term loan facility, with the aggregate principal amount to be advanced on this second term loan prior to the

Final Second DIP Order (as hereinafter defined) not to exceed $2,000,000, and with the maximum principal amount available to be borrowed on this term loan being subject to increase at the sole discretion of the Lender following the entry of the Final Second DIP Order and at the Borrower's request, to up to Eight Million Dollars ($8,000,000), all on the terms and conditions set forth in this Second Credit Agreement.

5.    To provide guarantees and security for the repayment of the Second DIP Obligations (as hereinafter defined) of the Borrower and Guarantors hereunder and under the other Second DIP Loan Documents (as hereinafter defined), the Borrower and Guarantors will provide the Lender the following, each as more fully described in this Second Credit Agreement:

A.    a joint and several guaranty from each of the Guarantors of the due and punctual payment and performance of the Second DIP Obligations of the Borrower, as set forth in Section 10 of this Second Credit Agreement; and

B.    priority Second DIP Liens (as hereinafter defined) on the Primary Collateral (as hereinafter defined), that will be junior in lien and priority only to the First DIP Facility as set forth in Section 2.10 and Section 9 of this Second Credit Agreement.

6.    On June 3, 2010 (the "Interim Second DIP Order Entry Date"), the Bankruptcy Court entered the Interim Second DIP Order (as hereinafter defined), pursuant to which the Borrower was authorized to borrow from the Lender up to $2,000,000, and pay all out of pocket and documented fees and expenses of the Lender, including reasonable attorney fees and costs of one outside counsel, incurred in connection with the negotiation, preparation and initial closing of this Second Credit Agreement and the obtaining of the Interim Second DIP Order (as provided in Section 11.04 of this Second Credit Agreement), pending entry and the terms of any further interim orders as may occur and the Final Second DIP Order  by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

ARTICLE I

DEFINITIONS AND ACCOUNTING TERMS

1.01    Defined Terms. As used in this Second Credit Agreement, the following terms shall have the meanings set forth below:

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.  "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.  Without limiting the generality of the foregoing, a Person shall be deemed to be Controlled by another Person if such other Person possesses, directly or indirectly, power to vote 10% or more of the securities having ordinary voting power for the election of directors, managing general partners or the equivalent.

2

"Amended First DIP Credit Agreement" has the meaning specified in Preliminary Statement 2 to this Second Credit Agreement.

"Attorney Costs" means and includes all reasonable fees, expenses and disbursements of any law firm or other external counsel.

"Attributable Indebtedness" means, on any date, (a) in respect of any capital lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease were accounted for as a capital lease.

"Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as codified in title 11 of the United States Code, 11 U.S.C. Sections 101-1532, as now in effect or hereafter amended.

"Bankruptcy Court" has the meaning specified in Preliminary Statement 1 to this Second Credit Agreement.

"Base Rate" means Fifteen Percent (15%) per annum.

"Borrower" has the meaning specified in the introductory paragraph hereto.

"Borrower's Projections" means projected cash flow statements for the Borrower for a 13 week period  starting from a date acceptable to Lender and otherwise in a form acceptable in all respects to the Lender.

"Budget" means the Borrower's Projections.

"Business Day" means any day other than a Saturday, Sunday or day on which banks in Indianapolis, Indiana or New York, New York are authorized or required by law to close.

"Carve-Out" means (i) fees pursuant to 28 U.S.C. § 1930(a)(6); (ii) fees payable to the clerk of the Bankruptcy Court and any agent thereof; (iii) in the event of a conversion of the Borrower's Case to a case under Chapter 7 of the Bankruptcy Code, fees and expenses incurred by a trustee and any professionals retained by such trustee, in an aggregate amount not exceeding $50,000; (iv) to the extent allowed at any time, whether by interim order, procedural order or otherwise, all unpaid fees and expenses (the "Professional Fees") incurred or accrued by professionals or professional firms retained by the Loan Parties pursuant to Section 327, 363 or 1103 of the Bankruptcy Code and/or by the Special Mediator (or his counsel) appointed pursuant to the order of the Bankruptcy Court dated April 8, 2010 (the "Professional Persons") at any time before or on the first Business Day following delivery by the Lender of a Carve-Out Trigger Notice, whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice; and (v) Professional Fees accruing after the first Business Day following delivery by the Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise, in an aggregate amount not to exceed $2,000,000.  No portion of the Carve-Out or proceeds of the Second Term Loan may be used for the payment of Professional Fees incurred in challenging, or in relation to the challenge of, any

of Lender's claims under or the exercise of any of Lender's rights or remedies provided for in this Second Credit Agreement or in the initiation or prosecution of any claim or action against the Lender.

"Carve-Out Trigger Notice" means a written notice delivered by the Lender to the Borrower's counsel of record in the Cases following the occurrence of an Event of Default expressly stating that the Carve-Out has been invoked.

"Cases" has the meaning specified in Preliminary Statement 1 to this Second Credit Agreement.

"Cash Equivalent Investments" means (i) short-term obligations of, or fully guaranteed by, the United States of America, (ii) commercial paper rated A-1 or better by Standard and Poor's Ratings Services, a division of The McGraw Hill Companies, Inc., or P-1 or better by Moody's Investors Service, Inc., (iii) demand deposit accounts maintained in the ordinary course of business, and (iv) certificates of deposit issued by and time deposits with commercial banks (whether domestic or foreign) having capital and surplus in excess of $100,000,000; *provided* in each case that the same provides for payment of both principal and interest (and not principal alone or interest alone) and is not subject to any contingency regarding the payment of principal or interest.

"Change of Control" means the occurrence of any of the following:  (a) Lauth Investment ceases to be the sole member of or ceases to own 100% of the outstanding Equity Interests of Development on a fully diluted basis; (b) Development ceases to be the sole member of or ceases to own 100% of the outstanding Equity Interests of the Borrower on a fully diluted basis; (c) the manager(s) and the most senior officer of any of the Loan Parties is any Person other than Robert C. Lauth, Jr., Gregory C. Gurnik, Lawrence B. Palmer or Michael S. Curless, unless none of these individuals is serving by reason of resignation, incapacity or death of all of such named individuals;  (d) Development ceases to control the voting rights with respect to any of its membership interests or other Equity Interests in the Borrower; or (e) the Borrower ceases to be a manager managed limited liability company either as the result of any action taken by Person other than the members of the Borrower which own the Equity Interests of the Borrower on the Closing Date or by reason of the Bankruptcy Court or any other court of competent jurisdiction invalidating the amendment to the Borrower's Operating Agreement which made it a manager managed limited liability company.

"Closing" means the execution and closing of this Second Credit Agreement.

"Closing Date" means the first Business Day which follows the Interim Second DIP Order Entry Date, which in no event shall be later than July 6, 2010, or any other date thereafter that may be agreed to in writing by the Borrower and the Lender.

"Closing Fee" has the meaning specified in Section 2.05(a).

"Code" means the Internal Revenue Code of 1986.

"Collateral" means all of the "Primary Collateral" and all of the other property and assets that are or are intended under the terms of the Collateral Documents or DIP Financing Orders to be subject to Liens in favor of the Lender.

"Collateral Documents" means, collectively, this Second Credit Agreement, and all other security agreements, pledge agreements or other similar agreements delivered to the Lender pursuant to Section 9.02, and each of the other agreements, instruments, supplements or documents that creates or purports to create a Lien in favor of the Lender to secure any of the Obligations.

"Commitment" means the Second Term Commitment.

"Compliance Certificate" means a certificate substantially in the form of Exhibit B.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any indenture, mortgage, deed of trust, contract, agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" has the meaning specified in the definition of "Affiliate."

"Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means an interest rate equal to a rate of two percent (2%) in excess of Base Rate.

"Discretionary Portion of the Second DIP Facility" has the meaning specified in Section 2.01.

"DIP Financing Orders" means the Interim First DIP Order or the Final First DIP Order or both, as the context may require.

"Dismissal Denial Order" means the order entered on July 23, 2009, by the Bankruptcy Court's minute entry (Docket No. 306), which the Bankruptcy Court more fully may reflect in a written order, denying in part the Motion to Dismiss the Debtor's Chapter 11 Cases and, as an Alternative and Interim Relief, to Appoint a Chapter 11 Trustee.

"Disposition" means the sale or other transfer to any Person by any Loan Party of any asset.

"Dollar" and "$" mean lawful money of the United States.

5

"Draw Request" means a written request by the Borrower, executed by a Responsible Officer of the Borrower, requesting a Second Term Loan Advance, and identifying therein the amount of such requested Second Term Loan Advance and the date it is to be made. Delivery of a Draw Request to the Lender is a representation and warranty by the Responsible Officer executing the Draw Request for the Borrower that no Default exists and that, as of the date of such Draw Request, the representations and warranties of the Borrower in Article V of this Second Credit Agreement are true and correct in all material respects.

"Environmental Action" means any action, suit, demand, demand letter, claim, notice of non-compliance or violation, notice of liability or potential liability, investigation, proceeding, consent order or consent agreement relating in any way to any Environmental Law, Environmental Permit or Hazardous Materials or arising from alleged injury or threat of injury to health, safety or the environment, including, without limitation, (a) by any governmental or regulatory authority for enforcement, cleanup, removal, response, remedial or other actions or damages and (b) by any governmental or regulatory authority or any third party for damages, contribution, indemnification, cost recovery, compensation or injunctive relief.

"Environmental Laws" means any and all Federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, licenses or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, noise, air emissions and discharges to waste or public systems.

"Environmental Permit" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership, membership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership, membership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership, membership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other ownership, membership or profit interests), and all of the other ownership or profit interests in such Person (including, without limitation, partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor statute.

"Event of Default" has the meaning specified in Section 8.01.

"Existing Indebtedness" means Indebtedness of each Loan Party existing on the Petition Date.

"Exit Fee" has the meaning specified in Section 2.05(b).

"Final Second DIP Order" means a final order of the Bankruptcy Court approving the terms and conditions of the Second DIP Loan Documents substantially in the form of and containing, among other things, the provisions present in the Interim Second DIP Order (including, without limitation, the obtaining of the full amount of the Second Term Loan of up to $8,000,000 and the granting of Liens and the super-priority status referred to in the Second DIP Loan Documents, subject only to the Lender's rights and interests under the First DIP Facility), which final order shall be in form and substance satisfactory to the Lender in its sole discretion and shall not have been reversed, amended, supplemented, modified, stayed or vacated.

"First DIP Facility" has the meaning specified in Preliminary Statement 3 to this Second Credit Agreement.

"GAAP" means generally accepted accounting principles in the United States in effect from time to time as applied by a significant segment of the accounting profession in the United States.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness of the payment or performance of such Indebtedness, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness of any other Person, whether or not such Indebtedness is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.  The term "Guarantee" as a verb has a corresponding meaning.

"Guaranteed Obligations" has the meaning specified in Section 10.01.

"Guarantors" means, collectively, Development and Lauth Investment, and "Guarantor" means either of such Guarantors, individually.

"Guaranty" has the meaning specified in Section 10.01.

7

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)     all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)     net obligations of such Person under any Swap Contract;

(d)     all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and not past due for more than 90 days after the date on which each such trade payable or account payable was created);

(e)     indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)     capital leases and Synthetic Lease Obligations;

(g)     all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interests in such Person or any other Person or any warrants, rights or options to acquire such Equity Interests, valued, in the case of redeemable preferred interests, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; provided, however, that the foregoing shall not include any obligations in respect of any Equity Interest if (i) such obligations are not included as indebtedness or a liability in accordance with GAAP on the balance sheet of such Person, and (ii) such purchase, redemption, retirement or payment may not occur until after the Second DIP Maturity Date; and

(h)     all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date. The amount of any capital lease or Synthetic Lease Obligation as of any date

8

shall be deemed to be the amount of Attributable Indebtedness in respect thereof as of such date. The amount of Indebtedness of any Person at any date shall be the outstanding balance at such date of all unconditional obligations as described above and the maximum liability, upon the occurrence of the contingency giving rise to the obligation, of any contingent obligations at such date; provided, that the amount outstanding at any time of any Indebtedness issued with the original issue discount is the face amount of such Indebtedness less the remaining unamortized portion of the original issue discount of such Indebtedness at such time as determined in conformity with GAAP.

"Indemnitees" has the meaning set forth in Section 11.05.

"Interest Payment Date" means the Second DIP Maturity Date.

"Interest Margin" means Fifteen Percent (15%) per annum.

"Interim Second DIP Order" has the meaning specified in Section 4.01(f).

"Interim Second DIP Order Entry Date" has the meaning set forth in Preliminary Statement 4 of this Second Credit Agreement.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of capital stock or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor incurs debt of the type referred to in clause (h) of the definition of "Indebtedness" set forth in this Section 1.01 in respect of such Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit or all or a substantial part of the business of, such Person; provided, however, that deposits made by any Loan Party in the ordinary course of business in connection with the acquisition of aircraft, airframes or engines or the entry into contracts (but excluding deposits to secure Indebtedness) shall not be considered an "Investment".  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"Laws" means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, any Governmental Authority.

"Lien" means any mortgage, pledge, security interest, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority, privilege or other security interest or preferential arrangement of any kind or nature whatsoever intended for security (including any conditional sale or other title retention agreement, any easement, right of

way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"Loan" means the Second Term Loan.

"Loan Parties" means, collectively, the Borrower and each Guarantor.

"Loan Party Group" means, collectively, the Loan Parties and their respective Subsidiaries.

"M&I Superpriority Allowed Claim" means the Superpriority Claim of M&I Marshall & Ilsey Bank granted and allowed in the Cases by order of the Bankruptcy Court (Docket No. 340), entered on August 4, 2009.

"Material Adverse Change" means a material adverse change in the business, financial condition, operations, performance, properties or financial prospects of the Borrower and the Guarantors taken as a whole from and after the Petition Date, other than any change of the type which customarily occurs as a result of events leading up to and following the commencement of a case under Chapter 11 of the Bankruptcy Code and the commencement of the Cases.

"Material Adverse Effect" means (a) a material adverse effect upon the business, financial condition, operations, performance, properties or financial prospects of the Borrower and the Guarantors taken as a whole, other than any effect of the type which customarily occurs as a result of events leading up to and following the commencement of a case under chapter 11 of the Bankruptcy Code and the commencement of the Cases; (b) a material impairment of the rights and remedies of the Lender under any Loan Document, or of the ability of any Loan Party to perform its obligations under any Loan Document to which it is a party; (c) a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party; or (d) a material impairment of the Collateral taken as a whole.

"Net Cash Proceeds" means:  (a) with respect to the Disposition of any Collateral by the Borrower, the excess, if any, of (i) the sum of cash and Cash Equivalent Investments received in connection with such Disposition (including any cash or Cash Equivalent Investments received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount of any Indebtedness that is secured by such asset and that is required to be repaid in connection with the Disposition thereof (other than Indebtedness under the Loan Documents), (B) the reasonable and customary out-of-pocket fees and expenses (including reasonable and customary brokerage and legal counsel fees) incurred by the Borrower in connection with such Disposition and (C) taxes reasonably estimated by the Borrower to be actually payable within one year of the date of the Disposition as a result of any gain recognized in connection therewith documented in form and substance reasonably satisfactory to the Lender; and  (b) with respect to the issuance of any capital stock or other Equity Interest by a Loan Party or the issuance of any Indebtedness by a Loan Party, the sum of the cash and Cash Equivalent Investments received in connection with such sale or issuance, less the underwriting discounts and commissions, and other out-of-pocket expenses incurred by such Loan Party in connection with such sale or issuance.

"Obligated Party" has the meaning specified in Section 10.03.

"Obligations" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under or pursuant to or in connection with any Second DIP Loan Document or otherwise with respect to the Second Term Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.  Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Second DIP Loan Documents include (a) the obligations to pay principal, interest, charges, expenses, fees, attorneys' fees and disbursements, indemnities and other amounts payable by the Borrower or any other Loan Party under any Second DIP Loan Document, and (b) the obligations of the Borrower or any other Loan Party to reimburse any amount in respect of any of the foregoing obligations under the Second DIP Loan Documents that the Lender, in its sole discretion, may elect to pay or advance on behalf of the Borrower.

"Orders" means the Second DIP Financing Orders or any other order of the Bankruptcy Court in connection with the Cases.

"Organization Documents" means (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Taxes" has the meaning specified in Section 3.01(b).

"Outstanding Amount" means, as of any date, the aggregate outstanding principal amount of the Second Term Loan after giving effect to any Second Term Loan Advances and prepayments or repayments of the Second Term Loan, occurring on such date.

