**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LAUTH INVESTMENT PROPERTIES, LLC, et al.[1] | ) | Case No. 09-06065-BHL-11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**SECOND AMENDED DISCLOSURE STATEMENT FOR THE DEBTORS' SECOND AMENDED
JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**IMPORTANT DATES:**

- Voting Deadline by which Ballots must be received:  May 13, 2011 at 5:00 p.m. (prevailing Eastern Time)

- Deadline by which to file and serve objections to Confirmation of the Plan:  May 13, 2011 at 5:00 p.m. (prevailing Eastern Time)

- Hearing on Confirmation of the Plan:  May 20, 2011 at 11:00 a.m. (prevailing Eastern Time)


| | |
|---|---|
| James A. Stempel (admitted *pro hac vice*) | Jerald I. Ancel |
| Ross M. Kwasteniet (admitted *pro hac vice*) | Jeffrey J. Graham |
| Arun K. Kurichety (admitted *pro hac vice*) | TAFT STETTINIUS & HOLLISTER LLP |
| KIRKLAND & ELLIS LLP | One Indiana Square, Suite 3500 |
| 300 North LaSalle Street | Indianapolis, Indiana  46204 |
| Chicago, Illinois  60654-3406 | Telephone:     (317) 713-3500 |
| Telephone:   (312) 862-2000 | Facsimile:      (317) 713-3699 |
| Facsimile:   (312) 862-2200 | |

Co-Counsel to the Debtors

Dated:  April 28, 2011

---

[1]     The Debtors include:  Lauth Investment Properties, LLC (09-06065); LIP Development, LLC (09-06066); and LIP Investment, LLC (09-06067).

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 PM PREVAILING EASTERN TIME ON MAY 13, 2011 UNLESS THE DEBTORS EXTEND THE VOTING DEADLINE. TO BE COUNTED, THE SOLICITATION AGENT MUST <u>ACTUALLY RECEIVE</u> YOUR BALLOT ON OR BEFORE THE APPLICABLE VOTING DEADLINE.**

**THE DEBTORS PROVIDE NO ASSURANCE THAT THE DISCLOSURE STATEMENT (AND THE EXHIBITS) ULTIMATELY APPROVED IN THE CHAPTER 11 CASES (A) WILL CONTAIN ANY OF THE TERMS IN THIS CURRENT DOCUMENT OR (B) WILL NOT CONTAIN DIFFERENT, ADDITIONAL, MATERIAL TERMS THAT DO NOT APPEAR IN THIS DOCUMENT.**

**THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND ANY EXHIBITS ATTACHED HERETO IS <u>HIGHLY SPECULATIVE</u>, AND SUCH DOCUMENTS SHOULD NOT BE RELIED UPON IN MAKING INVESTMENT DECISIONS WITH RESPECT TO (A) THE DEBTORS OR (B) ANY OTHER ENTITIES THAT MAY BE AFFECTED BY THE CHAPTER 11 CASES.**

K&E 15956155

**TABLE OF CONTENTS**

Page

I. INTRODUCTION AND GENERAL BACKGROUND..................................................4
  A. PURPOSE AND EFFECT OF THE PLAN ..............................................6
  B. OVERVIEW OF CHAPTER 11 ...............................................................6
  C. SUMMARY OF CLASSIFICATION AND TREATMENT OF ALLOWED CLAIMS
     AND EQUITY INTERESTS UNDER THE PLAN ...................................7
  D. ENTITIES ENTITLED TO VOTE ON THE PLAN ...............................11
  E. SOLICITATION PROCESS.....................................................................13
  F. VOTING PROCEDURES ........................................................................13
  G. CONFIRMATION HEARING ................................................................14
  H. CONFIRMATION AND CONSUMMATION OF THE PLAN .................15
  I. RISK FACTORS .....................................................................................15

II. BACKGROUND TO THESE CHAPTER 11 CASES........................................15
  A. OVERVIEW OF THE DEBTORS' BUSINESSES................................15
  B. DEBT AND CAPITAL STRUCTURE OF THE DEBTORS....................19

III. EVENTS LEADING UP TO CHAPTER 11 CASES ........................................20
  A. REASONS FOR FINANCIAL DISTRESS ............................................20
  B. DESCRIPTION OF PREPETITION RESTRUCTURING EFFORTS.........20

IV. CHAPTER 11 CASES OF THE DEBTORS.......................................................21
  A. INITIAL MOTIONS AND ORDERS.....................................................21
  B. OTHER MOTIONS AND PLEADINGS ................................................21

V. SUMMARY OF THE JOINT PLAN.................................................................24
  A. ADMINISTRATIVE AND PRIORITY CLAIMS...................................24
  B. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS .................25
  C. ACCEPTANCE OR REJECTION OF THE PLAN................................34
  D. CONFIRMATION PURSUANT TO SECTIONS 1129(a)(10) AND 1129(b) OF THE
     BANKRUPTCY CODE...........................................................................34
  E. CONTROVERSY CONCERNING IMPAIRMENT ..............................34
  F. MEANS FOR IMPLEMENTATION OF THE PLAN ...........................34
  G. PROVISIONS GOVERNING DISTRIBUTIONS ..................................38
  H. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
     DISPUTED CLAIMS...............................................................................40
  I. SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS............................42
  J. ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE CLAIMS .....................45
  K. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF
     THE PLAN .............................................................................................46
  L. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ..................47
  M. RETENTION OF JURISDICTION ........................................................47
  N. MISCELLANEOUS PROVISIONS .......................................................49

VI. SOLICITATION AND VOTING PROCEDURES ...........................................50
  A. RECORD DATE.....................................................................................50
  B. VOTING DEADLINE ............................................................................51
  C. SOLICITATION PROCEDURES ..........................................................51
  D. VOTING AND TABULATION PROCEDURES ....................................52

VII. CONFIRMATION PROCEDURES ................................................................54
  A. CONFIRMATION HEARING ................................................................54

K&E 15956155

    B.     STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ............................. 55
    C.     RISK FACTORS .......................................................................................... 58
    D.     CONTACT FOR MORE INFORMATION ........................................................ 58

**VIII.  PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ................................................................... 59**
    A.     GENERAL BANKRUPTCY LAW AND PLAN - RELATED CONSIDERATIONS ............... 59
    B.     RISKS ASSOCIATED WITH FORWARD LOOKING STATEMENTS ..................... 61
    C.     DISCLOSURE STATEMENT DISCLAIMER ................................................... 61
    D.     ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN .............. 63
    E.     VALUATION ANALYSIS ............................................................................ 63

**IX.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ........................................ 69**
    A.     GENERAL TAX CONSIDERATIONS ........................................................... 69
    B.     FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS AND HOLDERS OF EQUITY INTERESTS ............................................................................ 70
    C.     FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS ............................ 70
    D.     RESERVATION OF RIGHTS ........................................................................ 72

**X.     GLOSSARY OF DEFINED TERMS ............................................................. 73**

**XI.    CONCLUSION AND RECOMMENDATION ................................................... 81**

K&E 15956155

**EXHIBITS**

**Exhibit A**        Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code

**Exhibit B**        Signed Disclosure Statement Order (with the Solicitation Procedures attached thereto as Exhibit 1)

**Exhibit C**        Corporate Structure Chart as of the Petition Date

K&E 15956155

## I.    INTRODUCTION AND GENERAL BACKGROUND

On May 1, 2009 (the "Petition Date"),[2] Lauth Investment Properties, LIP Development, LLC and LIP Investment, LLC (collectively, the "Debtors") filed voluntary petitions with the Bankruptcy Court under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). The Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims in connection with: (a) the solicitation of votes to accept or reject the *Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, (as the same may be amended from time to time, the "Plan"), which was filed by the Debtors with the United States Bankruptcy Court for the Southern District of Indiana (the "Bankruptcy Court") and (b) the Confirmation Hearing (the "Confirmation Hearing"), which is scheduled for May 20, 2011, at 11:00 am prevailing Eastern Time (the "Confirmation Hearing Date"). A copy of the Plan is attached hereto as Exhibit A and incorporated herein by reference.

The purpose of this Disclosure Statement is to set forth information (a) regarding the history of the Debtors, their businesses and the Chapter 11 Cases, (b) concerning the Plan and alternatives to the Plan, (c) advising the Holders of Claims and Equity Interests of their rights under the Plan and (d) assisting the Holders of Claims in making an informed judgment regarding whether they should vote to accept or reject the Plan.

By order dated April 27, 2011 [Docket No. 1892] (the "Disclosure Statement Order"), the Bankruptcy Court approved this Disclosure Statement, in accordance with section 1125 of the Bankruptcy Code, as containing "adequate information" to enable a hypothetical, reasonable investor typical of Holders of Claims against, or Equity Interests in, the Debtors to make an informed judgment as to whether to accept or reject the Plan, and authorized its use in connection with the solicitation of votes with respect to the Plan.

The Disclosure Statement Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan, and for filing objections to confirmation of the Plan, the record date for voting purposes and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each Holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the Ballot in their entirety before voting on the Plan. These documents contain important information concerning the classification of Claims and Equity Interests for voting purposes and the tabulation of votes. **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN**. No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. In voting on the Plan, Holders of Claims should not rely on any information relating to the Debtors and their businesses, other than that contained in this Disclosure Statement, the Plan and all exhibits and appendices hereto and thereto.

The Debtors will file a plan supplement (the "Plan Supplement") as early as practicable but in no event less than five (5) Business Days prior to the Confirmation Hearing, or on such other date as may be established by the Bankruptcy Court. The Plan Supplement will contain, among other things, in substantially final form, (a) a schedule of Causes of Action to be retained by the Reorganized Debtors, (b) the Exit Term Loan Documents, and , and (c) the form of the New Class A Preferred Units. The Debtors will not serve copies of the Plan Supplement. However, parties may obtain a copy of the Plan Supplement (i) by writing to Kirkland & Ellis LLP, Attn: Arun Kurichety, 300 North LaSalle Street, Chicago, Illinois 60654 or (ii) for a fee via PACER at https://ecf.insb.uscourts.gov/.

**THE MANAGEMENT OF THE DEBTORS BELIEVES THAT THE PLAN PROVIDES FOR THE BEST AVAILABLE RECOVERY TO THE DEBTORS' STAKEHOLDERS. THE MANAGEMENT OF THE DEBTORS RECOMMENDS THAT HOLDERS OF CLAIMS IN CLASSES A-1, A-3, A-4, A-5, A-6, B-1, B-2, B-3, B-4, B-7, C-1, C-2, C-3, AND C-6 VOTE TO ACCEPT THE PLAN.**

---

[2]    All capitalized terms used but not otherwise defined herein shall have the meanings set forth in Section XI herein entitled, "Glossary of Defined Terms." To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the "Glossary of Defined Terms" are inconsistent, the definition included in the Glossary of Defined Terms shall control.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR THE DEBTORS' JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.

A GLOSSARY OF DEFINED TERMS UTILIZED IN THE PLAN AND DISCLOSURE STATEMENT IS SET FORTH IN SECTION XI OF THIS DISCLOSURE STATEMENT.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURE CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

IT IS THE DEBTORS' POSITION THAT THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. RATHER, HOLDERS OF CLAIMS AND EQUITY INTERESTS AND OTHER ENTITIES SHOULD CONSTRUE THIS DISCLOSURE STATEMENT AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT. THE DEBTORS OR THE REORGANIZED DEBTORS MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTORS' MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTORS HAVE USED THEIR REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF,

K&E 15956155

UNLESS OTHERWISE SPECIFICALLY NOTED.   ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO.  HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DISCLOSURE STATEMENT WAS FILED.  HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSES OF THE TERMS OF THE PLAN, INCLUDING, WITHOUT LIMITATION, ANY RISK FACTORS CITED HEREIN, IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL IN SECTION VIII HEREIN, "PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN."

ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND MADE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

A.      PURPOSE AND EFFECT OF THE PLAN

The primary purpose of the Plan is to effectuate the restructuring of the Debtors in order to bring them into alignment with the Debtors' present and future operating prospects and to provide the Debtors with greater liquidity post-emergence.  The Plan will allow the Debtors to continue their businesses in the ordinary course.  Presently, based on the current outlook, the funds expected to be generated by the Debtors' operation of their businesses and other sources will not be sufficient to meet the Company's current debt service requirements and satisfy their current debt obligations (which include the outstanding amounts under the DIP Credit Agreements) unless the restructuring is consummated.  The Debtors believe that the restructuring will reduce uncertainty with respect to their future and better position them to be successful once the credit and commercial real estate markets recover.  Accordingly, the Debtors strongly recommend that you vote to accept the Plan, if you are entitled to vote.

B.      OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the bankruptcy petition date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

Consummating a plan is the principal objective of a chapter 11 case.  The Bankruptcy Court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

Prior to soliciting acceptances of a proposed chapter 11 plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the chapter 11 plan. This Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.

**C. SUMMARY OF CLASSIFICATION AND TREATMENT OF ALLOWED CLAIMS AND EQUITY INTERESTS UNDER THE PLAN**

**THE FOLLOWING CHART IS A SUMMARY OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS AND THE POTENTIAL DISTRIBUTIONS UNDER THE PLAN. THE AMOUNTS SET FORTH BELOW ARE ESTIMATES ONLY. ANY ESTIMATES OF CLAIMS OR EQUITY INTERESTS IN THIS DISCLOSURE STATEMENT MAY VARY FROM THE FINAL AMOUNTS ALLOWED BY THE BANKRUPTCY COURT. AS A RESULT OF THE FOREGOING AND OTHER UNCERTAINTIES WHICH ARE INHERENT IN THE ESTIMATES, THE ESTIMATED RECOVERIES IN THIS DISCLOSURE STATEMENT MAY VARY FROM THE ACTUAL RECOVERIES RECEIVED. IN ADDITION, THE ABILITY TO RECEIVE DISTRIBUTIONS UNDER THE PLAN DEPENDS UPON THE ABILITY OF THE DEBTORS TO OBTAIN CONFIRMATION OF THE PLAN AND MEET THE CONDITIONS TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN, AS DISCUSSED IN THIS DISCLOSURE STATEMENT. THE RECOVERIES SET FORTH BELOW ARE PROJECTED RECOVERIES ONLY AND MAY CHANGE BASED UPON CHANGES IN THE AMOUNT OF ALLOWED CLAIMS AS WELL AS OTHER FACTORS RELATED TO THE DEBTORS' BUSINESS OPERATIONS AND GENERAL ECONOMIC CONDITIONS. REFERENCE SHOULD BE MADE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN FOR A COMPLETE DESCRIPTION OF THE CLASSIFICATION AND TREATMENT OF ALLOWED CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS.**

K&E 15956155

## SUMMARY OF EXPECTED RECOVERIES

| Class | Type of Claim or Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| A-1 | DIP Agreement Claims | Holders of Class A-1 DIP Agreement Claims held against Lauth Investment Properties, LLC (or their assignee) will receive, in full and final satisfaction, settlement, release and discharge and in exchange for each Allowed Class A-1 DIP Agreement Claim held against Lauth Investment Properties, LLC, (a) their Pro Rata share of the Exit Term Loan and (b) all Equity Interests in the Debtors shall be reinstated. | 100% |
| A-2 | LIP Guaranty Claims | Except to the extent a Holder of a Class A-2 LIP Guaranty Claim agrees to different treatment, on the Effective Date: (a) each Guaranty of Lauth Investment Properties, LLC shall be assumed by and reinstated against Lauth Investment Properties, LLC and Reorganized Lauth Investment Properties, LLC, shall survive the Confirmation Order and shall not be amended, altered, released, discharged or otherwise modified by any term of the Plan; and (b) each Guaranty of Lauth Investment Properties, LLC shall constitute the legal, valid and binding obligations of Lauth Investment Properties, LLC and Reorganized Lauth Investment Properties, LLC and shall be enforceable in accordance with its terms. Notwithstanding any other provision of the Plan to the contrary and except to the extent a Holder of a Class A-2 LIP Guaranty Claim agrees to different treatment, the Plan shall leave unaltered all of the legal, equitable and contractual rights of each Holder of a Class A-2 LIP Guaranty Claim under its Guaranty of Lauth Investment Properties, LLC. Subject to the occurrence of the Effective Date, each Holder of a Class A-2 LIP Guaranty Claim shall be deemed to hold an Allowed Claim that is not subject to estimation under the Bankruptcy Code or this Plan. | 100% |
| A-3 | M&I LOC Claims | Pursuant to the M&I Settlement Agreement, the Holders, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed Class A-3 M&I LOC Claim, shall receive the M&I Settlement Collateral on the Effective Date or as soon as reasonably practicable thereafter. | 75-100% |
| A-4 | M&I Adequate Protection Claims | Pursuant to the M&I Settlement Agreement, the Holders, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed Class A-4 M&I Adequate Protection Claim, shall receive the M&I Settlement Collateral on the Effective Date or as soon as reasonably practicable thereafter. | 75-100% |
| A-5 | Swap Agreement Claims | Except to the extent a Holder of an Allowed Class A-5 Swap Agreement Claim agrees to a less favorable treatment, each such Holder, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed Class A-5 Swap Agreement Claim, shall receive its Pro Rata share of the LIP Unsecured Claim Allocation in Cash on the later of the Effective Date or the date on which such Swap Agreement Claim becomes an Allowed Class A-5 Swap Agreement Claim or as soon as reasonably practicable thereafter. | Less than 1% |
| A-6 | General Unsecured Claims | Except to the extent a Holder of an Allowed Class A-6 General Unsecured Claim agrees to a less favorable treatment, each such Holder, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed Class A-6 General Unsecured Claim, shall receive its Pro Rata share of the LIP Unsecured Claim Allocation in Cash on the later of the Effective Date or the date on which such Unsecured Claim becomes an Allowed Class A-6 Unsecured Claim or as soon as reasonably practicable thereafter. | Less than 1% [3] |

---

[3]   The projected recovery under the Plan is based on an estimate of $36,898.62 in Allowed Class A-6 General Unsecured Claims. The actual amount of Allowed Class A-6 General Unsecured Claims may differ materially from $36,898.62, and this estimate is not and shall not be deemed an admission by the Debtors that the amount of Allowed Class A-6 General Unsecured Claims is $36,898.62. Because the value

## SUMMARY OF EXPECTED RECOVERIES

| Class | Type of Claim or Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| A-7 | Equity Interests | On the Effective Date, all Class A-7 Equity Interests shall be reinstated as provided in the treatment of Class A-1 Claims. | 100% |
| A-8 | Profits Interests | On the Effective Date, all Class A-8 Profits Interests shall be deemed canceled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distribution on account of such Profits Interests. | 0% |
| B-1 | DIP Agreement Claims | Holders of Class B-1 DIP Agreement Claims will receive the treatment specified in Class A-1. | 100% |
| B-2 | Mezzanine Loan Claims | Except to the extent a Holder of an Allowed Class B-2 Mezzanine Loan Claim agrees to a less favorable treatment, Holders of Allowed Class B-2 Mezzanine Loan Claims will receive, in full and final satisfaction, settlement, release and discharge and in exchange for each Mezzanine Loan Claim, their Pro Rata share of the New Preferred Class A Units. | 100% |
| B-3 | M&I LOC Claims | Pursuant to the M&I Settlement Agreement, the Holders, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed Class B-3 M&I LOC Claim, shall receive the M&I Settlement Collateral on the Effective Date or as soon as reasonably practicable thereafter. | 75-100% |
| B-4 | M&I Adequate Protection Claims | Pursuant to the M&I Settlement Agreement, the Holders, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed Class B-4 M&I Adequate Protection Claim, shall receive the M&I Settlement Collateral on the Effective Date or as soon as reasonably practicable thereafter. | 75-100% |
| B-5 | Other Secured Claims | Except to the extent a Holder of an Allowed Class B-5 Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed Class B-5 Other Secured Claim, each Allowed Class B-5 Other Secured Claim shall be paid in full in Cash or reinstated on the later of the Effective Date or the date on which such Other Secured Claim becomes an Allowed Class B-5 Other Secured Claim or as soon as reasonably practicable thereafter. | 100% |
| B-6 | LIP D Guaranty Claims | Except to the extent a Holder of a Class B-6 LIP D Guaranty Claim agrees to different treatment, on the Effective Date: (a) each Guaranty of LIP Development, LLC shall be assumed by and reinstated against LIP Development, LLC and Reorganized LIP Development, LLC, shall survive the Confirmation Order and shall not be amended, altered, released, discharged or otherwise modified by any term of the Plan; and (b) each Guaranty of LIP Development, LLC shall constitute the legal, valid and binding obligations of LIP Development, LLC and Reorganized LIP Development, LLC and shall be enforceable in accordance with its terms. Notwithstanding any other provision of the Plan to the contrary and except to the extent a Holder of a Class B-6 LIP D Guaranty Claim agrees to different treatment, the Plan shall leave unaltered all of the legal, equitable and contractual rights of each Holder of a Class B-6 LIP D Guaranty Claim under its Guaranty of LIP Development, LLC. Subject to the occurrence of the Effective Date, each Holder of a Class B-6 LIP D Guaranty Claim shall be deemed to hold an Allowed Claim that is not subject to estimation under the Bankruptcy Code or the Plan. | 100% |

allocated to this Class is fixed, the recovery to each Holder of the an Allowed Claim in this Class may be materially less if the amount of actual Allowed Claims in this Class is materially higher.

## SUMMARY OF EXPECTED RECOVERIES

| Class | Type of Claim or Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| B-7 | General Unsecured Claims | Except to the extent a Holder of an Allowed Class B-7 General Unsecured Claim agrees to a less favorable treatment for such Holder, each Allowed Class B-7 General Unsecured Claim shall receive its Pro Rata share of the LIP D Unsecured Claim Allocation in Cash on the later of the Effective Date or the date on which such Unsecured Claim becomes an Allowed Class B-7 Unsecured Claim or as soon as reasonably practicable thereafter. | Less than 1%[4] |
| B-8 | Equity Interests | On the Effective Date, all Class B-8 Equity Interests shall be reinstated as provided in the treatment of Class A-1 Claims. | 100% |
| C-1 | DIP Agreement Claims | Holders of Class B-1 DIP Agreement Claims will receive the treatment specified in Class A-1. | 100% |
| C-2 | M&I LOC Claims | Pursuant to the M&I Settlement Agreement, the Holders, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed Class C-2 M&I LOC Claim, shall receive the M&I Settlement Collateral on the Effective Date or as soon as reasonably practicable thereafter | 75-100% |
| C-3 | M&I Adequate Protection Claims | Pursuant to the M&I Settlement Agreement, the Holders, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed Class C-3 M&I Adequate Protection Claim, shall receive the M&I Settlement Collateral on the Effective Date or as soon as reasonably practicable thereafter. | 75-100% |
| C-4 | Secured Claims | Except to the extent a Holder of an Allowed Class C-4 Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed Class C-4 Secured Claim, each Allowed Class C-4 Secured Claim shall be paid in full in Cash or reinstated on the later of the Effective Date or the date on which such Secured Claim becomes an Allowed Class C-4 Secured Claim or as soon as reasonably practicable thereafter. | 100% |
| C-5 | LIP I Guaranty Claims | Except to the extent a Holder of a Class C-5 LIP I Guaranty Claim agrees to different treatment, on the Effective Date: (a) each Guaranty of LIP Investment, LLC shall be assumed by and reinstated against LIP Investment LLC and Reorganized LIP Investment, LLC, shall survive the Confirmation Order and shall not be amended, altered, released, discharged or otherwise modified by any term of the Plan; and (b) each Guaranty of LIP Investment, LLC shall constitute the legal, valid and binding obligations of LIP Investment, LLC and Reorganized LIP Investment, LLC and shall be enforceable in accordance with its terms. Notwithstanding any other provision of the Plan to the contrary and except to the extent a Holder of a Class C-5 LIP I Guaranty Claim agrees to different treatment, the Plan shall leave unaltered all of the legal, equitable and contractual rights of each Holder of a Class C-5 LIP I Guaranty Claim under its Guaranty of LIP Investment, LLC. Subject to the occurrence of the Effective Date, each Holder of a Class C-5 LIP I Guaranty Claim shall be deemed to hold an Allowed Claim that is not subject to estimation under the Bankruptcy Code or the Plan. | 100% |

---

[4] The projected recovery under the Plan is based on an estimate of $68,196.48 in Allowed Class B-7 General Unsecured Claims. The actual amount of Allowed Class B-7 General Unsecured Claims may differ materially from $68,196.48, and this estimate is not and shall not be deemed an admission by the Debtors that the amount of Allowed Class B-7 General Unsecured Claims is $68,196.48. Because the value allocated to this Class is fixed, the recovery to each Holder of the an Allowed Claim in this Class may be materially less if the amount of actual Allowed Claims in this Class is materially higher.