"Participant" has the meaning specified in Section 11.07(b).

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning specified in Preliminary Statement 1 to this Second Credit Agreement.

"Pledged Equity" has the meaning specified in Section 9.01.

"Post-Petition", when used with respect to any agreement or instrument, any claim or proceeding or any other matter, shall refer to an agreement or instrument that was entered into or became effective, a claim or proceeding that first arose or was first instituted, or another matter that first occurred, after the commencement of the Cases.

"Pre-Petition", when used with respect to any agreement or instrument, any claim or proceeding or any other matter, shall refer to an agreement or instrument that was entered into or became effective, a claim or proceeding that arose or was instituted, or another matter that occurred, prior to the Petition Date.

"Pre-Petition Payment" means a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Pre-Petition Indebtedness or trade payables or other Pre-Petition claims against the Borrower or any Guarantor.

"Primary Collateral" has the meaning specified in Section 9.01.

"Principal Balance" shall mean the outstanding principal balance of the Term Loan.

"Professional Fees" has the meaning ascribed to it in the definition of "Carve-Out" in Section 1.01.

"Professional Persons" has the meaning ascribed to it in the definition of "Carve-Out" in Section 1.01.

"Qualifying Distribution" means, any distribution made to the Borrower by any Subsidiary with respect to Pledged Equity owned by the Borrower: (a) which is comprised of proceeds from, or funded by or made as the result of, any sale, financing, refinancing or similar transaction (including without limitation, transactions which generate condemnation awards, payment of title insurance proceeds or casualty loss insurance proceeds, other than business interruption or rental loss insurance proceeds) of the real estate or improvements thereon, or any part thereof, owned by a Subsidiary; or (b) is a liquidating distribution made by a Subsidiary in connection with its dissolution.

"Refinancing Event" has the meaning specified in Section 2.05(c).

"Released Parties" has the meaning specified in Section 2.11.

"Releasing Parties" has the meaning specified in Section 2.11.

"Reorganization Plan" means a chapter 11 plan of reorganization or liquidation filed in its Case by the Borrower.

"Responsible Officer" means, (i) the chief executive officer, president, manager, chief financial officer, executive vice president or treasurer of a Loan Party, and (ii) with respect to each Loan Party (other than the Borrower), any person authorized by the manager or members of such Loan Party to execute documents in connection with the Loan Documents on behalf of such Loan Party.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate,

12

partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Loan Party, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to the Borrower's members (or the equivalent Persons thereof).

"Second DIP Facility" means the extensions of credits to Borrower from Lender contemplated under this Second Credit Agreement, the Second Term Note and the Collateral Documents.

"Second DIP Financing Orders" means the Interim Second DIP Order or the Final Second DIP Order or both, as the context may require.

"Second DIP Loan Documents" means, collectively, (a) this Second Credit Agreement, (b) the Second Term Note, and (c) the Collateral Documents.

"Second DIP Maturity Date" means the earliest of (a) the Scheduled Second DIP Maturity Date, (b) the effective date of any Reorganization Plan or the emergence of any of the Borrower or Guarantors from bankruptcy and (c) the acceleration of the loans and termination of the commitments under either the First DIP Facility or this Second DIP Facility, including, without limitation, as a result of the occurrence of certain events in bankruptcy to be determined.

"Scheduled Second DIP Maturity Date" means September 30, 2010.

"Second Term Commitment" means the Lender's obligation to make the Second Term Loan to the Borrower pursuant to Section 2.01.

"Second Term Loan" means the Second Term Loan Advances made by the Lender pursuant to Section 2.01 and evidenced by the Second Term Note.

"Second Term Loan Advances" has the meaning specified in Section 2.01.

"Second Term Note" means a promissory note of the Borrower payable to the order of the Lender, in substantially the form of Exhibit A, evidencing the aggregate Indebtedness of the Borrower to the Lender with respect to the Second Term Loan, as the same may be amended, restated or replaced from time to time.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.   Unless otherwise

13

specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Superpriority Claim" shall mean a claim against the Borrower and each Guarantor in each of the Cases pursuant to Section 364(c) (1) of the Bankruptcy Code having priority over any or all administrative expenses and other claims of the kind specified in, or otherwise arising or ordered under, any Sections of the Bankruptcy Code (including, without limitation, Sections 105, 326, 328, 330, 331, 503(b), 507, 546(c) and/or 726 thereof), whether or not such claim or expenses may become secured by a judgment lien or other non-consensual lien, levy or attachment.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts.

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or lease in which the lessee is contractually entitled to the tax benefits of ownership of the leased assets, or (b) an agreement for the use or possession of property creating obligations that do not appear on the balance sheet of such Person but which, upon the insolvency or bankruptcy of such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" has the meaning specified in Section 3.01(a).

"Total Commitment" has the meaning specified in Section 2.01.

"United States" and "U.S." mean the United States of America.

"UST/Clerk Fees" has the meaning set forth in the Interim Order.

"Warrant" has the meaning specified in Section 2.05(b).

1.02    Other Interpretive Provisions.  With reference to this Second Credit Agreement and each other Second DIP Loan Document, unless otherwise specified herein or in such other Second DIP Loan Document:

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b) (i)  The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Second DIP Loan Document shall refer to such Second DIP Loan Document as a whole and not to any particular provision thereof.

(ii)    Article, Section, Exhibit and Schedule references are to the Loan Document in which such reference appears.

(iii)    The term "including" is by way of example and not limitation.

(iv)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(c)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including," the words "to" and "until" each mean "to but excluding," and the word "through" means "to and including."

(d)    Section headings herein and in the other Second DIP Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Second Credit Agreement or any other Second DIP Loan Document.

1.03    Accounting Terms.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Second Credit Agreement shall be prepared in conformity with, GAAP, as in effect from time to time.

1.04    References to Agreements and Laws.  Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including the Second DIP Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are not prohibited by any Second DIP Loan Document; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

1.05    Times of Day.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

ARTICLE II

THE COMMITMENT AND TERM LOAN ADVANCES

2.01    The Second Term Loan.  Subject to the terms and conditions set forth in this Second Credit Agreement, including in Article IV of this Second Credit Agreement, on and after the date that the conditions to the funding of the Second Term Loan by the Lender are satisfied, including without limitation, delivery by the Borrower of the Budget to Lender, the Lender shall make the Second Term Loan to the Borrower by making advances of the principal thereof (collectively, "Second Term Loan Advances" and individually, each a "Second Term Loan Advance"), as may be represented by a Draw Request from the Borrower submitted to the Lender from time to time, in the aggregate amount not to exceed, prior to obtaining a Final Second DIP Order, the aggregate principal sum of $5,000,000 ("Total Commitment "), and after obtaining a Final Second DIP Order, the aggregate principal sum of up to $8,000,000. The maximum principal amount of the Second Term Loan which may be available after the obtaining of the Final Second DIP Order is sometimes referred to in this Second Credit Agreement as the "Maximum Second DIP Loan Amount"; the Total Commitment is subject to increase up to Maximum Second DIP Loan Amount solely as provided in Section 2.15.  Notwithstanding anything in the Second DIP Loan Documents to the contrary, the Lender shall have no obligation to make any Second Term Loan Advance while any unremedied Default exists or at any time on or after the Second DIP Maturity Date.  Payment of the Second Term Loan is subordinated in priority of payment only to the First DIP Facility. Amounts repaid with respect to the Second Term Loan may not be reborrowed.

2.02    Prepayments.

(a)    Optional.  The Borrower may, upon notice to the Lender, at any time or from time to time voluntarily prepay the Second Term Loan in whole or in part without premium or penalty; provided that (i) such notice must be received by the Lender not later than 1:00 p.m. (A) two Business Days prior to any date of any such prepayment; (ii) any prepayment of the Second Term Loan shall be in a minimum principal amount of $100,000 or a whole multiple of $25,000 in excess thereof; and if less, the Outstanding Amount of the Second Term Loan.  Each such notice shall specify the date and amount of such prepayment.  If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.

(b)    Mandatory.

(i)    Upon the issuance by any Loan Party of any of its capital stock or other Equity Interests to any Person other than another Loan Party or the Lender (or the receipt of any capital contribution by any Loan Party from any Person other than another Loan Party), the Borrower shall prepay an aggregate principal amount of the Second Term Loan equal to 100% of all Net Cash Proceeds received therefrom immediately upon receipt thereof by any Loan Party.

(ii)    Upon the incurrence or issuance by any Loan Party of any Indebtedness to any Person other than another Loan Party (other than Indebtedness expressly permitted to be

16

incurred or issued pursuant to Section 7.03(c)), the Borrower shall prepay an aggregate principal amount of the Second Term Loan equal to 100% of all Net Cash Proceeds received therefrom immediately upon receipt thereof by any Loan Party.

(iii)    Upon the sale or other disposition of any of the Collateral, the Borrower shall prepay any aggregate principal amount of the Second Term Loan equal to 100% of the Net Cash Proceeds received therefrom immediately upon closing of such sale or other disposition.

(iv)    Upon receipt of any Qualifying Distribution with respect to any of the Pledged Equity, the Borrower shall prepay an aggregate principal amount of the Second Term Loan equal to 100% of such Qualifying Distribution immediately upon receipt thereof.

All mandatory prepayments will be applied without penalty or premium.

(c)    Prepayments to Include Accrued Interest, Etc.    All prepayments under this Section 2.02 shall be made together with accrued and unpaid interest to the date of such prepayment on the principal amount so prepaid.

2.03    Repayment of the Obligation.    The Borrower shall repay to the Lender on the Second DIP Maturity Date the Outstanding Amount of the Second Term Loan, all accrued unpaid interest thereon, and all other Obligations outstanding on such date.

2.04    Interest.

(a)    Interest Rate.    Subject to the provisions of subsections (b) and (c) below, the Second Term Loan and Second Term Note shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the applicable Interest Margin per annum calculated on the basis of the actual number of days elapsed in a year of 360 days and payable quarterly in arrears.  For the purposes of this Second Credit Agreement, the applicable Interest Margin for the Second DIP Facility shall be 15.0%.

(b)    Default Rate.    Upon the occurrence and during the continuance of an Event of Default, all outstanding obligations shall bear interest at the Default Rate.

(c)    Payment Dates.    Interest on the Second Term Loan shall be due and payable in arrears on the Interest Payment Date and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment.

2.05    Fees and Other Compensation.

(a)    Commitment Fee.    Subject to the condition that a Interim Second DIP Order is obtained, the Borrower shall pay to the Lender, on the Maturity Date a closing fee equal to five percent (5.00%) of the Total Commitment (the "Commitment Fee").  The Commitment Fee shall be deemed fully earned on the execution of this Second Credit Agreement by the Lender and the

obtaining of the Interim Second DIP Order.  In the sole discretion of Lender, payment of the Commitment Fee may be deferred to a later date determined by Lender.

(b)      Exit Fee and Warrant Proposal.  Subject to the condition that this provision is expressly approved by the Bankruptcy Court as part of the Final Second DIP Order, the Borrower shall pay to the Lender, upon acceleration of the maturity of the Second Term Loan by the Lender by reason of the occurrence and continuance of any Event of Default, an exit fee (the "Exit Fee") equal to ten percent (10%) of the Outstanding Amount of the Second Term Loan as of the Second DIP Maturity Date.  Borrower may propose as part of any Reorganization Plan (the "Warrant Proposal") that in satisfaction of Borrower's obligation to pay the Exit Fee, the Borrower, upon the effective date of such Reorganization Plan, will issue to Lender and Lender will accept an assignable warrant and option (the "Warrant") which is immediately exercisable and have an exercise period term of not less than one (1) year from the date of its issuance, to purchase, for an aggregate purchase price of One Dollar ($1.00), equity interests in the reorganized Borrower equal to twenty-five percent (25%) of each class of equity interests of the reorganized Borrower.  If Lender accepts Borrower's Warrant Proposal, such Warrant shall be in a form which is reasonably satisfactory to the Lender and is approved by the Lender prior to the date the Final Second DIP Order is obtained.  If Lender rejects Borrower's Warrant Proposal, Borrower shall remain obligated to pay to Lender the Exit Fee.  This provision is not effective as a result of the entry of the Interim Second DIP Order and may only become effective if approved as part of the Final Second DIP Order.

(c)      Yield Maintenance Fee.  In the event a Final Second DIP Order is obtained with respect to this Second Credit Agreement, but prior to the Second DIP Maturity Date, the Second Term Loan is fully prepaid through means *exclusive of* a Reorganization Plan and the Second Term Commitment terminated (the "Refinancing Event") using in whole or in part proceeds of Indebtedness obtained by any of the Loan Parties with approval of the Bankruptcy Court (other than proceeds of Indebtedness obtained from the Lender), the Lender shall be paid, as compensation for this prepayment and as additional compensation for its Commitment, a yield maintenance fee for equal to seven and one-half percent (7.5%) of the Outstanding Amount as of the Refinancing Event.

2.06      Computation of Interest and Fees.  All computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year).  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid.  Each determination by the Lender of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

2.07      Evidence of Indebtedness.

(a)      Second Term Loan Advances and the Outstanding Amount and Second Term Note shall be evidenced by one or more accounts or records maintained by the Lender in the ordinary course of business.  The accounts or records maintained by the Lender shall be conclusive absent manifest error of the amount of the Second Term Loan Advances made by the Lender to the Borrower and the interest and payments thereon.  Any failure to so record or any

error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.

2.08    Payments Generally.

(a)    All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Lender in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein.

(b)    If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

2.09    Approval of Interest.    Approval of this Second Credit Agreement by the Bankruptcy Court shall constitute approval of the rates of interest and other amounts payable hereunder and a ruling that they are exempt from any otherwise applicable limitation.

2.10    Superpriority Nature of Obligations; Lender's Sole Priming Lien.

(a)    Except as set forth in this paragraph, subject to the Carve-Out, the Obligations shall be secured by:

(i)    an allowed joint and several superpriority administrative expense claim pursuant to Section 364(c)(1) of the Bankruptcy Code in each of the Cases having priority over, subject and inferior in priority only to the First DIP Facility and M&I Superpriority Allowed Claim, all administrative expense, claims and unsecured claims against the Loan Parties, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in, or ordered pursuant to Sections 105, 326, 328, 330, 331, 503(b), 507, 546(c), 726 or 1114 of the Bankruptcy Code whether or not such claims or expenses may become secured by a judgment lien or other non-consensual lien, levy or attachment, and shall at all times be senior to the rights of any Loan Party, any Loan Party's estate, and any successor trustee or estate representative in the Cases or any subsequent proceeding or case under the Bankruptcy Code.

(ii)    a continuing second priority Lien and security interest in and to all Primary Collateral (as herein defined) of the Loan Parties, subject only to (i) the first priority Lien of the Lender under the First DIP Facility, (ii) valid and perfected Liens in existence on the Petition Date and junior to such valid and perfected Liens; and (iii) valid, enforceable and nonavoidable Liens existing as of the Petition Date, but perfected after the Petition Date pursuant to Section 546(b) of the Bankruptcy Code only to the extent such post-petition perfection is expressly permitted under the Bankruptcy Code.

(b)    Notwithstanding the foregoing, the Loan Parties shall be permitted to pay, as the same may become due and payable, subject to the provisions of the Orders and this Section 2.10, the fees and expenses provided for in the definition of the Carve-Out.  Except for the Carve-Out, no costs or expenses of administration shall be imposed against the Lenders or the Collateral under Sections 105, 506(c) or 552 of the Bankruptcy Code, or otherwise.

BDDB01 6154564v8

2.11    Release.  The Borrower and the Guarantors each hereby acknowledge, effective as of the date of the Interim Second DIP Order, that the Borrower and the Guarantors have no defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all or any part of the Borrower's or the Guarantors' liability to repay the Lender as provided in this Second Credit Agreement or to seek affirmative relief or damages of any kind or nature from the Lender.  The Borrower and the Guarantors, each in its own right and on behalf of its bankruptcy estate, all its successors, assigns, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through it (collectively, the "Releasing Parties"), hereby fully, finally and forever release and discharge the Lender and all of its past and present officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them but only in their capacity as past and present officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries of the Lender (collectively, the "Released Parties") of and from any and all past and present actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now or existing against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Second Credit Agreement, the Interim Second DIP Order, the Final Second DIP Order and the debtor in possession financings contemplated or ordered therein, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to this Second Credit Agreement, the Interim Second DIP Order, the Final Second DIP Order or such financings; provided, however, that nothing herein shall affect the rights of any party to the agreements to be executed in connection with the Closing.  Nothing in this Section 2.11 shall release any claims against the Released Parties arising prior to the Petition Date, including without limitation, arising under Sections 541 and 550 of the Bankruptcy Code or that are not related to this Second Credit Agreement or the Interim Second DIP Order or the Final Second DIP Order.