10

## SUMMARY OF EXPECTED RECOVERIES

| Class | Type of Claim or Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|-------|----------------------------------|------------------------------------|-----------------------------------|
| C-6 | General Unsecured Claims | Except to the extent a Holder of an Allowed Class C-6 General Unsecured Claim agrees to a less favorable treatment, each such Holder, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed Class C-6 General Unsecured Claim, shall receive its Pro Rata share of the LIP I Unsecured Claim Allocation in Cash on the later of the Effective Date or the date on which such Unsecured Claim becomes an Allowed Class C-6 Unsecured Claim or as soon as reasonably practicable thereafter. | Less than 1%[5] |
| C-7 | Equity Interests | On the Effective Date, all Class C-7 Equity Interests shall be reinstated as provided in the treatment of Class A-1 Claims. | 100% |

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Fee Claims, and Priority Tax Claims have not been classified and are excluded from the foregoing classification (as set forth in Article II of the Plan).

**D.      ENTITIES ENTITLED TO VOTE ON THE PLAN**

Under the Bankruptcy Code, not all holders of claims against and equity interests in a debtor are entitled to vote on a chapter 11 plan.  Holders of Claims that are Unimpaired by the Plan are deemed to accept the Plan under section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote on the Plan.  Holders of Claims or Equity Interests Impaired by the Plan and receiving no distribution under the Plan are not entitled to vote because they are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.

The Classes of Claims and Equity Interests classify Claims and Equity Interests for all purposes, including voting, Confirmation and distribution pursuant to the Plan and sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or an Equity Interest to be classified in a particular Class only to the extent that the Claim or the Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of the Claim or Equity Interest qualifies within the description of a different Class.

## SUMMARY OF STATUS AND VOTING RIGHTS

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| A-1 | DIP Agreement Claims | Impaired | Entitled to Vote |
| A-2 | LIP Guaranty Claims | Unimpaired | Deemed to Accept |
| A-3 | M&I LOC Claims | Impaired | Entitled to Vote |
| A-4 | M&I Adequate Protection Claims | Impaired | Entitled to Vote |
| A-5 | Swap Agreement Claims | Impaired | Entitled to Vote |
| A-6 | General Unsecured Claims | Impaired | Entitled to Vote |

---

[5]    The projected recovery under the Plan is based on an estimate of $88,438.30 in Allowed Class C-4 General Unsecured Claims.  The actual amount of Allowed Class C-4 General Unsecured Claims may differ materially from $88,438.30, and this estimate is not and shall not be deemed an admission by the Debtors that the amount of Allowed Class C-4 General Unsecured Claims is $88,438.30.  Because the value allocated to this Class is fixed, the recovery to each Holder of an Allowed Claim in this Class may be materially less if the amount of actual Allowed Claims in this Class is materially higher.

### SUMMARY OF STATUS AND VOTING RIGHTS

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| A-7 | Equity Interests | Unimpaired | Deemed to Accept |
| A-8 | Profits Interests | Impaired | Deemed to Reject |
| B-1 | DIP Agreement Claims | Impaired | Entitled to Vote |
| B-2 | Mezzanine Loan Claims | Impaired | Entitled to Vote |
| B-3 | M&I LOC Claims | Impaired | Entitled to Vote |
| B-4 | M&I Adequate Protection Claims | Impaired | Entitled to Vote |
| B-5 | Other Secured Claims | Unimpaired | Deemed to Accept |
| B-6 | LIP D Guaranty Claims | Unimpaired | Deemed to Accept |
| B-7 | General Unsecured Claims | Impaired | Entitled to Vote |
| B-8 | Equity Interests | Unimpaired | Deemed to Accept |
| C-1 | DIP Agreement Claims | Impaired | Entitled to Vote |
| C-2 | M&I LOC Claims | Impaired | Entitled to Vote |
| C-3 | M&I Adequate Protection Claims | Impaired | Entitled to Vote |
| C-4 | Secured Claims | Unimpaired | Deemed to Accept |
| C-5 | LIP I Guaranty Claims | Unimpaired | Deemed to Accept |
| C-6 | General Unsecured Claims | Impaired | Entitled to Vote |
| C-7 | Equity Interests | Unimpaired | Deemed to Accept |

The following sets forth the Classes that are entitled to vote on the Plan and the Classes that are not entitled to vote on the Plan:

- The Debtors are **NOT** seeking votes from the Holders of Claims in Class A-2, A-7, B-5, B-6, B-8, C-4, C-5, and C-7 because those Classes, and the Claims of any Holders in those Classes, are Unimpaired under the Plan. Pursuant to section 1126(f) of the Bankruptcy Code, Class A-2, A-7, B-5, B-6, B-8, C-4, C-5, and C-7 are deemed to have accepted the Plan.

- The Debtors are **NOT** seeking votes from the Holders of Profits Interests in Class A-8. Pursuant to section 1126(g) of the Bankruptcy Code, Class A-6 is presumed to have rejected the Plan.

- The Debtors **ARE** soliciting votes to accept or reject the Plan from Holders of Claims in Classes A-1, A-3, A-4, A-5, A-6, B-1, B-2, B-3, B-4, B-7, C-1, C-2, C-3, and C-6 (collectively, the "Voting Classes"), because Allowed Claims in the Voting Classes are Impaired under the Plan and are expected to receive distributions under the Plan. Accordingly, Holders of Allowed Claims in the Voting Classes have the right to vote to accept or reject the Plan.

For a detailed description of the Classes of Claims and the Classes of Equity Interests, as well as their respective treatment under the Plan, please refer to Article III of the Plan.

E.      **SOLICITATION PROCESS**

      1.      **Solicitation Agent**

AlixPartners, LLP ("Alix") will act as solicitation agent in connection with the solicitation of votes to accept or reject the Plan (the "Solicitation Agent").

      2.      **Solicitation Package**

The following documents and materials will constitute the solicitation package (collectively, the "Solicitation Package"):

- a cover letter: (i) describing the contents of the Solicitation Package; and (ii) explaining that the Plan Supplement will be filed on or before five (5) Business Days before the Confirmation Hearing;

- the Disclosure Statement Order (with the Solicitation Procedures, which shall be <u>Exhibit 1</u> attached thereto);

- an appropriate form of Ballot and instructions with respect thereto, if applicable (with a pre-addressed, postage prepaid return envelope);

- the notice of the Confirmation Hearing (the "Confirmation Hearing Notice");

- the approved form of the Disclosure Statement (together with the Plan, which is <u>Exhibit A</u> thereto) in paper format; and

- such other materials as the Bankruptcy Court may direct.

Holders of Claims and Equity Interests in Class A-2, A-7, A-8, B-5, B-6, B-8, C-4, C-5, and C-7 will receive copies of the Non-Voting Status Notice, the Confirmation Hearing Notice and such other materials as the Court may direct.

F.      **VOTING PROCEDURES**

      1.      **Record Date**

**The Record Date is April 22, 2011, the date that the Disclosure Statement Hearing is scheduled to commence**.  The Record Date is the date on which the following will be determined:  (a) which Holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the Solicitation Procedures; and (b) whether Claims have been properly assigned or transferred to an assignee pursuant to Bankruptcy Rule 3001(e) such that the assignee can vote as the Holder of a Claim.

      2.      **Voting Deadline**

**The Voting Deadline shall be 5:00 p.m. prevailing Eastern Time on May 13, 2011.**  To be counted as votes to accept or reject the Plan, all Ballots, as applicable, must be properly executed, completed and delivered according to their applicable ballot instructions by:  (a) first class mail as directed on each Ballot; (b) overnight courier; or (c) personal delivery, so that they are **actually received** no later than the Voting Deadline by the Solicitation Agent.  The Ballots will clearly indicate the appropriate return address.  Ballots should be sent to:

---

**BALLOTS**

---

Ballots must be **actually received** by the Solicitation Agent by the Voting Deadline, by using the envelope provided to:

> Lauth Investment Properties, LLC et al.,
> c/o AlixPartners, LLP
> 2101 Cedar Springs Road
> Suite 1100
> Dallas, Texas 75201

If you have any questions on the procedures for voting on the Plan, please contact the Solicitation Agent at the address set forth above.

---

**IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE.**

**ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM, BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL NOT BE COUNTED.**

**EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.**

**IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT WHEN SUBMITTING A VOTE.**

**FOR FURTHER INFORMATION AND INSTRUCTIONS ON VOTING TO ACCEPT OR REJECT THE PLAN, SEE SECTION VI HEREOF ENTITLED "SOLICITATION AND VOTING PROCEDURES."**

**G.      CONFIRMATION HEARING**

Section 1128(a) of the Bankruptcy Code requires the bankruptcy court, after notice, to hold a hearing on confirmation of a plan filed under chapter 11 of the Bankruptcy Code. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the plan.

**1.      Confirmation Hearing Date**

**The Confirmation Hearing will commence on May 20, 2011 at 11:00 a.m. prevailing Eastern Time**, before the Honorable Basil H. Lorch III, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of Indiana, Room 311 of the United States Courthouse, 46 E. Ohio Street, Indianapolis, IN 46204. The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in

place additional procedures governing the Confirmation Hearing. The Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

        **2.**        **Plan Objection Deadline**

        **The Plan Objection Deadline is 5:00 p.m. prevailing Eastern Time on May 13, 2011**. All Plan Objections must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in accordance with the Disclosure Statement Order on or before the Plan Objection Deadline. In accordance with the Confirmation Hearing Notice filed with the Bankruptcy Court, Plan Objections or requests for modifications to the Plan, if any, must:

- be in writing;

- conform to the Bankruptcy Rules and the Local Bankruptcy Rules;

- state the name and address of the objecting Entity and the amount and nature of the Claim or Equity Interest of such Entity;

- state with particularity the basis and nature of the Plan Objection and, if practicable, a proposed modification to the Plan that would resolve such Plan Objection; and

- be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** by the notice parties identified in the Confirmation Hearing Notice on or prior to the Plan Objection Deadline.

        The Debtors' proposed schedule will provide Entities sufficient notice of the Plan Objection Deadline, which will be at least twenty-eight (28) days, as required by Bankruptcy Rule 2002(b). The Debtors believe that the Plan Objection Deadline will afford the Bankruptcy Court, the Debtors and other parties in interest reasonable time to consider the Plan Objections prior to the Confirmation Hearing.

> **THE BANKRUPTCY COURT WILL NOT CONSIDER PLAN OBJECTIONS UNLESS THEY ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER.**

**H.**        **CONFIRMATION AND CONSUMMATION OF THE PLAN**

        It will be a condition to Confirmation of the Plan that all provisions, terms and conditions of the Plan are approved in the Confirmation Order unless otherwise satisfied or waived pursuant to the provisions of Article X.C of the Plan. Following Confirmation, the Plan will be consummated on the Effective Date.

**I.**        **RISK FACTORS**

        **PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN SECTION VIII HEREIN ENTITLED, "PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN."**

        **II.**        **BACKGROUND TO THESE CHAPTER 11 CASES**

**A.**        **OVERVIEW OF THE DEBTORS' BUSINESSES**

        **1.**        **Summary of the Debtors' Businesses**

        The Debtors, along with their debtor and non-debtor affiliates (collectively, "Lauth" or the "Company") are a privately-held real estate business conglomerate which develops, constructs, manages and owns commercial real

estate focusing on health-care, office, industrial and retail developments in the United States.  The Debtors are holding companies for substantially all the real estate development projects currently engaged by the Company.  Prior to the recent economic recession, the Company was one of the largest commercial real estate development companies in the country and, as of 2008, was ranked as the 13th largest real estate developer in the United States as well as one of the top 100 contractors in the country.  The Company is currently developing or managing approximately 23 vertical projects (each a "Project," and collectively, the "Project Entities") and 9 land parcels over 33 separate subsidiaries spread across 15 states.  Currently, the Company employs approximately 27 employees, none of which are represented by a labor union.

The Company's headquarters are located in Indianapolis, Indiana and prior to the recent economic recession, the Company had offices in Denver, Charlotte, Pittsburgh, Orlando and Dallas.  The Company has completed many high-profile projects including some of the nation's most innovative corporate headquarters, healthcare facilities, national distribution centers and lifestyle retail centers.  The Company is vertically integrated and offers a variety of services to its customers, including planning, design, construction, feasibility analysis, financing, property management, environmental services and project recovery through its ProjectRescue Services offering.

The Company also provides services that cover every aspect of the construction of a Project from beginning to end, including conceptual and project cost estimating, sub-contractor qualification and selection, value engineering, permit procurement, local code compliance, bidding and contract negotiation, job site safety, sequencing and scheduling, cost control and accountability, quality assurance and punch-list and warranty follow-up.  In connection with each Project, the Company assigns a project executive to provide overall direction to the Project team, ensure all costs and schedules are met, monitor productivity and quality and make sure the right sub-contractors are in place.  The Company's design-build process provides a competitive advantage by combining master planners, architects, engineers, site analysis experts, cost estimators, and construction experts into one team, under one contract.

In addition, the Company provides asset management, leasing services and property management services once construction has been substantially completed.  The Company works closely with building owners to create plans that achieve cost efficiencies and improve tenant retention.  The Company's asset management, leasing services and property management advantages include:

- expertise in healthcare, office, industrial, retail, and property management;

- established relationships with both local and national service providers and contractors;

- a team approach to executing ownership, investor, and partnership strategies;

- operational benchmarking which focuses on the tracking and executing of efficiently run assets;

- a focused approach to financial reporting, asset planning, budgeting, and analysis; and

- exemplary levels of customer and tenant service and relations.

In 2008, the Company recorded net revenues of approximately $27 million.  As of the Petition Date, the Company had approximately $759 million in total assets and approximately $635 million in total liabilities.

## 2.    Overview of the Project Entities

The Debtors are currently involved in the development, construction and management of 14 Project Entities which can be divided into a variety of categories, the characteristics of which are described below: [6]

---

[6]    The chart does not include Debtors Brier Creek Medical Partners Two, LLC, Moores Chapel Partners, LLC, Brownsburg Station Partners, LLC, and Middleburg Heights Medical Partners, LLC, which entities are subject to the Global Settlement Agreement, and will be returned

| Project Category | Representative Projects | Square Feet | % Occupied |
|---|---|---|---|
| Healthcare | Bon Secours Virginia Beach | 84,478 | 80% |
| | Brier Creek Phase I (WakeMed Brier Creek) | 60,074 | 79% |
| | Fort Norfolk Plaza | 199,355 | 60% |
| | Imperial Point Medical Arts Pavilion | 64,013 | 37% |
| | North Meridian Medical Pavilion A | 84,332 | 100% |
| | North Meridian Medical Pavilion B | 88,887 | 100% |
| Industrial | ACC Building C | 406,959 | 100% |
| | Plastech - Lansing | 231,000 | 100% |
| | Salt River II | 936,000 | 33% |
| Office | Intech Ten | 116,232 | 81% |
| Retail | Bryan Towne Center | 58,268 | 69% |
| | Catawba Springs Promenade | 38,680 | 71% |
| | Shoppes at Rivercrest (Granite Falls) | 46,483 | 61% |
| | Sycamore Terrace | 47,695 | 80% |

### 3.      Corporate History

The Company was founded in 1977 as a small Indianapolis property manager known as Ernst-Eaton & Associates, Inc.  In 1982, Robert L. Lauth, Jr. joined the Company and began to expand its line of services to include office, industry, and healthcare development and formed Lauth Construction, which is now licensed as a general contractor in approximately 25 states.  In the early 1980's, the Company grew beyond its retail property management portfolio to become a fully integrated property developer of high-end retail, office, industrial and health industry properties.  The Company later added a commercial brokerage division to its business.  In the early 1990s, the Company decided to shed its brokerage and property management business and instead focus almost exclusively on its development and construction business.  In 1992, the Company obtained its first out-of-state development project in Orlando, Florida.  In the ensuing fifteen years, the Company expanded to assume a national footprint — as of the Petition Date, the Company owned and/or managed projects in 35 states.

More recently, the Company's revenue growth matched its geographic expansion.  The Company's gross revenues doubled in 2004 and again in 2005, with gross revenues increasing to $591 million annually by 2006.  By 2006, the Company's size and complexity had grown to a point where it required a more refined corporate structure. At the same time, equity and debt investors were clamoring for the opportunity to participate in the profits.  As a result, the Company engaged in a corporate reorganization that would allow it to accommodate and put to use new capital infusions.  The resulting structure took the form of a traditional corporate tree.  Lauth Investment Properties, LLC was left as the top-level real estate holding company and a number of mid-level holding companies were created to provide platforms to support structured debt, and the Company's various developments, the Project Entities, were placed in individual special purpose entities holding debt secured by the entity's development projects.

In conjunction with its strategic reorganization, the Company engaged in extensive negotiations with a wide variety of potential investors.  In 2007, after analyzing competing offers and extensive negotiations, the Company entered into a complex mezzanine lending arrangement with Inland American Real Estate Trust, Inc. ("Inland") that made up to $250 million in capital available for use in developing new projects as part of the Company's national strategy (the "Mezzanine Loan").  Eighteen of the Company's pre-existing building projects and thirteen parcels of land, with an estimated cost of $389 million and an estimated equity value of $64 million were contributed to the Debtors in connection with the Mezzanine Loan.  In addition, eight of Lauth's pre-existing building projects, with an estimated cost of $118 million and an estimated equity value of $30 million were

to Wells Fargo pursuant to the terms thereof.  This chart also does not include Lafayette Pavilions Partners, LLC and Porter's Vale Partners, LLC which are in the process of a deed in lieu transaction.

contributed to LIP Holdings, LLC, an entity created by an affiliate of Inland and Lauth Investment Properties, LLC to facilitate the Mezzanine Loan.

### 4.    Clients

The Company's clients include hospitals, corporations, retail chains, medical associations and public and private institutions including household names such as Bath & Body Works, the American Cancer Society, Best Buy, CitiFinancial, Inc., CVS, Eli Lilly & Company, FEMA, Kroger, Mercy Hospital, NASCAR, Nissan, Pepsi Cola, Purdue University, Target, U.S. Customs & Border Control, Wachovia, and Wal-Mart.

### 5.    Government Regulation

The Company is subject to certain United States federal, state and local provincial safety, labor, zoning and environmental laws and regulations regarding the construction of various Projects.  In the ordinary course of business, the Company requires permits and other authorizations from various local authorities to conduct its operations.  In addition, the Environmental Protection Agency (the "EPA") and similar state and local agencies may regulate the Company's operations and activities, including, but not limited to, construction materials and associated waste.  The Company does not anticipate that future expenditures for compliance with such laws and regulations will have a material adverse effect on the Company's financial position, results of operations, or competitive position.  The Company cannot give any assurance, however, that compliance with such laws and regulations, or compliance with other laws and regulations that may be enacted in the future, will not have an adverse effect on the Company's financial position, results of operations, or competitive position.

### 6.    Directors, Executive Officers and Management Team

As of the date hereof, set forth below are the executive officers of the Company and each officer's position therein.

| Name | Position |
| --- | --- |
| Robert L. Lauth, Jr. | Chairman, President & Chief Executive Officer, Lauth Investment Properties, LLC |
| Michael J. Garvey | Executive Vice President, Lauth Investment Properties, LLC |
| Michael J. Jones | Executive Vice President, Lauth Investment Properties, LLC |
| Vernon C. Back | Executive Vice President, Lauth Investment Properties, LLC |
| Jonathon L. Goodburn | Chief Financial Officer, Lauth Investment Properties, LLC |
| Stephen G. Eppink | Senior Vice President, Lauth Investment Properties, LLC |

Set forth below is a brief description of the business experience of the executive officers listed above.

*Robert L. Lauth, Jr., Chairman, President & Chief Executive Officer, Lauth Investment Properties, LLC*. Mr. Lauth joined the Company in 1982 and has served as Lauth Group, Inc.'s Chairman & Chief Executive Officer since 1995.  Mr. Lauth began his career as a sales associate at F.C. Tucker Company before spending 10 years at an Indianapolis based full-service commercial real estate firm where he served as Executive Vice President.  Mr. Lauth has 37 years of experience in virtually all aspects of the commercial real estate industry.  He earned a degree in Computer Technology from Purdue University.

*Michael J. Garvey, Executive Vice President, Lauth Investment Properties, LLC.*  Mr. Garvey is responsible for all aspects of project capital requirements including:  construction and permanent financing, joint venture relationships and acquisitions and dispositions of properties.  Prior to joining the Company, Mr. Garvey was Senior Vice-President and Manager for Laureate Capital, where he was a six time winner of the Chairman's Top Producer Award.  During his over 25 years in the real estate industry, Mr. Garvey has also worked for national

insurance companies in their real estate finance and investment departments. Mr. Garvey received his business degree in real estate and business administration from Indiana University.

*Michael J. Jones, Executive Vice President, Lauth Investment Properties, LLC.* Mr. Jones has overall responsibility for the Company's office and industrial speculative and build to suit projects across the country and is actively involved in the asset management of the Company's entire portfolio. Mr. Jones has over 20 years of experience in the construction and development industries and he has been involved from the ground up in many projects across the country. Prior to joining the Company, Mr. Jones was a project manager of an Indianapolis-based construction company and later served as a project manager for Prologis Trust. Mr. Jones earned a degree in construction technology from Purdue University.

*Vernon C. Back, Executive Vice President, Lauth Investment Properties, LLC.* Mr. Back provides executive oversight of the Company's day-to-day operations and reviews ongoing financial matters of the Company. Prior to joining the Company, Mr. Back was Senior Counsel for Thompson Inc., a worldwide consumer products and services company, responsible for mergers, acquisitions, venture capital investments, business development and strategic collaboration. Prior thereto, Mr. Back was an attorney for Eli Lilly and Company supporting Information Technology, e-commerce and the eLilly Venture Capital Fund. In addition, Mr. Back also was in the Lilly Environmental, Health and Safety Legal Group. Prior thereto, as an attorney with Krieg DeVault LLP, Mr. Back concentrated his legal practice in general corporate matters, mergers and acquisitions securities law, corporate finance and financial institutions. Prior to law school, Mr. Back, as a Certified Public Accountant, served at Arthur Andersen as a Senior Accountant.