2.12    Waiver of any Priming Rights.  Upon the Closing Date, and on behalf of themselves and their estates, and for so long as any Obligation shall be outstanding, the Borrower and the other Loan Parties hereby irrevocably waive any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, exclusive solely of the existing First DIP Facility, (a) to grant any Lien of equal or greater priority than the Lien securing the Second DIP Obligations, or (b) to approve or incur a claim of equal or greater priority than the Second DIP Obligations.

2.13    Payment of Obligations. Upon the Second DIP Maturity Date (whether by acceleration or otherwise) of any of the Second DIP Obligations, Lender shall be entitled to

immediate payment of such Second DIP Obligations without further application to or order of the Bankruptcy Court.

2.14   No Discharge; Survival of Claims.   The Borrower and each of the other Loan Parties agrees that (a) the Obligations shall not be discharged by the entry of an order confirming a Reorganization Plan (and the Borrower and each of the other Loan Parties, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (b) the Superpriority Claim granted to the Lender pursuant to the Interim Order and Final Order and described in Section 2.10 and the Liens granted to Lender pursuant to the Interim Order and Final Order and described in Section 9.01 shall not be affected in any manner by the entry of an order confirming a Reorganization Plan in any of the Cases.

2.15   Increase in Commitment.

(a)   Subject to the consent of the Lender and the conditions set forth below, the Borrower from time to time after the Final Second DIP Order is obtained may seek additional loans exceeding the Total Commitment up to Maximum Loan Amount (hereafter the sum of loans under the Second Credit Agreement exceeding the Total Commitment up to the Maximum Loan amount shall be referred to as the "Discretionary Portion of the Second DIP Facility"). Any additional loans that shall constitute the loans under the Discretionary Portion of the Second DIP Facility, may be made, if at all, solely in the discretion of the Lender; provided that:

(i)   no Default shall have occurred and be continuing hereunder as of the effective date of each such increase;

(ii)   the representations and warranties made by the Borrower and contained in Article V shall be true and correct in all material respects on and as of the effective date of each such increase with the same effect as if made on and as of such date (other than those representations and warranties that by their terms speak as of a particular date, which representations and warranties shall be true and correct as of such particular date);

(iii)   the aggregate amount of all such increases up to the Maximum Loan Amount shall not exceed $3,000,000;

(iv)   the aggregate amount of each additional loan that shall constitute a loan under the Discretionary Portion of the Second DIP Facility shall be an integral multiple of $500,000 and not less than $500,000; and

(v)   the Borrower shall have executed and delivered to the Lender all documents and instruments reasonably requested by the Lender in its reasonable discretion to effect each such loan constituting a loan that shall be within the Discretionary Portion of the Second DIP Facility, including without limitation, a replacement Second Term Note which is in the amount of the Second Term Note, plus (i) the sum of any prior loans under the Discretionary Portion of the Second DIP Facility, if any, plus (ii) the sum of the then requested loan under the Discretionary Portion of the Second DIP Facility and otherwise substantially the same as the initial Second Term Loan.

21

ARTICLE III

TAXES, YIELD PROTECTION AND ILLEGALITY

3.01   <u>Taxes</u>.

(a)      Except as otherwise provided in this Section 3.01, any and all payments by the Borrower to or for the account of the Lender under any Second DIP Loan Document shall be made free and clear of and without deduction for any and all present or future taxes, duties, levies, imposts, deductions, assessments, fees, withholdings or similar charges, and all liabilities with respect thereto, excluding, in the case of the Lender, taxes imposed on or measured by its overall net income, and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the Laws of which the Lender, is organized or is otherwise a resident or doing business (other than a jurisdiction in which the Lender is deemed to be doing business solely as a result of entering into, or performing its obligations under, any Second DIP Loan Document) (all such non-excluded taxes, duties, levies, imposts, deductions, assessments, fees, withholdings or similar charges, and liabilities being hereinafter referred to as ("<u>Taxes</u>").  If the Borrower shall be required by any Laws to deduct any Taxes from or in respect of any sum payable under any Second DIP Loan Document, then, except as otherwise provided in this Section 3.01, (i) the sum payable shall be increased as necessary so that after making all required deductions with respect to Taxes (including deductions applicable to additional sums payable under this Section), the Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions, (iii) the Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable Laws, and (iv) within 45 days after the date of such payment, the Borrower shall furnish to the Lender the original or a certified copy of a receipt evidencing payment thereof to the extent such a receipt is issued therefor, or other written proof of payment thereof that is reasonably satisfactory to the Lender.

(b)      In addition, the Borrower agrees to pay any and all present or future stamp, court or documentary taxes and any other excise or property, intangible, mortgage recording taxes or similar charges or similar levies which arise from any payment made under any Second DIP Loan Document or from the execution, delivery, performance, enforcement or registration of, or otherwise with respect to, any Second DIP Loan Document (hereinafter referred to as "<u>Other Taxes</u>").

(c)      If the Borrower shall be required to deduct or pay any Taxes or Other Taxes from or in respect of any sum payable under any Second DIP Loan Document to the Lender, the Borrower shall also pay to the Lender at the time interest is paid, such additional amount that the Lender specifies is necessary to preserve the after-tax yield (after factoring in all taxes, including taxes imposed on or measured by net income) that the Lender would have received if such Taxes or Other Taxes had not been imposed.

(d)      The Borrower agrees to indemnify the Lender for (i) the full amount of Taxes and Other Taxes (including any Taxes or Other Taxes imposed or asserted by any jurisdiction on amounts payable under this Section) paid by the Lender, (ii) amounts payable under Section

BDDB01 6154564v8

3.01(c) without duplication and (iii) any liability (including additions to tax, penalties, interest and expenses) arising therefrom or with respect thereto, in each case whether or not such Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority; but excluding amounts resulting from the failure to comply with the requirements of Section 11.05.  Payment under this subsection (d) shall be made within 30 days after the date the Lender makes a demand therefor.

(e)      If the Lender determines, in its sole discretion, that is has actually received or realized any refund of tax, any reduction of, or credit against, its withholding or payment of any additional amount by the Borrower pursuant to this Section 3.01, the Lender shall reimburse the Borrower in an amount equal to the net benefit, after tax, and net of all expenses incurred by the Lender in connection with such refund, reduction, credit or recovery; provided that nothing in this Section 3.01(e) shall require the Lender to make available its tax returns (or any other information relating to its taxes which it deems to be confidential or interfere with the Lender's right to arrange its tax affairs in whatever manner it deems fit or to obligate the Lender to claim any credit).  The Borrower shall return such amount to the Lender in the event that such Person is required to repay such refund of tax or is not entitled to such reduction of, or credit against its tax liabilities.

3.02      Matters Applicable to All Requests for Compensation.  A certificate of the Lender claiming compensation under this Article III and setting forth the additional amount or amounts to be paid to it hereunder and the basis therefor shall be conclusive in the absence of manifest error.  In determining such amount, the Lender may use any reasonable averaging and attribution methods.

3.03      Survival.  All of the Borrower's obligations under this Article III shall survive termination of the Commitment and repayment of all other Obligations hereunder.

ARTICLE IV

CONDITIONS PRECEDENT TO SECOND TERM LOAN ADVANCES

4.01      Conditions to Closing and Initial Second Term Loan Advance.  This Second Credit Agreement shall become effective, and the obligation of the Lender to make and fund any Second Term Loan Advances shall become effective, on and as of the first date on which all of the following conditions precedent shall have been satisfied or waived by the Lender:

(a)      The Lender's receipt of the following, each of which shall be originals or telecopies, facsimiles or electronically delivered PDF copies (followed promptly by originals) unless otherwise specified in this Article IV, each properly executed by a Responsible Officer of the signing Loan Party, and each in form and substance reasonably satisfactory to the Lender and its respective legal counsel:

(i)      counterparts of this Second Credit Agreement, sufficient in number for distribution to the Lender and the Borrower, duly executed by the appropriate Loan Parties;

(ii)      the Second Term Note duly executed by the Borrower;

23

(iii)     a copy of the Interim Second DIP Order certified by the clerk of the Bankruptcy Court, which Interim Second DIP Order shall be in the form acceptable to the Lender and shall not have been reversed, amended, supplemented, modified, stayed or vacated in any respect which is not acceptable to the Lender;

(iv)     such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Lender may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Second Credit Agreement and the other Second DIP Loan Documents to which such Loan Party is a party or is to be a party;

(v)     a certificate of a Responsible Officer of each Loan Party either (A) listing all consents, licenses and approvals required in connection with the execution, delivery and performance by such Loan Party and the validity against such Loan Party of the Second DIP Loan Documents to which it is a party, and such consents, licenses and approvals shall be in full force and effect, or (B) stating that no such consents, licenses or approvals are so required;

(vi)     such documents and certifications as the Lender may reasonably require to evidence that each Loan Party is duly organized or formed, and that each of the Loan Parties is validly existing and in good standing in its jurisdiction of organization; and

(vii)     a favorable opinion of counsel to the Loan Parties, addressed to the Lender, in the form and substance acceptable to the Lender and its counsel.

(b)     The Bankruptcy Court shall have approved by entry of final, non-appealable orders granting: (i) certain modifications to the Final First DIP Order and the Amended First DIP Credit Agreement, pursuant to which the "Interest Reserve Account" required under the Final First DIP Order is deleted and the provisions in the Amended First DIP Credit Agreement for the "Interest Payment Date" are modified in connection with the "Maturity Date" as defined in the Amended Credit Agreement, and (ii) the "Debtor's Motion For Entry Of An Order Authorizing The Debtors To Perform Under Asset Management" (docket #119) and approving the Asset Management Agreement proposed therein, as it may be amended with the approval of Lender.

(c)     The Lender shall have received the Budget and shall have determined in the Lender's sole and independent judgment that the components of the Budget are reasonable, are based on reasonable assumptions and reflect future financial performance, cash flows and financial conditions which are adequate in the Lender's sole and independent judgment to allow it to make the Second Term Loan.

(d)     The Closing Date shall have occurred and no Default shall exist.

(e)     The Lender shall have received evidence reasonably satisfactory to the Lender that the Loan Parties shall have complied in full with the notice and other requirements of the Bankruptcy Code in a manner reasonably acceptable to the Lender and its counsel.

24

(f)     The entry of an enforceable order of the Bankruptcy Court approving the terms and conditions of the Second Term Loan (including without limitation, (i) the finding that the Lender is extending the credit under the Second Term Loan in "good faith" within the meaning of Section 364(e) of the Bankruptcy Code, (ii) pursuant to Sections 364(c)(2) and (c)(3) of the Bankruptcy Code, authorizing and granting the security interests and liens upon all property of the Borrower's estate defined under Section 541 of the Bankruptcy Code and otherwise described above, and (iii) pursuant to Section 364(c)(1) of the Bankruptcy Code, the granting of the superpriority status and liens referred to herein, and (d) the automatic perfection of all liens referred to herein, such order to be in the form and substance satisfactory to the Lender in its sole discretion and which shall not have been reversed, modified, amended or stayed without the prior written consent of the Lender (the "Interim Second DIP Order").   Such order shall also (y) approve the Loan Parties' waiver of any and all claims and causes of action against the Lender (and its respective affiliates) directly related to the Second Term Loan or the negotiation of the terms thereof, and (z) prohibit subsequent granting of Liens or priority status superior to, or pari passu with, those provided in connection with the Second Term Loan.

(g)     Lender's reasonable determination that all motions, orders, and other pleadings or related documents to be filed or submitted to the Bankruptcy Court in connection with the Second Term Loan shall be consistent with the terms of the Second Term Loan and the Second DIP Loan Documents.

(h)     The Lender's reasonable determination that all other related orders entered by the Bankruptcy Court in the Cases are not inconsistent with the terms of the Second Term Loan and the Second DIP Loan Documents.

(i)     The completion of searches for existing Liens on the Collateral and the Lender shall have (i) pursuant to 11 U.S.C. §364(c)(1), a joint and several superpriority administrative expense claim status in the Cases (subject only and inferior in priority to (A) the superpriority administrative claims previously granted to Lender with respect to the First DIP Facility and (B) the M&I Superpriority Allowed Claim), and (ii) pursuant to 11 U.S.C. §364(c)(1), a valid and perfected second priority superpriority, second Lien on and security interest in the Collateral, subject solely to (A) the first priority lien under the First DIP Facility, (B) valid and perfected Liens in existence on the Petition Date and junior to such valid and perfected Liens; and (C) valid, enforceable and nonavoidable Liens existing as of the Petition Date, but perfected after the Petition Date pursuant to Section 546(b) of the Bankruptcy Code only to the extent such post-petition perfection is expressly permitted under the Bankruptcy Code.

(j)     The Lender shall have been paid by the Borrower all amounts then due it pursuant to Section 11.04.

(k)     The Lender shall have received evidence reasonably satisfactory to the Lender that Lender, with respect to the First DIP Facility, consents to the Second Term Loan and the Second DIP Loan Documents.

4.02   Conditions to Each Term Loan Advance.  The obligation of the Lender to fund each Second Term Loan Advance shall be subject to each of the following conditions precedent,

each of which shall have been satisfied or waived by the Lender as of the date of each such Second Term Loan Advance:

(a)      No Material Adverse Change shall have occurred.

(b)      The representations and warranties of the Borrower and each other Loan Party contained in Article V or any other Second DIP Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects on and as of the date of such Second Term Loan Advance, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date, and except that for purposes of this Section 4.02, the representations and warranties contained in subsections (a) and (b) of Section 5.05 shall be deemed to refer to the most recent statements furnished pursuant to clauses (a) and (b), respectively, of Section 6.01.

(c)      The Interim Second DIP Order or Final Second DIP Order shall be in full force and effect, and shall not have been reversed, amended, supplemented, modified, stayed or vacated.

(d)      Usage of the Total Commitment shall not be permitted to exceed the lesser of (i) the Total Commitment then in effect and (ii) the aggregate amount authorized and approved by the Interim Second DIP Order or the Final Second DIP Order, as the case may be.

(e)      The Lender shall have been paid by the Borrower all amounts then due it pursuant to or under Section 11.04.

4.03      <u>Additional Conditions</u>.  The obligation of the Lender to fund each Second Term Loan Advance which may be requested by the Borrower from and after the obtaining of a Final Second DIP Order shall be subject to each of the following conditions precedent, each of which shall have been satisfied or waived by the Lender as of the date of each such Second Term Loan Advance:

(a)      [Reserved]

(b)      [Reserved]

ARTICLE V

REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Lender that as of the Closing Date and as of the date of the making of each Term Loan Advance:

5.01      <u>Existence, Qualification and Power; Compliance with Laws</u>.  Each Loan Party (a) is a limited liability company duly organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its organization, (b) subject to the entry of the Second DIP Financing Orders has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and

26

(ii) execute, deliver and perform its obligations under the Second DIP Loan Documents, and (c) is duly qualified and is licensed and in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (b)(i) or to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

5.02    <u>Authorization; No Contravention</u>.  Following the entry of, and giving effect to, the Second DIP Financing Orders, the execution, delivery and performance by each Loan Party of each Second DIP Loan Document to which such Person is or is to be a party are within such Loan Party's limited liability company powers, have been duly authorized by all necessary organizational action, and do not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any material  breach or contravention of, or the creation of any Lien under, or require any payment to be made under (i) any Post-Petition Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (c) violate any Law.  No Loan Party is in breach of any such Contractual Obligation, the breach of which could be reasonably likely to have a Material Adverse Effect.

5.03    <u>Governmental Authorization; Other Consents</u>.  Following the entry of, and giving effect to, the Second DIP Financing Orders, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (i) the execution, delivery or performance by, or enforcement against, any Loan Party of this Second Credit Agreement or any other Second DIP Loan Document, (ii) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents or (iii) the perfection or maintenance of the Liens created under the Collateral Documents (including the requisite priority set forth in the Second DIP Financing Orders), except in each case for such consents, exemptions, authorizations, approvals, actions, notices and filings listed on Schedule 5.03 hereto, each of which has been obtained, taken, given or made and is in full force and effect other than those which the failure to so obtain would not reasonably be expected to result in a Material Adverse Effect.  All applicable waiting periods in connection with the Transaction have expired without any action having been taken by any Governmental Authority restraining, preventing or imposing materially adverse conditions upon the Transaction or the rights of the Loan Parties freely to transfer or otherwise dispose of, or to create any Lien on, any properties now owned or hereafter acquired by any of them.