*Jonathon L. Goodburn, Chief Financial Officer, Lauth Investment Properties, LLC.* Mr. Goodburn has overall responsibility for all financial reporting, accounting and budgeting in addition to human resources and information technology for all of the Company's operating and real estate holding companies. Prior to joining the Company, Mr. Goodburn was a Senior Manager with Ernst & Young where he spent 12 years providing audit and merger/acquisition due diligence services to clients with emphasis on real estate. Mr. Goodburn is Certified Public Accountant and member of the Construction Financial Managers Association. He earned a degree in accounting from the University of South Carolina.

*Stephen G. Eppink, Senior Vice President, Lauth Investment Properties, LLC.* Mr. Eppink has overall responsibility for all construction, pre-construction and site engineering operations at the Company. He has over 29 years of experience in the construction and development industry. Prior to joining the Company, Mr. Eppink was a project manager for the Beck Group of Dallas, Texas and later served as project manager for R.L. Turner Construction. Mr. Eppink earned a degree in construction technology from Purdue University.

### 7.      Other Matters Related to Officers of the Debtors

Certain of the Debtors' current and former officers personally guarantee debt related to certain of the Project Entities. The Debtors entered into a number of agreements with individual officers to provide indemnification on any liability that the individuals might incur as a result of their personal guaranties on the pre-existing projects that had been transferred to the Debtors and LIP Holdings, LLC as part of the collateral package under the Mezzanine Loan. These indemnification agreements supplemented the already existing indemnification provisions included in the Debtors' operating agreements.

## B.      DEBT AND CAPITAL STRUCTURE OF THE DEBTORS

### 1.      Summary of Prepetition Secured Indebtedness

Lauth Investment Properties, LLC has no outstanding prepetition secured indebtedness.

LIP Development, LLC, as borrower, and M&I Marshall & Ilsley Bank, as lender, are parties to that certain credit agreement, dated as of November 27, 2007 in the aggregate principal amount of not less than $15,030,966.

LIP Investment, LLC has no outstanding prepetition secured indebtedness.

> 2. **Pre-Petition Equity**

A depiction of the ownership and debt structure of the Company as of the Petition Date is attached hereto as Exhibit C.

### III.        EVENTS LEADING UP TO CHAPTER 11 CASES

### A.        REASONS FOR FINANCIAL DISTRESS

The Debtors finds themselves in their current circumstances as a result of a series of unprecedented events arising in the real estate financial market.  Beginning in 2007, the U.S. capital market deteriorated significantly due to rising sub-prime residential mortgage defaults and the deterioration in value of certain residential mortgage-backed securities.  The failures of Fannie Mae and Freddie Mac, followed by the government rescue of AIG and the bankruptcy of Lehman Brothers on September 15, 2008, brought the commercial real estate finance markets to a virtual shutdown that was not anticipated by even the most senior economists and the banking industry.

Despite its well-established portfolio and sound management, the Company was not immune to this credit crisis.  The Company saw tenants delay their leasing decisions, stop opening new locations and stores, and/or closed existing offices or stores which significantly impacted the leasing of the Projects.  As a result, the secured lenders for each of the Project Entities began demanding lower debt-to-equity ratios on many of the Project Entities' outstanding credit facilities in order to gain additional time to lease the projects.  This forced the Debtors to borrow more heavily against the Mezzanine Loan to lower the Project Entities' loan balances, which, in turn, increased LIP Development, LLC's interest obligations under the Mezzanine Loan.  Finally, the sales of developed real estate stopped and businesses cut back their expansion plans, leading to a reduction in demand for the Company's new developments and the Company's ability to create liquidity through sales of Projects.

Eventually, LIP Development, LLC was unable to make its interest payment on the Mezzanine Loan.  As a result, on December 31, 2008, rather than paying the entire interest payment to LIP Holdings, LLC on the Mezzanine Loan, LIP Development, LLC was only able to pay a potion of the interest expense, triggering an event of default under the Mezzanine Loan.  At the time of the event of default, LIP Holdings, LLC, the entity co-managed by the Company and Inland, took no action under the Mezzanine Loan and did not declare a default.  Instead, initially, the Company and Inland attempted to weather the economic downturn and preserve the value of the Project Entities by obtaining additional funding for the Debtors through loans from LIP Development, LLC and the Company's principals and by negotiating concessions with the respective lenders for the Project Entities.

### B.        DESCRIPTION OF PREPETITION RESTRUCTURING EFFORTS

Beginning in November, 2008, the Company attempted to restructure its operations and the loans for each of the Project Entities to reduce the burden of such loan payments on the Company's cash flow outside of bankruptcy.  Specifically, the Company transformed from a buy/develop/lease/sell business model with respect to the Project Entities to an almost purely leasing-based business model.  In connection with this shift, the Company reduced its employee headcount by over approximately 80% and significantly cut other costs.  Ultimately, the Company was unable to reduce the respective Project Entity's loan payments by a sufficient amount.  This resulting strain on liquidity coupled with the disruption and confusion caused by Inland as described above, forced the Debtors to file for emergency bankruptcy protection on the Petition Date.

In April, 2009, the Company retained Alix as its restructuring advisor to assist the Company's management in its restructuring efforts and initiatives.  Specifically, since the Petition Date, Alix has assisted the Company in (a) stabilizing operations, (b) meeting bankruptcy related reporting requirements including, but not limited to, filing monthly operating reports, (c) conducting the postpetition financing marketing process and closing on such financing, (d) negotiating settlements with the respective Project Entity lenders, and (e) providing and presenting evidence related to a motion to dismiss the Chapter 11 Cases (discussed below).

K&E 15956155

IV.        CHAPTER 11 CASES OF THE DEBTORS

A.        INITIAL MOTIONS AND ORDERS

Soon after the Petition Date, the Debtors also filed a number of motions and applications (collectively, the "Initial Motions") seeking certain emergency relief.  The purpose of such Initial Motions was to ensure that the Debtors were able to transition into the chapter 11 process with as little disruption to their business as possible and to function smoothly while their Chapter 11 Cases were pending.  After the Petition Date, the Bankruptcy Court entered several orders (the "Initial Orders"), to, among other things: (i) continue use of the Debtors' existing cash management system, bank accounts and business forms; (ii) grant the use of cash collateral; and (iii) enforce the automatic stay.

1.        Joint Administration

To facilitate, among other things, noticing, claims processing and voting-related matters, the Bankruptcy Court entered an Initial Order granting certain relief including authorization for the joint administration of the Debtors' in their chapter 11 cases [Docket Nos. 60, 61].

2.        Stabilizing Operations

As more fully described below, since any interruption of the Debtors' businesses, even for a brief period, would negatively impact the Debtors' operations, revenues and profits, soon after the Petition Date, the Debtors filed a number of Initial Motions to ensure the stabilization of operations.

a)        Cash Management System

By this Initial Motion, the Debtors requested entry of an order authorizing the Debtors to continue using their existing cash management system, bank accounts and business forms.  This relief allowed the Debtors to avoid administrative inefficiencies by maintaining the Debtors' cash management system.  The Bankruptcy Court entered an Initial Order granting the Debtors' request, among other things, to maintain their cash management system [Docket No. 63].

b)        Use of Cash Collateral

Soon after the Petition Date, the Debtors filed a motion requesting interim and final authorization to use cash collateral (the "Cash Collateral") held by Marshall & Ilsley Bank ("M&I") to secure that certain Credit Agreement, dated as of November 27, 2007, by and between LIP Development, LLC and M&I Marshall & Ilsley Bank as successor in interest to First Indiana Bank, N.A. (the "Cash Collateral Motion").  The Bankruptcy Court granted interim and final relief to use the cash collateral [Docket Nos. 90, 340] (collectively, the "Cash Collateral Orders").  Pursuant to the Cash Collateral Orders, the Debtors received authority to use the Cash Collateral and granted adequate protection to M&I.

c)        Enforcement of the Automatic Stay

The Debtors also filed a motion to enforce the automatic stay imposed by section 362 of the Bankruptcy Code in connection with the prepetition acts committed by Inland to disrupt the Debtors' restructuring efforts.  The Bankruptcy Court granted the motion and issued an Initial Order enforcing the automatic stay, including but not limited to any action against any debt owed by the Debtors and/or from the property of the Debtors' estates [Docket No. 194].

B.        OTHER MOTIONS AND PLEADINGS

In addition to the Initial Motions seeking emergency relief, after the Petition Date, the Debtors also filed several other significant motions related to the Debtors' postpetition financing as well as certain retention and procedural motions.  Relief on account of such motions was requested after the Petition Date.

1.      **Employment and Compensation of Advisors**

To assist the Debtors in carrying out their duties as debtors in possession and to otherwise represent the Debtors' interests in these Chapter 11 Cases, the Debtors filed motions seeking authorization to retain and employ certain advisors.  The Bankruptcy Court entered orders granting the retention of the following advisors: (a) AlixPartners, LLP as restructuring advisors to the Debtors [Docket No. 267]; (b) Kirkland & Ellis LLP, as general reorganization and bankruptcy counsel to the Debtors [Docket No. 273]; and (c) Taft Stettinuis & Hollister, LLP, as co-counsel to the Debtors [Docket No. 195].

2.      **Motion to Perform Asset Management Agreement**

On April 29, 2009, the Debtors entered into a market-based asset management agreement (as amended, modified and supplemented from time to time, the "Asset Management Agreement") with Lauth Management Group, LLC (the "Asset Manager").  Pursuant to the Asset Management Agreement, the Asset Manager would be paid a management fee to provide certain asset management and consulting services with respect to certain Projects indirectly owned by the Debtors.  Specifically, the Asset Manager would provide, among other things, critical services, information and analyses relating to the Project Entities' operations, leasing, value creation and certain capital expenditures.  On May 29, 2009, the Debtors filed a motion to perform under the Asset Management Agreement [Docket No. 119].  On July 28, 2009, the Bankruptcy Court entered an interim order allowing the Debtors to perform under the Asset Management Agreement [Docket Nos. 315].

3.      **Motion to Act as Debtors In Possession**

On May 13, 2009, the Debtors filed a motion for authority to operate their business pursuant to section 1108 of the Bankruptcy Code (the "1108 Motion") [Docket No. 30].  By this motion, the Debtors sought to clarify the authority granted to them by the Bankruptcy Code as debtors in possession and to protect the going concern value of their estates from actions taken by Inland.  On May 15, 2009, the Bankruptcy Court granted the 1108 Motion allowing the Debtors to manage their properties as debtors in possession pursuant to section 1108 of the Bankruptcy Code without impairing Inland's right to file pleadings regarding, but not limited to, whether the Chapter 11 Cases were properly authorized [Docket No. 97].  In addition, the 1108 Motion prevented the Debtors from entering into any agreement that cross-collateralized any of the assets of the Project Entities, issue new guarantees, or agree to additionally encumber any assets of the Debtors or any of their direct or indirect subsidiaries, without further order of the Bankruptcy Court.

4.      **Motion to Dismiss/Motion to Appoint a Trustee**

On June 1, 2009, through LIP Holdings, LLC, Inland filed a motion to dismiss the Chapter 11 Cases and, in the alternative, to appoint a chapter 11 trustee [Docket Nos. 127, 130, 209] (as amended and supplemented, the "Dismissal Motion").  The Dismissal Motion claimed that the Debtors did not have authority to file the Chapter 11 Cases because LIP Holdings, LLP had properly asserted its right to take management control of LIP Investment, LLC prior to the Petition Date and that the Debtors filed the Chapter 11 Cases in bad faith.  The Dismissal Motion sought to either dismiss or, in the alternative, have a trustee appointed to administer the Chapter 11 Cases.  On August 28, 2009, the Bankruptcy Court issued an order denying the Dismissal Motion finding, among other things, that only LIP Holdings, LLC's board may exercise remedies under the Mezzanine Loan and because LIP Holdings, LLC failed to obtain the approval of at least one Lauth manager, LIP Holdings, LLC was unable to exercise its discretion under the Mezzanine Loan [Docket No. 441].

On December 23, 2010, through LIP Holdings, Inland filed another motion to appoint a chapter 11 trustee [Docket No. 696] (the "Trustee Motion").  The Trustee Motion alleged, among other things, that certain conflicts of interests existed between the Debtors' creditors and certain of the Debtors' principals and, as a result, sought the appointment of a trustee to administer the Chapter 11 Cases.  Rather than prosecute the Trustee Motion, the parties agreed to engage in mediation with the assistance of a court-appointed special mediator [Docket Nos. 1009 and 1014].  As a result of this mediation, the parties entered into a global settlement agreement to resolve virtually all of their differences, which agreement was approved by the Bankruptcy Court on September 22, 2010.  The parties formally closed the settlement on October 1, 2010.  Pursuant to the settlement, the Debtors transferred the equity interests in six Project Entities to Inland.

5.      **Motions to Extend Exclusivity**

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptance of a plan or plans of reorganization or liquidation for an initial period of 120 days from the date on which the debtor filed for voluntary relief. If a debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the commencement date to solicit acceptances to the plan. During these exclusive periods, no other party in interest may file a competing chapter 11 plan. However, a court may extend these periods "for cause" upon request of a party in interest. On August 7, 2009, the Debtors filed a motion seeking to extend their exclusive period to file a plan of reorganization through November 30, 2009 and their exclusive period to solicit acceptance of such plan through January 29, 2010 [Docket No. 353]. The Bankruptcy Court granted this motion on August 24, 2009 [Docket No. 419]. On October 23, 2009, the Debtors filed a second motion seeking to further extend their exclusive period to file a plan of reorganization through and including January 31, 2010 and their exclusive period to solicit acceptance of such plan through March 31, 2010 [Docket No. 596]. The Bankruptcy Court granted this motion on November 18, 2009 [Docket No. 647]. Pursuant to the order resolving the Trustee Motion, the Debtors' exclusive periods were terminated [Docket No. 1009].

6.      **Motion to Obtain Postpetition Financing**

On July 21, 2009, the Debtors filed a motion requesting interim and final authorization to enter into a postpetition secured financing facility (the "First DIP Facility"). The Bankruptcy Court granted interim and final relief to enter into the DIP Facility [Docket Nos. 427, 621] (collectively, the "First DIP Orders"). Pursuant to the First DIP Orders, the Debtors received authority to enter into that certain Secured Debtor-In-Possession Credit and Security Agreement, dated as of August 25, 2009, by and between LIP Lender, LLC (the "DIP Lender"), LIP Investment, LLC, as borrower, and Lauth Investment Properties, LLC and LIP Development, LLC, as guarantors (as amended, modified, ratified, extended, renewed, restated or replaced, the "First DIP Credit Agreement"). Pursuant to the First DIP Credit Agreement, the DIP Lender agreed to provide a term loan up to an aggregate principal amount of $15,000,000 on a final basis subject to the terms and conditions of the First DIP Credit Agreement. The First DIP Facility specified that the proceeds from such facility would be used to fund working capital needs and general corporate purposes relating to postpetition operations. In addition, pursuant to the First DIP Orders and the Cash Collateral Orders, the liens granted to and the claims of M&I pursuant to the Cash Collateral Orders are senior to any liens and/or superpriority granted by the First DIP Orders.

Requiring additional liquidity, the Debtors filed a motion requesting authorization to increase the commitment under the DIP Facility by an additional $2,000,000 such that the total commitment amount would equal to $17,000,000 subject to the terms and conditions of the First DIP Credit Agreement [Docket No. 958]. In addition, the Debtors sought to enter into that certain Second Secured Debtor-In-Possession Credit and Security Agreement, dated as of June 3, 2010, by and between DIP Lender, LIP Investment, LLC, as borrower, and Lauth Investment Properties, LLC and LIP Development, LLC, as guarantors (as amended, modified, ratified, extended, renewed, restated or replaced, the "Second DIP Credit Agreement"). The Bankruptcy Court granted interim and final relief for the increased commitment under the First DIP Facility and authorization for the Debtors to enter into the Second DIP Credit Agreement [Docket Nos. 1137, 1215 and 1357] (the "Second DIP Orders"). Pursuant to the Second DIP Credit Agreement, the DIP Lender agreed to provide a term loan up to an aggregate principal amount of $8,000,000 on a final basis subject to the terms and conditions of the Second DIP Credit Agreement. The Second DIP Facility specified that the proceeds from such facility would be used to fund working capital needs and general corporate purposes relating to postpetition operations. In addition, pursuant to the Second DIP Orders and the Cash Collateral Orders, the liens granted to and the claims of M&I pursuant to the Cash Collateral Orders are senior to any liens and/or superpriority granted by the Second DIP Orders.

7.      **Wells Fargo Global Settlement Agreement**

On February 28, 2011 the Debtors filed the *Motion of the Debtors For Entry of an Order Approving Global Settlement Between (A) Debtors, (B) Wells Fargo Bank and (c) Certain Guarantors* [Docket No. 1736] and as approved by the Bankruptcy Court on April 6, 2011 [Docket No. 1871]. The Global Settlement Agreement, along with all documents executed pursuant thereto, and as such may be amended from time to time, shall survive the Confirmation Order, shall not be amended, altered, released, discharged or otherwise modified by any term of the

Plan, and shall be fully enforceable in accordance with its terms, and any Court order related thereto, all without the need or requirement that Wells Fargo file any Proof of Claim, motion for administrative Claim or the like.

### 8.     M&I Settlement Agreement

The Debtors intend to file the M&I Settlement Agreement as part of the Plan Supplement and the Confirmation Order shall approve such settlement. The M&I Settlement Agreement, along with all documents executed pursuant thereto, and as such may be amended from time to time, shall survive the Confirmation Order, shall not be amended, altered, released, discharged or otherwise modified by any term of the Plan, shall be fully incorporated into the terms of the Plan, and shall be fully enforceable in accordance with its terms, and any Court order related thereto, all without the need or requirement that M&I file any Proof of Claim, motion for administrative Claim or the like. To the extent of any conflict of the terms of the Plan and the M&I Settlement Agreement with respect to the rights of M&I, the M&I Settlement Agreement shall control in all respects.

## V.     SUMMARY OF THE JOINT PLAN[7]

### A.     ADMINISTRATIVE AND PRIORITY CLAIMS

#### 1.     Administrative Claims

##### a)     Administrative Claims Other Than Fee Claims

Subject to the provisions of sections 328, 330(a), and 331 of the Bankruptcy Code, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Administrative Claim, each Holder of such Allowed Administrative Claim shall be paid in full in Cash the unpaid portion of such Allowed Administrative Claim in accordance with the terms of the applicable contract or agreement governing such Claim, if any, or otherwise in the ordinary course of business.

Except as otherwise provided in Article II.A of the Plan, unless previously Filed, requests for payment of Administrative Claims (other than Fee Claims) must be Filed and served pursuant to the procedures specified in the Confirmation Order and prior to the Administrative Claims Bar Date. Holders of Administrative Claims (other than Fee Claims) that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, stopped, and enjoined from asserting such Administrative Claims against the Debtors, their Estates, or the Reorganized Debtors, and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the Debtors or the Reorganized Debtors, as applicable, and the requesting party by the later of (x) 180 days after the Effective Date and (y) 180 days after the Filing of the applicable request for payment of such Administrative Claims.

##### b)     Fee Claims

Professionals or other Entities asserting a Fee Claim for services rendered before the Confirmation Date must File and serve on the Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other order of the Bankruptcy Court an application for final allowance of such Fee Claim no later than 60 days after the Effective Date. Objections to any Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party by the later of (x) 60 days after the Effective Date and (y) 45 days after the Filing of the applicable request for payment of the Fee Claim. To the extent necessary, the Plan and the Confirmation Order shall amend and supersede any previously entered order regarding the payment of Fee Claims.

#### 2.     Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment or has been paid by the Debtors prior to the Effective Date, in full and final satisfaction, settlement, release, and

---

[7]     The following summary is qualified in its entirety by reference to the Plan. In the event of any inconsistency between the summary provided herein and the Plan, the Plan shall control in all respects.

discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive on account of such Claim, payment in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, regular installment payments in Cash: (1) of a total value, as of the Effective Date, equal to the Allowed amount of such Claim; (2) which total value shall include simple interest to accrue on any outstanding balance of such Allowed Priority Tax Claim starting on the Effective Date at the rate of interest determined under applicable nonbankruptcy law pursuant to section 511 of the Bankruptcy Code; and (3) over a period ending not later than five (5) years after the Petition Date.

## B.    CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

### 1.    Summary

All Claims and Equity Interests, other than Administrative Claims, Fee Claims, and Priority Tax Claims, are classified in the Classes set forth in Article III of the Plan for all purposes, including voting, Confirmation, and distributions pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest qualifies within the description of such other Classes. A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date. Notwithstanding anything to the contrary set forth herein, the claims, obligations and rights of (i) Wells Fargo under the Global Settlement Agreement, including, but not limited to, any guaranty obligations issued by the Debtors to or for the benefit of Wells Fargo and (ii) the Holders of Class A-2 LIP Guaranty Claims, Class B-6 LIP D Guaranty Claims, and Class C-5 LIP I Guaranty Claims, shall be expressly preserved and shall survive the Confirmation Order without offset, recoupment, defense, counterclaim, reduction, disallowance, and avoidance under any section of the Bankruptcy Code, including, but not limited to, sections 544, 547, and 548 of the Bankruptcy Code; provided, further, that notwithstanding anything to the contrary herein, in the event of any inconsistency between the Plan and the Global Settlement Agreement, the terms of the Global Settlement Agreement shall prevail; provided, further, that that notwithstanding anything to the contrary herein, in the event of any inconsistency between the Plan and the M&I Settlement Agreement, the terms of the M&I Settlement Agreement shall prevail.

### Summary of Classification and Treatment of Claims and Equity Interests

The classification of Claims and Equity Interests against the Debtors pursuant to the Plan is as follows:

a)    Lauth Investment Properties, LLC

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| A-1 | DIP Agreement Claims | Impaired | Entitled to Vote |
| A-2 | LIP Guaranty Claims | Unimpaired | Deemed to Accept |
| A-3 | M&I LOC Claims | Impaired | Entitled to Vote |
| A-4 | M&I Adequate Protection Claims | Impaired | Entitled to Vote |
| A-5 | Swap Agreement Claims | Impaired | Entitled to Vote |
| A-6 | General Unsecured Claims | Impaired | Entitled to Vote |
| A-7 | Equity Interests | Unimpaired | Deemed to Accept |
| A-8 | Profits Interests | Impaired | Deemed to Reject |

25

b)      LIP Development, LLC

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| B-1 | DIP Agreement Claims | Impaired | Entitled to Vote |
| B-2 | Mezzanine Loan Claims | Impaired | Entitled to Vote |
| B-3 | M&I LOC Claims | Impaired | Entitled to Vote |
| B-4 | M&I Adequate Protection Claims | Impaired | Entitled to Vote |
| B-5 | Other Secured Claims | Unimpaired | Deemed to Accept |
| B-6 | LIP D Guaranty Claims | Unimpaired | Deemed to Accept |
| B-7 | General Unsecured Claims | Impaired | Entitled to Vote |
| B-8 | Equity Interests | Unimpaired | Deemed to Accept |

c)      LIP Investment, LLC

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| C-1 | DIP Agreement Claims | Impaired | Entitled to Vote |
| C-2 | M&I LOC Claims | Impaired | Entitled to Vote |
| C-3 | M&I Adequate Protection Claims | Impaired | Entitled to Vote |
| C-4 | Secured Claims | Unimpaired | Deemed to Accept |
| C-5 | LIP I Guaranty Claims | Unimpaired | Deemed to Accept |
| C-6 | General Unsecured Claims | Impaired | Entitled to Vote |
| C-7 | Equity Interests | Unimpaired | Deemed to Accept |

2.      **Treatment of Claims and Equity Interests**

a)      Class A-1 -  DIP Agreement Claims

(i)      *Classification*:  Class A-1 consists of all DIP Agreement Claims that may exist against Lauth Investment Properties, LLC.