5.04    <u>Binding Effect</u>.  This Second Credit Agreement has been, and each other Second DIP Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Loan Party that is party thereto.  This Second Credit Agreement constitutes, and each other Second DIP Loan Document when so delivered will constitute, subject to the entry of the Interim Second DIP Order or Final Second DIP Order by the Bankruptcy Court, as applicable, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms.

5.05    <u>Financial Statements; No Material Adverse Effect</u>.

(a)     The unaudited financial statements of Borrower, dated March 31, 2010, and the related statements of income or operations, member equity and cash flows for the fiscal month ended on that date (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present the financial condition of Borrower as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.

(b)     Except for the filing of the Cases, since the Closing Date there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Change.

(c)     The Budget delivered to the Lender in connection with this Second Credit Agreement were prepared in good faith on the basis of the assumptions stated therein, which assumptions were fair in light of the conditions existing at the time of delivery of such forecasts, and represented, at the time of delivery, the Borrower's best estimate of its future financial performance.

5.06     <u>Litigation</u>.  Other than the Cases, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower after due and diligent investigation, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against the Borrower, the Guarantors or any of their respective Subsidiaries or against any of their properties or revenues that either individually or in the aggregate could reasonably be expected to have a Material Adverse Effect.   The performance of any action by any Loan Party required or contemplated by any of the Loan Documents is not restrained or enjoined (either temporarily, preliminary or permanently).   There are no actions, suits or proceedings pending that challenge the validity of any Second DIP Loan Document or the applicability or enforceability of any Second DIP Loan Document or any of the Orders or which seek to void, avoid, limit, or otherwise adversely affect the security interest created by or in any Second DIP Loan Document or any of the Orders or any payment made pursuant thereto.

5.07     <u>No Default</u>.  Neither the Borrower nor any other Loan Party is in default under or with respect to, or a party to, any Post Petition Contractual Obligation that could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  No Default has occurred and is continuing or would result from the execution, delivery or performance of this Second Credit Agreement or any other Second DIP Loan Document or the transactions contemplated hereby or thereby.

5.08     <u>Ownership of Property</u>.  <u>Schedule 5.08</u> is a complete and accurate list of all Liens on the Collateral as of the Closing Date, showing as of the Closing Date the lien holder thereof, the principal amount of the obligations or Indebtedness secured thereby and the Collateral subject thereto.  The Collateral is subject to no Liens, other than Liens set forth on <u>Schedule 5.08</u>, and as otherwise permitted by Section 7.01.

5.09     <u>Environmental Compliance</u>.  The Loan Parties are in compliance with all existing Environmental Laws and there are no pending, or to the knowledge of the Loan Parties, threatened claims against any of the Loan Parties alleging potential liability or responsibility for

28

violation of any Environmental Law on their respective businesses, operations and properties, excepting only such non-compliance or claims individually or in the aggregate, which reasonably could not be expected to have a Material Adverse Effect on any of the Loan Parties.

5.10    Insurance.  All policies of insurance of any kind or nature owned by or issued to the Loan Parties, including, without limitation, policies of life, fire, theft, product liability, public liability, property damage, other casualty, employee fidelity, workers' compensation, employee health and welfare, title, property and liability insurance, are in full force and effect, are issued by financially sound and reputable insurance companies not Affiliates of the Borrower and are of a nature and provide such coverage as was maintained by the Borrower on the Petition Date.

5.11    Taxes.  Except as otherwise set forth on Schedule 5.11, (a) the Loan Parties have filed all Federal, state and other material tax returns and reports required to be filed, and have paid or made adequate provision for payment of all Federal, state and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets that are due and payable, except, in each case, those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP; (b) there is no proposed tax assessment against any Loan Party that would, if made, have a Material Adverse Effect; and (c) no Loan Party is party to any tax sharing agreement with any Person other than another Loan Party, other than tax indemnity agreements in leasing transactions.

5.12    [Reserved]

5.13    Subsidiaries; Equity Interests.  As of the Closing Date, each Loan Party has no Subsidiaries other than other Loan Parties and those Subsidiaries specifically disclosed in Schedule 5.13, and all of the outstanding Equity Interests in each of such Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by the identified Loan Party in the amounts specified on Schedule 5.13, free and clear of all Liens except those created under the First DIP Facility or the Collateral Documents or Liens permitted under Sections 7.01(c) or 7.01(m).  Borrower has no equity investments in any other Person other than those specifically disclosed in Schedule 5.13.

5.14    Margin Regulations.  The Borrower is not engaged and will not engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Board of Governors of the Federal Reserve System of the United States), or extending credit for the purpose of purchasing or carrying margin stock and no proceeds of any Borrowings will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock.

5.15    Disclosure.  (a) All written information that has been made available to the Lender by the Borrower or any of its representatives in connection with the transactions contemplated hereby (including without limiting the generality of the foregoing, the Budget) is, taken as a whole, complete and correct in all material respects and does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not misleading in light of the circumstances under which such

29

statements were made and (b) all financial projections, if any, that have been prepared by the Borrower and made available to the Lender have been prepared in good faith based upon assumptions that were reasonable as of the date of the preparation of such financial projections, it being understood that no assurance is given that the results forecasted in the projections will in fact be achieved and that the projections are subject to uncertainties and contingencies, many of which are beyond the control of the Borrower, the Parent and its Subsidiaries.

5.16    Compliance with Laws.  Each Loan Party is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

5.17    [Reserved]

5.18    Security/Priority.

(a)      The Cases were commenced on the Petition Date in accordance with applicable Law and proper notice thereof and the proper notice for the hearing for the approval of the Interim Second DIP Order and the Final Second DIP Order has been given.

(b)      On and after the Closing Date and the entry of the Second DIP Financing Orders and after giving effect thereto, the provisions of the Second DIP Loan Documents and the Second DIP Financing Orders are effective to create in favor of the Lender, legal, valid and perfected Liens on and security interests (having the priority provided for herein and in the Second DIP Financing Orders) in all right, title and interest in the Collateral, enforceable against Borrower.

(c)      On and after the entry of the Second DIP Financing Orders and after giving effect thereto, all Obligations owing by the Borrower under the Second Term Loan and by the Guarantors in respect thereof will be secured, subject to the Carve-Out, by second priority superpriority Liens granted to the Lender pursuant to Section 364(c)(2) of the Bankruptcy Code on all of the Collateral, subject only and inferior to the superpriority administrative expense claims previously granted to (i) Lender with respect to the First DIP Facility and (b) the M&I Superpriority Allowed Claim; and

(d)      On and after the entry of the DIP Financing Orders and after giving effect thereto, all Obligations owing by the Borrower under the Second Term Loan and by the Guarantors in respect thereof subject to the Carve-Out, the First DIP Facility and the M&I Superpriority Allowed Claim, will be an allowed Superpriority Claim in each of the Cases.

5.19    Entry of the Orders.  The Interim Second DIP Order was entered by the Bankruptcy Court on the Interim Second DIP Order Entry Date and has not have been stayed, amended, vacated, reversed or rescinded in any respect which has been approved by the Lender in writing.  On the date of the making of any Second Term Loan Advance, the Interim Second DIP Order or the Final Second DIP Order, as the case may be, will have been entered and will not have been amended, stayed, vacated or rescinded in any respect other than as Lender may

30

approve or consent to in writing.  Upon the maturity (whether by the acceleration or otherwise) of any of the Obligations of the Borrower and under the other Second DIP Loan Documents, the Lender shall, subject to the provisions of Section 8.02, be entitled to immediate payment of such Obligations, and to enforce the remedies provided for hereunder.

5.20    <u>Representations and Warranties as to Collateral.</u>  (a) The Borrower's exact legal name is correctly set forth on the signature pages hereto.  The Borrower is located (within the meaning of Article 9 of the Uniform Commercial Code) in the State of Delaware.

(b)    The Borrower is the legal and beneficial owner of the Collateral free and clear of any Lien of others, except for those Liens identified on <u>Schedule 5.08</u> to this Second Credit Agreement and as permitted by the terms of Section 7.01 (d) and Section 7.01(n).

(c)    The Pledged Equity of any Subsidiary of the Borrower which is part of the Collateral has been duly authorized and validly issued and is fully paid and non-assessable.  The Pledged Equity of any Subsidiary of the Borrower constitutes 100% of the issued and outstanding Equity Interests of each such Subsidiary.

ARTICLE VI

AFFIRMATIVE COVENANTS

So long as the Lender shall have any Commitment hereunder, the Second Term Loan or other Obligations hereunder shall remain unpaid or unsatisfied (other than contingent indemnification obligations which are not then due and payable), the Borrower shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02, 6.03, 6.11 and 6.16) cause each Loan Party to:

6.01    <u>Financial Statements.</u>  Deliver to the Lender, in form and detail consistent with comparable reports delivered to the Lender or otherwise reasonably satisfactory to the Lender:

(a)    as soon as available, but in any event within 45 days after the end of each month (setting forth in each case in comparative form the corresponding figures for the corresponding month of the preceding fiscal year, all in reasonable detail and duly certified by the Chief Executive Officer or the Chief Financial Officer of each Loan Party, or in the case of financial statements for a Subsidiary of any Loan Party, by the senior financial officer of that Subsidiary: (i) a balance sheet for each Loan Party as of the end of such month and a statement of income and a statement of cash flows for each Loan Party for the period commencing at the end of the previous month and ending with the end of such month and a statement of income and a statement of cash flows of each Loan Party for the period commencing at the end of the previous fiscal year and ending with the end of such month; (ii) a statement of revenues and expenses for each Subsidiary of each Loan Party as of the end of such month and for the period commencing at the end of the previous fiscal year and ending with the end of such month;

(b)    as soon as available, but no more than five (5) Business Days after the end of each calendar month an updated 13 week rolling cash flow forecast, together with a reconciliation of actual cash flows for such calendar month against the Budget for all calendar months which have elapsed since the Interim Second DIP Order Entry Date;

31

(c)    as soon as available, but no more than five (5) Business Days after the end of each calendar week a cash balance report for such calendar week, which report shall show, among other things, the aggregate amount of cash and Cash Equivalent Investments to which each of the Loan Parties has unrestricted access as of the close of such calendar week;

(d)    as soon as available, but in any event within thirty (30) days after the end of each calendar month, a report, in form and substance acceptable to the Lender, that contains a detail of the invoiced and unpaid professional fees and expenses of the Borrower and the Guarantors and UST/Clerk Fees for each of the Cases; and

(e)    concurrently with delivery to the Lender of the financial statements required pursuant to Section 6.01(a) above, a Compliance Certificate executed by a responsible Officer of each of the Loan Parties.

6.02    <u>Certificates; Other Information</u>.  Deliver to the Lender, in form and detail as reasonably required from time to time by the Lender:

(a)    upon written request from the Lender, as soon as available and in any event within thirty (30) days after the end of each calendar quarter, a report summarizing the insurance coverages (specifying type, amount and carrier) in effect for each Loan Party and containing such additional information as the Lender may reasonably specify;

(b)    promptly upon request of the Lender, copies of all notices, requests, pleadings and other documents received by any Loan Party (and not otherwise distributed to the Lender) under or pursuant to any instrument, indenture, loan or credit or similar agreement and, from time to time upon request by the Lender, such information and reports regarding such instruments, indentures and loan and credit and similar agreements as the Lender may reasonably request;

(c)    promptly after the assertion or occurrence thereof, notice of any Environmental Action against or of any noncompliance by any Loan Party with any Environmental Law or Environmental Permit that could  reasonably be expected to have a Material Adverse Effect.

(d)    promptly after the same is available, copies of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of any of the Loan Parties with the Bankruptcy Court in the Cases, or distributed on behalf of any of the Loan Parties to any creditor of any of the Loan Parties, providing copies of the same to the Lender;

(e)    as soon as reasonably practicable, such additional information regarding the business, financial or company affairs of each Loan Party or their Subsidiaries, or compliance with the terms of the Loan Documents, as the Lender may from time to time reasonably request.

6.03    <u>Notices</u>.  Promptly notify the Lender:

(a)    of the occurrence of any Default;

(b)    of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect, including (i) breach or non-performance of, or any default under, a

material Post-Petition Contractual Obligation of any Loan Party; (ii) any dispute, litigation, investigation, proceeding or suspension between any Loan Party and any Governmental Authority; or (iii) the commencement of, or any material development in, any litigation or proceeding affecting any Loan Party, including pursuant to any applicable Environmental Laws;

(c)    of any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary of a Loan Party; and

(d)    of the (A) occurrence of any Disposition of Collateral for which the Borrower is required to make a mandatory prepayment pursuant to Section 2.02, (B) occurrence of any sale of capital stock or other Equity Interests for which the Borrower is required to make a mandatory prepayment pursuant to Section 2.02), (C) incurrence or issuance of any Indebtedness for which the Borrower is required to make a mandatory prepayment pursuant to Section 2.02(b).

Each notice pursuant to this Section 6.03, other than pursuant to Section 6.03(d), shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.  Each notice pursuant to Section 6.03(a) shall describe with particularity any and all provisions of this Second Credit Agreement and any other Second DIP Loan Document that have been breached.

6.04    Payment of Obligations.  Pay, discharge or satisfy promptly when due, but no later than within thirty (30) days after the same shall become due and payable, all its obligations and liabilities of whatever nature that constitute administrative expenses under Section 503(b) of the Bankruptcy Code, including (a) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets attributed to the period after the Petition Date to the extent permitted or required by the Bankruptcy Code or the Bankruptcy Court to be paid, (b) all lawful claims which, if unpaid, would by law become a Lien upon any of the Collateral; and (c) all Indebtedness, within thirty (30) days after the same shall become due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness unless, in each of (a), (b) and (c) above in this Section 6.04: (i) the Bankruptcy Code or an order of the Bankruptcy Court precludes making such payment; or (ii) the same are being contested in good faith by appropriate proceedings diligently conducted and adequate cash reserves to fully pay such payment are being maintained by the Loan Party.

6.05    Preservation of Existence, Etc.  (a) Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization; and (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

6.06    Maintenance of Properties.  (a) Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; (b) make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) use the standard of care typical in the industry in the operation and maintenance of its facilities.

6.07   Maintenance of Insurance.   Keep its insurable properties insured at all times, against such risks, including fire and other risks insured against by extended coverage, as is customary with companies of the same or similar size in the same or similar businesses and which is reasonably satisfactory to the Lender; and maintain in full force and effect public liability insurance against claims for personal injury or death or property damage occurring upon, in, about or in connection with the use of any property or asset owned, occupied or controlled by the Borrower or any Loan Party, as the case may be, in such amounts (giving effect to self-insurance) and with such deductibles as are required pursuant to Section 5.10; and maintain such other insurance or self insurance as may be required by law.

6.08   Compliance with Laws.   Comply in all material respects with the requirements of all Laws (including, without limitation, ERISA) and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted and adequate cash or Cash Equivalent Investment reserves in accordance with GAAP are being maintained by such Loan Party or (b) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

6.09   Books and Records.   Maintain proper books of record and account, in which full, true and correct entries consistent with GAAP shall be made of all financial transactions and matters involving the assets and business of the Borrower, any other Loan Party or any Subsidiary of any Loan Party, as the case may be.

6.10   Inspection Rights.   Permit representatives, agents, advisors and independent contractors of the Lender, at the expense of the Borrower, to visit and inspect any of the properties of any Loan Party or their respective Subsidiaries, to examine the company, financial and operating records of each Loan Party, and make copies thereof or abstracts therefrom, and to discuss the affairs, finances and accounts of each Loan Party with its members, officers, and independent public accountants (with the Borrower having the right to have a representative present at all such communications) and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower. Notwithstanding the foregoing, so long as no Event of Default shall have occurred and be continuing, the Borrower shall not be obligated to pay the fees, costs and expenses for more than one (1) such visit and/or inspection of the Loan Party Group conducted during any 12-month period prior to the Second DIP Maturity Date.

6.11   Use of Proceeds.   Use the proceeds of the Second Term Loan Advances as follows:  (i) to pay the costs of the Chapter 11 Cases (ii) to pay fees and expenses associated with the Second DIP Facility and administrative expenses and (iii) to provide for the ongoing working capital requirements of the Borrower, certain of its Subsidiaries, and Guarantors and for general corporate purposes, including the funding of arrangements made with mortgage lenders to Subsidiaries and obligations under confirmed Chapter 11 plans of such Subsidiaries.