(ii)     *Treatment*:  Holders of Class A-1 DIP Agreement Claims held against Lauth Investment Properties, LLC (or their assignee) will receive, in full and final satisfaction, settlement, release and discharge and in exchange for each Allowed Class A-1 DIP Agreement Claim held against Lauth Investment Properties, LLC, (a) their Pro Rata share of the Exit Term Loan and (b) all Equity Interests in the Debtors shall be reinstated.

(iii)    *Voting*:  Class A-1 is Impaired, and Holders of Class A-1 DIP Agreement Claims are entitled to vote to accept or reject the Plan.

b)      Class A-2 - LIP Guaranty Claims

(i)      *Classification*:  Class A-2 consists of all LIP Guaranty Claims that may exist against Lauth Investment Properties, LLC.

(ii)     *Treatment*:  Except to the extent a Holder of a Class A-2 LIP Guaranty Claim agrees to different treatment, on the Effective Date:  (a) each Guaranty of Lauth Investment Properties, LLC shall be assumed by and reinstated against Lauth Investment Properties, LLC and Reorganized Lauth Investment Properties, LLC, shall survive the Confirmation Order and shall not be amended, altered, released, discharged or otherwise modified by any term of the Plan; and (b) each Guaranty of Lauth Investment Properties, LLC shall constitute the

26

legal, valid and binding obligations of Lauth Investment Properties, LLC and Reorganized Lauth Investment Properties, LLC and shall be enforceable in accordance with its terms. Notwithstanding any other provision of the Plan to the contrary and except to the extent a Holder of a Class A-2 LIP Guaranty Claim agrees to different treatment, the Plan shall leave unaltered all of the legal, equitable and contractual rights of each Holder of a Class A-2 LIP Guaranty Claim under its Guaranty of Lauth Investment Properties, LLC. Subject to the occurrence of the Effective Date, each Holder of a Class A-2 LIP Guaranty Claim shall be deemed to hold an Allowed Claim that is not subject to estimation under the Bankruptcy Code or this Plan.

(iii)    *Voting*:  Class A-2 is Unimpaired, and Holders of Class A-2 LIP Guaranty Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class A-2 LIP Guaranty Claims are not entitled to vote to accept or reject the Plan.

c)    <u>Class A-3 - M&I LOC Claims</u>

(i)    *Classification*:  Class A-3 consists of all M&I LOC Claims that may exist against Lauth Investment Properties, LLC.

(ii)    *Treatment*:  Pursuant to the M&I Settlement Agreement, the Holders, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed Class A-3 M&I LOC Claim, shall receive the M&I Settlement Collateral on the Effective Date or as soon as reasonably practicable thereafter.

(iii)    *Voting*:  Class A-3 is Impaired, and Holders of Class A-3 M&I LOC Claims are entitled to vote to accept or reject the Plan.

d)    <u>Class A-4 - M&I Adequate Protection Claims</u>

(i)    *Classification*:  Class A-4 consists of all M&I Adequate Protection Claims that may exist against Lauth Investment Properties, LLC.

(ii)    *Treatment*:  Pursuant to the M&I Settlement Agreement, the Holders, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed Class A-4 M&I Adequate Protection Claim, shall receive the M&I Settlement Collateral on the Effective Date or as soon as reasonably practicable thereafter.

(iii)    *Voting*:  Class A-4 is Impaired, and Holders of Class A-4 M&I Adequate Protection Claims are entitled to vote to accept or reject the Plan.

e)    <u>Class A-5 - Swap Agreement Claims</u>

(i)    *Classification*:  Class A-5 consists of all Swap Agreement Claims that may exist against Lauth Investment Properties, LLC.

(ii)    *Treatment*:  Except to the extent a Holder of an Allowed Class A-5 Swap Agreement Claim agrees to a less favorable treatment, each such Holder, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed Class A-5 Swap Agreement Claim, shall receive its Pro Rata share of the LIP Unsecured Claim Allocation in Cash on the later of the Effective Date or the date on which such Swap Agreement Claim becomes an

27

Allowed Class A-5 Swap Agreement Claim or as soon as reasonably practicable thereafter.

(iii)     *Voting*:  Class A-5 is Impaired, and Holders of Class A-5 Swap Agreement Claims are entitled to vote to accept or reject the Plan.

f)     <u>Class A-6 - General Unsecured Claims</u>

(i)     *Classification*:  Class A-6 consists of all General Unsecured Claims that may exist against Lauth Investment Properties, LLC.

(ii)     *Treatment*:  Except to the extent a Holder of an Allowed Class A-6 General Unsecured Claim agrees to a less favorable treatment, each such Holder, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed Class A-6 General Unsecured Claim, shall receive its Pro Rata share of the LIP Unsecured Claim Allocation in Cash on the later of the Effective Date or the date on which such Unsecured Claim becomes an Allowed Class A-6 Unsecured Claim or as soon as reasonably practicable thereafter.

(iii)     *Voting*:  Class A-6 is Impaired, and Holders of Class A-6 General Unsecured Claims are entitled to vote to accept or reject the Plan.

g)     <u>Class A-7 - Equity Interests</u>

(i)     *Classification*:  Class A-7 consists of all Equity Interests (other than Profits Interests) in Lauth Investment Properties, LLC.

(ii)     *Treatment*:  On the Effective Date, all Class A-7 Equity Interests shall be reinstated as provided in the treatment of Class A-1 Claims.

(iii)     *Voting*:  Class A-7 is Unimpaired, and Holders of Class A-7 Equity Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class A-7 Equity Interests are not entitled to vote to accept or reject the Plan.

h)     <u>Class A-8 - Profits Interests</u>

(i)     *Classification*:  Class A-8 consists of all Profits Interests in Lauth Investment Properties, LLC.

(ii)     *Treatment*:  On the Effective Date, all Class A-8 Profits Interests shall be deemed canceled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distribution.

(iii)     *Voting*:  Class A-8 is Impaired, and Holders of Class A-8 Profits Interests are not entitled to receive or retain any property under the Plan on account of Class A-8 Profits Interests.  Therefore, Holders of Class A-8 Profits Interests are deemed not to have accepted the Plan pursuant to section 1126(g) of the Bankruptcy Code, and Holders of Class A-8 Profits Interests are not entitled to vote to accept or reject the Plan.

LIP Development, LLC

a)  Class B-1 - DIP Agreement Claims

    (i)  *Classification*:  Class B-1 consists of all DIP Agreement Claims that may exist against LIP Development, LLC.

    (ii)  *Treatment*:  Holders of Class B-1 DIP Agreement Claims will receive the treatment specified in Class A-1.

    (iii)  *Voting*:  Class B-1 is Impaired, and Holders of Class B-1 DIP Agreement Claims are entitled to vote to accept or reject the Plan.

b)  Class B-2 - Mezzanine Loan Claims

    (i)  *Classification*:  Class B-2 consists of all Mezzanine Loan Claims that may exist against LIP Development, LLC.

    (ii)  *Treatment*:  Except to the extent a Holder of an Allowed Class B-2 Mezzanine Loan Claim agrees to a less favorable treatment, Holders of Allowed Class B-2 Mezzanine Loan Claims will receive, in full and final satisfaction, settlement, release and discharge and in exchange for each Mezzanine Loan Claims, their Pro Rata share of the New Preferred Class A Units.

    (iii)  *Voting*:  Class B-2 is Impaired, and Holders of Class B-2 Mezzanine Loan Claims are entitled to vote on the Plan.

c)  Class B-3 - M&I LOC Claims

    (i)  *Classification*:  Class B-3 consists of all M&I LOC Claims that may exist against LIP Development, LLC.

    (ii)  *Treatment*:  Pursuant to the M&I Settlement Agreement, the Holders, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed Class B-3 M&I LOC Claim, shall receive the M&I Settlement Collateral on the Effective Date or as soon as reasonably practicable thereafter.

    (iii)  *Voting*:  Class B-3 is Impaired, and Holders of Class B-3 M&I LOC Claims are entitled to vote on the Plan.

d)  Class B-4 - M&I Adequate Protection Claims

    (i)  *Classification*:  Class B-4 consists of all M&I Adequate Protection Claims that may exist against LIP Development, LLC.

    (ii)  *Treatment*:  Pursuant to the M&I Settlement Agreement, the Holders, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed Class B-4 M&I Adequate Protection Claim, shall receive the M&I Settlement Collateral on the Effective Date or as soon as reasonably practicable thereafter.

    (iii)  *Voting*:  Class B-4 is Impaired, and Holders of Class B-4 M&I Adequate Protection Claims are entitled to vote to accept or reject the Plan.

K&E 15956155

e)  <u>Class B-5 - Other Secured Claims</u>

    (i)  *Classification*:  Class B-5 consists of all Other Secured Claims that may exist against LIP Development, LLC.

    (ii)  *Treatment*:  Except to the extent a Holder of an Allowed Class B-5 Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed Class B-5 Other Secured Claim, each Allowed Class B-5 Other Secured Claim shall be paid in full in Cash or reinstated on the later of the Effective Date or the date on which such Other Secured Claim becomes an Allowed Class B-5 Other Secured Claim or as soon as reasonably practicable thereafter.

    (iii)  *Voting*:  Class B-5 is Unimpaired, and Holders of Class B-5 Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class B-5 Other Secured Claims are not entitled to vote to accept or reject the Plan.

f)  <u>Class B-6 - LIP D Guaranty Claims</u>

    (i)  *Classification*:  Class B-6 consists of all LIP D Guaranty Claims that may exist against LIP Development, LLC.

    (ii)  *Treatment*:  Except to the extent a Holder of a Class B-6 LIP D Guaranty Claim agrees to different treatment, on the Effective Date:  (a) each Guaranty of LIP Development, LLC shall be assumed by and reinstated against LIP Development, LLC and Reorganized LIP Development, LLC, shall survive the Confirmation Order and shall not be amended, altered, released, discharged or otherwise modified by any term of the Plan; and (b) each Guaranty of LIP Development, LLC shall constitute the legal, valid and binding obligations of LIP Development, LLC and Reorganized LIP Development, LLC and shall be enforceable in accordance with its terms.  Notwithstanding any other provision of the Plan to the contrary and except to the extent a Holder of a Class B-6 LIP D Guaranty Claim agrees to different treatment, the Plan shall leave unaltered all of the legal, equitable and contractual rights of each Holder of a Class B-6 LIP D Guaranty Claim under its Guaranty of LIP Development, LLC.  Subject to the occurrence of the Effective Date, each Holder of a Class B-6 LIP D Guaranty Claim shall be deemed to hold an Allowed Claim that is not subject to estimation under the Bankruptcy Code or the Plan

    (iii)  *Voting*:  Class B-6 is Unimpaired, and Holders of Class B-6 LIP D Guaranty Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class B-6 LIP D Guaranty Claims are not entitled to vote to accept or reject the Plan.

g)  <u>Class B-7 - General Unsecured Claims</u>

    (i)  *Classification*:  Class B-7 consists of all General Unsecured Claims that may exist against LIP Development, LLC.

    (ii)  *Treatment*:  Except to the extent a Holder of an Allowed Class B-7 General Unsecured Claim agrees to a less favorable treatment for such Holder, each Allowed Class B-7 General Unsecured Claim shall receive its Pro Rata share of the LIP D Unsecured Claim Allocation in Cash on the later of the Effective Date

or the date on which such Unsecured Claim becomes an Allowed Class B-7 Unsecured Claim or as soon as reasonably practicable thereafter.

(iii)    *Voting*:  Class B-7 is Impaired, and Holders of Class B-7 General Unsecured Claims are entitled to vote to accept or reject the Plan.

h)    Class B-8 - Equity Interests

(i)    *Classification*:  Class B-8 consists of all Equity Interests in LIP Development, LLC.

(ii)    *Treatment*:  On the Effective Date, all Class B-8 Equity Interests shall be reinstated as provided in the treatment of Class A-1 Claims.

(iii)    *Voting*:  Class B-8 is Unimpaired, and Holders of Class B-8 Equity Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class B-8 Equity Interests are not entitled to vote to accept or reject the Plan.

LIP Investment, LLC

a)    Class C-1 -  DIP Agreement Claims

(i)    *Classification*:  Class C-1 consists of all DIP Agreement Claims that may exist against LIP Investment, LLC.

(ii)    *Treatment*:  Holders of Class C-1 DIP Agreement Claims will receive the treatment specified in Class A-1.

(iii)    *Voting*:  Class C-1 is Impaired, and Holders of Class C-1 DIP Agreement Claims are entitled to vote to accept or reject the Plan.

b)    Class C-2 - M&I LOC Claims

(i)    *Classification*:  Class C-2 consists of all M&I LOC Claims that may exist against LIP Investment, LLC.

(ii)    *Treatment*:  Pursuant to the M&I Settlement Agreement, the Holders, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed Class C-2 M&I LOC Claim, shall receive the M&I Settlement Collateral on the Effective Date or as soon as reasonably practicable thereafter.

(iii)    *Voting*:  Class C-2 is Impaired, and Holders of Class C-2 M&I LOC Claims are entitled to vote on the Plan.

c)    Class C-3 - M&I Adequate Protection Claims

(i)    *Classification*:  Class C-3 consists of all M&I Adequate Protection Claims that may exist against LIP Investment, LLC.

(ii)    *Treatment*:  Pursuant to the M&I Settlement Agreement, the Holders, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed Class C-3 M&I Adequate Protection Claim, shall receive the M&I Settlement Collateral on the Effective Date or as soon as reasonably practicable thereafter.

(iii)    *Voting*:  Class C-3 is Impaired, and Holders of Class C-3 M&I Adequate Protection Claims are entitled to vote to accept or reject the Plan.

d)    Class C-4 - Secured Claims

(i)    *Classification*:  Class C-4 consists of all Secured Claims that may exist against LIP Investment, LLC.

(ii)    *Treatment*:  Except to the extent a Holder of an Allowed Class C-4 Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed Class C-4 Secured Claim, each Allowed Class C-2 Secured Claim shall be paid in full in Cash or reinstated on the later of the Effective Date or the date on which such Secured Claim becomes an Allowed Class C-4 Secured Claim or as soon as reasonably practicable thereafter.

(iii)    *Voting*:  Class C-4 is Unimpaired, and Holders of Class C-4 Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class C-2 Secured Claims are not entitled to vote to accept or reject the Plan.

e)    Class C-5 - LIP I Guaranty Claims

(i)    *Classification*:  Class C-5 consists of all LIP I Guaranty Claims that may exist against LIP Investment, LLC.

(ii)    *Treatment*: Except to the extent a Holder of a Class C-5 LIP I Guaranty Claim agrees to different treatment, on the Effective Date:  (a) each Guaranty of LIP Investment, LLC shall be assumed by and reinstated against LIP Investment LLC and Reorganized LIP Investment, LLC, shall survive the Confirmation Order and shall not be amended, altered, released, discharged or otherwise modified by any term of the Plan; and (b) each Guaranty of LIP Investment, LLC shall constitute the legal, valid and binding obligations of LIP Investment, LLC and Reorganized LIP Investment, LLC and shall be enforceable in accordance with its terms.  Notwithstanding any other provision of the Plan to the contrary and except to the extent a Holder of a Class C-5 LIP I Guaranty Claim agrees to  different treatment, the Plan shall leave unaltered all of the legal, equitable and contractual rights of each Holder of a Class C-5 LIP I Guaranty Claim under its Guaranty of LIP Investment, LLC.  Subject to the occurrence of the Effective Date, each Holder of a Class C-5 LIP I Guaranty Claim shall be deemed to hold an Allowed Claim that is not subject to estimation under the Bankruptcy Code or the Plan.

(iii)    *Voting*:  Class C-5 is Unimpaired, and Holders of Class C-5 LIP I Guaranty Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class C-5 LIP I Guaranty Claims are not entitled to vote to accept or reject the Plan.

f)    Class C-6 - General Unsecured Claims

(i)    *Classification*:  Class C-6 consists of all General Unsecured Claims that may exist against LIP Development, LLC.

(ii)    *Treatment*:  Except to the extent a Holder of an Allowed Class C-6 General Unsecured Claim agrees to a less favorable treatment, each such Holder, in full

and final satisfaction, settlement, release and discharge of and in exchange for each Allowed Class C-6 General Unsecured Claim, shall receive its Pro Rata share of the LIP I Unsecured Claim Allocation in Cash on the later of the Effective Date or the date on which such Unsecured Claim becomes an Allowed Class C-6 Unsecured Claim or as soon as reasonably practicable thereafter.

(iii)   *Voting*:  Class C-6 is Impaired, and Holders of Class C-6 General Unsecured Claims are entitled to vote to accept or reject the Plan.

g)   <u>Class C-7 - Equity Interests</u>

(i)   *Classification*:  Class C-7 consists of all Equity Interests in LIP Investment, LLC.

(ii)   *Treatment*:  On the Effective Date, all Class C-7 Equity Interests shall be reinstated as provided in the treatment of Class A-1 Claims.

(iii)   *Voting:*  Class C-7 is Unimpaired, and Holders of Class C-7 Equity Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class C-7 Equity Interests are not entitled to vote to accept or reject the Plan.

### 3.   Intercompany Claims

Notwithstanding anything to the contrary herein, all Intercompany Claims on the Effective Date or as soon thereafter as is reasonably practicable, will be eliminated or waived based on accounting entries in the Debtors' or the Reorganized Debtors' books and records and other corporate activities by the Debtors or the Reorganized Debtors.  No distribution will be made to Holders of Intercompany Claims.

### 4.   Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

### 5.   Discharge of Claims

Pursuant to section 1141(c) of the Bankruptcy Code, all Claims and Equity Interests that are not expressly provided for and preserved in the Plan shall be extinguished upon the Effective Date.  Upon the Effective Date, the Debtors and all property dealt with in the Plan shall be free and clear of all such claims and interests, including, without limitation, Liens, security interests, and any and all other encumbrances; <u>provided</u>, <u>however</u>, that notwithstanding section 1141(c) or 1141(d) of the Bankruptcy Code, no provision of the Plan or any document executed pursuant to the Plan, shall either extinguish, alter, amend, modify, discharge or release any Claim, debt, obligation or duty of (i) any party as set forth in the Global Settlement Agreement, or any document executed pursuant thereto, (ii) any party as set forth in the Global Settlement Agreement, or any document executed pursuant thereto, (iii) any party to a Guaranty, and all rights, Claims and debts and obligations under the Global Settlement Agreement, the M&I Settlement Agreement, and under any Guaranty are expressly preserved and shall survive intact and without change notwithstanding the Confirmation Order; and that Wells Fargo, M&I Marshall & Ilsley Bank, and the Holders of Class A-2 LIP Guaranty Claims, Class B-6 LIP D Guaranty Claims, and Class C-5 LIP I Guaranty Claims shall not be required to file a Proof of Claim or motion in order for any such obligation to survive Confirmation of the Plan.  The Confirmation Order shall so expressly provide for the preservation of all such rights under the Global Settlement Agreement, the M&I Settlement Agreement, and under any Guaranty; and provided further, that notwithstanding the classification and treatment of the LIP I Guaranty Claims, the LIP D Guaranty Claims, and the LIP Guaranty Claims, none of the guaranty obligations issued under the Global Settlement Agreement, the M&I Settlement Agreement, or under any Guaranty shall be affected, altered, released, discharged,

or otherwise modified by the Plan or any document executed pursuant thereto, and all such guaranty obligations shall survive the Confirmation Order.

## C.     ACCEPTANCE OR REJECTION OF THE PLAN

### 1.     Presumed Acceptance of Plan

Class A-2, A-7, B-5, B-6, B-8, C-4, C-5, and C-7 are Unimpaired under the Plan and are, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

### 2.     Voting Classes

Class A-1, A-3, A-4, A-5, A-6, B-1, B-2, B-3, B-4, B-7, C-1, C-2, C-3, and C-6 are Impaired under the Plan, and Holders of Class A-1, A-3, A-4, A-5, A-6, B-1, B-2, B-3, B-4, B-7, C-1, C-2, C-3, and C-6 Claims as of the Record Date are entitled to vote to accept or reject the Plan.

### 3.     Acceptance by Impaired Classes of Claims

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims entitled to vote to accept or reject the Plan has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

### 4.     Presumed Rejection of Plan

Class A-8 is Impaired under the Plan and shall receive no distribution and is therefore presumed to rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

## D.     CONFIRMATION PURSUANT TO SECTIONS 1129(a)(10) AND 1129(b) OF THE BANKRUPTCY CODE

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Equity Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

## E.     CONTROVERSY CONCERNING IMPAIRMENT

If a controversy arises as to whether any Claims or Equity Interests, or any Class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## F.     MEANS FOR IMPLEMENTATION OF THE PLAN

### 1.     Sources of Consideration for Plan Distributions

Cash distributions under the Plan shall be funded from operations.  In addition, the Debtors intend to draw down the full commitment under the DIP Credit Agreements prior to the Effective Date to fund cash distributions under the Plan to the extent funds from operations are insufficient.

### 2.     Exit Term Loan

Confirmation shall be deemed approval of the Exit Term Loan (including the transactions contemplated thereby, such as any supplementation or additional syndication of the Exit Term Loan, and all actions to be taken,

undertakings to be made, and obligations to be incurred by Reorganized LIP Investment, LLC in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and authorization for Reorganized LIP Investment, LLC to enter into and execute the Exit Term Loan Documents and such other documents as may be required to effectuate the treatment afforded to the lenders under the Exit Term Loan pursuant to the Exit Term Loan Documents. Reorganized LIP Investment, LLC may use the Exit Term Loan for any purpose permitted thereunder, including the funding of obligations under the Plan and satisfaction of ongoing working capital needs.

Upon the Confirmation Date, (1) Reorganized LIP Investment, LLC is authorized to execute and deliver the Exit Term Loan Documents and perform its obligations thereunder including, without limitation, the payment or reimbursement of any fees, expenses, losses, damages, or indemnities, and (2) subject to the occurrence of the Effective Date, the Exit Term Loan Documents shall constitute the legal, valid, and binding obligations of Reorganized LIP Investment, LLC and be enforceable in accordance with their respective terms; provided, however, the terms of the Exit Term Loan shall be consistent with the terms of the Global Settlement Agreement.

### 3. M&I Settlement Agreement

To the extent not previously approved by the Bankruptcy Court, Confirmation shall be deemed approval of the M&I Settlement Agreement (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Debtors or the Reorganized Debtors, as applicable, in connection therewith) and authorization for the Debtors or the Reorganized Debtors, as applicable, to enter into and execute the M&I Settlement Agreement and such other documents as may be required to effectuate such settlement.

### 4. New Class A Preferred Units

On the Effective Date, and pursuant to the terms set forth in the Plan, Reorganized LIP Investment, LLC shall issue the New Class A Preferred Units to Holders of Allowed Claims in Class B-2. The New Class A Preferred Units shall represent all of the preferred equity interests in Reorganized LIP Investment, LLC as of the Effective Date. The Reorganized Debtors shall not be obligated to list the New Class A Preferred Units on a national securities exchange.