6.12.   Further Assurances.   Promptly upon request, (a) correct any material defect or error that may be discovered in any Second DIP Loan Document or in the execution, acknowledgment, filing or recordation thereof, and (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, certificates,

assurances and other agreements and instruments as the Lender may reasonably require from time to time in order to (i) carry out more effectively the purposes of the Second DIP Loan Documents, (ii) to the fullest extent permitted by applicable Laws, subject any Loan Party's properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Collateral Documents or the Second DIP Financing Orders, (iii) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens intended to be created thereunder and under the Second DIP Financing Orders and (iv) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Lender the rights granted or now or hereafter intended to be granted to the Lender under any Second DIP Loan Document, the Second DIP Financing Orders or under any other instrument executed in connection with any Loan Document to which the Borrower is or is to be a party.

## ARTICLE VII

## NEGATIVE COVENANTS

So long as the Lender shall have any Commitment hereunder, the Second Term Loan or other Obligations hereunder shall remain unpaid or unsatisfied (other than contingent indemnification obligations which are not then due and payable), the Borrower shall not, nor shall it permit any other Loan Party to, directly or indirectly:

7.01    <u>Liens</u>.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, or sign or file or suffer to exist under the Uniform Commercial Code of any jurisdiction a financing statement that names the Borrower or any Guarantor, as debtor, or sign or suffer to exist any security agreement authorizing any secured party thereunder to file such financing statement, or assign any accounts or other right to receive income, other than the following:

(a)    Liens granted or arising pursuant to any Second DIP Loan Document;

(b)    Liens granted or arising pursuant to the First DIP Facility;

(c)    Liens existing on the Petition Date;

(d)    Liens for taxes, assessments or governmental charges or claims not delinquent for a period of more than 30 days or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(e)    Liens of landlords, carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which are not overdue for a period of more than thirty (30) days or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person;

(f)    Liens incurred or pledges or deposits in the ordinary course of business made in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA;

(g)        Liens incurred or deposits made to secure the performance of tenders, bids, trade contracts, leases (real and personal) (other than Indebtedness), statutory obligations, surety bonds (other than bonds related to judgments or litigation), performance and return of money (but not borrowed money) bonds, reimbursement obligations and chargeback rights of Persons performing credit card processing services for a Loan Party and other obligations of a like nature incurred in the ordinary course of business;

(h)        easements, rights-of-way, restrictions, minor defects, encroachments or irregularities of title and other similar charges or encumbrances affecting real property which do not materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the applicable Person;

(i)        Liens with respect to which the Lender has given its written consent;

(j)        Liens securing judgments and attachments not constituting an Event of Default under Section 8.01 or securing appeal or other surety bonds related to such judgments;  Liens securing Indebtedness permitted under Section 7.03 and which is Indebtedness incurred to acquire property; provided that (i) such Liens do not at any time encumber any property other than the property acquired by such Indebtedness and (ii) with respect to capital leases, such Liens do not at any time extend to or cover any Collateral or assets other than the assets subject to such capital leases;

(k)        Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(l)        operating leases or subleases of real or personal property granted to others not interfering in any material respect with the business of the Loan Parties, taken as a whole;

(m)        Liens in favor of collecting or payor banks and credit card processors having a right of setoff, revocation, refund or chargeback with respect to money or instruments of any Loan Party on deposit with or in possession of such bank; and

(n) Liens in favor of: (i) Inland American Charlotte Lender, L.L.C. with respect to the Equity Interests owned by the Borrower in Corporate Plaza Partners, LLC; (ii) Huntington National Bank or an Affiliate thereof with respect to the Equity Interests owned by the Borrower in Eaglepoint Partners Five, LLC; and (iii) Bank of America, N.A. with respect to the Equity Interests owned by the Borrower in Riverview Partners One, LLC.

7.02    Investments.  Make or hold any Investments, except:

(a)        Investments held by any Loan Party in the form of Cash Equivalent Investments;

(b)        Investments with respect to which the Lender has given its written consent;

(c)        equity Investments of the Borrower or any Guarantor in their respective Subsidiaries;

(d)     Investments in accounts, contract rights and chattel paper (each as defined in the Uniform Commercial Code, as in effect in Indiana), notes receivable and similar items arising or acquired in the ordinary course of business and Investments received in settlement of amounts due to any Loan Party effected in the ordinary course of business;

(e)     Guarantees permitted by Section 7.04; and

(f)     Investments consisting of intercompany debt permitted under Section 7.03.

7.03     Indebtedness.  Create, incur, assume or suffer to exist any Indebtedness, except:

(a)     Indebtedness with respect to which the Lender has given its written consent;

(b)     in the case of any Loan Party (other than the Borrower), Indebtedness owed to the Borrower; and

(c)     in the case of the Loan Parties,

(i)     Indebtedness under the Second DIP Loan Documents;

(ii)     Indebtedness under the First DIP Facility;

(iii)     Existing Indebtedness, refinancings and replacements thereof, provided that (A) the principal amount of such Existing Indebtedness shall not be increased above the principal amount thereof outstanding immediately prior to such refinancing or replacement, (B) the maturity of such Existing Indebtedness shall not be shortened as a result of such refinancing or replacement, and (C) the direct and contingent obligors therefor shall not be changed, as a result of or in connection with such refinancing or replacement;

(iv)     Indebtedness incurred after the Petition Date consisting of Guarantees permitted by Section 7.04;

(v)     letters of credit issued by banks reasonably acceptable to the Lender to the extent that (A) the Loan Party requesting the issuance of any such letter of credit pledges to and deposits with the issuer of such letter of credit cash collateral in an amount not less than 100% of the face amount of such letter of credit and not in excess of 103% of the face amount of such letter of credit, (B) in the event of a drawing under any such letter of credit, the issuer of such letter of credit looks first to the cash collateral for reimbursement of such drawing and (C) after giving effect to the issuance of each such letter of credit, the sum of all obligations under such all such letters of credit shall not exceed $1,000,000 (or such other higher amount as may be approved by Lender from time to time); and

(vi)  Indebtedness of any Loan Party arising from agreements of any Loan Party providing for indemnification, adjustment of purchase price, earn-out or other similar obligations, in each case incurred or assumed in connection with the Disposition of any assets

7.04    <u>Guarantees and Other Liabilities</u>.  Purchase or repurchase (or agree, contingently or otherwise, so to do) the Indebtedness of, or assume, guarantee (directly or indirectly or by an instrument having the effect of assuring another's payment or performance of any obligation or capability of so doing, or otherwise), endorse or otherwise become liable, directly or indirectly, in connection with the Indebtedness, stock or dividends of any Person, except (a) for any guaranty of Indebtedness of the Borrower or any Guarantor if the Borrower or such Guarantor could have incurred such Indebtedness under this Second Credit Agreement, (b) by endorsement of negotiable instruments for deposit or collection in the ordinary course of business, (c) customary indemnities in favor of officers, employees, directors, consultants, attorneys, accountants or other advisors; and (d) guaranties of Indebtedness of any Subsidiary of a Loan Party by that Loan Party.

7.05    <u>Fundamental Changes</u>.  Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, or take any action which will result in or does result in a Change of Control.

7.06    [Reserved]

7.07    <u>Restricted Payments</u>.  Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, or issue or sell any Equity Interests or accept any capital contributions, except that, so long as no Default shall have occurred and be continuing at the time of any action described below or would result therefrom:

(a)    each Loan Party may make Restricted Payments to any Loan Party which is its direct parent;

(b)    each Loan Party may declare and make dividend payments or other distributions payable solely in the common stock or other common Equity Interests of such Person; and

(c)    any Loan Party may issue Equity Interests to another Loan Party.

7.08    <u>Change in Nature of Business</u>.  Engage in any material line of business substantially different from those lines of business conducted by the Borrower and its Subsidiaries on or prior to the Petition Date or any business substantially related or incidental thereto.

7.09    <u>Transactions with Affiliates</u>.  Enter into any transaction of any kind with any Affiliate of the Borrower, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to the Borrower or such Loan Party as would be obtainable by the Borrower or such Loan Party at the time in a comparable arm's length transaction with a Person other than an Affiliate, provided that the foregoing restriction shall not apply to (a) transactions between or among the Borrower and any of the Guarantors or between and among any of the Guarantors; (b) reasonable and customary fees and compensation paid to, and indemnity provided on behalf of, officers, directors or employees of any Loan Party; (c) any Restricted Payments not prohibited by Section 7.07; (d) any payments or other distributions by a Subsidiary to its direct or indirect parent to enable such parent to pay its liabilities for taxes attributable to such Subsidiary; (e) transactions between any Loan Party with any employee labor

unions or other employee groups of any Loan Party; (f) the Second DIP Loan Documents and the transactions contemplated thereby; and (g) the Asset Management Agreement identified on Schedule 7.09.

7.10    Use of Proceeds.  Use the proceeds of any Second Term Loan Advance, whether directly or indirectly, and whether immediately, incidentally or ultimately, to purchase or carry margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System of the United States) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund Indebtedness originally incurred for such purpose.

7.11    [Reserved]

7.12    Amendments of Organization Documents.  Amend any of its Organization Documents other than for amendments which in the aggregate have no Material Adverse Effect.

7.13    Changes in Fiscal Year.  Make any change in its fiscal year.

7.14    Prepayments Etc. of Indebtedness.    Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner, or make any payment in violation of any subordination terms of, any Indebtedness, except (a) the prepayment of the Term loan under the First DIP Facility; (b) the prepayment of the Second Term Loan in accordance with the terms of this Second Credit Agreement, (c) regularly scheduled or required repayments or redemptions of Existing Indebtedness, and (d) refinancing or replacement of Existing Indebtedness permitted by Section 7.03(c)(iii).

7.15    Formation of Subsidiaries. Organize or invest in any new direct Subsidiary, unless the Equity Interests of such direct Subsidiary are owned entirely by the Borrower and the Lender is granted concurrently with the acquisition of such Equity Interests by the Borrower in such direct Subsidiary a first priority security interest therein as security for the payment of the Obligations, with such security interest to be granted either by an amendment to this Second Credit Agreement adding such Equity Interests as part of the pledged Equity or by a separate pledge and security agreement executed by the Borrower and which is acceptable in all respects to the Lender.

7.16    Chapter 11 Claims.    Incur, create, assume, suffer to exist or permit any Superpriority Claim that is pari passu with or senior to any of the claims of the Lender against the Borrower and the Guarantors, except with respect to the Carve-Out and the First DIP Facility and except for the M&I Superpriority Allowed Claim.

7.17    Limitation on Prepayments and Pre-Petition Obligations.  Except as otherwise allowed pursuant to the DIP Financing Orders, the Second DIP Financing Orders or any other order of the Bankruptcy Court, (a) make any payment or prepayment on or redemption or acquisition for value (including, without limitation, by way of depositing with the trustee with respect thereto money or securities before the due date for the purpose of paying when due) of any Pre-Petition Indebtedness or other Pre-Petition obligations of the Borrower or any Guarantor, (b) pay any interest on any Pre-Petition Indebtedness of the Borrower or any Guarantor (whether in cash, in kind securities or otherwise), or (c) make any payment or create or permit any Lien pursuant to Section 361 of the Bankruptcy Code (or pursuant to any other

provision of the Bankruptcy Code authorizing adequate protection), or apply to the Bankruptcy Court for the authority to do any of the foregoing; provided, however, that notwithstanding the foregoing, the Borrower and the Guarantors may (and may file motions seeking to) (i) pay cure costs with respect to executory contracts or unexpired leases that the Borrower or Guarantors have been allowed by the Bankruptcy Court to assume under Section 365 of the Bankruptcy Code, (ii) make or pay accrued payroll (including without limitation accrued vacation days and accrued sick days) and related expenses and employee benefits as of the Petition Date, (iii) pay sales and use taxes, (iv) pay other Pre-Petition Payments in an amount not to exceed the amounts specified in the DIP Financing Orders and the Second DIP Financing Orders, (v) pay all obligations required to be paid pursuant to Section 6.04 and other provisions of this Second Credit Agreement, (vi) make payments for administrative expenses that are allowed and payable under Sections 330 and 331 of the Bankruptcy Code, (vii) make adequate protection payments to secured creditors as may be approved by orders of the Bankruptcy Court relating to the Cases, and (viii) make payments to such other claimants and in such amounts as may be consented to by the Lender and approved by the Bankruptcy Court.

7.18    Change in Capital Structure.  Make any material change in its equity capital structure as in existence on the Petition Date without the prior written consent of the Lender.

## ARTICLE VIII

## EVENTS OF DEFAULT AND REMEDIES

8.01    Events of Default. Any of the following shall constitute an Event of Default:

(a)    Non-Payment.  The Borrower or any other Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of the Second Term Loan, or (ii) within three (3) Business Days after the same becomes due, any interest on the Second Term Loan, or any commitment or other fee due hereunder, or (iii) within five (5) days after the same becomes due, any other amount payable hereunder or under any other Second DIP Loan Document; or

(b)    Specific Covenants.  (i) The Borrower or any Loan Party fails to perform or observe any term, covenant or agreement contained in any of Section 6.03 (Notices), Section 6.05 (Preservation of Existence), Section 6.10 (Inspection Rights), Section 6.11 (Use of Proceeds), or Article VII or (ii) the Borrower fails to perform or observe any term, covenant or agreement contained in any of Section 6.01 or Section 6.02 and such failure continues for ten (10) Business Days after the earlier of the date on which (A) a Responsible Officer becomes aware of such failure or (B) written notice thereof shall have been given to the Borrower by the Lender; or

(c)    Other Defaults.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) above or (t) below) contained in any Second DIP Loan Document on its part to be performed or observed and such failure continues unremedied for forty-five (45) days  and ten (10) Business Days after the earlier of the date on which (A) a Responsible Officer becomes aware of such failure or (B) written notice thereof shall have been given to the Borrower by the Lender; or

(d)    <u>Representations and Warranties</u>.  Any representation, warranty or certification made or deemed made by or on behalf of the Borrower or any other Loan Party herein, in any other Second DIP Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(e)    <u>Cross-Default</u>.  (i) An Event of Default (as defined in the Amended First DIP Credit Agreement) occurs with respect to the First DIP Facility; or (ii) any Loan Party (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) of the obligations under the First DIP Facility; (B) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Post-Petition Indebtedness or Post-Petition Guarantee (other than Indebtedness hereunder) having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than $500,000, or (C) fails to observe or perform any other agreement or condition relating to any such Post-Petition Indebtedness or Post-Petition Guarantee or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, in each case the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness or the beneficiary or beneficiaries of such Guarantee (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded; or (iii) there occurs under any Swap Contract an Early Termination Date (as defined in such Swap Contract) resulting from (A) any event of default under such Swap Contract as to which the Borrower is the Defaulting Party (as defined in such Swap Contract) or (B) any Termination Event (as so defined) under such Swap Contract as to which the Borrower is an Affected Party (as so defined) and, in either event, the Swap Termination Value owed by the Loan Party as a result thereof is greater than $500,000; or

(f)    <u>Judgments.</u>  There is entered against any Loan Party (i) a final judgment or order for the payment of money in an aggregate amount exceeding $500,000, as an administrative expense of the kind specified in Section 503(b) of the Bankruptcy Code (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of such claim and does not dispute coverage), or (ii) any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, there is a period of ten (10) consecutive Business Days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect; or

(g)    [Reserved]

(h)    <u>Invalidity of Loan Documents</u>.  Any provision of any Second DIP Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be valid and binding on or enforceable against any Loan Party intended to be a party to it; any Loan Party

41

files a motion or other pleading seeking to challenge the validity of any Second DIP Loan Document or the applicability or enforceability of any Second DIP Loan Document or any of the Orders or which seeks to void, avoid, limit, or otherwise adversely affect the security interest created by or in any Second DIP Loan Document or any of the Orders or any payment made pursuant thereto; or any Loan Party denies that it has any or further liability or obligation under any Second DIP Loan Document, or purports to revoke, terminate or rescind any Loan Document; or

(i)    Change of Control.  There occurs any Change of Control, or

(j)    Collateral Document.  Any Collateral Document after delivery thereof pursuant to Section 4.01 or Section 6.12 shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected lien on and security interest in the Collateral purported to be covered thereby having the priority contemplated by the Second DIP Loan Documents and the Second DIP Financing Orders; or