The New Class A Preferred Units issued under the Plan are issued under section 1145 of the Bankruptcy Code. All of the New Class A Preferred Units issued pursuant to the Plan shall be duly authorized, validly issued and, if applicable, fully paid and non-assessable. Each distribution and issuance referred to in Article V of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

In connection with the distribution of New Class A Preferred Units, the Reorganized Debtors may take whatever actions are necessary to comply with applicable federal, state, local, and international tax withholding obligations, including withholding from distributions a portion of the New Class A Preferred Units and selling such securities to satisfy tax withholding obligations including, without limitation, income, social security, and Medicare taxes.

### 5. Corporate Existence

The Debtors shall continue to exist after the Effective Date as a separate corporate entity or limited liability company, with all the powers of a corporation or limited liability company pursuant to the applicable law in the jurisdiction in which the Debtors are incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents in the case of a limited liability company) in effect prior to the Effective Date. In addition, the Debtors shall remain member managed in the same form and manner in effect prior to the Effective Date.

K&E 15956155

6.        **Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan or in any agreement, instrument or other document relating thereto, on or after the Effective Date, all property of each Estate (including, without limitation, Causes of Action) shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  Except as may be provided in the Plan, on and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.

7.        **Cancellation of Securities and Agreements**

On the Effective Date, except as provided in Article III of the Plan with respect to the treatment of the Class A-2 LIP Guaranty Claims, the Class B-6 LIP D Guaranty Claims, and the Class C-5 LIP I Guaranty Claims, and except as otherwise specifically provided for in the Plan:  (1) the obligations of the Debtors under any Certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Equity Interest (except such Certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically reinstated pursuant to the Plan), shall be cancelled as to the Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, Certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, Certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically reinstated pursuant to the Plan) shall be released and discharged; provided, however, notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the Holder of a Claim or Equity Interest shall continue in effect solely for purposes of allowing Holders to receive distributions under the Plan.

8.        **Restructuring Transactions**

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including:  (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, certificates of incorporation, operating agreements, bylaws, or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; and (3) all other actions that the Reorganized Debtors determine are necessary or appropriate; provided, however, that notwithstanding anything to the contrary herein, in the event of any inconsistency between the Plan and the Global Settlement Agreement, the terms of the Global Settlement Agreement shall prevail; provided, further, that notwithstanding anything to the contrary herein, in the event of any inconsistency between the Plan and the M&I Settlement Agreement, the terms of the M&I Settlement Agreement shall prevail.

9.        **Effectuating Documents; Further Transactions**

On and after the Effective Date, the Reorganized Debtors and the managers, officers, and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

10.     **Exemption from Certain Taxes and Fees**

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.  Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, Lien, or other security interest; (2) any restructuring transaction authorized by Article V.F.8 of the Plan; or (3) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including:  (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation, or dissolution; (c) deeds; (d) bills of sale; or (e) assignments executed in connection with any restructuring transaction occurring under the Plan.

11.     **Indemnification Provisions**

Notwithstanding anything to the contrary herein the Reorganized Debtors (if necessary to continue all Indemnification Provisions in full force), as of the Effective Date, shall assume all Indemnification Provisions, including, but not limited to, LIP Investment, LLC's obligation to indemnify any personal guarantors of the indebtedness of the Project Entities.  All Indemnification Provisions in place on and prior to the Effective Date for current and former officers, directors, managers, and employees of the Debtors and their subsidiaries and such current and former officers', directors', managers', and employees' respective Affiliates shall survive the Effective Date for all Claims related to or in connection with, without limitation, any actions, omissions, or transactions occurring prior to the Effective Date; provided, however, that notwithstanding anything to the contrary herein, the Debtors shall not indemnify or assume any Indemnification Provision as to any of the Non-Released Parties for any matter; provided, further, that any Indemnification Provision shall be subject to and consistent with the Global Settlement Agreement and the M&I Settlement Agreement.

12.     **Guaranties**

Notwithstanding anything to the contrary herein, and unless the Holder of a LIP Guaranty Claim, LIP D Guaranty Claim or LIP I Guaranty Claim, respectively, agrees to different treatment, the Reorganized Debtors (if necessary to continue any Guaranty in full force), as of the Effective Date, shall assume all obligations and liabilities under any Guaranty.  Any Guaranty in place on and prior to the Effective Date shall survive the Effective Date for all LIP Guaranty Claims, LIP D Guaranty Claims and LIP I Guaranty Claims, including without limitation, any such Claims arising or occurring prior to the Effective Date.  Subject to the occurrence of the Effective Date, (a) the Reorganized Debtors are authorized to perform their obligations under any Guaranty including, without limitation, the payment or reimbursement of any fees, expenses, losses, damages, or indemnities, and (a) each Guaranty shall constitute the legal, valid, and binding obligations of the Reorganized Debtors and be enforceable in accordance with its respective terms.

13.     **Preservation of Rights of Action**

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the Debtor Release provided by Article VII.B of the Plan), the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them.  Except with respect to Causes of Action as to which the Debtors or Reorganized Debtors have released any Person or Entity on or prior to the Effective Date (pursuant to the Debtor Release or otherwise), the Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise

37

expressly provided in the Plan.  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.   Notwithstanding anything to the contrary herein, the Debtors waive and release all Avoidance Actions; provided, however, the Debtors shall have preserved no rights of action whatsoever against Wells Fargo except as otherwise set forth in the Global Settlement Agreement; provided, further, the Debtors shall have preserved no rights of action whatsoever against M&I Marshall & Ilsley Bank except as otherwise set forth in the M&I Settlement Agreement.

**G.     PROVISIONS GOVERNING DISTRIBUTIONS**

**1.     Timing and Calculation of Amounts to Be Distributed**

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided in the Plan.   In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.   If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VI of the Plan.   Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for under the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

**2.     Disbursing Agent**

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Reorganized Debtors as Disbursing Agent or such other Entity designated by the Reorganized Debtors as a Disbursing Agent on the Effective Date.  A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  In the event that a Disbursing Agent is so ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

**3.     Rights and Powers of Disbursing Agent**

a)     Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to:   (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

b)     Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

4.      **Distributions on Account of Claims Allowed After the Effective Date**

      a)      <u>Payments and Distributions on Disputed Claims</u>

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

      b)      <u>Special Rules for Distributions to Holders of Disputed Claims</u>

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtors or the Reorganized Debtors, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

5.      **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

      a)      <u>Delivery of Distributions in General</u>

Except as otherwise provided in the Plan, the Reorganized Debtors shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtors' books and records as of the date of any such distribution; <u>provided</u>, <u>however</u>, that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors; and <u>provided</u>, <u>further</u>, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.

      b)      <u>Minimum Distributions</u>

The Reorganized Debtors shall not be required to make partial distributions or payments of fractions of shares of New Class A Preferred Units and such fractions shall be deemed to be zero.

      c)      <u>Undeliverable Distributions and Unclaimed Property</u>

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; <u>provided</u>, <u>however</u>, such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Equity Interest in property shall be discharged and forever barred.

6.      **Compliance with Tax Requirements/Allocations**

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements.  Notwithstanding any provision to the contrary herein, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

**7.     Setoffs**

The Debtors and the Reorganized Debtors may withhold (but not set off except as set forth below) from the distributions called for under the Plan on account of any Allowed Claim (other than DIP Agreement Claims, LIP Guaranty Claims, LIP D Guaranty Claims, LIP I Guaranty Claims, in the case of Wells Fargo as set forth in the Global Settlement Agreement, or in the case of M&I Marshall & Ilsley Bank as set forth in the M&I Settlement Agreement) an amount equal to any Claims, equity interests, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim. In the event that any such Claims, equity interests, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim) the amount of any adjudicated or resolved claims, equity interests, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount. Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, equity interests, rights, and Causes of Action that the Debtors or the Reorganized Debtors may possess against any such Holder, except as specifically provided under the Plan.

**H.     PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS**

**1.     Resolution of Disputed Claims**

a)     Allowance of Claims

After the Effective Date, the Reorganized Debtors shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim deemed Allowed under the Plan. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim. All settled claims approved before the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties; provided, however, notwithstanding anything to the contrary set forth herein, the rights of Wells Fargo under the Global Settlement Agreement, the rights of M&I Marshall & Ilsley Bank under the M&I Settlement Agreement, and the rights of Holders of LIP Guaranty Claims, LIP D Guaranty Claims, and LIP I Guaranty Claims under any Guaranty shall be expressly preserved and shall survive any order of confirmation without offset, recoupment, defense, counterclaim, reduction, disallowance, and avoidance under any section of the Bankruptcy Code including, but not limited to, sections 544, 547, and 548 of the Bankruptcy Code.

b)     Prosecution of Objections to Claims

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date until the Claims Objection Bar Date, the Reorganized Debtors, shall have the exclusive authority to File objections to Claims, settle, compromise, withdraw, or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; provided, however, this provision shall not apply to (i) Fee Claims, (ii) any right, Claim, or duty owing to Wells Fargo under the Global Settlement Agreement, (iii) any right, Claim, or duty owing to M&I Marshall & Ilsley Bank under the M&I Settlement Agreement, nor to (iv) any right, Claim, or duty owing to the Holders of LIP Guaranty Claims, LIP D Guaranty Claims, and LIP I Guaranty Claims under any Guaranty. From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without any further notice to or action, order, or approval of the Bankruptcy Court. The

40

Reorganized Debtors shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval of the Bankruptcy Court.

c)      Claims Estimation

Before the Effective Date, the Debtors, and after the Effective Date, the Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim, or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.  Notwithstanding any provision to the contrary herein, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

d)      Expungement or Adjustment to Claims Without Objection

Any Claim that has been paid, satisfied or superseded may be expunged on the Claims Register by the Reorganized Debtors, and any Claim that has been amended may be adjusted thereon by the Reorganized Debtors, in both cases without a claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

e)      Deadline to File Objections to Claims

Any objections to Claims shall be Filed no later than the Claims Objection Bar Date.

**2.      Disallowance of Claims**

All Claims of any Entity from which property is sought by the Debtors or the Reorganized Debtors under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if (i) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code and (ii) such Entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

**EXCEPT AS OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED FOR PURPOSES OF DISTRIBUTION OR ANY OTHER TREATMENT UNDER THE PLAN AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS, ON OR BEFORE THE DATE OF THE CONFIRMATION HEARING, SUCH LATE CLAIM HAS BEEN DEEMED TIMELY FILED BY A BANKRUPTCY COURT ORDER.**

**3.      Amendments to Claims**

On or after the Effective Date, except as otherwise provided under the Plan, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and, to the extent such prior authorization is not received, any such new or amended Claim Filed shall be deemed disallowed and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

K&E 15956155

I.      SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

1.      **Compromise and Settlement**

Notwithstanding anything contained to the contrary herein, the allowance, classification, and treatment of all Allowed Claims and their respective distributions and treatments hereunder, takes into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(b) and (c) of the Bankruptcy Code, or otherwise.  As of the Effective Date, any and all contractual, legal, and equitable subordination rights, whether arising under general principles of equitable subordination, section 510(b) and (c) of the Bankruptcy Code, or otherwise, relating to the allowance, classification, and treatment of all Allowed Claims and their respective distributions and treatments hereunder are settled, compromised, terminated, and released pursuant hereto.

The Confirmation Order will constitute the Bankruptcy Court's finding and determination that the settlements reflected in the Plan are (1) in the best interests of the Debtors, their Estates, and all Holders of Claims, (2) fair, equitable, and reasonable, (3) made in good faith, and (4) approved by the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019.  **In addition, the allowance, classification, and treatment of Allowed Claims take into account any Causes of Action, whether under the Bankruptcy Code or otherwise under applicable nonbankruptcy law, that may exist:  (1) between the Debtors, on the one hand, and the Debtor Releasees, on the other hand; and (2) between the Releasing Parties, on the one hand, and the Debtor Releasees, on the other hand; and, as of the Effective Date, any and all such Causes of Action are settled, compromised, and released pursuant hereto.**  The Confirmation Order shall approve the releases by all Entities of all such contractual, legal, and equitable subordination rights or Causes of Action that are satisfied, compromised, and settled pursuant hereto.  Nothing in Article VIII.A of the Plan shall compromise or settle in any way, any Causes of Action that the Debtors or the Reorganized Debtors may have against the Non-Released Parties or provide for the indemnity of the Non-Released Parties; provided, however, that notwithstanding such compromise and settlement, or release, as provided above, or in any other provision of the Plan, no provision of the Plan or any document executed pursuant to the Plan, shall either extinguish, alter, amend, impair, discharge, or release any Claim, debt, obligation, or duty of any Entity as set forth in the Global Settlement Agreement or the M&I Settlement Agreement, in any Guaranty, or any document whereby any Entity has guaranteed the obligations of any Affiliates or subsidiaries of the Debtors or the Reorganized Debtors under a loan or credit agreement, or any document executed pursuant thereto and the Confirmation Order shall so expressly provide.

In accordance with the provisions of the Plan, including Article VI, and pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date (a) the Reorganized Debtors may, in their sole and absolute discretion, compromise and settle Claims against them and (b) the Reorganized Debtors may, in their respective sole and absolute discretion, compromise and settle Causes of Action against other Entities.

2.      **Debtor Release**

NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, ON THE EFFECTIVE DATE AND EFFECTIVE AS OF THE EFFECTIVE DATE (SUCH THAT THE REORGANIZED DEBTORS WILL NOT RECEIVE ANY CLAIM OR CAUSE OF ACTION RELEASED HEREUNDER), FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE DEBTOR RELEASEES, INCLUDING: (A) THE DISCHARGE OF DEBT AND ALL OTHER GOOD AND VALUABLE CONSIDERATION PAID PURSUANT HERETO; AND (B) THE SERVICES OF THE DEBTORS' PRESENT AND FORMER OFFICERS, DIRECTORS, MANAGERS, ATTORNEYS, FINANCIAL ADVISORS, AND PROFESSIONALS IN FACILITATING THE EXPEDITIOUS IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED HEREBY, THE DEBTORS DISCHARGE AND RELEASE AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO EACH DEBTOR RELEASEE (AND EACH SUCH DEBTOR RELEASEE SO RELEASED SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY THE DEBTORS) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF THE

EFFECTIVE DATE IN LAW, AT EQUITY, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, INCLUDING THOSE THAT THE DEBTORS OR THE REORGANIZED DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT OR THAT ANY HOLDER OF A CLAIM OR AN EQUITY INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF THE DEBTORS OR THEIR ESTATES, INCLUDING THE AVOIDANCE ACTIONS; PROVIDED, HOWEVER, THAT THE FOREGOING "DEBTOR RELEASE" SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CAUSES OF ACTION OF ANY DEBTOR: (A) AGAINST A DEBTOR RELEASEE ARISING FROM ANY CONTRACTUAL OBLIGATIONS OWED TO THE DEBTORS; OR (B) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS.   NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, THE PLAN DOES NOT RELEASE ANY CAUSES OF ACTION THAT THE DEBTORS OR THE REORGANIZED DEBTORS HAVE OR MAY HAVE NOW OR IN THE FUTURE AGAINST THE NON-RELEASED PARTIES.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (A) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE DEBTOR RELEASEES; (B) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (C) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS; (D) FAIR, EQUITABLE, AND REASONABLE; (E) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (F) A BAR TO THE DEBTORS OR THE REORGANIZED DEBTORS ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE; PROVIDED, HOWEVER, THAT NOTWITHSTANDING THIS PROVISION NOR ANY OTHER RELEASE, NO PROVISION OF THE PLAN OR ANY DOCUMENT EXECUTED PURSUANT TO THE PLAN, SHALL EITHER EXTINGUISH, ALTER, AMEND, MODIFY, DISCHARGE, OR RELEASE ANY CLAIM, DEBT, OBLIGATION, OR DUTY OF ANY PARTY AS SET FORTH IN THE GLOBAL SETTLEMENT AGREEMENT OR THE M&I SETTLEMENT AGREEMENT, ANY GUARANTY, OR ANY DOCUMENT EXECUTED PURSUANT THERETO, AND THE CONFIRMATION ORDER SHALL SO EXPRESSLY PROVIDE.  NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, THE PLAN DOES NOT (A) RELEASE OR DISCHARGE ANY CLAIMS, CAUSES OF ACTION OR LIABILITIES THAT ANY ENTITY HAS OR MAY HAVE NOW OR IN THE FUTURE AGAINST THE DEBTORS AND THE REORGANIZED DEBTORS ARISING UNDER ANY GUARANTY; (B) RELEASE OR DISCHARGE ANY CLAIMS, CAUSES OF ACTION, LIABILITIES, OR LIENS THAT ANY ENTITY HAS OR MAY HAVE NOW OR IN THE FUTURE AGAINST ANY AFFILIATES OR SUBSIDIARIES OF THE DEBTORS AND THE REORGANIZED DEBTORS UNDER ANY LOAN OR CREDIT AGREEMENT; OR (C) RELEASE OR DISCHARGE ANY CLAIMS, CAUSES OF ACTION, LIABILITIES, OR LIENS THAT ANY ENTITY HAS OR MAY HAVE IN THE FUTURE AGAINST ANY ENTITY THAT HAS GUARANTEED THE OBLIGATIONS OF ANY AFFILIATES OR SUBSIDIARIES OF THE DEBTORS AND THE REORGANIZED DEBTORS ARISING UNDER ANY LOAN OR CREDIT AGREEMENT.

3.      **Exculpation**

**The Exculpated Parties shall neither have, nor incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming, or effecting the Consummation of the Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, including, but not limited to, the Chapter 11 Cases; provided, however, that the foregoing "Exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; provided, further, that the forgoing "Exculpation" shall have no effect on the liability of (a) any Entity arising under any Guaranty; (b) any affiliate or subsidiary of the Debtors or the Reorganized Debtors arising under any loan or credit agreement; or (c) any Entity arising under any**

guaranty of obligations of any Affiliates or subsidiaries of the Debtors or the Reorganized Debtors arising under any loan or credit agreement; **provided**, **further**, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her, or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement; **provided**, **however**, that notwithstanding this provision nor any other exculpation or release, no provision of the Plan or any document executed pursuant to the Plan, shall either extinguish, alter, amend, impair, discharge, or release any Claim, debt, obligation, or duty of any party as set forth in the Global Settlement Agreement, the M&I Settlement Agreement, any Guaranty, any document whereby any party has guaranteed the obligations of any Affiliates or subsidiaries of the Debtors or the Reorganized Debtors under a loan or credit agreement, or any document executed pursuant thereto and the Confirmation Order shall so expressly provide.

4.    **Injunction**

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES THAT: (A) HAVE BEEN DISCHARGED PURSUANT TO ARTICLE III.E OF THE PLAN; (B) HAVE BEEN RELEASED PURSUANT TO ARTICLE VII.B OF THE PLAN; (C) HAVE BEEN RELEASED PURSUANT TO ARTICLE VII.D OF THE PLAN; OR (D) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VII.C OF THE PLAN (BUT ONLY TO THE EXTENT OF THE EXCULPATION PROVIDED IN ARTICLE VII.C OF THE PLAN), ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST ANY ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, DISCHARGED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST ANY ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, DISCHARGED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (C) CREATING, PERFECTING OR ENFORCING ANY LIEN, CLAIM, OR ENCUMBRANCE OF ANY KIND AGAINST ANY ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, DISCHARGED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM ANY ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, DISCHARGED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES UNLESS SUCH HOLDER HAS FILED A MOTION REQUESTING THE RIGHT TO PERFORM SUCH SETOFF ON OR BEFORE THE CONFIRMATION DATE, AND NOTWITHSTANDING ANY INDICATION IN A PROOF OF CLAIM OR EQUITY INTEREST OR OTHERWISE THAT SUCH HOLDER ASSERTS, HAS OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO SECTION 553 OF THE BANKRUPTCY CODE OR OTHERWISE; AND (E) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST ANY ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, DISCHARGED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES RELEASED OR SETTLED PURSUANT TO THE PLAN. NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, THE PLAN DOES NOT (A) RELEASE OR DISCHARGE ANY CLAIMS, CAUSES OF ACTION OR LIABILITIES THAT ANY ENTITY HAS OR MAY HAVE NOW OR IN THE FUTURE AGAINST THE DEBTORS AND THE REORGANIZED DEBTORS ARISING UNDER ANY GUARANTY; (B) RELEASE OR DISCHARGE ANY CLAIMS, CAUSES OF ACTION, LIABILITIES OR LIENS THAT ANY ENTITY HAS OR MAY HAVE NOW OR IN THE FUTURE AGAINST ANY AFFILIATES OR SUBSIDIARIES OF THE DEBTORS AND THE REORGANIZED

44

DEBTORS ARISING UNDER ANY LOAN OR CREDIT AGREEMENT; AND (C) RELEASE OR DISCHARGE ANY CLAIMS, CAUSES OF ACTION, LIABILITIES, OR LIENS THAT ANY ENTITY HAS OR MAY HAVE IN THE FUTURE AGAINST ANY PARTY THAT HAS GUARANTEED THE OBLIGATIONS OF ANY AFFILIATES OR SUBSIDIARIES OF THE DEBTORS AND THE REORGANIZED DEBTORS ARISING UNDER ANY LOAN OR CREDIT AGREEMENT.

### 5.    Setoffs

Except as otherwise provided under the Plan, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable nonbankruptcy law, or as may be agreed to by the Holder of a Claim or Equity Interest, may set off against any Allowed Claim (other than DIP Agreement Claims, other than against any right, claim, or obligation due to Wells Fargo under the Global Settlement Agreement, and other than against any right, claim, or obligation due to Holders of Class A-2 LIP Guaranty Claims, Class B-6 LIP D Guaranty Claims, and Class C-5 LIP I Guaranty Claims under any Guaranty) or Equity Interest and the distributions to be made pursuant to the Plan on account of such Allowed Claim or Equity Interest (before any distribution is made on account of such Allowed Claim or Equity Interest), any Claims, rights, and Causes of Action of any nature that such Debtors or Reorganized Debtors, as applicable, may hold against the Holder of such Allowed Claim or Equity Interest, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim or Equity Interest pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtors of any such Claims, rights, and Causes of Action that such Reorganized Debtors may possess against such Holder.  Except as provided under orders approving the DIP Credit Agreements, in no event shall any Holder of Claims or Equity Interests be entitled to setoff any Claim or Equity Interest against any Claim, right, or Cause of Action of the Debtors or Reorganized Debtors, as applicable, unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or Equity Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise; provided, however, that (i) any right of set off in favor of Wells Fargo, pertaining to any obligation, right, duty, or lien created or arising under or in connection with the Global Settlement Agreement or any document executed pursuant thereto shall be expressly preserved, (ii) any right of set off in favor of M&I Marshall & Ilsley Bank, pertaining to any obligation, right, duty, or lien created or arising under or in connection with the M&I Settlement Agreement or any document executed pursuant thereto shall be expressly preserved, and (ii) any right of set off in favor of Holders of Class A-2 LIP Guaranty Claims, Class B-6 LIP D Guaranty Claims, and Class C-5 LIP I Guaranty Claims, pertaining to any obligation, right, duty, or lien created or arising under or in connection with any Guaranty or any document executed pursuant thereto shall be expressly preserved.

### 6.    Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns; provided, however, that no such release of liens shall pertain to any obligation, right, duty, or lien created or arising under or in connection with the Global Settlement Agreement or the M&I Settlement Agreement or any document executed pursuant thereto.