(k)    Conversion of the Cases.  Any of the Cases concerning the Borrower or any of the Guarantors shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code or any Loan Party shall file a motion or other pleading or support a motion or other pleading filed by any other Person seeking the dismissal or conversion to chapter 7 of the Bankruptcy Code of any of the Cases concerning the Borrower or any of the Guarantors under Section 1112 of the Bankruptcy Code or otherwise; a trustee appointed pursuant to Section 1104 of the Bankruptcy Code or otherwise under chapter 7 or chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases and the order appointing such trustee, responsible officer or examiner shall not be reversed or vacated within 30 days after the entry thereof; or an application shall be filed by the Borrower or either of the Guarantors for the approval of any other claim or Superpriority Claim (other than the Carve-Out) in any of the Cases which is pari passu with or senior to any of the claims (including, without limitation, the Superpriority Claim) of the Lender against the Borrower or either of the Guarantors hereunder, or there shall arise or be granted any such pari passu or senior to any such claims (including, without limitation, a Superpriority Claim), excepting only First DIP Facility, the M&I Super-Priority Allowed Claim; or

(1)    Relief from Automatic Stay.  The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest or creditor to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Loan Parties or the Subsidiaries, or to permit other actions which would responsibly be expected to have a Material Adverse Effect; or

(m)    Modification of Orders.  An order of the Bankruptcy Court shall be entered reversing, amending, supplementing or staying for a period in excess of ten (10) Business Days, vacating or otherwise modifying in a manner that is adverse to the Lender any of DIP Financing Orders or Second DIP Financing Orders; or

(n)     <u>Pre-Petition Payment</u>.  Except as permitted by the Orders, any Loan Party shall make any Pre-Petition Payment in violation of Section 7.17; or

(o)     <u>Material Adverse Change</u>.  Except for the filing of the Cases, there occurs any event or circumstance that would give rise to a Material Adverse Change since the Closing Date; or

(p)     <u>Defaults Under Orders</u>.  The Borrower or either of the Guarantors fails to perform or observe any term or condition contained in the Second DIP Financing Orders; or

(q)     <u>Final Order.</u>  The entry of a Final Second DIP Order shall not have occurred on or before September 3, 2010; or

(r)     <u>Bankruptcy Court Motions</u>.  Any Loan Party shall bring or consent to a motion in the Cases:  (i) to obtain financing from any Person other than the Lender under Sections 364(c) or (d) of the Bankruptcy Code other than (x) with respect to a financing used, in whole or part, to repay in full the Obligations or (y) in connection with any Indebtedness permitted by Section 7.03; or (ii) to grant any Lien other than those permitted under Section 7.01 upon or affecting any Collateral; or (iii) to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code; or (v) to grant a Superpriority Claim pari passu or senior to the Superpriority Claim granted to the Lender other than that granted in the Second DIP Financing Orders, the DIP Financing Orders and other than with respect to the Carve-Out; provided, however, that notwithstanding the foregoing, nothing shall preclude any Loan Party from bringing or consenting to any motion that seeks approval of a payment, Lien or other transaction expressly permitted under the Second DIP Loan Documents; or

(s)     <u>Plan</u>.  An order shall be entered by the Bankruptcy Court confirming a plan of reorganization or liquidation in any of the Cases (or any Loan Party shall propose a plan of reorganization or liquidation in any of the Cases) that does not provide for termination of the Total Commitment and payment in full in cash of the Obligations (other than contingent indemnification obligations not then due and payable) on the effective date of such plan or any order shall be entered which dismisses any of the Chapter 11 Cases and which order does not provide for termination of the Total Commitment under the Second DIP Facility and payment in full in cash of the Obligations (other than contingent indemnification obligations not then due and payable), or any of the Debtors shall seek, support, or fail to contest in good faith the filing or confirmation of such a plan or the entry of such an order; or

(t)     <u>Non-Authorized Disposition</u>.  Without advance written consent of Lender, entry of an order by the Bankruptcy Court, (i) approving a sale or other Disposition of any of the Collateral or assets owned directly or indirectly by any Loan Party or a substantial part of the assets of any of the Subsidiaries or (ii) confirming a Reorganization Plan or other chapter 11 plan of reorganization or liquidation with respect to any of the Debtors or Subsidiaries; or

(u)     <u>Order for Termination</u>.  An order shall be entered by the Bankruptcy Court, or any Loan Party shall make a motion for an order of the Bankruptcy Court, dismissing any of the

Cases that does not contain a provision for termination of all of the Commitments and indefeasible payment in full in cash of the Obligations on the date any such order is entered; or

(v)    Loan Party Actions.  The Debtors shall take any action in support of any of the foregoing (a) through (u) provisions or any person other than the Debtors shall do so and such application is not contested in good faith by the Debtors and the relief requested is granted in an order that is not stayed pending appeal; or

(w)    Maturity of First DIP Facility.  Maturity of obligations under the First DIP Facility by virtue of an event of default thereunder or otherwise; or

(x)    Dismissal Order.  The Dismissal Denial Order is withdrawn by the Bankruptcy Court or is reversed in any material respect on appeal.

8.02    Remedies upon Event of Default.  If any Event of Default occurs and is continuing, the Lender may take any or all of the following actions, in the case of Section 8.02(a) and (b), without further order of or application to the Bankruptcy Court:

(a)    declare the Commitment of the Lender to make any further advances of the Second Term Loan to be terminated, whereupon such Commitment shall be terminated;

(b)    declare the unpaid principal amount of the Second Term Loan, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Second DIP Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower and the Loan Parties;

(c)    subject only to obtaining prior authorization of the Bankruptcy Court:  (i) exercise all rights and remedies available to it in respect of the Collateral; or (ii) exercise all rights and remedies available to it and the Lender under the Second DIP Loan Documents, the DIP Financing Orders, the Second DIP Financing Orders or applicable Laws and not described in Section 8.02(a) and (b).  Any declaration of an Event of Default by the Lender must be in good faith and the Lender shall have the burden to establish to the satisfaction of the Bankruptcy Court such good faith.  The Lender must also demonstrate to the Bankruptcy Court that the exercise of any requested remedy is appropriate in light of such Event of Default; and

(d) exercise the remedies set forth in Section 9.07.

8.03    Application of Funds.  After the exercise of remedies provided for in Section 8.02 and subject to the terms of the First DIP Facility and Carve-Out, any amounts received on account of the Obligations shall be applied by the Lender in the following order:

First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts;

Second, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans;

44

Third, to payment of that portion of the Obligations constituting unpaid principal of the Loans;

Fourth, to the payment of all other Obligations of the Loan Parties owing under or in respect of the Second DIP Loan Documents that are due and payable to the Lender; and

Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full (other than contingent indemnification obligations not then due and payable), to the Borrower or as otherwise required by Law.

ARTICLE IX

SECURITY

9.01    <u>Grant of Security</u>.  To induce the Lender to make the Second Term Loan to implement the Second DIP Financing Orders but without in any way diminishing or limiting the effect of the Second DIP Financing Orders or the security interests and Liens granted thereunder, the Borrower hereby grants to the Lender, as security for the full and prompt payment when due of the Obligations, a continuing second priority Lien and security interest in and to all of the Primary Collateral (as defined below) (subject only to the Liens granted to Lender under the First DIP Facility, (ii) to valid and perfected Liens in existence on the Petition Date and junior to such valid and perfected Liens, (iii) valid, enforceable and nonavoidable Liens existing as of the Petition Date, but perfected after the Petition Date pursuant to Section 546(b) of the Bankruptcy Code, only to the extent such Post-Petition perfection is expressly permitted under the Bankruptcy Code, and (iv) the Carve-Out, all in accordance with Subsection 364(c)(2) of the Bankruptcy Code.

"<u>Primary Collateral</u>" means, except as otherwise specified in the Second DIP Financing Orders:

(i)    all shares of stock, membership units, membership interests and other Equity Interests now owned or from time to time acquired by the Borrower in any manner in each of its direct Subsidiaries, now or hereafter existing (excepting the Equity Interests of the Borrower in Corporate Plaza Partners, LLC, Riverview Partners One, LLC, and Eaglepoint Partners Five, LLC) and all of the other Persons identified on <u>Schedule 9.01</u> to this Second Credit Agreement (the "<u>Pledged Equity</u>"), and the certificates, if any, representing such additional shares or other Equity Interests, and all dividends, distributions, return of capital, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such shares or other Equity Interests and all subscription warrants, rights or options issued thereon or with respect thereto, and all of the Borrower's rights, privileges, authority and power related to the economic interests of Borrower as owner of the Pledged Equity, including but not limited to all general intangibles, accounts and payment intangibles related thereto and, to the extent not included in the foregoing;

(ii)    all other investment property (including, without limitation, all securities, whether certificated or uncertificated, security entitlements, and securities accounts) in which the Borrower has now, or acquires from time to time hereafter, any right, title or interest in any manner, and the certificates or instruments, if any, representing or evidencing such investment

property, and all dividends, distributions, return of capital, interest, distributions, value, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such investment property and all warrants, rights or options issued thereon or with respect thereto; and

(iii)   all proceeds of the property described in (i) and (ii) above, now existing or hereafter arising.

9.02   <u>Further Assurances</u>.

(a)   The Borrower agrees that from time to time, at the expense of the Borrower, it will promptly execute and deliver, or otherwise authenticate, all further instruments and documents, and take all further action that may be necessary, or that the Lender may reasonably request, in order to perfect and protect any pledge or security interest granted or purported to be granted by the Borrower hereunder or to enable the Lender to exercise and enforce its rights and remedies hereunder with respect to any Collateral.   Without limiting the generality of the foregoing, the Borrower will within a commercially reasonable time with respect to the Collateral:   (i) take such actions as the Lender reasonably may request in order to perfect and preserve the security interest and Lien granted or purported to be granted by the Borrower hereunder; (ii) deliver to the Lender certificates representing Pledged Equity or other Collateral that constitutes certificated securities, accompanied by undated stock or bond powers executed in blank; (iii) at the request of the Lender, take all action reasonably necessary to ensure within the time required hereunder that the Lender has "control" of the Pledged Equity or investment property as provided in IC-26-9.1-106 (being Section 9-106 of the Uniform Commercial Code) and in Section 16 of the Uniform Electronics Transactions Act, as in effect in the jurisdiction governing such transferable record; and (iv) at the request of the Lender, take all action reasonably necessary to ensure that the Lender's security interest is noted on any certificate of ownership related to any Collateral evidenced by a certificate of ownership.

(b)   The Borrower hereby authorizes the Lender to file one or more financing or continuation statements, and amendments thereto, including, without limitation, one or more financing statements indicating that such financing statements cover all assets or all personal property (or words of similar effect) of the Borrower, in each case without the signature of the Borrower, and regardless of whether any particular asset described in such financing statements falls within the scope of the Uniform Commercial Code or the granting clause of this Second Credit Agreement.

(c)   The Borrower will furnish to the Lender from time to time statements and schedules further identifying and describing the Collateral of the Borrower and such other reports in connection with the Collateral as the Lender may reasonably request, all in reasonable detail.

(d)   Notwithstanding subsections (a) and (b) of this Section 9.02, or any failure on the part of the Borrower or the Lender to take any of the actions set forth in such subsections, the Liens and security interests granted herein shall be deemed valid, enforceable and perfected by entry of the Interim Order and the Final Order, as applicable.   No financing statement, notice of lien, mortgage, deed of trust or similar instrument in any jurisdiction or filing office need be filed

46

or any other action taken in order to validate and perfect the Liens and security interests granted by or pursuant to this Second Credit Agreement, the Interim Second DIP Order or the Final Second DIP Order.

9.03    Rights of Lender; Limitations on Lender's Obligations.  Subject to each Loan Party's rights and duties under the Bankruptcy Code (including Section 365 of the Bankruptcy Code), and anything herein to the contrary notwithstanding, (i) the Borrower shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein to perform all of its duties and obligations thereunder to the same extent as if this Second Credit Agreement had not been executed (including paying cure costs if such contracts or agreements are assumed), (ii) the exercise by the Lender of any of the rights hereunder shall not release the Borrower from any of its duties or obligations under the contracts and agreements included in the Collateral, and (iii) Lender shall not have any obligation or liability under the contracts and agreements included in the Collateral by reason of this Second Credit Agreement or any other Loan Document, nor shall Lender be obligated to perform any of the obligations or duties of the Borrower thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

9.04    Covenants of the Loan Parties with Respect to Collateral.  The Borrower hereby covenants and agrees with the Lender that from and after the date of this Second Credit Agreement and until the Obligations (other than contingent indemnification obligations which are not then due and payable) are fully satisfied and subject to the rights of Lender under the First DIP Facility:

(a)    Delivery and Control of Pledged Equity.

(i)    All certificates or instruments representing or evidencing Pledged Equity or other Collateral shall be delivered to the Lender and held by or on behalf of the Lender pursuant hereto at the request of the Lender, and shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance reasonably satisfactory to the Lender.

(ii)    With respect to any Pledged Equity or other Collateral in which the Borrower has any right, title or interest and that constitutes an uncertificated security, the Borrower will cause the issuer thereof either (i) to register the Lender as the registered owner of such security or (ii) to agree in an authenticated record with the Borrower and the Lender that such issuer will comply with instructions with respect to such security originated by the Lender without further consent of the Borrower, such authenticated record to be in form and substance reasonably satisfactory to the Lender.  Upon the request of the Lender, the Borrower will notify each issuer of Pledged Equity or investment property which is Collateral that such Pledged Equity or investment property is subject to the security interest granted hereunder and by the DIP Financing Orders.

(iii)    Except as provided in Section 9.07 and subject to Article VII, the Borrower will be entitled to exercise all voting, consent and membership or shareholder rights with respect to the Pledged Equity and any investment property which is part of the Collateral.

47

(b)     <u>Maintenance of Records</u>.  The Borrower will keep and maintain, at its own cost and expense, satisfactory and complete records of the Collateral, in all material respects, including, without limitation, a record of all payments received and all credits granted with respect to the Collateral and all other dealings concerning the Collateral in each case in accordance with its normal business practice.

(c)     <u>Indemnification with Respect to Collateral</u>.  In any suit, proceeding or action brought by the Lender relating to any Collateral for any sum owing thereunder or to enforce any provision of any Collateral in each case, brought by the Lender in accordance with this Second Credit Agreement, the Borrower will save, indemnify and keep the Lender harmless from and against all expense, loss or damage suffered by the Lender by reason of any defense, setoff, counterclaim, recoupment or reduction of liability whatsoever of the obligor thereunder, arising out of a breach by the Borrower of any obligation thereunder or arising out of any other agreement, indebtedness or liability at any time owing to, or in favor of, such obligor or its successors from the Borrower, and all such obligations of Borrower shall be and remain enforceable against and only against the Borrower and shall not be enforceable against the Lender.

(d)     <u>Limitation on Liens on Collateral</u>.  The Borrower will defend the Collateral against and take such other action as is necessary to remove, any Lien on the Collateral except Liens permitted under Section 7.01 and will defend the right, title and interest of the Lender in and to all of the Borrower's rights under the Collateral against the claims and demands of all Persons whomsoever other than claims or demands arising out of Liens permitted under Section 7.01.

(e)     <u>Notices</u>.   The Borrower will advise the Lender promptly after it obtains knowledge thereof, in reasonable detail, (i) of any Lien asserted against any of the Collateral other than Liens permitted by this Second Credit Agreement, and (ii) of the occurrence of any other event which would result in a Material Adverse Change with respect to the aggregate value of the Collateral or on the security interests created hereunder.

9.05    <u>Performance by Lender of the Obligations</u>.

(a)     <u>Lender Appointed Attorney-in-Fact</u>.   Each Loan Party hereby irrevocably appoints the Lender such Loan Party's attorney-in-fact, with full authority in the place and stead of such Loan Party and in the name of such Loan Party or otherwise, from time to time, in the Lender's discretion after the occurrence and during the continuance of an Event of Default, and after the Lender has complied with the notice provisions of the Interim Second DIP Order or the Final Second DIP Order, to take any action and to execute any instrument that the Lender may deem necessary or advisable to accomplish the purposes of this Second Credit Agreement subject to the rights of Lender under the First DIP Facility, including, without limitation:

(i)     to obtain and adjust insurance required to be paid to the Lender pursuant to this Second Credit Agreement,

(ii)    to ask for, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral,

(iii)    to receive, indorse and collect any drafts or other instruments, documents and chattel paper, in connection with clause (i) or (ii) above, and

(iv)    to file any claims or take any action or institute any proceedings that the Lender may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of the Lender with respect to any of the Collateral; provided that the Lender shall not exercise any such rights under this Section 9.05(a) except upon occurrence and during the continuance of an Event of Default and after complying with the notice provisions of the Interim Second DIP Order or the Final Second DIP Order.