## J.    ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE CLAIMS

### 1.    Professional Fee Escrow Account

On the Effective Date, the Reorganized Debtors shall fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount for all Professionals.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals with respect to unpaid fees or expenses or for whom fees or expenses have been held back pursuant to the Interim Compensation Order.  Such funds shall not property or be deemed

property of the Reorganized Debtors. The Reorganized Debtors shall cause Accrued Professional Compensation to be paid in Cash to such Professionals from the Professional Fee Escrow Account when such Claims are Allowed by a Bankruptcy Court order; provided that the Debtors' or the Reorganized Debtors' liability for Accrued Professional Compensation shall not be limited nor be deemed to be limited to the funds available from the Professional Fee Escrow Account. When all Allowed Fee Claims have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, shall be paid to the Reorganized Debtors.

2.      **Professional Fee Reserve Amount**

On or before the Effective Date, the Professionals shall estimate their Accrued Professional Compensation prior to and as of the Confirmation Date and shall deliver such estimate to the Debtors. If a Professional does not provide an estimate, the Reorganized Debtors may estimate the unpaid fees and expenses of such Professional. The total amount so estimated as of the Confirmation Date shall comprise the Professional Fee Reserve Amount; provided, however, that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Professional.

3.      **Post-Confirmation Date Fees and Expenses**

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash (a) the reasonable legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Reorganized Debtors and (b) the reasonable legal, professional, or other fees and expenses related to the Project Entities, including, but not limited to, any Project Entities that have filed or may file petitions for relief under Chapter 11 of the Bankruptcy Code. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional for services rendered or expenses incurred after the Confirmation Date in the ordinary course of business without any further notice to any party or action, order, or approval of the Bankruptcy Court.

K.      **CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

1.      **Conditions Precedent to Confirmation**

It shall be a condition to Confirmation that all provisions, terms, and conditions hereof are approved or waived pursuant to the provisions of Article IX.C of the Plan.

2.      **Conditions Precedent to Consummation**

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article X.C of the Plan:

(a)   The Confirmation Order shall be a Final Order in form and substance acceptable to the Debtors.

(b)   The Plan and Plan Supplement, including any amendments, modifications, or supplements thereto shall be acceptable to the Debtors.

(c)   All actions, documents, certificates, and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable governmental units in accordance with applicable laws.

3.      **Waiver of Conditions**

The conditions to Confirmation of the Plan and to Consummation of the Plan set forth in Article X of the Plan may be waived only by consent of the Debtors.

4.      **Effective Date**

The Effective Date shall be the first Business Day upon which all of the conditions specified in Article X.B of the Plan have been satisfied or waived.

5.      **Effect of Non-Occurrence of Conditions to Consummation**

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

## L.      MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

1.      **Modification and Amendments**

Except as otherwise specifically provided in the Plan, the Debtors reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan with respect to such Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article X of the Plan.

2.      **Effect of Confirmation on Modifications**

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

3.      **Revocation or Withdrawal of the Plan**

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Equity Interest or Class of Claims or Equity Interests) and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Equity Interests; (b) prejudice in any manner the rights of such Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtors or any other Entity.

## M.      RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Equity Interests;

47

2.       decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.       ensure that distributions to Holders of Allowed Claims and Equity Interests are accomplished pursuant to the provisions of the Plan;

4.       adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

5.       adjudicate, decide, or resolve any and all matters related to Causes of Action;

6.       adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.       enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8.       enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.       resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the discharge, releases, injunctions, exculpations, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Equity Interest for amounts not timely repaid pursuant to Article III;

13.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.      determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.      adjudicate any and all disputes arising from or relating to distributions under the Plan;

16.      consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

17.      determine requests for the payment of Claims and Equity Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

18.      hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

19. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20. hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

21. enforce all orders previously entered by the Bankruptcy Court;

22. hear any other matter not inconsistent with the Bankruptcy Code; and

23. enter an order concluding or closing the Chapter 11 Cases.

## N.    MISCELLANEOUS PROVISIONS

### 1.    Immediate Binding Effect

Subject to Article IX.B of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in the Plan, and each Entity acquiring property under the Plan.

### 2.    Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or Reorganized Debtors, as applicable, and all Holders of Claims or Equity Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 3.    Payment of Statutory Fees

All fees payable pursuant to section 1930(a) of the Judicial Code shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

### 4.    Dissolution of Committees

On the Effective Date, the Committees, if any, shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.

### 5.    Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtors with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtors with respect to the Holders of Claims or Equity Interests prior to the Effective Date.

**6.      Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

**7.      Service of Documents**

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

| | |
|---|---|
| Lauth Investment Properties, LLC | Kirkland & Ellis LLP |
| Attn:  Vernon C. Back | Attn:  Ross Kwasteniet and Arun Kurichety |
| 401 Pennsylvania Parkway | 300 North LaSalle Drive |
| Indianapolis, Indiana  46280 | Chicago, Illinois 60654-3406 |

After the Effective Date, the Debtors may, in their sole discretion, notify Entities that, in order to continue to receiving documents pursuant to Bankruptcy Rule 2002, such Entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

**8.      Term of Injunctions or Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**9.      Entire Agreement**

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

**10.      Nonseverability of Plan Provisions**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) nonseverable and mutually dependent.

## VI.      SOLICITATION AND VOTING PROCEDURES

### A.      RECORD DATE

**The Record Date is April 22, 2011**.  The Record Date is the date on which the following will be determined:  (a) which Holders of Claims (including holders of bonds, debentures, notes and other securities) are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the Solicitation

Procedures; and (b) whether Claims have been properly assigned or transferred to an assignee pursuant to Bankruptcy Rule 3001(e) such that the assignee can vote as the Holder of a Claim.

**B.     VOTING DEADLINE**

**The Voting Deadline shall be 5:00 p.m. prevailing Eastern Time on May 13, 2011.**

To be counted as votes to accept or reject the Plan, all Ballots, as applicable, must be properly executed, completed and delivered according to their applicable ballot instructions by: (a) first class mail as directed on each Ballot; (b) overnight courier; or (c) personal delivery, so that they are **actually received** no later than the Voting Deadline.  The Ballots will clearly indicate the appropriate return address.  Ballots should be sent to:

---

### BALLOTS

Ballots must be **actually received** by the Solicitation Agent by the Voting Deadline, by using the envelope provided to:

> Lauth Investment Properties, LLC et al.,
> c/o AlixPartners, LLP
> 2101 Cedar Springs Road
> Suite 1100
> Dallas, Texas  75201

If you have any questions on the procedures for voting on the Plan, please contact the Solicitation Agents at the address set forth above.

---

**C.     SOLICITATION PROCEDURES**

**1.     Solicitation Package**

The following documents and materials will constitute the Solicitation Package:

(a)  a cover letter (i) describing the contents of the Solicitation Package; and (ii) explaining that the Plan Supplement will be filed on or before five Business Days before the Confirmation Hearing;

(b)  the Disclosure Statement Order (with the Solicitation Procedures, which shall be Exhibit 1 attached thereto);

(c)  an appropriate form of Ballot and Ballot Instructions with respect thereto, if applicable (with a pre-addressed, postage prepaid return envelope);

(d)  the Confirmation Hearing Notice;

(e)  the approved form of the Disclosure Statement (together with the Plan, which is Exhibit A thereto) in paper format; and

(f)  such other materials as the Bankruptcy Court may direct.

### 2. Distribution of the Solicitation Package

The Solicitation Package will be distributed to Holders of Claims in the Voting Classes as of the Record Date. The Solicitation Package will be distributed in accordance with the Solicitation Procedures.

## D. VOTING AND TABULATION PROCEDURES[8]

### 1. Who May Vote

Only the following Holders of Claims in Voting Classes are entitled to vote:

(a) Holders of Claims for which Proofs of Claims have been timely-filed, as reflected on the Claim Register as of the Record Date; provided, however, that Holders of Claims to which an objection is pending at least 15 days prior to the Confirmation Hearing shall not be entitled to vote unless such Holders become eligible to vote through a Resolution Event in accordance with section D.4 of the Solicitation Procedures;

(b) Holders of Claims that are listed in the Debtors' Schedules, with the exception of those Holders whose Claims are scheduled as contingent, unliquidated, or disputed (excluding such scheduled Claims that have been superseded by a timely-filed Proof of Claim); provided, however, that Holders of Claims that are scheduled as contingent, unliquidated, or disputed, or any combination thereof, for which the applicable Bar Date has not passed may vote;

(c) Holders whose Claims arise pursuant to an agreement or settlement with the Debtors, as reflected in a document filed with the Bankruptcy Court, in an order of the Bankruptcy Court or in a document executed by the Debtors pursuant to authority granted by the Bankruptcy Court, in each case regardless of whether a Proof of Claim has been filed; and

(d) the assignee of any transferred or assigned Claim shall be permitted to vote such Claim only if the transfer or assignment has been fully effectuated pursuant to the procedures dictated by Bankruptcy Rule 3001(e) and such transfer is reflected on the Claims Register on or before the Record Date.

### 2. Establishing Claim Amounts

In tabulating votes, the following hierarchy will be used to determine the amount of the Claim associated with each vote:

(a) the amount of the Claim settled and/or agreed upon by the Debtors, as reflected in a court pleading, stipulation, agreement or other document filed with the Bankruptcy Court, in an order of the Bankruptcy Court or in a document executed by the Debtors pursuant to authority granted by the Bankruptcy Court;

(b) the amount of the Claim Allowed (temporarily or otherwise) pursuant to a Resolution Event under the procedures set forth in the Solicitation Procedures;

(c) the amount of the Claim contained in a Proof of Claim that has been timely-filed by the applicable Bar Date (or deemed timely-filed by the Bankruptcy Court under applicable law) except for any amounts in such Proofs of Claim asserted on account of any interest accrued after the Petition Date; provided that Ballots cast by Holders whose Claims are not listed on the Schedules, but that timely file a Proof of Claim in an unliquidated or unknown amount, with respect to any portion of the Claim, that are not the subject of an objection, will count for satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code and will count as Ballots for Claims in the amount of $1.00 solely for the purposes of satisfying the dollar amount provisions of section 1126(c) of the Bankruptcy Code; provided further that to the extent the amount of the Claim contained in the Proof of Claim is different from the amount of the Claim set forth in a document filed with the Bankruptcy Court as referenced in

---

8    Unless otherwise defined herein, capitalized terms in this section VI.D shall have the meanings set forth in the Solicitation Procedures.

section D.2.c. of the Solicitation Procedures, the amount of the Claim in the document filed with the Bankruptcy Court shall supersede the amount of the Claim set forth on the respective Proof of Claim;

(d)    the amount of the Claim listed in the Schedules, provided that such Claim is not scheduled as contingent, unliquidated, or disputed and has not been paid; provided further that if the Holder of a contingent, unliquidated, or disputed Claim is allowed to vote its Claim because the applicable Bar Date has not passed, then the amount of the Claim listed in the Schedules; and

(e)    in the absence of any of the foregoing, zero.

The amount of the Claim established in the Solicitation Procedures shall control for voting purposes only and shall not constitute the Allowed amount of any Claim. Moreover, any amounts filled in on Ballots by the Debtors through the Solicitation Agent are not binding for any purposes, including for purposes of voting and distribution.

3.    **General Ballot Tabulation**

The following voting procedures and standard assumptions will be used in tabulating ballots:

(a)    except as otherwise provided in the Solicitation Procedures or unless waived by the Debtors, unless the Ballot being furnished is timely submitted on or prior to the Voting Deadline, the Debtors shall reject such Ballot as invalid and, therefore, decline to count it in connection with Confirmation;

(b)    the Solicitation Agent will date and time-stamp all Ballots when received. The Solicitation Agent shall retain all original Ballots and an electronic copy of the same for a period of six (6) years after the Effective Date of the Plan, unless otherwise ordered by the Bankruptcy Court;

(c)    an original executed Ballot is required to be submitted by the Entity submitting such Ballot. Delivery of a Ballot to the Solicitation Agent by facsimile, email or any other electronic means shall not be valid;

(d)    pursuant to Local Bankruptcy Rule B-3018-1(a), the Debtors shall File a certified Balloting Report with the Bankruptcy Court no later than three (3) calendar days prior to the Confirmation Hearing;

(e)    the method of delivery of Ballots to the Solicitation Agent is at the election and risk of each Holder of a Claim. Except as otherwise provided in the Solicitation Procedures, such delivery will be deemed made only when the Solicitation Agent actually receives the originally executed Ballot;

(f)    no Ballot should be sent to the Debtors, the Debtors' agents (other than the Solicitation Agent) or the Debtors' legal advisors and if so sent will not be counted;

(g)    if multiple Ballots are received from the same Holder of a Claim or Equity Interest with respect to the same Claim or Equity Interest prior to the Voting Deadline, the latest-dated valid Ballot received prior to the Voting Deadline will supersede and revoke any prior dated Ballot;

(h)    Holders must vote all of their Claims within a particular Class either to accept or reject the Plan and may not split any such votes. Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted. Further, if a Holder has multiple Claims within the same Class, the Debtors may, in their discretion, aggregate the Claims of any particular Holder within a Class for the purpose of counting votes;

(i)    a person signing a Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity must indicate such capacity when signing and, if required or requested by the applicable Nominee or its agent, the Solicitation Agent, the Debtors or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder;

(j)  the Debtors, subject to contrary order of the Bankruptcy Court, may waive any defects or irregularities as to any particular Ballot at any time, either before or after the close of voting;

(k)  neither the Debtors, nor any other Entity, will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots, nor will any of them incur any liability for failure to provide such notification;

(l)  unless waived by the Debtors, subject to contrary order of the Bankruptcy Court, any defects or irregularities in connection with deliveries of Ballots must be cured prior to the Voting Deadline or such Ballots will not be counted;

(m)  in the event a designation for lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim or Equity Interest will be counted for purposes of determining whether the Plan has been accepted and/or rejected by such Claim or Equity Interest;

(n)  subject to any contrary order of the Bankruptcy Court, the Debtors reserve the right to reject any and all Ballots not in proper form, the acceptance of which, in the opinion of the Debtors, would not be in accordance with the provisions of the Bankruptcy Code or the Bankruptcy Rules;

(o)  if a Claim or Equity Interest has been estimated or otherwise Allowed for voting purposes by an order of the Bankruptcy Court pursuant to Bankruptcy Rule 3018(a), such Claim or Equity Interest shall be temporarily Allowed in the amount so estimated or Allowed by the Bankruptcy Court for voting purposes only and not for purposes of allowance or distribution;

(p)  if an objection to a Claim is Filed, such Claim shall be treated in accordance with the Solicitation Procedures; and

(q)  the following Ballots shall not be counted in determining the acceptance or rejection of the Plan: (a) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (b) any Ballot cast by any Entity that does not hold a Claim in a Class that is entitled to vote on the Plan; (c) any unsigned Ballot; (d) any Ballot not marked to accept or reject the Plan or any Ballot marked both to accept and reject the Plan; or (e) any Ballot submitted by any Entity not entitled to vote pursuant to the Solicitation Procedures.

## VII.   CONFIRMATION PROCEDURES

### A.   CONFIRMATION HEARING

The Confirmation Hearing will commence on May 20, 2011 at 11:00 a.m. prevailing Eastern Time.

The Plan Objection Deadline is 5:00 p.m. prevailing Eastern Time on May 13, 2011.

All objections to the Plan must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in accordance with the Disclosure Statement Order on or before the Plan Objection Deadline.

The Debtors' proposed schedule will provide Entities sufficient notice of the Plan Objection Deadline, which will be at least 28 days, as required by Bankruptcy Rule 2002(b).  The Debtors believe that the Plan Objection Deadline will afford the Bankruptcy Court, the Debtors and other parties in interest reasonable time to consider the Plan Objections prior to the Confirmation Hearing.

THE BANKRUPTCY COURT WILL NOT CONSIDER PLAN OBJECTIONS UNLESS THEY ARE TIMELY–SERVED AND FILED IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER.

Following the Disclosure Statement Hearing, the Debtors will publish the Confirmation Hearing Notice, which will contain, among other things, the Plan Objection Deadline, the Voting Deadline and the date that the Confirmation Hearing is first scheduled, in one or more of the following publications: *Indianapolis Business Journal* and/or the *Indianapolis Star* on or before April 28, 2011 or as reasonably practicable thereafter to provide notification to those Entities that may not receive notice by mail.

**Plan Objections must be served on all of the following parties:**

| | |
|---|---|
| KIRKLAND & ELLIS LLP<br>James A. Stempel<br>Ross M. Kwasteniet<br>Arun Kurichety<br>300 North LaSalle Street<br>Chicago, Illinois 60654 | TAFT STETTINUIS & HOLLISTER, LLP<br>Jerald I. Ancel<br>Jeffrey J. Graham<br>One Indiana Square, Suite 3500<br>Indianapolis, Indiana 46204 |
| *Co-Counsel to the Debtors* | |
| United States Bankruptcy Court for the Southern District of Indiana<br>Kevin P. Dempsey, Clerk<br>Office of the Bankruptcy Court<br>P.O. Box 44978<br>Indianapolis, IN 46244 | Charles R. Wharton<br>Office of the United States Trustee<br>101 W. Ohio Street, Suite 1000<br>Indianapolis, IN 46204 |
| *Clerk of the Bankruptcy Court* | *Office of the United States Trustee for the Southern District of Indiana* |

## B.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11 of the Bankruptcy Code; (2) the Debtors have complied or will have complied with all of the necessary requirements of chapter 11 of the Bankruptcy Code; and (3) the Plan has been proposed in good faith. Specifically, in addition to others, as applicable, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponent, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

- Either each Holder of an Impaired Claim has accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code, including pursuant to section 1129(b) of the Bankruptcy Code for Equity Interests deemed to reject the Plan.

- Each Class of Claims that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such Class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims and Other Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date.

### 1.    Best Interests of Creditors Test/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor liquidated under chapter 7 of the Bankruptcy Code.  To make these findings, the bankruptcy court must:  (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if the Chapter 11 Cases were converted to chapter 7 cases and the assets of debtors' estates were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim or an equity interest would receive from such liquidation proceeds under the priority scheme dictated under chapter 7; and (c) compare such holder's liquidation distribution to the distribution under the plan that such holder would receive if the plan were confirmed and consummated.

In chapter 7 cases, unsecured creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid fully or any such payment is provided for:  (a) holders of secured claims (to the extent of the value of their collateral); (b) holders of priority claims; (c) holders of unsecured claims; (d) holders of debt expressly subordinated by its terms or by order of the bankruptcy court; and (e) holders of equity interests.

The Debtors believe that the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code would be less than the value of distributions under the Plan because, among other reasons, the Debtors believe that the outstanding amounts under the DIP Credit Agreements exceed the current value of the Debtors.  Moreover, distributions in chapter 7 cases may not occur for a longer period of time, thereby reducing the present value of such distributions.  In this regard, it is possible that distribution of the proceeds of a liquation could be delayed for a period in order for a chapter 7 trustee and its professionals to become knowledgeable about the Chapter 11 Cases and the Claims against the Debtors.  In addition, proceeds received in a chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the "forced sale" of the Debtors' assets, and the fees and expenses of a chapter 7 trustee would likely further reduce Cash available for distribution.

### 2.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in the plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan.  By converting claims on account of the DIP Credit Agreements, the Debtors believe they will have the requisite liquidity to continue operations in the future.

### 3.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  A class is "impaired" unless the plan:  (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.  For a class of impaired equity interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by equity interest holders that hold at least two-thirds in amount of the allowed equity interests of such class, counting only those equity interests that actually voted to accept or reject the plan.  Thus, a class of equity interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

The Claims in Class A-2, A-7, B-5, B-6, B-8, C-4, C-5, and C-7 are Unimpaired under the Plan.  Pursuant to section 1126(f) of the Bankruptcy Code, Holders of such Claims are conclusively presumed to have accepted the Plan and their votes will not be solicited.

The Claims in Class A-1, A-3, A-4, A-5, A-6, B-1, B-2, B-3, B-4, B-7, C-1, C-2, C-3, and C-6 are Impaired under the Plan.  These Classes will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of such Class (other than any Claims of Creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

The members of Class A-8 are Impaired under the Plan and will not receive a distribution under the Plan.  Pursuant to section 1126(g) of the Bankruptcy Code, the members of Class A-8 are deemed to reject the Plan and their votes will not be solicited.

### 4.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it, provided that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

#### a)    No Unfair Discrimination

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

b)    <u>Fair and Equitable Test</u>

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in such class.

*Secured Claims*:  The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that:  (1) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (2) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

*Unsecured Claims*:  The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the following requirement that either:  (1) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

*Equity Interests*:  The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either:  (1) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of:  (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (2) if the class does not receive the amount as required under (1) hereof, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Plan Supplement document, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

The Debtors submit that if the Debtors "cram down" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan will be structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

## C.    RISK FACTORS

Prior to deciding whether and how to vote on the Plan, each Holder of a Claim should consider carefully all of the information in this Disclosure Statement and should particularly consider the Risk Factors described in Section IX, "Plan-Related Risk Factors and Alternatives to Confirmation and Consummation of the Plan."

## D.    CONTACT FOR MORE INFORMATION

Any interested party desiring further information about the Plan should contact legal counsel to the Debtors, by writing to Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn:  Ross M. Kwasteniet and Arun K. Kurichety.

VIII.    PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND
CONSUMMATION OF THE PLAN

THE IMPLEMENTATION OF THE PLAN IS SUBJECT TO A NUMBER OF RISKS, INCLUDING
THOSE ENUMERATED BELOW.  PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL
HOLDERS OF CLAIMS AND EQUITY INTERESTS THAT ARE IMPAIRED AND ENTITLED TO VOTE
ON THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN,
AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS
DISCLOSURE STATEMENT AND OTHER DOCUMENTS DELIVERED TOGETHER HEREWITH
AND/OR INCORPORATED BY REFERENCE HEREIN.  THESE RISK FACTORS SHOULD NOT,
HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION
WITH THE PLAN AND ITS IMPLEMENTATION, OR ALTERNATIVES TO THE PLAN.

A.    GENERAL BANKRUPTCY LAW AND PLAN - RELATED CONSIDERATIONS

1.    General

The filing of a bankruptcy petition by the Debtors and the publicity attendant thereto may affect the
Debtors' businesses adversely.  Any such adverse effects may worsen during the pendency of a protracted
bankruptcy case if the Plan is not timely confirmed and consummated as expected.

2.    Parties in Interest May Object to the Debtors' Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a
particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in
such class.  The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with
the requirements set forth in the Bankruptcy Code because the Debtors created certain Classes of Claims and Equity
Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other
Claims and Equity Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court
will reach the same conclusion.

3.    Failure to Satisfy Vote Requirement

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan,
the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that
sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan.  There can be
no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of
Allowed Claims as those proposed in the Plan.

4.    The Debtors May Not Be Able to Secure Confirmation of the Plan or Confirmation May Be
Delayed

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and
requires, among other things, a finding by the bankruptcy court that:  (a) such plan "does not unfairly discriminate"
and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be
followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is
contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity
interests within a particular class under such plan will not be less than the value of distributions such holders would receive if
the debtor was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the
requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A
non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or
whether the Solicitation Procedures and voting results satisfy the requirements of the Bankruptcy Code or
Bankruptcy Rules.  Even if the Bankruptcy Court determined that the Disclosure Statement, the Solicitation

K&E 15956155

Procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

The Confirmation and Consummation of the Plan also are subject to certain other conditions. No assurance can be given that these conditions will be satisfied.