(b)    <u>Lender May Perform</u>.  If any Loan Party fails to perform any agreement contained herein, the Lender may, as the Lender deems necessary to protect the security interest granted hereunder in the Collateral or to protect the value thereof, but without any obligation to do so after the occurrence and during the continuance of an Event of Default, and after the Lender has complied with any applicable notice provisions of the Interim Second DIP Order or the Final Second DIP Order, itself perform, or cause performance of, such agreement, and the expenses of the Lender incurred in connection therewith shall be payable by such Loan Party pursuant to Section 11.04.

(c)    <u>Lender Not Liable</u>.  The Lender shall in no way be responsible for the payment of any costs incurred in connection with preserving or disposing of Collateral pursuant to Section 506(c) of the Bankruptcy Code (excluding the Carve-Out) and the Collateral may not be charged for the incurrence of any such cost.

9.06    <u>The Lender's Duties</u>.  The powers conferred on the Lender hereunder are solely to protect the Lender's interest in the Collateral and shall not impose any duty upon it to exercise any such powers.  Other than the exercise of reasonable care to assure the safe custody of the Collateral while being held by the Lender pursuant to the terms of the Second DIP Loan Documents, the Lender shall have no duty or liability to preserve rights pertaining thereto, it being understood and agreed that the grantor of such Collateral shall be responsible for preservation of all rights in the Collateral, and the Lender shall be relieved of all responsibility for the Collateral upon surrendering it or tendering the surrender of it to such grantor.  The Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which the Lender accords its own property, which shall be no less than the treatment employed by a reasonable and prudent lender in the industry, it being understood that the Lender shall not have responsibility for taking any necessary steps to preserve rights against any parties with respect to any of the Collateral.

9.07    <u>Remedies</u>.  If any Event of Default shall have occurred and be continuing:

BDDB01 6154564v8

(a)     The Lender may, subject to the interests of Lender under the First DIP Facility and in compliance with the notice provisions of the Interim Second DIP Order, or the Final Second DIP Order (if issued), and upon authorization by the Bankruptcy Court after the occurrence of and during the continuance of an Event of Default, exercise in respect of the Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party upon default under the Uniform Commercial Code (whether or not the Uniform Commercial Code applies to the affected Collateral) and also may:  (i) require the Borrower to, and the Borrower hereby agrees that it will at its expense and upon request of the Lender forthwith, assemble all or part of the Collateral as directed by the Lender and make it available to the Lender at a place and time to be designated by the Lender that is reasonably convenient to such Loan Party and the Lender; (ii) without notice except as specified below or in the Orders, sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of the Lender's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as are commercially reasonable; and (iii) exercise any and all rights and remedies of the Borrower under or in connection with the Collateral, or otherwise in respect of the Collateral, including, without limitation, any and all rights of the Borrower to demand or otherwise require payment of any amount under, or performance of any provision of, the Collateral.  The Borrower agrees that, to the extent notice of sale shall be required by law, at least 10 days' notice to the Borrower of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification.  The Lender shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(b)     Subject to the rights of Lender under the First DIP Facility and Carve-Out, any cash held by or on behalf of the Lender and all cash proceeds received by or on behalf of the Lender in respect of any sale of, collection from, or other realization upon all or any part of the Collateral shall be applied against the Obligations, in the manner set forth in Section 8.03.  Any surplus of such cash or cash proceeds held by the Lender and remaining after payment in full of the Obligations (other than contingent indemnification obligations not then due and payable) shall be paid over to the Borrower or to whomever may be lawfully entitle to receive such surplus.

(c)     Subject to the rights of Lender under the First DIP Facility and the Carve-Out, all payments received by the Borrower under or in connection with the Collateral shall be received in trust for the benefit of the Lender, shall be segregated from other funds of the Borrower and shall be forthwith paid over to the Lender in the same form as so received (with any necessary endorsement).

(d)     The Lender is authorized, in connection with any sale of Collateral pursuant to this Section 9.07, to deliver or otherwise disclose to any prospective purchaser of any of the Collateral any information in its possession relating to such Collateral.

9.08   Modifications.

The Liens, lien priority, administrative priorities and other rights and remedies granted to the Lender pursuant to this Second Credit Agreement, the Interim Second DIP Order and/or the Final Second DIP Order (specifically, including, but not limited to, the existence, perfection and priority of the Liens provided herein and therein and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by any of the Loan Parties (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of any of the Cases, or by any other act or omission whatsoever. Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

       (i)     except for the First DIP Facility, Carve-Out and the M&I Superpriority Allowed Claim having priority over the Obligations, no costs or expenses of administration which have been or may be incurred in any of the Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of the Lender or the Lender against the Loan Parties in respect of any of the Obligations;

       (ii)     the liens and security interests granted herein and in the Second DIP Financing Orders shall constitute valid and perfected first priority liens and security interest in the Collateral (subject only to (A) the Carve-Out, (B) valid and perfected liens in existence on the Petition Date and junior to such valid and perfected Liens and (C) only to the extent such post-petition perfection is expressly permitted by the Bankruptcy Code, valid, nonavoidable and enforceable Liens existing as of the Petition Date, but perfected after the Petition Date, in accordance with Sections 364(c) (2) and (3) of the Bankruptcy Code, and shall be prior to all other Liens and security interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever; and

       (iii)     the Liens and security interests granted hereunder shall continue valid and perfected security interest without the necessity that financing statements be filed or that any other action be taken or notices given under applicable non-bankruptcy law.

9.09    Release; Termination.

(a)    Upon any sale, transfer or other disposition of any item of Collateral in accordance with the terms of the Second DIP Loan Documents, such Collateral shall be released from the security interest granted hereby, and in connection therewith, the Lender will, at the Borrower's expense, execute and deliver to the Borrower such documents as the Borrower shall reasonably request to evidence the release of such item of Collateral from the security interest granted hereby; provided, however, that (i) at the time of such request and such release no Default shall have occurred and be continuing, (ii) the proceeds of any such sale, transfer or other disposition required to be applied, or any payment to be made in connection therewith, in accordance with Section 2.02, shall, to the extent so required, be paid or made to, or in accordance with the instructions of, the Lender when and as required under Section 2.02, and (iii) in the case of Collateral sold or disposed of, the release of a Lien created hereby will not be effective until the receipt by the Lender of the Net Cash Proceeds arising from the sale or disposition of such Collateral in accordance with the terms hereof.

(b)     Upon the payment in full in cash of the Obligations (other than contingent indemnification obligations which are not then due and payable, the pledge and security interest granted hereby shall terminate and all rights to the Collateral shall revert to the Borrower.  Upon any such termination, the Lender will, at the Borrower's expense, execute and deliver to the Borrower such documents as the Borrower shall reasonably request to evidence such termination.

ARTICLE X

GUARANTY

10.01   <u>Guaranty</u>.  Each Guarantor, severally, unconditionally and irrevocably guarantees (the undertaking by each Guarantor under this Article X being the "<u>Guaranty</u>") the punctual payment when due, whether at scheduled maturity or on any date of a required prepayment or by acceleration, demand or otherwise, of all of the Obligations of the Borrower now or hereafter existing under or in respect of the Second DIP Loan Documents (including, without limitation, any extensions, modifications, substitutions, amendments or renewals of any or all of the foregoing Obligations), whether direct or indirect, absolute or contingent, and whether for principal, interest, premium, fees, indemnification payments, contract causes of action, costs, expenses or otherwise (such Obligations being the "<u>Guaranteed Obligations</u>"), and agrees to pay any and all expenses (including, without limitation, reasonable fees and expenses of counsel) incurred by the Lender solely in enforcing any rights under this Guaranty or any other Second DIP Loan Document.

10.02   <u>Guaranty Absolute</u>.  Each Guarantor guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Second DIP Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Lender with respect thereto.  This Guaranty is a guaranty of payment and not of collection.  The Obligations of each Guarantor under this Guaranty are independent of the Guaranteed Obligations or any other Obligations of any Loan Party under the Second DIP Loan Documents, and a separate action or actions may be brought and prosecuted against such Guarantor to enforce this Guaranty, irrespective of whether any action is brought against any other Loan Party or whether any other Loan Party is joined in any such action or actions.  The liability of each Guarantor under this Guaranty shall be absolute, unconditional and irrevocable irrespective of, and such Guarantor hereby irrevocably waives any defenses it may now or hereafter have in any way relating to, any and all of the following:

(a)     any lack of validity or enforceability of any Second DIP Loan Document or any other agreement or instrument relating thereto;

(b)     any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations or any other Obligations of any Loan Party under the Second DIP Loan Documents, or any other amendment or waiver of or any consent to departure from any Second DIP Loan Document, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Loan Party or any of its Subsidiaries or otherwise;

(c)        any taking, exchange, release or nonperfection of any Collateral, or any taking, release or amendment or waiver of or consent to departure from this Guaranty or any other guaranty, for all or any of the Guaranteed Obligations;

(d)        any manner of application of Collateral, or proceeds thereof, to all or any of the Guaranteed Obligations, or any manner of sale or other disposition of any Collateral for all or any of the Guaranteed Obligations or any other Obligations of any Loan Party under the Second DIP Loan Documents, or any other property and assets of any other Loan Party or any of its Subsidiaries;

(e)        any change, restructuring or termination of the legal structure or existence of any other Loan Party or any of its Subsidiaries;

(f)        any failure of the Lender to disclose to any Loan Party any information relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Loan Party now or hereafter known to the Lender, as the case may be (such Guarantor waiving any duty on the part of the Lender to disclose such information);

(g)        the failure of any other Person to execute this Second Credit Agreement or any other guarantee or agreement of the release or reduction of the liability of any of the other Loan Parties or any other guarantor or surety with respect to the Guaranteed Obligations; or (h) any other circumstance (including, without limitation, any statute of limitations or any existence of or reliance on any representation by the Lender) that might otherwise constitute a defense available to, or a discharge of, such Guarantor, any other Loan Party or any other guarantor or surety.

This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by the Lender or by any other Person upon the insolvency, bankruptcy or reorganization of any other Loan Party or otherwise, all as though such payment had not been made.

10.03    Waivers and Acknowledgments.

(a)        Each Guarantor hereby unconditionally and irrevocably waives promptness, diligence, notice of acceptance, presentment, demand for performance, notice of nonperformance, default, acceleration, protest or dishonor and any other notice with respect to any of the Guaranteed Obligations and this Guaranty, and any requirement that the Lender protect, secure, perfect or insure any Lien or any property or assets subject thereto or exhaust any right or take any action against any other Loan Party or any other Person or any Collateral. Each Guarantor waives any right to require the Lender to sue the Borrower, any other Guarantor, any other guarantor, or any other Person obligated for all or any part of the Guaranteed Obligations (each, an "Obligated Party"), or otherwise to enforce its payment against any Collateral securing all or any part of the Guaranteed Obligations.

(b)        Each Guarantor hereby unconditionally waives any right to revoke this Guaranty, and acknowledges that this Guaranty is continuing in nature and applies to all Guaranteed obligations, whether existing now or in the future. Each Guarantor further agrees that the Guaranteed Obligations may be extended or renewed in whole or in part without notice to or

further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal.

(c)     Each Guarantor hereby unconditionally and irrevocably waives (i) any defense arising by reason of any claim or defense based upon an election of remedies by the Lender which in any manner impairs, reduces, releases or otherwise adversely affects the subrogation, reimbursement, exoneration, contribution or indemnification rights of such Guarantor or other rights to proceed against any of the other Loan Parties, any other guarantor or any other Person or any Collateral, and (ii) any defense based on any right of setoff or counterclaim against or in respect of the Obligations of such Guarantor hereunder.

(d)     Each Guarantor hereby unconditionally and irrevocably waives any duty on the part of Lender to disclose to such Guarantor any matter, fact or thing relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Loan Party or any of its Subsidiaries now or hereafter known by Lender.  The obligations of each Guarantor hereunder are not subject to any defense or setoff, counterclaim, recoupment, or termination whatsoever by reason of the invalidity, illegality, or unenforceability of any of the Guaranteed Obligations or otherwise, or any provision of applicable law or regulation purporting to prohibit payment by any Obligated Party, of the Guaranteed Obligations or any part thereof.

(e)     Each Guarantor acknowledges that it will receive substantial direct and indirect benefits from the financing arrangements contemplated by the Loan Documents and that the waivers set forth in Section 10.02 and this Section 10.03 are knowingly made in contemplation of such benefits.

10.04  Subrogation.  Each Guarantor hereby unconditionally and irrevocably agrees not to exercise any rights that it may now have or may hereafter acquire against any other Loan Party or any other insider guarantor that arise from the existence, payment, performance or enforcement of its Obligations under this Guaranty or under any other Second DIP Loan Document, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Lender against such other Loan Party or any other insider guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from such other Loan Party or any other insider guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right, until such time as all of the Guaranteed Obligations shall have been paid in full in cash (other than contingent indemnification obligations not then due and payable), terminated or been cancelled and the Commitments shall have expired or terminated.  If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the latest of (a) the payment in full in cash of all of the Guaranteed Obligations (other than contingent indemnification obligations not then due and payable) and all other amounts payable under this Guaranty, and (b) the Second DIP Maturity Date, such amount shall be received and held in trust for the benefit of the Lender (in the same form as so received) and shall forthwith be paid to the Lender (without any necessary endorsement or assignment) to be credited and applied to the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms of the Second DIP Loan Documents, or to be held as Collateral for any Guaranteed Obligations thereafter arising.

If (i) any Guarantor shall pay to the Lender all or any part of the Guaranteed Obligations, (ii) all of the Guaranteed Obligations shall have been paid in full in cash (other than contingent indemnification obligations not then due and payable), and (iii) the Second DIP Maturity Date shall have occurred, the Lender will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from the payment made by such Guarantor pursuant to this Guaranty.

10.05  Subordination.  Each Guarantor agrees that any and all present and future debts and obligations of the Borrower or any other Guarantor to such Guarantor hereby are subordinated to the claims of the Lender and hereby are assigned by such Guarantor to the Lender as security for the payment and performance of such Guarantor's Guaranteed Obligations.

10.06  Continuing Guarantee; Assignments.  This Guaranty is a continuing guaranty and each Guarantor agrees that the Guaranteed Obligations of such Guarantor under this Guaranty shall be primary obligations of such Guarantor, shall not be subject to any counterclaim, set-off, abatement, deferment or defense based upon any claim that such Guarantor may have against the Lender, the Borrower, any other Guarantor or any other Person and shall (a) remain in full force and effect until the latest of (i) the payment in full in cash of all of the Guaranteed Obligations (other than contingent indemnification obligations not then due and payable), and (ii) the Second DIP Maturity Date, (b) be binding upon each Guarantor and its successors and assigns and (c) inure to the benefit of, and be enforceable by, the Lender and its successors, transferees and assigns.  Without limiting the generality of clause (c) of the immediately preceding sentence, the Lender may assign or otherwise transfer all or any portion of its rights and obligations under this Second Credit Agreement to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to the Lender under this Article X.

10.07  No Reliance.  Each Guarantor has, independently and without reliance upon the Lender, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Guaranty and each other Second DIP Loan Document to which it is or is to be a party, and such Guarantor has established adequate means of obtaining from each other Loan Party on a continuing basis information pertaining to, and is now and on a continuing basis will be completely familiar with, the business, condition (financial or otherwise), operations, performance, properties and prospects of such other Loan Party.

ARTICLE XI

MISCELLANEOUS

11.01  Amendments, Etc.  No amendment or waiver of any provision of this Second Credit Agreement or any other Second DIP Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Lender and the Borrower or the applicable Loan Party, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

11.02    <u>Notices and Other Communications; Facsimile Copie</u>s.

(a)    <u>General</u>.  Unless otherwise expressly provided in Section 2.02 or otherwise, all notices and other communications provided for hereunder or any other Second DIP Loan Document shall be in writing (including by facsimile transmission or electronic mail).  All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or (subject to subsection (c) below) electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable address, facsimile number, electronic mail address or telephone number specified for such Person on the signature page hereto or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties.