If the Plan is not confirmed in a timely manner, it is unclear whether the transactions contemplated thereby could be implemented and what Holders of Claims and Equity Interests would ultimately receive in respect of their Claims and Equity Interests. It is possible that any alternative could provide Holders of Claims with less than they would have received pursuant to the Plan. Moreover, nonconfirmation of the Plan could result in an extended chapter 11 proceeding.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in a less favorable treatment of any non-accepting Class, as well as of any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

5.     **Nonconsensual Confirmation - "Cramdown"**

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.

Although the Debtors believe that the Plan will meet such tests, the Debtors cannot be certain that the Bankruptcy Court would reach the same conclusion. If the Bankruptcy Court does not confirm the Plan, the Debtors may pursue one of the following alternatives: (a) confirmation of an alternative plan of reorganization under chapter 11 of the Bankruptcy Code, (b) dismissal of the Chapter 11 Cases or (c) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

6.     **The Debtors May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan, the Cash Collateral Orders and the DIP Orders, the Debtors and the Reorganized Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

7.     **Risk of Non-Occurrence of the Effective Date**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

8.     **Risk Affecting Potential Recoveries of Holders of Claims in Voting Classes**

The Debtors cannot state with any degree of certainty what recovery will be available to Holders of Claims in Voting Classes. Two unknown factors make certainty impossible. First, the Debtors cannot know with any certainty, at this time, the number or size of Claims in Voting Classes which will ultimately be Allowed. Third, the Debtors cannot know with certainty, at this time, the number or size of Claims in Classes senior to the Voting Classes, or Claims that are unclassified, which will ultimately be Allowed.

9.      **Risk that the Debtors' Business Plan Will Not Be Realized**

The Plan is predicated upon the Debtors having sufficient liquidity to operate until the economy and real estate markets improve. There are many factors outside of the Debtors' control that may prevent these macroeconomic factors from recovering. At this time, the Debtors cannot be certain whether these conditions will or will not occur in the required time horizon. Moreover, it is possible that the Debtors may not receive enough income through operations prior to a broader economic recovery. This could cause the Debtors to run out of cash prior to implementing its long term business plan. Consequently, the Debtors can provide no assurance that it will be successful in implementing its business plan.

B.      **RISKS ASSOCIATED WITH FORWARD LOOKING STATEMENTS**

**The financial information contained in this Disclosure Statement has not been audited**. In preparing this Disclosure Statement, the Debtors relied on financial data derived from its books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

C.      **DISCLOSURE STATEMENT DISCLAIMER**

1.      **Information Contained Herein Is for Soliciting Votes**

The information contained in this Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.

2.      **This Disclosure Statement Was Not Reviewed or Approved by the Securities and Exchange Commission**

This Disclosure Statement was not filed with the Commission under the Securities Act or applicable state securities laws. Neither the Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

3.      **This Disclosure Statement May Contain Forward Looking Statements**

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analysis, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

4.      **No Legal or Tax Advice Is Provided to You by this Disclosure Statement**

**This Disclosure Statement is not legal advice to you**. The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

61

5.      **No Admissions Made**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Equity Interests or any other parties in interest.

6.      **Failure to Identify Litigation Claims or Projected Objections**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement.  The Debtors or the Reorganized Debtors may seek to investigate, file and prosecute Claims and Equity Interests and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies such Claims or Objections to Claims.

**NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO CLAIM IS, OR IS NOT, IDENTIFIED IN THIS DISCLOSURE STATEMENT.  MOREOVER, THE DEBTORS OR THE REORGANIZED DEBTORS, AS APPLICABLE, MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE LITIGATION CLAIMS AND PROJECTED OBJECTIONS TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.**

7.      **No Waiver of Right to Object or Right to Recover Transfers and Assets**

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors or the Reorganized Debtors (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtors or its respective Estates are specifically or generally identified herein.

8.      **Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors**

Counsel to and other advisors retained by the Debtors has relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

9.      **Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

10.     **No Representations Outside the Disclosure Statement are Authorized**

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.

## D.       ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed, the alternatives include (i) continuation of the Chapter 11 Cases and formulation of an alternative plan or plans of reorganization or (ii) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.  Each of these possibilities is discussed in turn below.

### 1.       Continuation of the Chapter 11 Cases

If the Debtors remain in chapter 11, the Debtors could continue to operate their businesses and manage their properties as debtors in possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code.  It is not clear whether the Debtors could continue as viable going concern in a protracted chapter 11 cases.  The Debtors could have difficulty operating with high costs, operating financing and the eroding confidence of the lenders to the respective Project Entities, if the Debtors remained in chapter 11.  It is highly unlikely that the Debtors would be able to find alternative financing if the DIP Credit Agreements were terminated.  If the Debtors were able to obtain financing and continue as a viable going concern, the Debtors (or other parties in interest) could ultimately propose another plan or attempt to liquidate the Debtors under chapter 7 or chapter 11.  Such plans might involve either a reorganization and continuation of the Debtors' businesses, or an orderly liquidation of their assets, or a combination of both.

### 2.       Liquidation Under Chapter 7 or Chapter 11

If the Plan is not confirmed, the Chapter 11 Cases could be converted to liquidation cases under chapter 7 of the Bankruptcy Code.  In chapter 7, a trustee would be appointed to promptly liquidate the assets of the Debtors.

The Debtors believe that in a liquidation under chapter 7, before creditors received any distributions, additional administrative expenses involved in the appointment of a trustee and attorneys, accountants and other professionals to assist such trustee, along with an increase in expenses associated with an increase in the number of unsecured claims that would be expected, would cause a substantial diminution in the value of the Estates.  The assets available for distribution to creditors and equity holders would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and the failure to realize the greater going concern value of the Debtors' assets.  The Debtors could also be liquidated pursuant to the provisions of a chapter 11 plan of reorganization.  In a liquidation under chapter 11, the Debtors' assets could be sold in a more orderly fashion over a longer period of time than in a liquidation under chapter 7.  Thus, chapter 11 liquidation might result in larger recoveries than in a chapter 7 liquidation, but the delay in distributions could result in lower present values being received and higher administrative costs.  Because a trustee is not required in a chapter 11 case, expenses for professional fees could be lower than in a chapter 7 case, in which a trustee must be appointed.  Any distributions to the Holders of Claims or Equity Interests under a chapter 11 liquidation plan probably would be delayed substantially.

In addition, the Debtors believe that recoveries would be significantly less in a liquidation than under the Plan.  The Debtors do not believe that this is the best time to liquidate the commercial real estate assets of the Project Entities.  The Project Entities are encumbered by significant first-lien mortgage indebtedness.  Moreover, pursuant to the DIP Credit Agreements, the DIP Lender has a lien on the equity in each of the Project Entities and would need to be paid in full in Cash before any value would be available to creditors of LIP Investment, LLC.  The Debtors estimate that in a liquidation, the distributable value of Debtor LIP Investment, LLC would be approximately $10-15 million and that there would be no distributable value for Debtors Lauth Investment Properties, LLC and LIP Development, LLC.

## E.       VALUATION ANALYSIS

THIS VALUATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING "ADEQUATE INFORMATION" UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER

63

PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS OR ANY OF THEIR AFFILIATES.

THE ESTIMATES OF ENTERPRISE VALUE DETERMINED BY THE DEBTORS IN CONNECTION WITH THIS VALUATION REPRESENT DO NOT NECESSARY REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS.

**1.      Overview**

The Debtors are providing estimates of the value distributable to creditors of Lauth Investment Properties, LLC, LIP Development, LLC, and LIP Investment, LLC.  These estimates are based on information available as of the date of this Disclosure Statement.  The Debtors have undertaken this valuation analysis to determine the value available for distribution to Holders of Allowed Claims pursuant to the Plan and to analyze the relative recoveries to such Holders thereunder.  The estimated total value available for distribution to holders of Allowed Claims (the "Enterprise Value") consists of the estimated value of the Debtors' assets and operations.  The valuation analysis assumes that the Effective Date of the Plan occurs on or around June 1, 2011 (the "Assumed Effective Date").

Solely for purposes of the Plan, the Debtors estimate that the Enterprise Value of Debtor LIP Investment, LLC, which is derived from LIP Investment LLC's ownership interests in its various project level subsidiaries, falls within a range from approximately $25-35 million as of the Assumed Effective Date if the projects are sold during 2011 based on the methodologies set forth herein and the Enterprise Value increases to $35-44 million if sold over the next two years taking into consideration various assumptions regarding leasing and market conditions over the next two years. For purposes of this valuation, the Debtors have assumed that no material changes that would affect value will occur between the date of the Disclosure Statement and the Assumed Effective Date.  The Debtors estimate that Debtors LIP Development, LLC and Lauth Investment Properties, LLC have no Enterprise Value.

THE DEBTORS' ENTERPRISE VALUE ESTIMATES REFLECT WORK PERFORMED BY THE DEBTORS AND THEIR ADVISORS ON THE BASIS OF INFORMATION AVAILABLE TO THE DEBTORS AS OF THE DATE OF THIS DISCLOSURE STATEMENT.  ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT THE CONCLUSIONS SET FORTH HEREIN, THE DEBTORS HAVE NO OBLIGATION TO UPDATE, REVISE, OR REAFFIRM THEIR ESTIMATES.

In estimating the Enterprise Value, the Debtors:  (a) relied on their considerable experience in the commercial real estate industry, (b) reviewed certain historical appraisals and analyses, (c) reviewed certain historical financial information of the Debtors for recent years and interim periods; (d) reviewed certain internal financial and operating data of the Debtors which relate to the Debtors' business and their prospects; (c) reviewed certain publicly available financial data for, and considered the market value of, companies that the Debtors deemed generally comparable to the Debtors; (e) considered certain economic and industry information relevant to the Debtors; and (f) conducted and/or evaluated such other studies, analyses, inquiries, and investigations as they deemed appropriate.

The Debtors did not obtain third-party valuations or appraisals when formulating their estimates of Enterprise Values.  The Debtors' estimates of Enterprise Value were developed solely for purposes of the formulation and negotiation of the Plan, the analysis of implied relative recoveries to Holders of Allowed Claims thereunder, and to provide "adequate information" pursuant to section 1125 of the Bankruptcy Code.

The Debtors estimates of Enterprise Value reflect the application of standard valuation techniques and do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value, which may be significantly different than the amounts set forth herein.  The value of an operating business is subject to numerous uncertainties and contingencies which are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business.  To the extent that commercial real estate pricing and demand in the markets in which the Debtors operate recover more slowly or more quickly than the Debtors anticipate, or the costs of the Debtors' operations are inconsistent with those currently expected by management, such differences may have a material impact on the valuation analysis of Debtor LIP Investment, LLC presented herein.  The Debtors do not anticipate that Debtors LIP Development, LLC or Lauth Investment Properties will have positive Enterprise Value under any reasonable set of assumptions or projections.  As a result, the estimated

Enterprise Values set forth herein are not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein.  The Debtors do not assume responsibility for any differences between an estimated Enterprise Value and actual outcomes.

2.      **Property Portfolio**

Debtor LIP Investment, LLC is currently involved in the development, construction and management of numerous Project Entities which can be divided into a variety of categories, the characteristics of which are described below:[9]

| Project Category | Projects | Square Feet | % Occupied | Cap Rate | Discount Rate | Corporate Guarantees | Personal Guarantees |
|---|---|---|---|---|---|---|---|
| Healthcare | Bon Secours Virginia Beach | 84,478 | 80% | 10.0% | 10.0% | N | Y |
| | Brier Creek Phase I | 60,074 | 79% | 9.0% | 9.0% | N | Y |
| | Fort Norfolk Plaza | 199,355 | 60% | 9.0% | 9.0% | LIP, LIP D, LIP I | N |
| | Imperial Point Medical Arts Pavilion | 64,013 | 37% | 8.5% | 9.5% | LIP, LIP D, LIP I | N |
| | North Meridian Medical Pavilion A | 84,332 | 100% | 10.0% | 10.0% | N | N |
| | North Meridian Medical Pavilion B | 88,887 | 100% | 10.0% | 10.0% | N | Y |
| Industrial | ACC Building C | 406,959 | 100% | 10.5% | 10.5% | N | N |
| | Plastech - Lansing | 231,000 | 100% | 11.0% | 11.0% | N | N |
| | Salt River II | 936,000 | 33% | 10.0% | 10.0% | LIP | Y |
| Office | Intech Ten | 116,232 | 81% | 10.0% | 9.0% | LIP | N |
| Retail | Bryan Towne Center | 58,268 | 69% | 9.5% | 9.5% | LIP | N |
| | Catawba Springs Promenade | 38,680 | 71% | 9.0% | 9.0% | N | Y |
| | Shoppes at Rivercrest (Granite Falls) | 46,483 | 61% | 11.0% | 9.0% | N | Y |
| | Sycamore Terrace | 47,695 | 80% | 9.5% | 9.5% | LIP | Y |

---

[9]    The chart does not include Debtors Brier Creek Medical Partners Two, LLC, Moores Chapel Partners, LLC, Brownsburg Station Partners, LLC, and Middleburg Heights Medical Partners, LLC, which entities are subject to the Global Settlement Agreement, and will be returned to Wells Fargo pursuant to the terms thereof.  This chart also does not include Lafayette Pavilions Partners, LLC and Porter's Vale Partners, LLC which are in the process of a deed in lieu transaction.

K&E 15956155

3.       **Valuation Methodology**

In performing their analysis, the Debtors considered three methodologies:   (1) Cost Analysis;
(2) Comparables Analysis; and (3) Discounted Cash Flow Analysis.  Each of these analyses is substantially similar
in approach to those used by the Debtors in the ordinary course of their business.  These valuation methodologies
are based upon financial information provided by the Debtors.  For the reasons discussed in detail below, the
Debtors' valuation analysis relies predominately on the Comparables analysis; while Cost Analysis and
Discounted Cash Flow Analysis was performed, the Debtors' reliance on such methodologies for purposes of
determining the Enterprise Value was minimal.

In determining the Enterprise Value, the Debtors considered the "fair market value" of their assets, defined
as "the price at which the property would change hands between a willing buyer and a willing seller, neither being
under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts."  This definition is
from the United States Department of the Treasury's Internal Revenue Code, Subchapter B, §20.2031-1(b) and was
utilized in United States v. Cartwright, 411 U.S. 546, 550–51 (1973) (internal citation omitted).  The fair market
value is assumed to occur in an open and unrestricted market, with "normal" conditions for (1) capital and financing
markets, (2) strategic interests and (3) supply of similar assets.

a)       Cost Analysis

The "Cost Analysis" is based on the theory that buyers will not pay more for a property than its cost of
replacement, less appropriate depreciation, plus value of land.  The Cost Analysis is extremely cumbersome as the
estimates of replacement cost and depreciation are subject to multiple interpretations.  Furthermore, the Debtors
believe that many recent commercial real estate transactions have involved sale prices far less than the cost of
constructing the project, and therefore do not believe that the "Cost Analysis" provides a reasonably proxy for the
value of the Project Entities for purposes of calculating Enterprise Value.

b)       Comparables Analysis

The "Comparables Analysis" is based on enterprise values of publicly traded companies that have assets,
operating, and financial characteristics similar to the Debtors.  This analysis evaluates publicly traded companies in
the construction and development industry and compares them to the Debtors based on their mean and median
enterprise values.  This analysis also analyzes sale data with respect to comparable properties in the various markets
in which the Project Entities are located.

The Debtors concluded range of the Enterprise Value of Debtor LIP Investment, LLC is approximately
$25-35 million based market comparables if the Project Entities are sold during 2011 and the Enterprise Value
increases to $35-44 million if sold over the next two years, taking into consideration various assumptions regarding
leasing and market conditions over the next two years.  Given the obligations of LIP I, and taking into account the
Mezzanine Loan which is secured by LIP Development, LLC's equity interest in LIP Investment, LLC, the Debtors
believe that LIP Development, LLC and Lauth Investment Properties, LLC have no positive Enterprise Value.

With respect to the Plan prepared by the Debtors' management, the Debtors have relied on the best
available estimates as to the potential future operating and financial performance of the Plan.   The
Comparables Analysis assumes that operating results projected by the Debtors will be achieved by the
Reorganized Debtors.

c)       Discounted Cash Flow Analysis

The discounted cash flow analysis ("DCF Analysis") valuation methodology relates the value of an asset or
business to the present value of expected future cash flows to be generated by that asset or business.  The DCF
Analysis is a "forward looking" valuation methodology approach that discounts the expected future cash flows by a
theoretical or observed discount rate determined by calculating the average cost of debt and equity for companies
that are similar to the Debtors.  This approach has two components:  (a) the present value of the projected un-levered

67

after-tax free cash flows for a determined period; and (b) the present value of the terminal value of cash flows, which represents the Debtors' value beyond the time horizon of the Plan.

The Debtors recognized that real estate investment assets, the Debtors' most significant assets, are capital goods — *i.e.*, there are benefits from owning such assets and such benefits are received over a prolonged time, typically estimated for at least ten years.  As such, the value of a capital good is established and measured by calculating the present worth, as of a particular valuation date, of the anticipate future benefits (income) to the owner over a specified period of time.  This process is known as capitalization and the result of such process is known as the present value estimate.  This is the amount that a hypothetical prudent, informed investor would pay as of the valuation date for the right to receive the forecast income over the specified period of time.

To apply a specific capitalization rate (derived from the market) to an anticipated future income stream in order to develop a present value estimate, the Debtors made assumptions regarding the appropriate discount rates to be utilized.  In particular, in formulating appropriate discount rates, the Debtors recognized the following factors:

a)  <u>Time Preference</u>:  This is the basis for the riskless or "pure" rate of interest.

b)  <u>Illiquidity</u>:  An investor in real estate assets gives up considerable liquidity in its asset holdings.

c)  <u>Investment Management</u>:  This is not management of the property, which is an operating expense, but of the investment; for example, tax accounting, mortgage payments and managing money flows.

d)  <u>Risk Assumption</u>:  These risks vary by type of property and investment position.  They are influenced by the forecast timing, stability and certainty of the forecast annual income flow.

After analysis of the following factors, the Debtors utilized various industry sources that report real estate rates of return constructed on a national basis, by location and property sector.  This analysis presents conclusions on rates of return, capitalization rates, discount rates and reversionary capitalization rates estimated after analysis of sales data and interviews with active buyers to ascertain their investment motivations, expectations and criteria regarding typical holding periods by use of a discounted cash flow technique, and by use of a market-derived internal rate of return or yield rate requirement.  As such, a range of discount rates and capitalization rates were utilized based on the characteristics of each individual asset.

With respect to the Plan prepared by the Debtors' management, the Debtors have relied on the best available estimates as to the potential future operating and financial performance of the Plan.  The DCF Analysis assumes that operating results projected by the Debtors will be achieved by the Reorganized Debtors.

**4.    Valuation Considerations**

Although the Debtors considered all three valuation methodologies, they primarily relied on the Comparables Analysis in determining the Debtors' Enterprise Value.

An estimate of total enterprise value is not entirely mathematical; rather it involves complex considerations and judgments concerning potential variances in projected financial and operating characteristics, as well as other factors that could affect the future prospects and cost of capital considerations for the Reorganized Debtors.  Moreover, the value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business.  As a result, the estimates of total enterprise value set forth herein are not necessarily indicative of actual outcomes, which may be significantly different than those set forth herein.  Because such estimates are inherently subject to a number of uncertainties, neither the Debtors, the Reorganized Debtors, nor any other person, assumes responsibility for their accuracy.  Depending on the results of the Debtors' and Reorganized Debtors' operations or changes in the financial markets, the Debtors valuation analysis as of the Effective Date may differ from that disclosed herein.  Accordingly,

K&E 15956155

the Enterprise Value estimated does not necessarily reflect, and should not be construed as reflecting, values that will be attained in the public or private markets.

## IX.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.   GENERAL TAX CONSIDERATIONS

The following discussion is a summary of certain material federal income tax consequences expected to result from the Consummation of the Plan, is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular Holder of a Claim or Equity Interest.   This discussion does not purport to be a complete analysis or listing of all potential tax considerations.   This discussion does not address aspects of federal income taxation that may be relevant to a particular Holder of a Claim or Equity Interest subject to special treatment under federal income tax laws (such as foreign taxpayers, broker dealers, banks, thrifts, insurance companies, financial institutions, regulated investment companies, real estate investment trusts and pension plans and other tax exempt investors), and does not discuss any aspects of state, local or foreign tax laws.   Furthermore, this summary does not address all of the federal income tax consequences that may be relevant to a Holder of a Claim or Equity Interest, such as the potential application of the alternative minimum tax.

This discussion is based on existing provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), existing and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions.   Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the federal income tax consequences of the Plan.   Any such changes or interpretations may be retroactive and could significantly affect the federal income tax consequences of the Plan.

No ruling has been requested or obtained from the Internal Revenue Service (the "IRS") with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto. No representations or assurances are being made to the Holders of Claims or Equity Interests with respect to the federal income tax consequences described herein.

Accordingly, the following summary of certain federal income tax consequences of the plan is for informational purposes only and is not a substitute for careful tax planning or advice based upon the individual circumstances pertaining to a particular Holder of a claim or interest.   Each Holder of a claim or interest is strongly urged to consult with its own tax advisors regarding the federal, state, local and other tax consequences of the Plan.

\*        \*        \*        \*        \*

**INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE:   TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE UNITED STATES INTERNAL REVENUE SERVICE, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX RELATED PENALTIES UNDER THE TAX CODE.   TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT WRITTEN TO SUPPORT THE PROMOTION, MARKETING OR PROMOTION OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT.   EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

\*        \*        \*        \*        \*

**B.    FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS AND HOLDERS OF EQUITY INTERESTS**

The Debtors are treated as a partnership for U.S. federal income tax purposes. Accordingly, the U.S. federal income tax consequences of the Plan will generally not be borne by the Debtors, but will be borne by the Debtor's partners (*i.e.*, Holders of Equity Interests).

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. Under Section 108 of the IRC, a taxpayer is not required to include COD Income in gross income if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case (the "Bankruptcy Exception"). Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income. In general, tax attributes will be reduced in the following order: (a) net operating losses ("NOLs"); (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits. Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets pursuant to Section 108(b)(5) of the IRC.

Under Section 108(d)(6) of the IRC, when an entity that is taxed as a partnership realizes COD Income, its partners are treated as receiving their allocable share of such COD Income and the Bankruptcy Exception (and related attribute reduction) is applied at the partner level rather than at the entity level. Accordingly, the Holders of Equity Interests will be treated as receiving their allocable share of the COD Income realized by the Debtors.

The Debtors expect to recognize COD Income equal to the excess of the total amount of (a) Allowed Class A-3 Swap Agreement Claims and Allowed Class A-4 General Unsecured Claims over the LIP Unsecured Claim Allocation, (b) Allowed Class B-6 General Unsecured Claims over the LIP D Unsecured Claim Allocation and (c) Allowed C-4 General Unsecured Claims over the LIP I Unsecured Claim Allocation, <u>however</u>, if either the DIP Agreement Claims or the Exit Term Loan are considered "publicly traded" for tax purposes, then the Debtors would recognize additional COD Income to the extent that the adjusted issue price of the DIP Agreement Claims exceeds the fair value of the Exit Term Loan.