(b)    <u>Effectiveness of Facsimile Documents and Signatures</u>.  Second DIP Loan Documents may be transmitted and/or signed by facsimile or electronically delivered PDF copies thereof.  The effectiveness of any such documents and signatures shall, subject to applicable Law, have the same force and effect as manually signed originals and shall be binding on all Loan Parties, and the Lender.  The Lender may also require that any such documents and signatures be confirmed by a manually-signed original thereof; provided, however, that the failure to request or deliver the same shall not limit the effectiveness of any facsimile or electronically delivered PDF document or signature.

(c)    <u>Limited Use of Electronic Mail</u>.  Electronic mail and Internet and intranet websites may be used only to distribute routine communications, such as financial statements and other information as provided in Section 6.02, and to distribute Second DIP Loan Documents for execution by the parties thereto, and may not be used for any other purpose as effective notice under this Second Credit Agreement.

(d)    <u>Reliance by Lender</u>.  The Lender shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Borrower or any Guarantor even if (i) such party notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify the Lender from all losses, costs, expenses and liabilities resulting from the reliance by the Lender on each notice purportedly given by or on behalf of the Borrower or any Guarantor.

11.03    <u>No Waiver; Cumulative Remedies</u>.  No failure by the Lender to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or any other Second DIP Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each other Second DIP Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

11.04    <u>Attorney Costs, Expenses and Taxes</u>.  The Borrower agrees (a) to pay or reimburse the Lender for all reasonable out-of-pocket costs and expenses incurred in connection

with the development, preparation, negotiation and execution of this Second Credit Agreement and the other Second DIP Loan Documents and the Second DIP Financing Orders and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transaction contemplated hereby or thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, including all Attorney Costs (including, without limitation, local counsel), and (b) to pay or reimburse the Lender for all costs and expenses reasonably incurred in connection with the enforcement of any rights or remedies under this Second Credit Agreement or the other Second DIP Loan Documents (including all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law), including all Attorney Costs.  The foregoing costs and expenses shall include all search, filing and recording fees and taxes related thereto, and other out-of-pocket expenses incurred by the Lender.  The Lender shall provide the Borrower and all counsel of record in these Cases reasonable detail of the expenses (including attorneys' fees) charged to the Borrower and shall file periodic reports with the Bankruptcy Court detailing such expenses.  Parties in interest shall have ten (10) calendar days to object to any such expenses and if an objection is raised, the Bankruptcy Court shall determine the reasonableness of the expense and the Borrower shall only be obligated to pay the amount as determined by the Bankruptcy Court.  All amounts due under Section 11.04(a) that have been incurred prior to the Closing Date shall be paid on the later of the date that is the eleventh (11th) day following notice provided no objection has been filed or the date on which any objection is resolved by the Bankruptcy Court and becomes a final order.  The agreements in this Section 11.04 shall survive the termination of the Second Term Loan Commitment and payment of all other Obligations.  If any Loan Party fails to pay when due any costs, expenses or other amounts payable by it hereunder or under any Second DIP Loan Document, including, without limitation, Attorney Costs and indemnities, such amount may be paid on behalf of such Loan Party by the Lender, in its sole discretion, and such payment by the Lender shall be deemed for all purposes as a Second Term Loan Advance as of the date so paid.

11.05   <u>Indemnification by the Loan Parties</u>.  Each Loan Party shall defend (with counsel satisfactory to Lender), protect, indemnify and hold harmless Lender, each affiliate or subsidiary of Lender, and each of their respective shareholders, members, officers, directors, managers, employees, attorneys, advisors and agents (collectively, the "<u>Indemnitees</u>") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature (including, without limitation, the disbursements and the Attorney Costs in connection with any investigative, administrative or judicial proceeding, whether or not the Indemnified Party shall be designated a party thereto), which may be imposed on, incurred by, or asserted against, any Indemnified Party (whether direct, indirect or consequential and whether based on any federal, state or local laws or regulations, including, without limitation, securities laws and regulations, environmental laws and commercial laws and regulations, under common law or in equity, or based on contract or otherwise) in any manner relating to or arising out of this Second Credit Agreement or any act, event or transaction related or attendant thereto, the making or issuance and the management of the Second Term Loan or the use or intended use of the proceeds of the Second Term Loan; except to the extent that direct damages (as opposed to special) indirect, consequential or punitive damages (including, without limitation, any loss of products, business or anticipated savings) are determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from the willful misconduct or gross negligence of such Indemnified Party. To

the extent that the undertaking to indemnify set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, Borrower shall satisfy such undertaking to the maximum extent permitted by applicable Laws.  Any liability, obligation, loss, damage, penalty, cost or expense covered by this indemnity shall be paid to each Indemnified Party on demand, and, failing prompt payment, shall, together with interest thereon at the highest rate then applicable to Loans hereunder from the date incurred by each Indemnified Party until paid by Loan Parties, be added to the Obligations of Borrower and be secured by the Collateral.  The provisions of this Section 11.05 shall survive the satisfaction and payment of the Obligations.

11.06  <u>Payments Set Aside</u>.  To the extent that any payment by or on behalf of the Borrower is made to the Lender, or the Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred.

11.07  <u>Successors and Assigns.</u>

(a)    The provisions of this Second Credit Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Lender.  Nothing in this Second Credit Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, to the extent expressly contemplated hereby, the Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Second Credit Agreement.

(b)    The Lender may, without the consent of the Borrower,  sell participations to one or more Persons (a "<u>Participant</u>") in all or a portion of the Lender's rights and obligations under this Second Credit Agreement (including all or a portion of its Commitment and the Second Term Loan owing to it); <u>provided</u> that (A) the Lender's obligations under this Second Credit Agreement shall remain unchanged, (B) the Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower shall continue to deal solely and directly with the Lender in connection with the Lender's rights and obligations under this Second Credit Agreement.  Any agreement or instrument pursuant to which the Lender sells such a participation shall provide that the Lender shall retain the sole right to enforce this Second Credit Agreement and to approve any amendment, modification or waiver of any provision of this Second Credit Agreement; <u>provided</u> that such agreement or instrument may provide that the Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that affects such Participant.

(c)    The Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Second Credit Agreement to secure obligations of the Lender;

provided that no such pledge or assignment of a security interest shall release the Lender from any of its obligations hereunder or substitute any such pledgee or assignee for the Lender as a party hereto.

      11.08   Counterparts.  This Second Credit Agreement and each other Second DIP Loan Document may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Delivery by telecopier or electronically of an executed counterpart or PDF copy of a signature page to this Second Credit Agreement and each other Second DIP Loan Document shall be effective as delivery of an original executed counterpart of this Second Credit Agreement and such other Loan Document.

      11.09   Integration.  This Second Credit Agreement and the Second DIP Financing Orders and the other Second DIP Loan Documents comprise the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersede all prior agreements, written or oral, on such subject matter.  In the event of any conflict between the provisions of this Second Credit Agreement and those of any other Second DIP Loan Document, the provisions of this Second Credit Agreement shall control; provided that the inclusion of supplemental rights or remedies in favor of the Lender in any other Second DIP Loan Document shall not be deemed a conflict with this Second Credit Agreement.  In the event of any conflict between this Second Credit Agreement or any other Second DIP Loan Document and the Second DIP Financing Orders, the Second DIP Financing Orders shall control.  Each Second DIP Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

      11.10   Survival of Representations and Warranties.  All representations and warranties made hereunder and in any other Second DIP Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Lender, regardless of any investigation made by the Lender or on its behalf and notwithstanding that the Lender may have had notice or knowledge of any Default at the time of any Second Term Loan Advance, and shall continue in full force and effect as long as the Second Term Loan shall remain unpaid or unsatisfied.

      11.11   Severability.  If any provision of this Second Credit Agreement or the other Second DIP Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Second Credit Agreement and the other Second DIP Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

      11.12   Governing Law.

      (a)     THIS SECOND CREDIT AGREEMENT AND EACH OTHER SECOND DIP LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE

WITH, THE LAW OF THE STATE OF INDIANA AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

(b) EACH PARTY TO THIS SECOND CREDIT AGREEMENT HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS SECOND CREDIT AGREEMENT OR ANY OF THE OTHER SECOND DIP LOAN DOCUMENTS, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE JURISDICTION OF THE BANKRUPTCY COURT. EACH OF THE BORROWER AND THE LENDER IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF ANY SECOND DIP LOAN DOCUMENT OR OTHER DOCUMENT RELATED THERETO. THE BORROWER AND THE LENDER WAIVES PERSONAL SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER PROCESS, WHICH MAY BE MADE BY ANY OTHER MEANS PERMITTED BY APPLICABLE LAW.

11.16 <u>Waiver of Right to Trial by Jury</u>. EACH PARTY TO THIS SECOND CREDIT AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER ANY SECOND DIP LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY SECOND DIP LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS SECOND CREDIT AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

11.17 <u>Binding Effect</u>. This Second Credit Agreement shall become effective when it shall have been executed by the Borrower and the Lender and thereafter shall be binding upon and inure to the benefit of the Borrower, and the Lender and their respective successors and assigns, except that the Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of the Lender.

[*Signatures of the Lender and Loan Parties are on following pages*]

BDDB01 6154564v8

IN WITNESS WHEREOF, the parties hereto have caused this Second Credit Agreement to be duly executed as of the date first above written.

LENDER:

LIP LENDERS, LLC

By: _____
Name: Robert L. Lauth, Jr.
Title:   Manager
Address:       401 Pennsylvania Parkway
                     Indianapolis, IN 46280
Facsimile:     (317) 848-6511
Attention:       Robert L. Lauth, Jr., Manager

BORROWER:

LIP INVESTMENT, LLC

By: _____
Name: Gregory C. Gurnik
Title:   Manager
Address:       c/o Lauth Group, Inc.
                     401 Pennsylvania Parkway
                     Indianapolis, IN 46280
Facsimile:     (317) 848-6511
Jurisdiction of Organization:  Delaware

GUARANTORS:

LIP DEVELOPMENT, LLC

By: _____
Name: Gregory C. Gurnik
Title:   President
Address:       c/o Lauth Group, Inc.
                     401 Pennsylvania Parkway
                     Indianapolis, IN 46280
Facsimile:     (317) 848-6511
Jurisdiction of Organization:  Delaware

LAUTH INVESTMENT PROPERTIES, LLC

By: _____

Name: Gregory C. Gurnik

Title:   President

Address:        c/o Lauth Group, Inc.

                          401 Pennsylvania Parkway

                          Indianapolis, IN 46280

Facsimile:     (317) 848-6511

Jurisdiction of Organization:  Indiana

## EXHIBIT A
### FORM OF SECOND TERM NOTE

$5,000,000.00

June 3, 2010

FOR VALUE RECEIVED, LIP INVESTMENT, LLC, a Delaware limited liability company (the "Borrower") promises to pay to the order of LIP LENDERS, LLC, an Indiana limited liability company ("Payee") (i) the principal amount of FIVE MILLION AND NO/100ths DOLLARS ($5,000,000.00), or such lesser amount thereof as may be advanced to Borrower by Payee pursuant to the Second Credit Agreement (as defined below).

Borrower also promises to pay interest on the unpaid principal amount hereof, from the date hereof until paid in full, at the rates and at the times that shall be determined in accordance with the provisions of that certain Second Secured Debtor-in Possession Credit and Security Agreement dated as of the date hereof, as the same may be further amended, supplemented, restated, amended and restated, or otherwise modified from time to time (the "Second Credit Agreement"), by and among Borrower, as borrower, LIP Development, LLC and Lauth Investment Properties, LLC, as guarantors, and Payee, as lender. Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Second Credit Agreement.

Except as provided below, Borrower shall make principal payment on this Second Term Note, together with all accrued and unpaid interest and fees in the manner set forth in Section 2.03(a) of the Second Credit Agreement.

This Second Term Note is issued pursuant to and entitled to the benefits of the Second Credit Agreement, to which reference is hereby made for a more complete statement of the terms and conditions under which the Second Term Loan evidenced hereby were made and are to be repaid.

All payments of principal and interest of this Second Term Note and any fees hereunder shall be made in lawful money of the United States of America in same day funds at the office of the Payee at 401 Pennsylvania Parkway, Indianapolis, Indiana 46280, or at such other place as shall be designated in writing for such purpose in accordance with the terms of the Second Credit Agreement.

Whenever any payment on this Second Term Note shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest on this Second Term Note.

This Second Term Note is subject to mandatory prepayment as provided in Section 2.02(b) of the Second Credit Agreement and to prepayment at the option of the Borrower as provided in Section 2.02(a) of the Second Credit Agreement.

**THIS SECOND TERM NOTE AND THE RIGHTS AND OBLIGATIONS OF BORROWER AND PAYEE HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL**

**LAWS OF THE STATE OF INDIANA WITHOUT REGARD TO CONFLICTS-OF-LAWS PRINCIPLES.**

Upon the occurrence and during the continuation of an Event of Default, the unpaid balance of the principal amount of this Second Term Note, together with all accrued and unpaid interest thereon, may become, or may be declared to be, due and payable in the manner, upon the conditions, and with the effect provided in the Second Credit Agreement.

The terms of this Second Term Note are subject to amendment only in the manner provided in the Second Credit Agreement.

This Second Term Note is guaranteed pursuant to the provisions of the Second Credit Agreement and is also secured by the other Collateral Documents, as more fully set forth in the Second Credit Agreement.

No reference herein to the Second Credit Agreement and no provision of this Second Term Note or the Second Credit Agreement shall alter or impair the obligations of Borrower, which are absolute and unconditional, to pay the principal of and interest on this Second Term Note at the place, at the respective times, and in the currency herein prescribed.

Borrower promises to pay all costs and expenses, including reasonable attorneys' fees, all as provided in Section 11.04 of the Second Credit Agreement, incurred in the collection and enforcement of this Second Term Note.  Borrower and any endorsers of this Second Term Note hereby consent to renewals and extensions of time at or after the maturity hereof, without notice, and hereby waive diligence, presentment, protest, demand and notice of every kind and, to the full extent permitted by law, the right to plead any statute of limitations as a defense to any demand hereunder.

Borrower hereby waives presentment for payment, protest and demand and notice of protest, demand, dishonor and nonpayment of this Second Term Note, and expressly agrees that this Second Term Note, or any payment hereunder, may be extended from time to time before, at or after maturity, without in any way affecting the liability of the Borrower hereunder or any guarantor hereof.

Time for the performance of the Borrower's obligations under this Second Term Note is of the essence.

IN WITNESS WHEREOF, Borrower has caused this Second Term Note to be duly executed and delivered by its officer thereunto duly authorized as of the date and at the place first written above.

BORROWER:

LIP INVESTMENT, LLC

By:  _____
Name:  _____
Title:  _____

2

## EXHIBIT B

FORM OF COMPLIANCE CERTIFICATE


COMPLIANCE CERTIFICATE


Dated as of June 3, 2010

This Compliance Certificate (the "<u>Compliance Certificate</u>") is given by _____(the "<u>Loan Party</u>"), pursuant to section 6.02(a) of that certain Second Secured Debtor-In-Possession Credit and Security Agreement dated as of _____, 2010, among LIP INVESTMENT, LLC, as borrower, LIP DEVELOPMENT, LLC and LAUTH INVESTMENT PROPERTIES, LLC, as guarantors, and LIP LENDERS, LLC, as lender (the "<u>Lender</u>") (as amended, supplemented, modified or restated from time to time, the "<u>Second Credit Agreement</u>").  Capitalized terms used herein without definition shall have the meanings set forth in the Second Credit Agreement.

The officer executing this certificate is the Responsible Officer of the Loan Party and as such is duly authorized to execute and deliver this certificate on behalf of the Loan Party and not in any individual capacity.  By executing this certificate, the Loan Party hereby certifies to the Lender that:

(a)    the financial statements delivered with this Compliance Certificate in accordance with subsection 6.02(a) of the Second Credit Agreement fairly present in all material respects the revenues and expenditures of the Loan Party as of the dates of such financial statements; and

(c)    no Default or Event of Default has occurred or is presently continuing.


IN WITNESS WHEREOF, the Loan Party has caused this Compliance Certificate to be executed by its _____ as of the date first written above.


_____

By:     _____
Name:  _____
Title:   _____


3

LIST OF SCHEDULES

**SCHEDULES TO BE PROVIDED BY THE BORROWER**

Schedule 5.03 – Required Approvals

Schedule 5.08 – Liens on Collateral

Schedule 5.11 – Taxes (exceptions to representation)

Schedule 5.13(a) – Subsidiaries

Schedule 5.13 – Investments

Schedule 7.09—Identification of Asset Management Agreement

Schedule 9.01 – Pledged Equity

4