**C.    FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS**

**1.    Consequences to Holders of Claims**

Pursuant to the Plan, Holders of Class A-1, B-1, and C-1 DIP Agreement Claims will surrender such Claims for their Pro Rata share of the Exit Term Loan. This should be treated as a taxable exchange under Section 1001 of the IRC. Accordingly, Holders of such Claims should recognize gain or loss equal to the difference between: (a) the Holder's adjusted basis in such Claims, and (b) the stated principal amount of the share of the Exit Term Loan received, assuming that neither the Claims nor the Exit Term Loan are viewed as publicly traded for tax purposes. Such gain or loss should be capital in nature so long as such Claims are held as capital assets (subject to the "market discount" rules described below) and should be long term capital gain or loss if such Claims were held for more than one year. To the extent that a portion of the Exit Term Loan received is allocable to accrued but untaxed interest, the Holder may recognize ordinary income. See "Accrued But Untaxed Interest" below.

Pursuant to the Plan, Holders of Class B-2 Mezzanine Loan Claims will surrender such Claims for their Pro Rata share of the New Class A Preferred Units. This should be treated as a taxable exchange under Section 1001 of the IRC. Accordingly, Holders of such Claims should recognize gain or loss equal to the difference between: (a) the Holder's adjusted basis in such Claims, and (b) the fair market value of the New Class A Preferred Units received. Such gain or loss should be capital in nature so long as such Claims are held as capital assets (subject to the "market discount" rules described below) and should be long term capital gain or loss if such Claims were held for more than one year. To the extent that a portion of the New Class A Preferred Units received is allocable to accrued but untaxed interest (including any accrued original issue discount), the Holder may recognize ordinary income. See "Accrued But Untaxed Interest" below

Case 09-06065-BHL-11    Doc 1968    Filed 05/05/11    EOD 05/05/11 16:03:56    Pg 73 of 87

Pursuant to the Plan, Class A-2 LIP Guaranty Claims, Class A-6 General Unsecured Claims, Class B-5 Other Secured Claims, Class B-6 LIP D Guaranty Claims, Class B-7 General Unsecured Claims, Class C-4 Secured Claims, Class C-5 LIP I Guaranty Claims, and Class C-6 General Unsecured Claims will be reinstated or surrendered for Cash. To the extent that such Claims are surrendered for Cash, such exchange will be treated as a taxable exchange under Section 1001 of the IRC. Accordingly, Holders of such Claims should recognize gain or loss equal to the difference between: (a) the amount of any Cash received in exchange for such Claims; and (b) the Holder's adjusted basis, if any, in such Claims. Such gain or loss should be capital in nature so long as such Claims are held as capital assets (subject to the "market discount" rules described below) and should be long term capital gain or loss if such Claims were held for more than one year. To the extent that a portion of the Cash received in exchange for such Claims is allocable to accrued but untaxed interest, the Holder may recognize ordinary income. See "Accrued But Untaxed Interest" below.

<p style="padding-left:2em">a)    <u>Accrued But Untaxed Interest</u></p>

To the extent that any amount received under the Plan by a Holder is attributable to accrued but untaxed interest, such amount should be taxable to the Holder as ordinary interest income, if such accrued interest has not been previously included in the Holder's gross income for U.S. federal income tax purposes. Conversely, a Holder may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for bad debts) to the extent that any accrued interest was previously included in the Holder's gross income but was not paid in full by Debtors.

The extent to which amounts received by a Holder will be attributable to accrued but untaxed interest is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be treated as first satisfying an amount equal to the stated principal amount of the Allowed Claim for such Holders and any remaining consideration as satisfying accrued, but unpaid, interest, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a bankruptcy plan is binding for U.S. federal income tax purposes. However, the IRS could take the position that the consideration received by a Holder should be allocated in some way other than as provided in the Plan. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

<p style="padding-left:2em">b)    <u>Market Discount</u></p>

Holders who exchange Claims for Cash may be affected by the "market discount" provisions of the sections 1276 through 1278 of the IRC. Under these rules, some or all of the gain realized by a Holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on such Claims.

In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition. However, a debt obligation will not be a "market discount bond" if such excess is less than a statutory de minimis amount (equal to 0.25 percent of the debt obligation's stated redemption price at maturity or revised issue price, in the case of a debt obligation issued with original issue discount).

Any gain recognized by a Holder on the taxable disposition of Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claims were considered to be held by a Holder (unless the Holder elected to include market discount in income as it accrued).

**2.      Information Reporting and Backup Withholding**

Under the backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact, or (b) provides a

71

correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income.  Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax.

The Debtors will withhold all amounts required by law to be withheld from payments made under the Plan. The Debtors will comply with all applicable reporting requirements of the IRC and Treasury Regulations.

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

**D.     RESERVATION OF RIGHTS**

This tax section is subject to change (possibly substantially) based on subsequent changes to other provisions of the Plan.  The Debtors and their advisors reserve the right to further modify, revise or supplement this Section X and the other tax related sections of the Plan prior to the date by which objections to Confirmation of the Plan must be filed and served.

K&E 15956155

## X.  GLOSSARY OF DEFINED TERMS

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan; (e) unless otherwise stated, the words ''herein,'' "hereof" and ''hereto'' refer to the Disclosure Statement in its entirety rather than to a particular portion of the Disclosure Statement; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the state of New York, without giving effect to the principles of conflict of laws thereof.

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.      "*Accrued Professional Compensation*" means, at any given moment, all accrued fees and expenses (including success fees) for services rendered by a Professional through and including the Confirmation Date, to the extent such fees and expenses have not been paid pursuant to the Interim Compensation Orders or other order of the Bankruptcy Court and regardless of whether a fee application has been Filed for such fees and expenses.  To the extent the Bankruptcy Court or any higher court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall no longer constitute Accrued Professional Compensation.

2.      "*Administrative Claim*" means a Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) compensation for legal, financial advisory, and other services and reimbursement of expenses Allowed pursuant to sections 328, 330(a), or 331 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date; (c) all fees and charges assessed against the Estates pursuant to chapter 123 of the Judicial Code; and (d) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

3.      "*Administrative Claims Bar Date*" means the first Business Day that is 90 days following the Effective Date, except as otherwise provided in the Plan.

4.      "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

5.      "*Allowed*" means with respect to Claims: (a) any Claim proof of which is timely Filed (or for which Claim under the Plan, the Bankruptcy Code, or Final Order of the Bankruptcy Court a Proof of Claim is or shall not be required to be Filed); (b) any Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; or (c) any Claim Allowed pursuant to the

Plan; provided, however, that with respect to any Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to any Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed for voting purposes only by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

6.      "*Avoidance Actions*" means any and all Claims for relief of the Debtors under Chapter 5 of the Bankruptcy Code, but excluding any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

7.      "*Ballots*" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process, and which must be actually received on or before the Voting Deadline.

8.      "Balloting Report" means the tabulation of Ballots pursuant to Local Bankruptcy Rule B-3018-1(b)(2).

9.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as applicable to the Chapter 11 Cases.

10.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Indiana having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 and/or the order of the United States District Court for the Southern District of Indiana, the United States District Court for the Southern District of Indiana.

11.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

12.      "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

13.      "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

14.      "*Cash Collateral Orders*" means collectively the interim and final orders authorizing the Debtors' use of cash collateral held by M&I Marshall & Ilsley Bank to secure that certain Credit Agreement, dated as of November 27, 2007, by and between LIP Development, LLC and M&I Marshall & Ilsley Bank as successor in interest to First Indiana Bank, N.A [Docket Nos. 90, 340].

15.      "*Causes of Action*" means any Claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  Cause of Action also includes: (a) any right of setoff, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any state law fraudulent transfer claim; and (f) any claim listed in the Plan Supplement; but excluding any Avoidance Actions.

16.     "*Certificate*" means any instrument evidencing a Claim or an Equity Interest.

17.     "*Chapter 11 Cases*" means the chapter 11 cases pending for the Debtors under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

18.     "*Claim*" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

19.     "*Claims Bar Date*" means, as applicable:  (a) the General Bar Date; (b) the Government Claims Bar Date; (c) the Administrative Claims Bar Date; or (d) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for filing such Claims.

20.     "*Claims Objection Bar Date*" means, as applicable, the latest of:  (a) 180 days after the Effective Date; or (b) such later period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors.

21.     "*Claims Register*" means the official register of Claims.

22.     "*Class*" means a category of Holders of Claims or Equity Interests as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

23.     "*Committee*" or "*Committees*" means any official committee (and any and all subcommittees thereof) appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

24.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to all conditions specified in Article IX.A of the Plan having been:  (a) satisfied; or (b) waived pursuant to Article IX.C of the Plan

25.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

26.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court on Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

27.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

28.     "*Consummation*" means the occurrence of the Effective Date.

29.     "*D&O Liability Insurance Policies*" means all insurance policies for directors', managers', and officers' liability maintained by the Debtors as of the Petition Date.

30.     "*Debtor*" means one of the Debtors, in its individual capacity as a debtor and as a debtor in possession in the Chapter 11 Cases.

31.     "*Debtor Release*" means the release given by the Debtors to the Debtor Releasees as set forth in Article VII.B of the Plan.

32.     "*Debtor Releasee*" means, collectively, (a) all current and former officers, directors, managers, and employees of the Debtors; (b) all attorneys, financial advisors, advisors, accountants, investment bankers, investment advisors, actuaries, professionals, and affiliates of the Debtors, their subsidiaries, and each of their respective predecessors and successors in interest, and all of their respective current and former members (including *ex officio* members), officers, directors, employees, partners, attorneys, financial advisors, accountants, managed funds, investment bankers, investment advisors, actuaries, professionals, and affiliates, each in their respective capacities as such; and (c) the DIP Lender; provided, however, that no Non-Released Party will be a Debtor Releasee.

K&E 15956155

33.    "*Debtors*" means, collectively, Lauth Investment Properties, LLC, LIP Development, LLC, and LIP Investment, LLC.

34.    "*Debtors in Possession*" means the Debtors, as debtors in possession in the Chapter 11 Cases, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

35.    "*DIP Credit Agreement*s" means, collectively, (a) the Secured Debtor-In-Possession Credit and Security Agreement, dated as of August 25, 2009, by and between the DIP Lender and the Debtors, as the same may be amended, modified, ratified, extended, renewed, restated, or replaced and (b) the Second Secured Debtor-In-Possession Credit and Security Agreement, dated as of June 3, 2010, by and between the DIP Lender and the Debtors, as the same may be amended, modified, ratified, extended, renewed, restated, or replaced.

36.    "*DIP Credit Agreement Claim*" means any Claim arising under or related to the DIP Credit Agreements.

37.    "*DIP Lender*" means LIP Lenders, LLC.

38.    "*Disbursing Agent*" means the Reorganized Debtors, or the Entity or Entities chosen by the Reorganized Debtors to make or facilitate distributions pursuant to the Plan.

39.    "*Disclosure Statement*" means the *Disclosure Statement for the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, dated March 14, 2011, as amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law.

40.    "*Disputed*" means, with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

41.    "*Effective Date*" means the date selected by the Debtors that is a Business Day after the Confirmation Date on which the conditions as specified in the Plan, including Article IX.B of the Plan, have been satisfied or waived.  Unless otherwise specifically provided in the Plan, any of the documents contained in the Plan Supplement, or the DIP Credit Agreement, anything required to be done by the Debtors on the Effective Date may be done on the Effective Date or as soon as reasonably practicable thereafter.

42.    "*Entity*" means an entity as defined in section 101(15) of the Bankruptcy Code.

43.    "*Equity Interest*" means any share of common stock, preferred stock, or other instrument evidencing an ownership interest in the Debtors, whether or not transferable, and any option, warrant, or right, contractual or otherwise, to acquire any such interest in the Debtors that existed immediately prior to the Effective Date, including any Claim subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising therefrom.

44.    "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

45.    "*Exculpated Parties*" means, collectively: (a) the Debtors; (b) the Reorganized Debtors; (c) the Debtor Releasees; (d) the Third Party Releasees; and (e) all of the current and former members (including *ex officio* members), officers, directors, managers, employees, partners, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, agents, affiliates and representatives of each of the foregoing Entities (whether current or former, in each case in his, her or its capacity as such); provided, however, that no Non-Released Party will be an Exculpated Party.

46.    "*Exculpation*" means the exculpation provision set forth in Article VII.C of the Plan.

47.     *"Exit Term Loan"* means that certain secured term loan in an amount equal to the balance owed under the DIP Credit Agreement to be entered into by Reorganized LIP Investment, LLC pursuant to the agreement to be executed on or before and subject to the occurrence of the Effective Date, including any agreements, amendments, supplements or documents related thereto, on terms reasonably satisfactory to the Debtors and the DIP Lender and materially consistent with the Exit Term Loan Documents.

48.     *"Exit Term Loan Agreement"* means that certain credit agreement to be entered into as of and subject to the occurrence of the Effective Date by and among LIP Investment, LLC, as borrower, and the Exit Term Loan lenders named therein, and the parties thereto, as amended, supplemented or otherwise modified from time to time.

49.     *"Exit Term Loan Documents"* means, collectively, all related agreements, documents or instruments to be executed or delivered in connection with the Exit Term Loan, to be included as an exhibit to the Plan Supplement.

50.     *"Fee Claim"* means a Claim for Accrued Professional Compensation.

51.     *"File,"* *"Filed,"* or *"Filing"* means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

52.     *"Final Order"* means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought.

53.     *"General Bar Date"* means January 29, 1010.

54.     *"General Unsecured Claim"* means any unsecured Claim against the Debtors that is not:  (a) an Administrative Claim; (b) a Priority Tax Claim; (c) a Secured Claim; or (d) an Intercompany Claim.

55.     *"Global Settlement Agreement"* means that certain Wells Fargo Settlement Term Sheet attached to the *Motion of the Debtors For Entry of an Order Approving Global Settlement Between (A) Debtors, (B) Wells Fargo Bank and (C) Certain Guarantors*, filed on February 28, 2011 [Docket No. 1736], as such may be amended from time to time, and as approved by the Bankruptcy Court on April 6, 2011 [Docket No. 1871], along with all documents executed pursuant thereto.

56.     *"Government Claims Bar Date"* means February 25, 2010.

57.     *"Governmental Unit"* means a governmental unit as defined in section 101(27) of the Bankruptcy Code.

58.     *"Guaranty"* means any guaranty issued by the Debtors in connection with any loan or credit agreement; provided, however, that notwithstanding the classification and treatment of the LIP Guaranty Claims, the LIP I Guaranty Claims, and the LIP D Guaranty Claims, none of the guaranty obligations of any or all of the Debtors, the DIP Lender, or any other parties under the Global Settlement Agreement or under the LIP Guaranty Claims, LIP D Guaranty Claims, and the LIP I Guaranty Claims shall be affected, altered, released, discharged, or otherwise modified by the Plan or any document executed pursuant thereto, and all such guaranty obligations shall survive the Confirmation Order.

59.     *"Holder"* means any Entity holding a Claim or an Equity Interest.

60.     *"Impaired"* means any Claim or Equity Interest in an Impaired Class.

61.     "*Impaired Class*" means an impaired Class within the meaning of section 1124 of the Bankruptcy Code.

62.     "*Indemnification*" means the indemnification provision set forth in Article IV.I of the Plan.

63.     "*Indemnification Provision*" means each of the Debtors' indemnification provisions currently in place whether in the bylaws, certificates of incorporation, other formation documents, board resolutions, employment contracts, or other indemnification agreements for the current and former directors, officers, managers, employees, attorneys, other professionals and agents of the Debtors and such current and former directors', officers', and managers' respective Affiliates.

64.     "*Indemnified Parties*" means, collectively, the Debtors and their respective current and former officers, directors, managers, and employees, each in their respective capacities as such.

65.     "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor or any Claim held by an Affiliate against a Debtor.

66.     "*Interim Compensation Orders*" means orders of the Bankruptcy Court allowing Professionals to seek interim compensation in accordance with the procedures approved therein, as the same may be modified by a Bankruptcy Court order approving the retention of a specific Professional or otherwise.

67.     "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

68.     "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

69.     "*LIP Guaranty Claim*" means any Claim against Lauth Investment Properties, LLC arising from a Guaranty issued Lauth Investment Properties, LLC.

70.     "*LIP D Guaranty Claim*" means any Claim against LIP Development, LLC arising from a Guaranty issued by LIP Development, LLC.

71.     "*LIP I Guaranty Claim*" means any Claim against LIP Investment, LLC arising from a Guaranty issued LIP Investment, LLC.

72.     "*LIP Mezz Lender*" means LIP Mezz Lender, LLC.

73.     "*LIP Unsecured Claim Allocation*" means $10,000.

74.     "*LIP D Unsecured Claim Allocation*" means $10,000.

75.     "*LIP I Unsecured Claim Allocation*" means $1,000.

76.     "*Mezzanine Loan*" means that certain Mezzanine Loan Agreement by and between LIP Development, LLC and LIP Holdings, LLC and which Claim was subsequently transferred and assigned to LIP Mezz Lender pursuant to the *Order Approving Global Settlement Between the Debtors and LIP Holdings, LLC* [Docket No. 1416].

77.     "*Mezzanine Loan Claims*" means any Claim arising out of the Mezzanine Loan; it being expressly understood that any Mezzanine Loan Claim shall be consistent with the Global Settlement Agreement.

78.     "*M&I Adequate Protection Claim*" means any claim against the Debtors arising out of the Cash Collateral Orders for adequate protection.

79.     "*M&I Line of Credit*" means that certain credit agreement, dated as of November 27, 2007, by and between LIP Development, LLC, as borrower, and M&I Marshall & Ilsley Bank, as successor in interest to

First Indiana Bank, N.A., as lender, in the aggregate principal amount of not less than $15,030,966.

80.     "*M&I LOC Claim*" means any Claim against the Debtors arising out of the M&I Line of Credit.

81.     "*M&I Settlement Agreement*" means that certain settlement agreement between the Debtors and M&I Marshall & Ilsley Bank resolving all claims of M&I Marshall & Ilsley Bank against the Debtors to be filed prior to the Confirmation Date.

82.     "*M&I Settlement Collateral*" means the land collateral securing the M&I Line of Credit and the land collateral securing the adequate protection obligations under the Cash Collateral Orders, which includes the land owned by Edgewater Park Partners, LLC, JC Medical Partners, LLC, Parcland Park Partners, LLC, Riverview Park Partners, LLC, Southgate Park Partners, LLC, and Whitestone Medical Partners Two, LP.

83.     "*New Class A Preferred Units*" means the Class A preferred units of equity in Reorganized LIP Investment, LLC to be authorized, issued, or reserved on the Effective Date pursuant to the Plan.

84.     "*Non-Released Parties*" means those Entities identified in the Plan Supplement as Non-Released Parties.

85.     "*Other Secured Claim*" means any secured Claim, other than (a) a DIP Agreement Claim and (b) a M&I LOC Claim.

86.     "*Person*" means a person as defined in section 101(41) of the Bankruptcy Code.

87.     "*Petition Date*" means May 1, 2009, the date on which the Debtors Filed their voluntary petitions for relief commencing the Chapter 11 Cases in the Bankruptcy Court.

88.     "*Plan*" means this *Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, as amended, supplemented, or modified from time to time, including the Plan Supplement, which is incorporated herein by reference.

89.     "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed prior to the Confirmation Hearing, as amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules, including, (a) a schedule of Causes of Action to be retained by the Reorganized Debtors, (b) the Exit Term Loan Documents, (c) the Amended M&I Line of Credit Documents and (d) the form of the New Class A Preferred Units.

90.     "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

91.     "*Priority Tax Claims Bar Date*" means the first Business Day that is 180 days after the Effective Date.

92.     "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

93.     "*Professional*" means an Entity:  (a) retained pursuant to a Final Order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 363, and 331 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

94.     "*Professional Fee Escrow Account*" means an interest-bearing account in an amount equal to the Professional Fee Reserve Amount funded and maintained by the Reorganized Debtors on and after the

Effective Date solely for the purpose of paying all Allowed and unpaid Fee Claims.

95.     "*Professional Fee Reserve Amount*" means the aggregate Accrued Professional Compensation through the Confirmation Date as estimated by the Professionals in accordance with Article VIII.B of the Plan.

96.     "*Profits Interests*" means profits interests in Lauth Investment Properties, LLC.

97.     "*Project Entities*" means all indirect and direct subsidiaries of LIP Investment, LLC.

98.     "*Proof of Claim*" means a proof of Claim Filed against the Debtors in the Chapter 11 Cases.

99.     "*Record Date*" means the close of business on April 22, 2011.

100.    "*Releasing Parties*" means, collectively: (a) the DIP Lender; and (b) all Holders of Claims or Equity Interests except Holders of any Claims or Equity Interests: (x) who vote to reject the Plan; (y) who are in a Class that is deemed to accept the Plan; or (z) who are in a Class that is deemed to reject the Plan.

101.    "*Reorganized Debtors*" means the Debtors or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

102.    "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

103.    "*Secured*" means when referring to a Claim:  (a) secured by a Lien on property in which the Estates have an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estates, interest in such property, or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan as a Secured Claim.

104.    "*Secured Claim*" means a Claim that is Secured.

105.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, or any similar federal, state, or local law.

106.    "*Securities Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78nn, as amended.

107.    "*Swap Agreements*" means interest rate swaps entered into under ISDA Master Agreements.

108.    "*Swap Agreements Claim*" means any Claim against Lauth Investment Properties, LLC by counterparties to Swap Agreements.

109.    "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests, a Claim or an Equity Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

110.    "*Voting Deadline*" means 5:00 p.m. (prevailing Eastern Time) on May 13, 2011.

111.    "*Wells Fargo*" means Wells Fargo Bank, National Association.

**XI.**
**CONCLUSION AND RECOMMENDATION**

We believe that confirmation of the Plan is preferable to the alternatives described above because it provides the greatest distributions and opportunity for distributions to certain Holders of Claims against the Debtors. In addition, any alternative to confirmation of the Plan could result in extensive delays and increased administrative expenses.

Accordingly, we urge all Holders of Claims entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they are received no later than 5:00 p.m. prevailing Eastern Time on May 13, 2011.

K&E 15956155

Dated:  April 28, 2011

Respectfully submitted,

LAUTH INVESTMENT PROPERTIES, LLC, et al.

/s/ Robert L. Lauth, Jr.

Name:    Robert L. Lauth, Jr.

Its:        Chairman & Chief Executive Officer

Prepared By:

James A. Stempel (admitted *pro hac vice*)          Jerald I. Ancel
Ross M. Kwasteniet (admitted *pro hac vice*)       Jeffrey J. Graham
Arun K. Kurichety (admitted *pro hac vice*)         TAFT STETTINIUS & HOLLISTER LLP
KIRKLAND & ELLIS LLP                                       One Indiana Square, Suite 3500
300 North LaSalle Drive                                       Indianapolis, Indiana  46204
Chicago, Illinois  60654-3406                               Telephone:      (317) 713-3500
Telephone:   (312) 862-2000                               Facsimile:      (317) 713-3699
Facsimile:    (312) 862-2200

Co-Counsel to the Debtors

**<u>Exhibit A</u>**

Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code

[See Attached]

K&E 15956155

**<u>Exhibit B</u>**

Disclosure Statement Order

[See Attached]

1

**Exhibit C**

CORPORATE STRUCTURE CHART AS OF PETITION DATE

K&E 15956155