AMENDED AND RESTATED
CREDIT AND SECURITY AGREEMENT

Dated as of _____ ___, 2011

LIP INVESTMENT, LLC, as the Borrower,

LIP DEVELOPMENT, LLC
and
LAUTH INVESTMENT PROPERTIES, LLC, as Guarantors

and

LIP LENDERS, LLC, as the Lender

**Exhibit A**

AMENDED AND RESTATED
CREDIT AND SECURITY AGREEMENT

This AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT (this "Credit Agreement") is entered into as of _____ ___, 2011, by and among LIP INVESTMENT, LLC, a Delaware limited liability company (the "Borrower"), LIP DEVELOPMENT, LLC, a Delaware limited liability company ("Development"), and LAUTH INVESTMENT PROPERTIES, LLC, an Indiana limited liability company ("Lauth Investment"; Development and Lauth Investment are referred to collectively as "Guarantors" and individually as "Guarantor"), and LIP LENDERS, LLC, an Indiana limited liability company (the "Lender").

PRELIMINARY STATEMENTS

1.       On May 1, 2009 (the "Petition Date"), the Borrower and Guarantors respectively filed voluntary petitions for relief in the United States Bankruptcy Court for the Southern District of Indiana (such court, together with any other court having jurisdiction over the Cases from time to time, the "Bankruptcy Court"), and commenced their bankruptcy cases, jointly administered, (the "Cases"), under Chapter 11 of the Bankruptcy Code (as hereinafter defined).

2.       On July 21, 2009, the Borrower and Guarantors, as debtors-in-possession, filed a motion requesting interim and final authorization to enter into a postpetition secured financing facility (the "First DIP Facility"). The Bankruptcy Court granted interim and final relief to enter into the First DIP Facility (collectively, the "First DIP Orders"). Pursuant to the First DIP Orders, the Borrower and Guarantors, as debtors-in-possession, received authority to enter into that certain Secured Debtor-In-Possession Credit and Security Agreement, dated as of August 25, 2009, by and between Lender as the "DIP Lender," LIP Investment, LLC, as borrower, and Lauth Investment Properties, LLC and LIP Development, LLC as guarantors (as amended, modified, ratified, extended, renewed, restated or replaced, the "First DIP Credit Agreement"). Pursuant to the First DIP Credit Agreement, the Lender, as DIP Lender, agreed to provide a term loan up to an aggregate principal amount of $15,000,000 on a final basis subject to the terms and conditions of the First DIP Credit Agreement.

3.       Requiring additional liquidity, Borrower and Guarantors, as debtors-in-possession, filed a motion requesting authorization to increase the commitment under the First DIP Facility by an additional $2,000,000 such that the total commitment amount would equal $17,000,000 subject to the terms and conditions of the First DIP Credit Agreement. In addition, Borrower and Guarantors, as debtors-in-possession, sought to enter into that certain Second Secured Debtor-In-Possession Credit and Security Agreement, dated as of June 3, 2010, by and between Lender, as DIP Lender, LIP Investment, LLC, as borrower, and Lauth Investment Properties, LLC and LIP Development, LLC, as guarantors (as amended, modified, ratified, extended, renewed, restated or replaced, the "Second DIP Credit Agreement"). The Bankruptcy Court granted interim and final relief for the increased commitment under the First DIP Facility and authorization for the Borrower and Guarantors, as debtors-in-possession, to enter into the Second DIP Credit Agreement (the "Second DIP Orders"). Pursuant to the Second DIP Credit Agreement, the Lender, as DIP Lender, agreed to provide a term loan to Borrower, as a debtor-in-possession, up to an aggregate principal amount of $8,000,000 on a final basis subject to the terms and conditions of the Second DIP Credit Agreement (the "Second DIP Facility"). (Hereafter, the First DIP Credit

Agreement and Second DIP Credit Agreement sometimes may be referred to as the "DIP Credit Agreements"; and the First DIP Facility and Second DIP Facility sometimes may be referred to as the "DIP Facilities.")

4.    On _____, 2011 (the "Confirmation Date"), the Bankruptcy Court entered an Order (the "Confirmation Order") confirming that certain Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code (the "Chapter 11 Plan") filed in the Cases.

5.    As of the filing of the Chapter 11 Plan, the DIP Facilities mature on the earlier of (a) June 30, 2011, and (b) the effective date of the confirmed Chapter 11 Plan.  Under the terms of the Chapter 11 Plan, among other things, the equity interests in Borrower, as debtor-in-possession, and Guarantors, as debtors-in-possession, are reinstated, in the Borrower and Guarantors, to their respective equity interests immediately prior to the filing of the Cases.

6.    Under the terms of the Chapter 11 Plan and as approved in the Confirmation Order, on the Confirmation Date, Borrower and Guarantors, as "Reorganized Debtors" (as defined in the Chapter 11 Plan), will enter into a secured term loan in an amount equal to the balance owed Lender under the DIP Credit Agreements on terms satisfactory to the Borrower and Guarantors, as debtors-in-possession, and the Lender, as DIP Lender (the "Exit Term Loan").

7.    This Credit Agreement and all related agreements, documents, and instruments to be executed or delivered in connection with the Exit Term Loan collectively are the "Exit Term Loan Documents" as contemplated in the Chapter 11 Plan, and constitute the Exit Term Loan.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

ARTICLE I

DEFINITIONS AND ACCOUNTING TERMS

1.01    Defined Terms. As used in this Credit Agreement, the following terms shall have the meanings set forth below:

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.  "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.  Without limiting the generality of the foregoing, a Person shall be deemed to be Controlled by another Person if such other Person possesses, directly or indirectly, power to vote 10% or more of the securities having ordinary voting power for the election of directors, managing general partners or the equivalent.

"Attorney Costs" means and includes all reasonable fees, expenses and disbursements of any law firm or other external counsel.

"Attributable Indebtedness" means, on any date, (a) in respect of any capital lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease were accounted for as a capital lease.

"Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as codified in title 11 of the United States Code, 11 U.S.C. Sections 101-1532, as now in effect or hereafter amended.

"Bankruptcy Court" has the meaning specified in Preliminary Statement 1 to this Credit Agreement.

"Base Rate" means Nine and Eighty-Six One Hundredths Percent (9.86%) per annum.

"Borrower" has the meaning specified in the introductory paragraph hereto.

"Borrower's Projections" means projected cash flow statements for the Borrower for a 13 week period  starting from a date acceptable to Lender and otherwise in a form acceptable in all respects to the Lender.

"Business Day" means any day other than a Saturday, Sunday or day on which banks in Indianapolis, Indiana or New York, New York are authorized or required by law to close.

"Cases" has the meaning specified in Preliminary Statement 1 to this Credit Agreement.

"Cash Equivalent Investments" means (i) short-term obligations of, or fully guaranteed by, the United States of America, (ii) commercial paper rated A-1 or better by Standard and Poor's Ratings Services, a division of The McGraw Hill Companies, Inc., or P-1 or better by Moody's Investors Service, Inc., (iii) demand deposit accounts maintained in the ordinary course of business, and (iv) certificates of deposit issued by and time deposits with commercial banks (whether domestic or foreign) having capital and surplus in excess of $100,000,000; *provided* in each case that the same provides for payment of both principal and interest (and not principal alone or interest alone) and is not subject to any contingency regarding the payment of principal or interest.

"Change of Control" means the occurrence of any of the following:  (a) Lauth Investment ceases to be the sole member of or ceases to own 100% of the outstanding Equity Interests of Development on a fully diluted basis; (b) Development ceases to be the sole member of or ceases to own 100% of the outstanding Equity Interests of the Borrower on a fully diluted basis, exclusive only of the "New Preferred Class A Units" received by the "Holders of an Allowed Class B-2 Mezzanine Loan Claim" as defined and provided for in the Chapter 11 Plan; (c) the manager(s) and the most senior officer of any of the Loan Parties is any Person other than Robert C. Lauth, Jr., Gregory C. Gurnik, or Lawrence B. Palmer, unless none of these individuals is serving by reason of resignation, incapacity or death of all of such named individuals; or (d) excepting only the voting rights of the New Preferred Class A Units, Development ceases to control the voting rights with respect to any of its membership interests or other Equity Interests in the Borrower.

"Chapter 11 Plan" has the meaning specified in Preliminary Statement 4 to this Credit Agreement.

"Closing" means the execution and closing of this Credit Agreement.

"Closing Date" means the first Business Day which follows the "Effective Date" of the Chapter 11 Plan (as defined in the Chapter 11 Plan), or any other date thereafter that may be agreed to in writing by the Borrower and the Lender.

"Code" means the Internal Revenue Code of 1986.

"Collateral" means all of the "Primary Collateral" and all of the other property and assets that are or are intended under the terms of the Collateral Documents to be subject to Liens in favor of the Lender.

"Collateral Documents" means, collectively, this Credit Agreement, and all other security agreements, pledge agreements or other similar agreements delivered to the Lender pursuant to Section 9.02, and each of the other agreements, instruments, supplements or documents that creates or purports to create a Lien in favor of the Lender to secure any of the Obligations.

"Commitment" means the Term Commitment.

"Compliance Certificate" means a certificate substantially in the form of Exhibit B.

"Confirmation Date" has the meaning specified in Preliminary Statement 4 to this Credit Agreement.

"Confirmation Order" has the meaning specified in Preliminary Statement 4 to this Credit Agreement.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any indenture, mortgage, deed of trust, contract, agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" has the meaning specified in the definition of "Affiliate".

"Conversion Fee" has the meaning specified in Section 2.05.

"Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means an interest rate equal to Base Rate plus 3.0% per annum.

4

"DIP Credit Agreements" has the meaning specified in Preliminary Statement 3 to this Credit Agreement.

"DIP Facilities" has the meaning specified in Preliminary Statement 3 to this Credit Agreement.

"DIP Facilities Accrued Unpaid Interest" means the aggregate sum of accrued, unpaid interest owing under the DIP Facilities to Lender as of the Closing Date, which sum as of May 31, 2011, is calculated to be in the amount of $4,319,449.00.

"Disposition" means the sale or other transfer to any Person by any Loan Party of any asset.

"Dollar" and "$" mean lawful money of the United States.

"Environmental Action" means any action, suit, demand, demand letter, claim, notice of non-compliance or violation, notice of liability or potential liability, investigation, proceeding, consent order or consent agreement relating in any way to any Environmental Law, Environmental Permit or Hazardous Materials or arising from alleged injury or threat of injury to health, safety or the environment, including, without limitation, (a) by any governmental or regulatory authority for enforcement, cleanup, removal, response, remedial or other actions or damages and (b) by any governmental or regulatory authority or any third party for damages, contribution, indemnification, cost recovery, compensation or injunctive relief.

"Environmental Laws" means any and all Federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, licenses or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, noise, air emissions and discharges to waste or public systems.

"Environmental Permit" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership, membership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership, membership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership, membership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other ownership, membership or profit interests), and all of the other ownership or profit interests in such Person (including, without limitation, partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor statute.

"Event of Default" has the meaning specified in Section 8.01.

5

"<u>Existing Indebtedness</u>" means Indebtedness of each Loan Party existing on the Closing Date.

"<u>Exit Term Loan</u>" has the meaning specified in Preliminary Statement 6 to this Credit Agreement.

"<u>Exit Term Loan Documents</u>" means, collectively, (a) this Credit Agreement, (b) the Term Note, and (c) the Collateral Documents.

"<u>FATCA</u>" means Sections 1471 through 1474 of the Code, and the U.S. Treasury Regulations and any published guidance with respect thereto.

"<u>First DIP Credit Agreement</u>" has the meaning specified in Preliminary Statement 2 to this Credit Agreement.

"<u>First DIP Facility</u>" has the meaning specified in Preliminary Statement 2 to this Credit Agreement.

"<u>First DIP Orders</u>" has the meaning specified in Preliminary Statement 2 to this Credit Agreement.

"<u>GAAP</u>" means generally accepted accounting principles in the United States in effect from time to time as applied by a significant segment of the accounting profession in the United States.

"<u>Governmental Authority</u>" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"<u>Guarantee</u>" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness of the payment or performance of such Indebtedness, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness of any other Person, whether or not such Indebtedness is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect

thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"<u>Guaranteed Obligations</u>" has the meaning specified in Section 10.01.

"<u>Guarantors</u>" means, collectively, Development and Lauth Investment, and "<u>Guarantor</u>" means either of such Guarantors, individually.

"<u>Guaranty</u>" has the meaning specified in Section 10.01.

"<u>Hazardous Materials</u>" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"<u>Indebtedness</u>" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)      all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)      all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)      net obligations of such Person under any Swap Contract;

(d)      all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and not past due for more than 90 days after the date on which each such trade payable or account payable was created);

(e)      indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)      capital leases and Synthetic Lease Obligations;

(g)      all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interests in such Person or any other Person or any warrants, rights or options to acquire such Equity Interests, valued, in the case of redeemable preferred interests, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; provided, however, that the foregoing shall not include any obligations in respect of any Equity Interest if (i) such obligations are not included as indebtedness or a liability in accordance with GAAP on the balance sheet of such Person, and (ii) such purchase, redemption, retirement or payment may not occur until after the Maturity Date; and

7

(h)    all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date. The amount of any capital lease or Synthetic Lease Obligation as of any date shall be deemed to be the amount of Attributable Indebtedness in respect thereof as of such date. The amount of Indebtedness of any Person at any date shall be the outstanding balance at such date of all unconditional obligations as described above and the maximum liability, upon the occurrence of the contingency giving rise to the obligation, of any contingent obligations at such date; provided, that the amount outstanding at any time of any Indebtedness issued with the original issue discount is the face amount of such Indebtedness less the remaining unamortized portion of the original issue discount of such Indebtedness at such time as determined in conformity with GAAP.

"Indemnitees" has the meaning specified in Section 11.05.

"Interest Payment Date" means the last Business Day of each September, December, March and June first occurring from and after the Closing, and the Maturity Date.

"Interest Rate Buy Down Payment" means the sum of $3,000,000.00 to be paid by Borrower to Lender to effect a reduction of the interest rate applicable to the Term Loan from fifteen percent (15%) per annum to the Base Rate.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of capital stock or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor incurs debt of the type referred to in clause (h) of the definition of "Indebtedness" set forth in this Section 1.01 in respect of such Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit or all or a substantial part of the business of, such Person; provided, however, that deposits made by any Loan Party in the ordinary course of business in connection with the acquisition of aircraft, airframes or engines or the entry into contracts (but excluding deposits to secure Indebtedness) shall not be considered an "Investment". For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"Laws" means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, any Governmental Authority.

"<u>Lien</u>" means any mortgage, pledge, security interest, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority, privilege or other security interest or preferential arrangement of any kind or nature whatsoever intended for security (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"<u>Loan</u>" means the Term Loan.

"<u>Loan Parties</u>" means, collectively, the Borrower and each Guarantor.

"<u>Loan Party Group</u>" means, collectively, the Loan Parties and their respective Subsidiaries.

"<u>Material Adverse Effect</u>" means (a) a material adverse effect upon the business, financial condition, operations, performance, or properties of the Borrower and the Guarantors taken as a whole; (b) a material impairment of the rights and remedies of the Lender under any Exit Term Loan Document, or of the ability of any Loan Party to perform its obligations under any Exit Term Loan Document to which it is a party; (c) a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Exit Term Loan Document to which it is a party; or (d) a material impairment of the Collateral taken as a whole.

"<u>Maturity Date</u>" means the earliest of (a) the Scheduled Maturity Date, and (b) the date of termination in whole of the Commitment, pursuant to Section 8.02(b).

"<u>Net Cash Proceeds</u>" means:  (a) with respect to the Disposition of any Collateral by the Borrower, the excess, if any, of (i) the sum of cash and Cash Equivalent Investments received in connection with such Disposition (including any cash or Cash Equivalent Investments received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount of any Indebtedness that is secured by such asset and that is required to be repaid in connection with the Disposition thereof (other than Indebtedness under the Exit Term Loan Documents), (B) the reasonable and customary out-of-pocket fees and expenses (including reasonable and customary brokerage and legal counsel fees) incurred by the Borrower in connection with such Disposition and (C) taxes reasonably estimated by the Borrower to be actually payable within one year of the date of the Disposition as a result of any gain recognized in connection therewith documented in form and substance reasonably satisfactory to the Lender; and  (b) with respect to the issuance of any capital stock or other Equity Interest by a Loan Party or the issuance of any Indebtedness by a Loan Party, the sum of the cash and Cash Equivalent Investments received in connection with such sale or issuance, less the underwriting discounts and commissions, and other out-of-pocket expenses incurred by such Loan Party in connection with such sale or issuance.

"<u>Obligated Party</u>" has the meaning specified in Section 10.03.

"<u>Obligations</u>" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under or pursuant to or in connection with any Exit Term Loan Document or otherwise with respect to the Term Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan

Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding. Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Exit Term Loan Documents include (a) the obligations to pay principal, interest, charges, expenses, fees, attorneys' fees and disbursements, indemnities and other amounts payable by the Borrower or any other Loan Party under any Exit Term Loan Document, and (b) the obligations of the Borrower or any other Loan Party to reimburse any amount in respect of any of the foregoing obligations under the Exit Term Loan Documents that the Lender, in its sole discretion, may elect to pay or advance on behalf of the Borrower.

"Organization Documents" means (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Taxes" has the meaning specified in Section 3.01(b).

"Outstanding Amount" means, as of any date, the aggregate outstanding principal amount of the Term Loan after giving effect to any Term Loan Re-Advances and prepayments or repayments of the Term Loan, occurring on such date.

"Participant" has the meaning specified in Section 11.07(b).

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning specified in Preliminary Statement 1 to this Credit Agreement.

"Pledged Equity" has the meaning specified in Section 9.01.

"Primary Collateral" has the meaning specified in Section 9.01.

"Principal Balance" shall mean the outstanding principal balance of the Term Loan.

"Qualifying Distribution" means, any distribution made to the Borrower by any Subsidiary with respect to Pledged Equity owned by the Borrower: (a) which is comprised of proceeds from, or funded by or made as the result of, any sale, financing, refinancing or similar transaction (including without limitation, transactions which generate condemnation awards, payment of title insurance proceeds or casualty loss insurance proceeds, other than business interruption or rental loss insurance proceeds) of the real estate or improvements thereon, or any part thereof, owned by a Subsidiary; or (b) is a liquidating distribution made by a Subsidiary in connection with its dissolution.

"Re-Advance Request" means a written request by the Borrower, executed by a Responsible Officer of the Borrower, requesting a Term Loan Re-Advance, and identifying therein the amount of such requested Term Loan Re-Advance and the date it is to be made. Delivery of a Re-Advance Request to the Lender is a representation and warranty by the Responsible Officer executing the Re-Advance Request for the Borrower that no Default exists and that, as of the date of such Re-Advance Request, the representations and warranties of the Borrower in Article V of this Credit Agreement are true and correct in all material respects.

"Refinancing Event" has the meaning specified in Section 2.05(c).

"Released Parties" has the meaning specified in Section 2.11.

"Releasing Parties" has the meaning specified in Section 2.11.

"Responsible Officer" means, (i) the chief executive officer, president, manager, chief financial officer, executive vice president or treasurer of a Loan Party, and (ii) with respect to each Loan Party (other than the Borrower), any person authorized by the manager or members of such Loan Party to execute documents in connection with the Exit Term Loan Documents on behalf of such Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Loan Party, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to the Borrower's members (or the equivalent Persons thereof).

"Scheduled Maturity Date" means that date which is the third anniversary of the Closing Date.

"Second DIP Credit Agreement" has the meaning specified in Preliminary Statement 3 to this Credit Agreement.

"Second DIP Orders" has the meaning specified in Preliminary Statement 3 to this Credit Agreement.

"Second DIP Facility" has the meaning specified in Preliminary Statement 3 to this Credit Agreement.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise

11

specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts.

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or lease in which the lessee is contractually entitled to the tax benefits of ownership of the leased assets, or (b) an agreement for the use or possession of property creating obligations that do not appear on the balance sheet of such Person but which, upon the insolvency or bankruptcy of such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" has the meaning specified in Section 3.01(a).

"Term Commitment" means, the Lender's obligation to make the Term Loan to the Borrower pursuant to Section 2.01.

"Term Loan" means the Term Loan made by the Lender pursuant to Section 2.01 and evidenced by the Term Note.

"Term Loan Re-Advances" has the meaning specified in Section 2.01.

"Term Note" means a promissory note of the Borrower payable to the order of the Lender, in substantially the form of Exhibit A, evidencing the aggregate Indebtedness of the Borrower to the Lender with respect to the Term Loan, as the same may be amended, restated or replaced from time to time.

"United States" and "U.S." mean the United States of America.

1.02    Other Interpretive Provisions.  With reference to this Credit Agreement and each other Exit Term Loan Document, unless otherwise specified herein or in such other Exit Term Loan Document:

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b) (i)  The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Exit Term Loan Document shall refer to such Exit Term Loan Document as a whole and not to any particular provision thereof.

(ii)    Article, Section, Exhibit and Schedule references are to the Exit Term Loan Document in which such reference appears.

(iii)    The term "including" is by way of example and not limitation.

(iv)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(c)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including," the words "to" and "until" each mean "to but excluding," and the word "through" means "to and including."

(d)    Section headings herein and in the other Exit Term Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Credit Agreement or any other Exit Term Loan Document.

1.03    Accounting Terms.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Credit Agreement shall be prepared in conformity with, GAAP, as in effect from time to time.

1.04    References to Agreements and Laws.  Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including the Exit Term Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are not prohibited by any Exit Term Loan Document; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

1.05    Times of Day.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

# ARTICLE II

## THE COMMITMENT AND TERM LOAN

2.01    <u>The Term Loan</u>.  Subject to the terms and conditions set forth in this Credit Agreement, including in Article IV of this Credit Agreement, the Lender shall make the Term Loan to the Borrower.  The principal amount of the Term Loan shall be the sum of Twenty-Four Million Five Hundred Thousand and 00/100 Dollars ($24,500,000.00).  To the extent of the sum of principal payments made by Borrower on the Term Loan, if any, and subject to the conditions precedent set forth in Section 4.02, the Borrower shall be permitted to re-borrow up to such sum (the "<u>Term Loan Re-Advances</u>"), as may be represented by a Re-Advance Request from the Borrower submitted to the Lender from time to time. Notwithstanding anything in the Exit Term Loan Documents to the contrary, the Lender shall have no obligation to make any Term Loan Re-Advance while any unremedied Default exists or at any time on or after the Maturity Date.

2.02    <u>Prepayments</u>.

(a)    <u>Optional</u>.  The Borrower may, upon notice to the Lender, at any time or from time to time voluntarily prepay the Term Loan in whole or in part without premium or penalty; provided that (i) such notice must be received by the Lender not later than 1:00 p.m. (A) two Business Days prior to any date of any such prepayment; (ii) any prepayment of the Term Loan shall be in a minimum principal amount of $100,000 or a whole multiple of $25,000 in excess thereof; and if less, the Outstanding Amount of the Term Loan.  Each such notice shall specify the date and amount of such prepayment.  If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.

(b)    <u>Mandatory</u>.

(i)    Upon the issuance by any Loan Party of any of its capital stock or other Equity Interests to any Person other than another Loan Party or the Lender (or the receipt of any capital contribution by any Loan Party from any Person other than another Loan Party), the Borrower shall prepay an aggregate principal amount of the Term Loan equal to 100% of all Net Cash Proceeds received therefrom no later than the next Business Day following the date of receipt of the proceeds thereof.

(ii)    Upon the incurrence or issuance by any Loan Party of any Indebtedness to any Person other than another Loan Party (other than Indebtedness expressly permitted to be incurred or issued pursuant to Section 7.03(c)), the Borrower shall prepay an aggregate principal amount of the Term Loan equal to 100% of all Net Cash Proceeds received therefrom no later than the next Business Day following the date of receipt of the proceeds thereof.

(iii)    No later than the next Business Day following receipt by Borrower of proceeds of any sale or other disposition of any of the Collateral, (but excluding (A) proceeds from sales or dispositions of assets in the ordinary course of business, (B) up to $250,000 of proceeds from sales or dispositions of other assets during any four (4) fiscal quarter period), and (C) proceeds from any casualty insurance policies or eminent domain,

14

condemnation or similar proceedings), the Borrower shall prepay any aggregate principal amount of the Term Loan equal to 100% of the Net Cash Proceeds received therefrom except to the extent such proceeds from the sale of assets, casualty insurance policies, eminent domain, condemnation or similar proceeds shall be reinvested in the business of the Loan Parties within 360 days following receipt thereof.

(iv)    Upon receipt of any Qualifying Distribution with respect to any of the Pledged Equity, the Borrower shall prepay an aggregate principal amount of the Term Loan equal to 100% of such Qualifying Distribution immediately upon receipt thereof.

(c)    Prepayments to Include Accrued Interest, Etc.  All prepayments under this Section 2.02 shall be made together with accrued and unpaid interest to the date of such prepayment on the principal amount so prepaid.

2.03    Repayment of the Obligation.  The Borrower shall repay to the Lender on the Maturity Date the Outstanding Amount of the Term Loan, and all Term Loan Re-Advances, if any, all accrued unpaid interest thereon, and all other Obligations outstanding on such date.

2.04    Interest.

(a)    Interest Rate.

(i)    Subject to the provisions of subsections 2.04 (b) and (c) below, the Term Loan and Term Note shall bear interest on the outstanding principal amount thereof at a rate per annum equal to the Base Rate, until the entire outstanding principal amount has been paid in full.  All interest accrued on the Term Note since an Interest Payment Date (or, in the case of the first Interest Payment Date, the date of the Term Note) that is not paid as due on an Interest Payment Date, shall be "payable-in-kind" and added to the principal amount of the Term Note, and shall thereafter bear interest as aforesaid in subsection 2.04(a)(i).

(ii)    In addition to and notwithstanding anything to the contrary herein, the aggregate sum of Term Loan Re-Advances, if any, shall bear interest at the rate of fifteen percent (15%) per annum, payable quarterly on each Interest Payment Date after any and each Term Loan Re-Advance; any interest accrued on the Term Loan Re-Advances that is not paid as due on any Interest Payment Date, shall be "payable-in-kind" and added to the aggregate principal amount of the Term Loan Re-Advances, and shall thereafter bear interest as aforesaid in this subsection 2.04(a)(iii).

(b)    Default Rate.  Upon the occurrence and during the continuance of an Event of Default, interest shall accrue at the Default Rate and shall be payable as aforesaid and on demand and, to the extent permitted by law, any overdue payment of interest on the Term Note shall bear interest at such rate until paid in full.  Notwithstanding anything herein to the contrary, in no event shall the interest payable on the Term Note exceed the maximum rate permitted by law.

(c)    Interest Payment Dates.  Interest on the Term Loan shall be due and payable in arrears on each Interest Payment Date and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment.

2.05    Conversion Fee.   On the Closing Date, the Borrower shall pay to the Lender a fee in consideration of the conversion of the Borrower's Indebtedness and obligations under the DIP Facilities to the Indebtedness and obligations under this Exit Term Loan equal to five percent (5%) of the Term Loan (the "Conversion Fee").

2.06    Computation of Interest and Fees.   All computations of fees and interest shall be made on the basis of a 365-366 day year, as applicable, and actual days elapsed.   Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid.   Each determination by the Lender of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

2.07    Evidence of Indebtedness.   The Outstanding Amount shall be evidenced by one or more accounts or records maintained by the Lender in the ordinary course of business.   The accounts or records maintained by the Lender shall be conclusive absent manifest error of the amount of the Term Loan, and the Term Loan Re-Advances, if any, and the interest and payments thereon.   Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.

2.08    Payments Generally.

(a)    All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.   Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Lender in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein.

(b)    If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

2.09    No Priming Liens.   On the Closing Date, and for so long as any Obligations shall be outstanding, the Obligations shall be secured by a continuing first priority Lien and security interest in and to all Primary Collateral (as herein defined) of the Loan Parties, subject only to valid and perfected Liens set forth on Schedule 5.08.

2.10    Release.   The Borrower and the Guarantors each hereby acknowledge, effective as of the date of the Closing Date, that the Borrower and the Guarantors have no defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all or any part of the Borrower's or the Guarantors' liability to repay the Lender as provided in this Credit Agreement,   or to seek affirmative relief or damages of any kind or nature from the Lender.   The Borrower and the Guarantors, each in its own right and all its successors, assigns, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through it (collectively, the "Releasing Parties"), hereby fully, finally and forever release and discharge the Lender and all of its past and present officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them but only in their capacity as past and present

16

officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries of the Lender (collectively, the "Released Parties") of and from any and all past and present actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now or existing against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Credit Agreement, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to this Credit Agreement, provided, however, that nothing herein shall affect the rights of any party to the agreements to be executed in connection with the Closing.

2.11    Payment of Obligations. Upon the Maturity Date (whether by acceleration or otherwise) of any of the Obligations, Lender shall be entitled to immediate payment of such Obligations.

## ARTICLE III

## TAXES, YIELD PROTECTION AND ILLEGALITY

3.01    Taxes.

(a)    Except as otherwise provided in this Section 3.01, any and all payments by the Borrower to or for the account of the Lender under any Exit Term Loan Document shall be made free and clear of and without deduction for any and all present or future taxes, duties, levies, imposts, deductions, assessments, fees, withholdings or similar charges, and all liabilities with respect thereto, excluding, in the case of the Lender, (i) taxes imposed on or measured by its overall net income, and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the Laws of which the Lender, is organized or is otherwise a resident or doing business (other than a jurisdiction in which the Lender is deemed to be doing business solely as a result of entering into, or performing its obligations under, any Exit Term Loan Document); (ii) in the case of a Non-U.S. Participant (other than an assignee pursuant to a request by a Borrower under Section 2.12(e)), any withholding tax that is imposed on amounts payable to such Non-U.S. Participant at the time such Non-U.S. Participant becomes a party to this Agreement (or designates a new lending office) or is attributable to such Non-U.S. Participant's failure to comply with Section 2.12(f), except to the extent that such Non-U.S. Participant (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrowers with respect to such withholding tax pursuant to Section 2.12(b); and (iii) any United States federal withholding Taxes imposed by FATCA (all such non-excluded taxes, duties, levies, imposts, deductions, assessments, fees, withholdings or similar charges, and liabilities being hereinafter referred to as

17

("Taxes").  If the Borrower shall be required by any Laws to deduct any Taxes from or in respect of any sum payable under any Exit Term Loan Document, then, except as otherwise provided in this Section 3.01, (i) the sum payable shall be increased as necessary so that after making all required deductions with respect to Taxes (including deductions applicable to additional sums payable under this Section), the Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions, (iii) the Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable Laws, and (iv) within 45 days after the date of such payment, the Borrower shall furnish to the Lender the original or a certified copy of a receipt evidencing payment .thereof to the extent such a receipt is issued therefor, or other written proof of payment thereof that is reasonably satisfactory to the Lender.

(b)      In addition, the Borrower agrees to pay any and all present or future stamp, court or documentary taxes and any other excise or property, intangible, mortgage recording taxes or similar charges or similar levies which arise from any payment made under any Exit Term Loan Document or from the execution, delivery, performance, enforcement or registration of, or otherwise with respect to, any Exit Term Loan Document (hereinafter referred to as "Other Taxes").

(c)      If the Borrower shall be required to deduct or pay any Taxes or Other Taxes from or in respect of any sum payable under any Exit Term Loan Document to the Lender, the Borrower shall also pay to the Lender at the time interest is paid, such additional amount that the Lender specifies is necessary to preserve the after-tax yield (after factoring in all taxes, including taxes imposed on or measured by net income) that the Lender would have received if such Taxes or Other Taxes had not been imposed.

(d)      The Borrower agrees to indemnify the Lender for (i) the full amount of Taxes and Other Taxes (including any Taxes or Other Taxes imposed or asserted by any jurisdiction on amounts payable under this Section) paid by the Lender, (ii) amounts payable under Section 3.01(c) without duplication and (iii) any liability (including additions to tax, penalties, interest and expenses) arising therefrom or with respect thereto, in each case whether or not such Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority; but excluding amounts resulting from the failure to comply with the requirements of Section 11.05.  Payment under this subsection (d) shall be made within 30 days after the date the Lender makes a demand therefor.

(e)      If the Lender determines, in its sole discretion, that is has actually received or realized any refund of tax, any reduction of, or credit against, its withholding or payment of any additional amount by the Borrower pursuant to this Section 3.01, the Lender shall reimburse the Borrower in an amount equal to the net benefit, after tax, and net of all expenses incurred by the Lender in connection with such refund, reduction, credit or recovery; provided that nothing in this Section 3.01(e) shall require the Lender to make available its tax returns (or any other information relating to its taxes which it deems to be confidential or interfere with the Lender's right to arrange its tax affairs in whatever manner it deems fit or to obligate the Lender to claim any credit).  The Borrower shall return such amount to the Lender in the event that such Person is required to repay such refund of tax or is not entitled to such reduction of, or credit against its tax liabilities.

(f)     To the extent permitted by applicable law, any assignee Lender that is not a United States person within the meaning of Code section 7701(a)(30) (a "Non-U.S. Participant") shall deliver to the Borrower on the date of such assignment to such Lender) two accurate and complete original signed copies of IRS Form W-8BEN, W-8ECI, or W-8IMY (or any successor or other applicable form prescribed by the IRS) certifying to such Lender's entitlement to a complete exemption from, or a reduced rate in, United States withholding tax on interest payments to be made hereunder or any Term Loan.  If a Lender that is a Non-U.S. Participant is claiming a complete exemption from withholding on interest pursuant to Sections 871(h) or 881(c) of the Code, such Lender shall deliver (along with two accurate and complete original signed copies of IRS Form W-8BEN) a certificate in form and substance reasonably acceptable to the Borrower (any such certificate, a "Withholding Certificate").  If a payment made to Lender hereunder would be subject to U.S. federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower, at the time or times prescribed by law and at such time or times reasonably requested by the Borrower, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower as may be necessary for the Borrower to comply with its obligations under FATCA, to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.   Any Lender that is not a Non-U.S. Participant (other than any such Lender which is taxed as a corporation for U.S. federal income tax purposes) shall provide two properly completed and duly executed copies of IRS Form W-9 (or any successor or other applicable form) to the Borrower certifying that such Lender is exempt from United States backup withholding tax.

3.02     <u>Matters Applicable to All Requests for Compensation</u>.  A certificate of the Lender claiming compensation under this Article III and setting forth the additional amount or amounts to be paid to it hereunder and the basis therefor shall be conclusive in the absence of manifest error.  In determining such amount, the Lender may use any reasonable averaging and attribution methods.

3.03     <u>Survival</u>.  All of the Borrower's obligations under this Article III shall survive termination of the Commitment and repayment of all other Obligations hereunder.

ARTICLE IV

CONDITIONS PRECEDENT TO TERM LOAN RE-ADVANCES

4.01     <u>Conditions to Closing</u>.  This Credit Agreement shall become effective, and the obligation of the Lender to make the Term Loan and fund Term Loan Re-Advances shall become effective, on and as of the first date on which all of the following conditions precedent shall have been satisfied or waived by the Lender:

(a)     The Lender's receipt of the following, each of which shall be originals or telecopies,  facsimiles or electronically delivered PDF copies (followed promptly by originals) unless otherwise specified in this Article IV, each properly executed by a Responsible Officer of

the signing Loan Party, and each in form and substance reasonably satisfactory to the Lender and its respective legal counsel:

(i)     counterparts of this Credit Agreement, sufficient in number for distribution to the Lender and the Borrower, duly executed by the appropriate Loan Parties;

(ii)    the Term Note duly executed by the Borrower;

(iii)   a copy of the Confirmation Order certified by the clerk of the Bankruptcy Court, which Confirmation Order shall be in the form acceptable to the Lender and shall not have been reversed, amended, supplemented, modified, stayed or vacated in any respect which is not acceptable to the Lender;

(iv)    such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Lender may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Credit Agreement and the other Exit Term Loan Documents to which such Loan Party is a party or is to be a party;

(v)     a certificate of a Responsible Officer of each Loan Party either (A) listing all consents, licenses and approvals required in connection with the execution, delivery and performance by such Loan Party and the validity against such Loan Party of the Exit Term Loan Documents to which it is a party, and such consents, licenses and approvals shall be in full force and effect, or (B) stating that no such consents, licenses or approvals are so required;

(vi)    such documents and certifications as the Lender may reasonably require to evidence that each Loan Party is duly organized or formed, and that each of the Loan Parties is validly existing and in good standing in its jurisdiction of organization; and

(vii)   a favorable opinion of counsel to the Loan Parties, addressed to the Lender, in the form and substance acceptable to the Lender and its counsel.

(b)     The Lender shall have received the Borrower's Projections and shall have determined in the Lender's sole and independent judgment that they are reasonable, are based on reasonable assumptions and reflect future financial performance, cash flows and financial conditions which are adequate in the Lender's sole and independent judgment to allow it to make the Term Loan.

(c)     The "Commitment Fees" owing to Lender (as defined, respectively, in the DIP Credit Agreements and approved in the First DIP Orders and Second DIP Orders), aggregating the sum of $1,225,000.00, shall have been paid.

(d)     The DIP Facilities Accrued Unpaid Interest shall have been paid.

(e)     The Conversion Fee shall have been paid.

BDDB01 6638031v6

(f)     The Interest Rate Buy Down Payment shall have been paid.

(g)     The Closing Date shall have occurred and no Default shall exist.

(h)     The completion of searches for existing Liens on the Collateral and the Lender shall have a valid and perfected first and senior priority Lien on and security interest in the Collateral.

(i)     The Lender shall have been paid by the Borrower all amounts then due it pursuant to Section 11.04.

4.02    <u>Conditions to Each Term Loan Re-Advance</u>.  The obligation of the Lender to fund any and each Term Loan Re-Advance shall be at the sole discretion of Lender, and in all events, subject to each of the following conditions precedent, each of which shall have been satisfied or waived by the Lender as of the date of each such Term Loan Re-Advance:

(a)     The Outstanding Amount shall be less than the sum of $24,500,000, and the amount of the requested amount of the Term Loan Re-Advance, plus the then Outstanding Amount, shall not exceed the sum of $24,500,000.

(b)     No event or circumstance shall have occurred that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)     No Event of Default shall have occurred and be continuing.

(d)     The representations and warranties of the Borrower and each other Loan Party contained in Article V or any other Exit Term Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects on and as of the date of such Term Loan Re-Advance, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date, and except that for purposes of this Section 4.02, the representations and warranties contained in subsections (a) and (b) of Section 5.05 shall be deemed to refer to the most recent statements furnished pursuant to clause (a) of Section 6.01.

(d)     The Lender shall have been paid by the Borrower all amounts then due it pursuant to or under Section 11.04.

ARTICLE V

REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Lender that as of the Closing Date:

5.01    <u>Existence, Qualification and Power; Compliance with Laws</u>.  Each Loan Party (a) is a limited liability company duly organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its organization, (b)  has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Exit

Term Loan Documents, and (c) is duly qualified and is licensed and in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (b)(i) or to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

5.02    Authorization; No Contravention.  The execution, delivery and performance by each Loan Party of each Exit Term Loan Document to which such Person is or is to be a party are within such Loan Party's limited liability company powers, have been duly authorized by all necessary organizational action, and do not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any material  breach or contravention of, or the creation of any Lien under, or require any payment to be made under (i) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (c) violate any Law.  No Loan Party is in breach of any such Contractual Obligation, the breach of which could be reasonably likely to have a Material Adverse Effect.

5.03    Governmental Authorization; Other Consents.  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (i) the execution, delivery or performance by, or enforcement against, any Loan Party of this Credit Agreement or any other Exit Term Loan Document, (ii) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents or (iii) the perfection or maintenance of the Liens created under the Collateral Documents, except in each case for such consents, exemptions, authorizations, approvals, actions, notices and filings listed on Schedule 5.03 hereto, each of which has been obtained, taken, given or made and is in full force and effect other than those which the failure to so obtain would not reasonably be expected to result in a Material Adverse Effect.  All applicable waiting periods in connection with the Transaction have expired without any action having been taken by any Governmental Authority restraining, preventing or imposing materially adverse conditions upon the Transaction or the rights of the Loan Parties freely to transfer or otherwise dispose of, or to create any Lien on, any properties now owned or hereafter acquired by any of them.

5.04    Binding Effect.  This Credit Agreement has been, and each other Exit Term Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Loan Party that is party thereto.  This Credit Agreement constitutes, and each other Exit Term Loan Document when so delivered will constitute a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms.

5.05    Financial Statements; No Material Adverse Effect.

(a)    The unaudited financial statements of Borrower, dated March 31, 2011, and the related statements of income or operations, member equity and cash flows for the fiscal month ended on that date (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present the financial condition of Borrower as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.

(b)      Since the Closing Date there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

(c)      The Borrower's Projections delivered to the Lender in connection with this Credit Agreement were prepared in good faith on the basis of the assumptions stated therein, which assumptions were fair in light of the conditions existing at the time of delivery of such forecasts, and represented, at the time of delivery, the Borrower's best estimate of its future financial performance, it being agreed and understood that the Borrower's Projections are not to be viewed as facts, are subject to significant uncertainties and contingencies, many of which are beyond the Borrower's and the other Loan Parties' control, that no assurance can be given that Borrower's Projections will be realized, that actual results during the period or periods covered by the Borrower's Projections may differ from Borrower's Projections and that the difference may be material.

5.06      <u>Litigation</u>.  There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower after due and diligent investigation, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against the Borrower, the Guarantors or any of their respective Subsidiaries or against any of their properties or revenues that either individually or in the aggregate could reasonably be expected to have a Material Adverse Effect, except as set forth on <u>Schedule 5.06</u>.  The performance of any action by any Loan Party required or contemplated by any of the Exit Term Loan Documents is not restrained or enjoined (either temporarily, preliminary or permanently).  There are no actions, suits or proceedings pending that challenge the validity of any Exit Term Loan Document or the applicability or enforceability of any Exit Term Loan Document or any of the Orders or which seek to void, avoid, limit, or otherwise adversely affect the security interest created by or in any Exit Term Loan Document or any of the Orders or any payment made pursuant thereto.

5.07      <u>No Default</u>.  Neither the Borrower nor any other Loan Party is in default under or with respect to, or a party to, any Contractual Obligation that could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  No Default has occurred and is continuing or would result from the execution, delivery or performance of this Credit Agreement or any other Exit Term Loan Document or the transactions contemplated hereby or thereby.

5.08      <u>Ownership of Property</u>.  <u>Schedule 5.08</u> is a complete and accurate list of all Liens on the Collateral as of the Closing Date, showing as of the Closing Date the lien holder thereof, the principal amount of the obligations or Indebtedness secured thereby and the Collateral subject thereto.  The Collateral is subject to no Liens, other than Liens set forth on <u>Schedule 5.08</u>, and as otherwise permitted by Section 7.01.

5.09      <u>Environmental Compliance</u>.  The Loan Parties are in compliance with all existing Environmental Laws and there are no pending, or to the knowledge of the Loan Parties, threatened claims against any of the Loan Parties alleging potential liability or responsibility for violation of any Environmental Law on their respective businesses, operations and properties, excepting only such non-compliance or claims individually or in the aggregate, which reasonably could not be expected to have a Material Adverse Effect on any of the Loan Parties.

5.10    Insurance.  All policies of insurance of any kind or nature owned by or issued to the Loan Parties, including, without limitation, policies of life, fire, theft, product liability, public liability, property damage, other casualty, employee fidelity, workers' compensation, employee health and welfare, title, property and liability insurance, are in full force and effect, are issued by financially sound and reputable insurance companies not Affiliates of the Borrower and are of a nature and provide such coverage as was maintained by the Borrower as of the Confirmation Date.

5.11    Taxes.  Except as otherwise set forth on Schedule 5.11, (a) the Loan Parties have filed all Federal, state and other material tax returns and reports required to be filed, and have paid or made adequate provision for payment of all Federal, state and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets that are due and payable, except, in each case, those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP; (b) there is no proposed tax assessment against any Loan Party that would, if made, have a Material Adverse Effect; and (c) no Loan Party is party to any tax sharing agreement with any Person other than another Loan Party, other than tax indemnity agreements in leasing transactions.

5.12    Subsidiaries; Equity Interests.  As of the Closing Date, each Loan Party has no Subsidiaries other than other Loan Parties and those Subsidiaries specifically disclosed in Schedule 5.12, and all of the outstanding Equity Interests in each of such Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by the identified Loan Party in the amounts specified on Schedule 5.12, free and clear of all Liens except those created under the Collateral Documents or Liens permitted under Sections 7.01(c) or 7.01(m).  Borrower has no equity investments in any other Person other than those specifically disclosed in Schedule 5.12.

5.13    Margin Regulations.  The Borrower is not engaged and will not engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Board of Governors of the Federal Reserve System of the United States), or extending credit for the purpose of purchasing or carrying margin stock and no proceeds of any Borrowings will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock.

5.14    Disclosure.  (a) All written information that has been made available to the Lender by the Borrower or any of its representatives in connection with the transactions contemplated hereby (other than the Borrower's Projections and pro forma information contained therein) is, taken as a whole, complete and correct in all material respects and does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not misleading in light of the circumstances under which such statements were made and (b) all financial projections, if any, that have been prepared by the Borrower and made available to the Lender have been prepared in good faith based upon assumptions that were reasonable as of the date of the preparation of such financial projections, it being understood that any such projections are not to be viewed as facts,  no assurance is given that the results forecasted in the projections will in fact be achieved and that actual results during the period or periods covered by such projections may differ from such projections (and that the difference may be material), and that the projections are subject to uncertainties and contingencies, many of which are beyond the control of the Borrower, the Parent and its Subsidiaries.

24

5.15    <u>Compliance with Laws</u>.  Each Loan Party is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

5.16    <u>Security/Priority</u>.

(a)    On and after the Closing Date, the provisions of the Exit Term Loan Documents are effective to create in favor of the Lender, legal, valid and perfected Liens on and security interests (having the priority provided for herein, subject only to Liens permitted hereunder) in all right, title and interest in the Collateral, enforceable against Borrower; and

(b)    All Obligations owing by the Borrower under the Term Loan and by the Guarantors in respect thereof will be secured by first priority Liens granted to the Lender on all of the Collateral (other than Liens permitted hereunder).

5.17    <u>Entry of the Confirmation Order</u>.  The Confirmation Order was entered by the Bankruptcy Court on the Confirmation Date and has not been stayed, amended, vacated, reversed or rescinded in any respect.  Upon the maturity (whether by the acceleration or otherwise) of any of the Obligations of the Borrower and under the other Exit Term Loan Documents, the Lender shall, subject to the provisions of Section 8.02, be entitled to immediate payment of such Obligations, and to enforce the remedies provided for hereunder.

5.18    <u>Representations and Warranties as to Collateral.</u>  (a) The Borrower's exact legal name is correctly set forth on the signature pages hereto.  The Borrower is located (within the meaning of Article 9 of the Uniform Commercial Code) in the State of Delaware.

(b)    The Borrower is the legal and beneficial owner of the Collateral free and clear of any Lien of others, except for those Liens identified on <u>Schedule 5.08</u> to this Credit Agreement and as permitted hereunder.

(c)    The Pledged Equity of any Subsidiary of the Borrower which is part of the Collateral has been duly authorized and validly issued and is fully paid and non-assessable.  The Pledged Equity of any Subsidiary of the Borrower constitutes 100% of the issued and outstanding Equity Interests of each such Subsidiary.

ARTICLE VI

AFFIRMATIVE COVENANTS

So long as the Lender shall have any Commitment hereunder, the Term Loan or other Obligations hereunder shall remain unpaid or unsatisfied (other than contingent indemnification obligations which are not then due and payable), the Borrower shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02, 6.03, 6.11 and 6.16) cause each Loan Party to:

25

6.01     Financial Statements.  Deliver to the Lender, in form and detail consistent with comparable reports delivered to the Lender or otherwise reasonably satisfactory to the Lender:

(a)     as soon as available, but in any event within 45 days after the end of each calendar quarter (setting forth in each case in comparative form the corresponding figures for the corresponding month of the preceding fiscal year, all in reasonable detail and duly certified by the Chief Executive Officer or the Chief Financial Officer of each Loan Party, or in the case of financial statements for a Subsidiary of any Loan Party, by the senior financial officer of that Subsidiary: (i) a balance sheet for each Loan Party as of the end of such month and a statement of income and a statement of cash flows for each Loan Party for the period commencing at the end of the previous month and ending with the end of such month and a statement of income and a statement of cash flows of each Loan Party for the period commencing at the end of the previous fiscal year and ending with the end of such month; (ii) a statement of revenues and expenses for each Subsidiary of each Loan Party as of the end of such month and for the period commencing at the end of the previous fiscal year and ending with the end of such month; and

(b)     concurrently with delivery to the Lender of the financial statements required pursuant to Section 6.01(a) above, a Compliance Certificate executed by a responsible Officer of each of the Loan Parties.

6.02     Certificates; Other Information.  Deliver to the Lender, in form and detail as reasonably required from time to time by the Lender:

(a)     upon written request from the Lender, as soon as available and in any event within thirty (30) days after the end of each fiscal year, a report summarizing the insurance coverages (specifying type, amount and carrier) in effect for each Loan Party and containing such additional information as the Lender may reasonably specify;

(b)     promptly upon request of the Lender, copies of all notices, requests, pleadings and other documents received by any Loan Party (and not otherwise distributed to the Lender) under or pursuant to any instrument, indenture, loan or credit or similar agreement and, from time to time upon request by the Lender, such information and reports regarding such instruments, indentures and loan and credit and similar agreements as the Lender may reasonably request;

(c)     promptly after the assertion or occurrence thereof, notice of any Environmental Action against or of any noncompliance by any Loan Party with any Environmental Law or Environmental Permit that could reasonably be expected to have a Material Adverse Effect.

(d)     as soon as reasonably practicable, such additional information regarding the business, financial or company affairs of each Loan Party or their Subsidiaries, or compliance with the terms of the Exit Term Loan Documents, as the Lender may from time to time reasonably request.

6.03     Notices.  Promptly notify the Lender:

(a)     of the occurrence of any Default;

26

(b)    of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect, including (i) breach or non-performance of, or any default under, a material Contractual Obligation of any Loan Party; (ii) any dispute, litigation, investigation, proceeding or suspension between any Loan Party and any Governmental Authority; or (iii) the commencement of, or any material development in, any litigation or proceeding affecting any Loan Party, including pursuant to any applicable Environmental Laws;

(c)    of any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary of a Loan Party; and

(d)    of the (A) occurrence of any Disposition of Collateral for which the Borrower is required to make a mandatory prepayment pursuant to Section 2.02 (subject to the reinvestment rights provided therein), (B) occurrence of any sale of capital stock or other Equity Interests for which the Borrower is required to make a mandatory prepayment pursuant to Section 2.02), (C) incurrence or issuance of any Indebtedness for which the Borrower is required to make a mandatory prepayment pursuant to Section 2.02(b).

Each notice pursuant to this Section 6.03, other than pursuant to Section 6.03(d), shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.  Each notice pursuant to Section 6.03(a) shall describe with particularity any and all provisions of this Credit Agreement and any other Exit Term Loan Document that have been breached.

6.04    Payment of Obligations.  Pay, discharge or satisfy promptly when due, but no later than within thirty (30) days after the same shall become due and payable, all its obligations and liabilities of whatever nature, including (a) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, (b) all lawful claims which, if unpaid, would by law become a Lien upon any of the Collateral; and (c) all Indebtedness, within thirty (30) days after the same shall become due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness unless, in each of (a), (b) and (c) above in this Section 6.04 the same are being contested in good faith by appropriate proceedings diligently conducted and adequate cash reserves to fully pay such payment are being maintained by the Loan Party.  Notwithstanding the foregoing provisions of this Section 6.04, no violation or breach of this affirmative covenant shall be deemed to exist or have occurred so long as at any given time the aggregate sum of unpaid, nondischarged or unsatisfied amounts under subparts (a), (b) and (c) stated immediately hereinabove does not exceed $100,000.00.

6.05    Preservation of Existence, Etc.  (a) Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization; and (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

6.06    Maintenance of Properties.  (a) Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; (b) make all necessary repairs thereto and renewals

and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) use the standard of care typical in the industry in the operation and maintenance of its facilities.

6.07   <u>Maintenance of Insurance</u>.   Keep its insurable properties insured at all times, against such risks, including fire and other risks insured against by extended coverage, as is customary with companies of the same or similar size in the same or similar businesses and which is reasonably satisfactory to the Lender; and maintain in full force and effect public liability insurance against claims for personal injury or death or property damage occurring upon, in, about or in connection with the use of any property or asset owned, occupied or controlled by the Borrower or any Loan Party, as the case may be, in such amounts (giving effect to self-insurance) and with such deductibles as are required pursuant to Section 5.10; and maintain such other insurance or self insurance as may be required by law.

6.08   <u>Compliance with Laws</u>.   Comply in all material respects with the requirements of all Laws (including, without limitation, ERISA) and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted and adequate cash or Cash Equivalent Investment reserves in accordance with GAAP are being maintained by such Loan Party or (b) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

6.09   <u>Books and Records</u>.   Maintain proper books of record and account, in which full, true and correct entries consistent with GAAP shall be made of all financial transactions and matters involving the assets and business of the Borrower, any other Loan Party or any Subsidiary of any Loan Party, as the case may be.

6.10   <u>Inspection Rights</u>.   Permit representatives, agents, advisors and independent contractors of the Lender, at the expense of the Borrower, to visit and inspect any of the properties of any Loan Party or their respective Subsidiaries, to examine the company, financial and operating records of each Loan Party, and make copies thereof or abstracts therefrom, and to discuss the affairs, finances and accounts of each Loan Party with its members, officers, and independent public accountants (with the Borrower having the right to have a representative present at all such communications) and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower. Notwithstanding the foregoing, so long as no Event of Default shall have occurred and be continuing, the Borrower shall not be obligated to pay the fees, costs and expenses for more than one (1) such visit and/or inspection of the Loan Party Group conducted during any 12-month period prior to the Maturity Date.

6.11   <u>Use of Proceeds</u>.   Use the proceeds of the Term Loan and any Term Loan Re-Advances as follows:  (a) to provide general working capital and to pay ordinary operating costs and expenses of the Loan Parties and their Subsidiaries; (b) to fund the obligations of Borrower pursuant to the Chapter 11 Plan; and (c) to pay for fees and expenses in connection with the Closing.

6.12.  <u>Further Assurances</u>.  Promptly upon request, (a) correct any material defect or error that may be discovered in any Exit Term Loan Document or in the execution, acknowledgment, filing or recordation thereof, and (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, certificates, assurances and other agreements and instruments as the Lender may reasonably require from time to time in order to (i) carry out more effectively the purposes of the Exit Term Loan Documents, (ii) to the fullest extent permitted by applicable Laws, subject any Loan Party's properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Collateral Documents, (iii) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens intended to be created thereunder, and (iv) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Lender the rights granted or now or hereafter intended to be granted to the Lender under any Exit Term Loan Document, or under any other instrument executed in connection with any Exit Term Loan Document to which the Borrower is or is to be a party.

ARTICLE VII

NEGATIVE COVENANTS

So long as the Term Loan or other Obligations hereunder shall remain unpaid or unsatisfied (other than contingent indemnification obligations which are not then due and payable), the Borrower shall not, nor shall it permit any other Loan Party to, directly or indirectly:

7.01  <u>Liens</u>.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, or sign or file or suffer to exist under the Uniform Commercial Code of any jurisdiction a financing statement that names the Borrower or any Guarantor, as debtor, or sign or suffer to exist any security agreement authorizing any secured party thereunder to file such financing statement, or assign any accounts or other right to receive income, other than the following:

(a)    Liens granted or arising pursuant to any Exit Term Loan Document;

(b)    Liens set forth on <u>Schedule 5.08</u>;

(c)    Liens for taxes, assessments or governmental charges or claims not delinquent for a period of more than 30 days or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(d)    Liens of landlords, carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which are not overdue for a period of more than thirty (30) days or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person;

(e)    Liens incurred or pledges or deposits in the ordinary course of business made in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA;

29

(f)       Liens incurred or deposits made to secure the performance of tenders, bids, trade contracts, leases (real and personal) (other than Indebtedness), statutory obligations, surety bonds (other than bonds related to judgments or litigation), performance and return of money (but not borrowed money) bonds, reimbursement obligations and chargeback rights of Persons performing credit card processing services for a Loan Party and other obligations of a like nature incurred in the ordinary course of business;

(g)       easements, rights-of-way, restrictions, minor defects, encroachments or irregularities of title and other similar charges or encumbrances affecting real property which do not materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the applicable Person;

(h)       Liens with respect to which the Lender has given its written consent;

(i)       Liens securing judgments and attachments not constituting an Event of Default under Section 8.01 or securing appeal or other surety bonds related to such judgments; Liens securing Indebtedness permitted under Section 7.03 and which is Indebtedness incurred to acquire property; provided that (i) such Liens do not at any time encumber any property other than the property acquired by such Indebtedness and (ii) with respect to capital leases, such Liens do not at any time extend to or cover any Collateral or assets other than the assets subject to such capital leases;

(j)       Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(k)       operating leases or subleases of real or personal property granted to others not interfering in any material respect with the business of the Loan Parties, taken as a whole; and

(1)       Liens in favor of collecting or payor banks and credit card processors having a right of setoff, revocation, refund or chargeback with respect to money or instruments of any Loan Party on deposit with or in possession of such bank.

Notwithstanding subsections 7.01 (c) and (d) to the contrary, Liens for taxes, assessments or governmental charges or claims or Liens of landlords, carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course against property may be delinquent or overdue for more than thirty (30) days if such Liens solely affect property that a Loan Party has agreed in writing to transfer to a mortgagee by a deed-in-lieu in full satisfaction of debt.

7.02    <u>Investments</u>.  Make or hold any Investments, except:

(a)       Investments held by any Loan Party in the form of Cash Equivalent Investments;

(b)       Investments with respect to which the Lender has given its written consent;

(c)       equity Investments of the Borrower or any Guarantor in their respective Subsidiaries;

(d)      Investments in accounts, contract rights and chattel paper (each as defined in the Uniform Commercial Code, as in effect in Indiana), notes receivable and similar items arising or acquired in the ordinary course of business and Investments received in settlement of amounts due to any Loan Party effected in the ordinary course of business;

(e)      Guarantees permitted by Section 7.04; and

(f)      Investments consisting of intercompany debt permitted under Section 7.03.

7.03    Indebtedness.  Create, incur, assume or suffer to exist any Indebtedness, except:

(a)      Indebtedness with respect to which the Lender has given its written consent;

(b)      in the case of any Loan Party (other than the Borrower), Indebtedness owed to the Borrower; and

(c)      in the case of the Loan Parties,

(i)      Indebtedness under the Exit Term Loan Documents;

(ii)      Existing Indebtedness, refinancings and replacements thereof, provided that (A) the principal amount of such Existing Indebtedness shall not be increased above the principal amount thereof outstanding immediately prior to such refinancing or replacement, (B) the maturity of such Existing Indebtedness shall not be shortened as a result of such refinancing or replacement, and (C) the direct and contingent obligors therefor shall not be changed, as a result of or in connection with such refinancing or replacement;

(iii)      Indebtedness consisting of Guarantees permitted by Section 7.04;

(iv)      letters of credit issued by banks reasonably acceptable to the Lender to the extent that (A) the Loan Party requesting the issuance of any such letter of credit pledges to and deposits with the issuer of such letter of credit cash collateral in an amount not less than 100% of the face amount of such letter of credit and not in excess of 103% of the face amount of such letter of credit, (B) in the event of a drawing under any such letter of credit, the issuer of such letter of credit looks first to the cash collateral for reimbursement of such drawing and (C) after giving effect to the issuance of each such letter of credit, the sum of all obligations under such all such letters of credit shall not exceed $1,000,000 (or such other higher amount as may be approved by Lender from time to time); and

(v)  Indebtedness of any Loan Party arising from agreements of any Loan Party providing for indemnification, adjustment of purchase price, earn-out or other similar obligations, in each case incurred or assumed in connection with the Disposition of any assets

7.04    Guarantees and Other Liabilities.  Purchase or repurchase (or agree, contingently or otherwise, so to do) the Indebtedness of, or assume, guarantee (directly or indirectly or by an instrument having the effect of assuring another's payment or performance of any obligation or

31

capability of so doing, or otherwise), endorse or otherwise become liable, directly or indirectly, in connection with the Indebtedness, stock or dividends of any Person, except (a) for any guaranty of Indebtedness of the Borrower or any Guarantor if the Borrower or such Guarantor could have incurred such Indebtedness under this Credit Agreement, (b) by endorsement of negotiable instruments for deposit or collection in the ordinary course of business, (c) customary indemnities in favor of officers, employees, directors, consultants, attorneys, accountants or other advisors; and (d) guaranties of Indebtedness of any Subsidiary of a Loan Party by that Loan Party.

7.05    <u>Fundamental Changes</u>.  Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, or take any action which will result in or does result in a Change of Control.

7.06    <u>Restricted Payments</u>.  Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, or issue or sell any Equity Interests or accept any capital contributions, except that, so long as no Default shall have occurred and be continuing at the time of any action described below or would result therefrom:

(a)    each Loan Party may make Restricted Payments to any Loan Party which is its direct parent;

(b)    each Loan Party may declare and make dividend payments or other distributions payable solely in the common stock or other common Equity Interests of such Person; and

(c)    any Loan Party may issue Equity Interests to another Loan Party.

7.07    <u>Change in Nature of Business</u>.  Engage in any material line of business substantially different from those lines of business conducted by the Borrower and its Subsidiaries on or prior to the Closing Date or any business substantially related or incidental thereto.

7.08    <u>Transactions with Affiliates</u>.  Enter into any transaction of any kind with any Affiliate of the Borrower, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to the Borrower or such Loan Party as would be obtainable by the Borrower or such Loan Party at the time in a comparable arm's length transaction with a Person other than an Affiliate, provided that the foregoing restriction shall not apply to (a) transactions between or among the Borrower and any of the Guarantors or between and among any of the Guarantors; (b) reasonable and customary fees and compensation paid to, and indemnity provided on behalf of, officers, directors or employees of any Loan Party; (c) any Restricted Payments not prohibited by Section 7.06; (d) any payments or other distributions by a Subsidiary to its direct or indirect parent to enable such parent to pay its liabilities for taxes attributable to such Subsidiary; (e) transactions between any Loan Party with any employee labor unions or other employee groups of any Loan Party; (f) the Exit Term Loan Documents and the transactions contemplated thereby; and (g) the Asset Management Agreement identified on <u>Schedule 7.08</u>.

7.09    <u>Use of Proceeds</u>.  Use the proceeds of the Term Loan, and any Term Loan Re-Advances, whether directly or indirectly, and whether immediately, incidentally or ultimately, to purchase or carry margin stock (within the meaning of Regulation U of the Board of Governors

of the Federal Reserve System of the United States) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund Indebtedness originally incurred for such purpose.

7.10    Amendments of Organization Documents.    Amend any of its Organization Documents other than for amendments which in the aggregate have no Material Adverse Effect.

7.11    Changes in Fiscal Year.  Make any change in its fiscal year.

7.12    Prepayments Etc. of Indebtedness.  Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner, or make any payment in violation of any subordination terms of, any Indebtedness, except (a) any prepayment of the Term Loan in accordance with the terms of this Credit Agreement, (b) regularly scheduled or required repayments or redemptions of Existing Indebtedness, including without limitation, obligations under the Chapter 11 Plan, and (c) refinancing or replacement of Existing Indebtedness permitted by Section 7.03(c) (ii).

7.13    Formation of Subsidiaries. Organize or invest in any new direct Subsidiary, unless the Equity Interests of such direct Subsidiary are owned entirely by the Borrower and the Lender is granted concurrently with the acquisition of such Equity Interests by the Borrower in such direct Subsidiary a first priority security interest therein as security for the payment of the Obligations, with such security interest to be granted either by an amendment to this Credit Agreement adding such Equity Interests as part of the pledged Equity or by a separate pledge and security agreement executed by the Borrower and which is acceptable in all respects to the Lender.

7.14    Change in Capital Structure.  Make any material change in its equity capital structure as in existence on the Closing Date without the prior written consent of the Lender.

ARTICLE VIII

EVENTS OF DEFAULT AND REMEDIES

8.01    Events of Default. Any of the following shall constitute an Event of Default:

(a)    Non-Payment.  The Borrower or any other Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of the Term Loan, or (ii) within three (3) Business Days after the same becomes due, any interest on the Term Loan, or any commitment or other fee due hereunder, or (iii) within five (5) days after the same becomes due, any other amount payable hereunder or under any other Exit Term Loan Document; or

(b)    Specific Covenants.  (i) The Borrower or any Loan Party fails to perform or observe any term, covenant or agreement contained in any of Section 6.03 (Notices), Section 6.05 (Preservation of Existence), Section 6.10 (Inspection Rights), Section 6.11 (Use of Proceeds), or Article VII or (ii) the Borrower fails to perform or observe any term, covenant or agreement contained in any of Section 6.01 or Section 6.02 and such failure continues for ten (10) Business Days after the earlier of the date on which (A) a Responsible Officer becomes aware of such failure or (B) written notice thereof shall have been given to the Borrower by the Lender; or

(c)     Other Defaults.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) above or (t) below) contained in any Exit Term Loan Document on its part to be performed or observed and such failure continues unremedied for forty-five (45) days  and ten (10) Business Days after the earlier of the date on which (A) a Responsible Officer becomes aware of such failure or (B) written notice thereof shall have been given to the Borrower by the Lender; or

(d)     Representations and Warranties.  Any representation, warranty or certification made or deemed made by or on behalf of the Borrower or any other Loan Party herein, in any other Exit Term Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(e)     Cross-Default.  (i) Any Loan Party (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) (other than Indebtedness hereunder) having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than $500,000, or (B) fails to observe or perform any other agreement or condition contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, in each case the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness or the beneficiary or beneficiaries of such Guarantee (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded; or (ii) there occurs under any Swap Contract an Early Termination Date (as defined in such Swap Contract) resulting from (A) any event of default under such Swap Contract as to which the Borrower is the Defaulting Party (as defined in such Swap Contract) or (B) any Termination Event (as so defined) under such Swap Contract as to which the Borrower is an Affected Party (as so defined) and, in either event, the Swap Termination Value owed by the Loan Party as a result thereof is greater than $500,000; or

(f)     Judgments.  There is entered against any Loan Party (i) a final judgment or order for the payment of money in an aggregate amount exceeding $500,000 (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of such claim and does not dispute coverage), or (ii) any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, there is a period of ten (10) consecutive Business Days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect; or

(g)     Invalidity of Exit Term Loan Documents.  Any provision of any Exit Term Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be valid and binding on or enforceable against any Loan Party intended to be a party to it; or any Loan Party denies that it has any or further liability or obligation under any Exit Term Loan Document, or purports to revoke, terminate or rescind any Exit Term Loan Document; or

34

(h)     <u>Change of Control</u>.  There occurs any Change of Control, or

(i)     <u>Collateral Document</u>.  Any Collateral Document after delivery thereof pursuant to Section 4.01 or Section 6.12 shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected lien on and security interest in the Collateral purported to be covered thereby having the priority contemplated by the Exit Term Loan Documents and the DIP Financing Orders; or

(j)     <u>Material Adverse Effect</u>.  There occurs any event or circumstance that would give rise to a Material Adverse Effect since the Closing Date.

8.02    <u>Remedies upon Event of Default</u>.  If any Event of Default occurs and is continuing, the Lender may take any or all of the following actions:

(a)     declare the Commitment of the Lender to be terminated, whereupon such Commitment shall be terminated;

(b)     declare the unpaid principal amount of the Term Loan, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Exit Term Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower and the Loan Parties;

(c)     (i) exercise all rights and remedies available to it in respect of the Collateral; or (ii) exercise all rights and remedies available to it and the Lender under the Exit Term Loan Documents, the DIP Financing Orders or applicable Laws and not described in Section 8.02(a) and (b); and

(d)     exercise the remedies set forth in Section 9.07.

8.03    <u>Application of Funds</u>.  After the exercise of remedies provided for in Section 8.02, any amounts received on account of the Obligations shall be applied by the Lender in the following order:

First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts;

Second, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans;

Third, to payment of that portion of the Obligations constituting unpaid principal of the Loans;

Fourth, to the payment of all other Obligations of the Loan Parties owing under or in respect of the Exit Term Loan Documents that are due and payable to the Lender; and

Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full (other than contingent indemnification obligations not then due and payable), to the Borrower or as otherwise required by Law.

ARTICLE IX

SECURITY

9.01     Grant of Security.  To induce the Lender to make and agree to the Term Loan per the Chapter 11 Plan and Confirmation Order, the Borrower hereby grants to the Lender, as security for the full and prompt payment when due of the Obligations, a continuing Lien that shall be a continuing first priority Lien (other than Liens permitted hereunder) and security interest in and to all of the Primary Collateral (as defined below).

"Primary Collateral" means:

(i)     all shares of stock, membership units, membership interests and other Equity Interests now owned or from time to time acquired by the Borrower in any manner in each of its direct Subsidiaries, now or hereafter existing, and all of the other Persons identified on Schedule 9.01 to this Credit Agreement (the "Pledged Equity"), and the certificates, if any, representing such additional shares or other Equity Interests, and all dividends, distributions, return of capital, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such shares or other Equity Interests and all subscription warrants, rights or options issued thereon or with respect thereto, and all of the Borrower's rights, privileges, authority and power related to the economic interests of Borrower as owner of the Pledged Equity, including but not limited to all general intangibles, accounts and payment intangibles related thereto and, to the extent not included in the foregoing;

(ii)     all other investment property (including, without limitation, all securities, whether certificated or uncertificated, security entitlements, and securities accounts) in which the Borrower has now, or acquires from time to time hereafter, any right, title or interest in any manner, and the certificates or instruments, if any, representing or evidencing such investment property, and all dividends, distributions, return of capital, interest, distributions, value, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such investment property and all warrants, rights or options issued thereon or with respect thereto;

(iii)     all proceeds of the property described in (i) and (ii) above, now existing or hereafter arising; and

(iv)     as additional collateral which also shall constitute Primary Collateral, Development hereby grants and pledges to Lender, as security for the full and prompt payment when due of the Obligations, a continuing first priority Lien and security interest in and to all amounts due and owing under that certain $1,500,000 Promissory Note dated February 25, 2009 from Lauth Group, Inc. to Development.

9.02     Further Assurances.

(a)     The Borrower agrees that from time to time, at the expense of the Borrower, it will promptly execute and deliver, or otherwise authenticate, all further instruments and documents, and take all further action that may be necessary, or that the Lender may reasonably request, in order to perfect and protect any pledge or security interest granted or purported to be granted by the Borrower hereunder or to enable the Lender to exercise and enforce its rights and remedies hereunder with respect to any Collateral.  Without limiting the generality of the foregoing, the Borrower will within a commercially reasonable time with respect to the Collateral:  (i) take such actions as the Lender reasonably may request in order to perfect and preserve the security interest and Lien granted or purported to be granted by the Borrower hereunder; (ii) deliver to the Lender certificates representing Pledged Equity or other Collateral that constitutes certificated securities, accompanied by undated stock or bond powers executed in blank; (iii) at the request of the Lender, take all action reasonably necessary to ensure within the time required hereunder that the Lender has "control" of the Pledged Equity or investment property as provided in IC-26-9.1-106 (being Section 9-106 of the Uniform Commercial Code) and in Section 16 of the Uniform Electronics Transactions Act, as in effect in the jurisdiction governing such transferable record; and (iv) at the request of the Lender, take all action reasonably necessary to ensure that the Lender's security interest is noted on any certificate of ownership related to any Collateral evidenced by a certificate of ownership.

(b)     The Borrower hereby authorizes the Lender to file one or more financing or continuation statements, and amendments thereto, including, without limitation, one or more financing statements indicating that such financing statements cover all assets or all personal property (or words of similar effect) of the Borrower, in each case without the signature of the Borrower, and regardless of whether any particular asset described in such financing statements falls within the scope of the Uniform Commercial Code or the granting clause of this Credit Agreement.

(c)     The Borrower will furnish to the Lender from time to time statements and schedules further identifying and describing the Collateral of the Borrower and such other reports in connection with the Collateral as the Lender may reasonably request, all in reasonable detail.

9.03    Rights of Lender; Limitations on Lender's Obligations.  Notwithstanding anything herein to the contrary, (i) the Borrower shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein to perform all of its duties and obligations thereunder to the same extent as if this Credit Agreement had not been executed, (ii) the exercise by the Lender of any of the rights hereunder shall not release the Borrower from any of its duties or obligations under the contracts and agreements included in the Collateral, and (iii) Lender shall not have any obligation or liability under the contracts and agreements included in the Collateral by reason of this Credit Agreement or any other Exit Term Loan Document, nor shall Lender be obligated to perform any of the obligations or duties of the Borrower thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

9.04    Covenants of the Loan Parties with Respect to Collateral.  The Borrower hereby covenants and agrees with the Lender that from and after the date of this Credit Agreement and until the Obligations (other than contingent indemnification obligations which are not then due and payable) are fully satisfied:

(a)     Delivery and Control of Pledged Equity.

(i)     All certificates or instruments representing or evidencing Pledged Equity or other Collateral shall be delivered to the Lender and held by or on behalf of the Lender pursuant hereto at the request of the Lender, and shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance reasonably satisfactory to the Lender.

(ii)     With respect to any Pledged Equity or other Collateral in which the Borrower has any right, title or interest and that constitutes an uncertificated security, the Borrower will cause the issuer thereof either (i) to register the Lender as the registered owner of such security or (ii) to agree in an authenticated record with the Borrower and the Lender that such issuer will comply with instructions with respect to such security originated by the Lender without further consent of the Borrower, such authenticated record to be in form and substance reasonably satisfactory to the Lender.  Upon the request of the Lender, the Borrower will notify each issuer of Pledged Equity or investment property which is Collateral that such Pledged Equity or investment property is subject to the security interest granted hereunder.

(iii)     Except as provided in Section 9.07 and subject to Article VII, the Borrower will be entitled to exercise all voting, consent and membership or shareholder rights with respect to the Pledged Equity and any investment property which is part of the Collateral.

(b)     Maintenance of Records.  The Borrower will keep and maintain, at its own cost and expense, satisfactory and complete records of the Collateral, in all material respects, including, without limitation, a record of all payments received and all credits granted with respect to the Collateral and all other dealings concerning the Collateral in each case in accordance with its normal business practice.

(c)     Indemnification with Respect to Collateral.  In any suit, proceeding or action brought by the Lender relating to any Collateral for any sum owing thereunder or to enforce any provision of any Collateral in each case, brought by the Lender in accordance with this Credit Agreement, the Borrower will save, indemnify and keep the Lender harmless from and against all expense, loss or damage suffered by the Lender by reason of any defense, setoff, counterclaim, recoupment or reduction of liability whatsoever of the obligor thereunder, arising out of a breach by the Borrower of any obligation thereunder or arising out of any other agreement, indebtedness or liability at any time owing to, or in favor of, such obligor or its successors from the Borrower, and all such obligations of Borrower shall be and remain enforceable against and only against the Borrower and shall not be enforceable against the Lender.

(d)     Limitation on Liens on Collateral.  The Borrower will defend the Collateral against and take such other action as is necessary to remove, any Lien on the Collateral except Liens permitted under Section 7.01 and will defend the right, title and interest of the Lender in and to all of the Borrower's rights under the Collateral against the claims and demands of all Persons whomsoever other than claims or demands arising out of Liens permitted under Section 7.01.

(e)    Notices.  The Borrower will advise the Lender promptly after it obtains knowledge thereof, in reasonable detail, (i) of any Lien asserted against any of the Collateral other than Liens permitted by this Credit Agreement, and (ii) of the occurrence of any other event which would result in a Material Adverse Effect with respect to the aggregate value of the Collateral or on the security interests created hereunder.

9.05    Performance by Lender of the Obligations.

(a)    Lender Appointed Attorney-in-Fact.  Each Loan Party hereby irrevocably appoints the Lender such Loan Party's attorney-in-fact, with full authority in the place and stead of such Loan Party and in the name of such Loan Party or otherwise, from time to time, in the Lender's discretion after the occurrence and during the continuance of an Event of Default, and to take any action and to execute any instrument that the Lender may deem necessary or advisable to accomplish the purposes of this Credit Agreement, including, without limitation:

(i)    to obtain and adjust insurance required to be paid to the Lender pursuant to this Credit Agreement,

(ii)    to ask for, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral,

(iii)    to receive, indorse and collect any drafts or other instruments, documents and chattel paper, in connection with clause (i) or (ii) above, and

(iv)    to file any claims or take any action or institute any proceedings that the Lender may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of the Lender with respect to any of the Collateral; provided that the Lender shall not exercise any such rights under this Section 9.05(a) except upon occurrence and during the continuance of an Event of Default.

(b)    Lender May Perform.  If any Loan Party fails to perform any agreement contained herein, the Lender may, as the Lender deems necessary to protect the security interest granted hereunder in the Collateral or to protect the value thereof, but without any obligation to do so after the occurrence and during the continuance of an Event of Default, itself perform, or cause performance of, such agreement, and the expenses of the Lender incurred in connection therewith shall be payable by such Loan Party pursuant to Section 11.04.

9.06    The Lender's Duties.  The powers conferred on the Lender hereunder are solely to protect the Lender's interest in the Collateral and shall not impose any duty upon it to exercise any such powers.  Other than the exercise of reasonable care to assure the safe custody of the Collateral while being held by the Lender pursuant to the terms of the Exit Term Loan Documents, the Lender shall have no duty or liability to preserve rights pertaining thereto, it being understood and agreed that the grantor of such Collateral shall be responsible for preservation of all rights in the Collateral, and the Lender shall be relieved of all responsibility for the Collateral upon surrendering it or tendering the surrender of it to such grantor.  The Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which the Lender accords its own

property, which shall be no less than the treatment employed by a reasonable and prudent lender in the industry, it being understood that the Lender shall not have responsibility for taking any necessary steps to preserve rights against any parties with respect to any of the Collateral.

9.07    <u>Remedies</u>.  If any Event of Default shall have occurred and be continuing:

(a)    The Lender may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party upon default under the Uniform Commercial Code (whether or not the Uniform Commercial Code applies to the affected Collateral) and also may:  (i) require the Borrower to, and the Borrower hereby agrees that it will at its expense and upon request of the Lender forthwith, assemble all or part of the Collateral as directed by the Lender and make it available to the Lender at a place and time to be designated by the Lender that is reasonably convenient to such Loan Party and the Lender; (ii) without notice except as specified below, sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of the Lender's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as are commercially reasonable; and (iii) exercise any and all rights and remedies of the Borrower under or in connection with the Collateral, or otherwise in respect of the Collateral, including, without limitation, any and all rights of the Borrower to demand or otherwise require payment of any amount under, or performance of any provision of, the Collateral.  The Borrower agrees that, to the extent notice of sale shall be required by law, at least 10 days' notice to the Borrower of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification.  The Lender shall not be obligated to make any sale of Collateral regardless of notice of sale having been given.  The Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(b)    Any cash held by or on behalf of the Lender and all cash proceeds received by or on behalf of the Lender in respect of any sale of, collection from, or other realization upon all or any part of the Collateral shall be applied against the Obligations, in the manner set forth in Section 8.03. Any surplus of such cash or cash proceeds held by the Lender and remaining after payment in full of the Obligations (other than contingent indemnification obligations not then due and payable) shall be paid over to the Borrower or to whomever may be lawfully entitle to receive such surplus.

(c)    All payments received by the Borrower under or in connection with the Collateral shall be received in trust for the benefit of the Lender, shall be segregated from other funds of the Borrower and shall be forthwith paid over to the Lender in the same form as so received (with any necessary endorsement).

(d)    The Lender is authorized, in connection with any sale of Collateral pursuant to this Section 9.07, to deliver or otherwise disclose to any prospective purchaser of any of the Collateral any information in its possession relating to such Collateral.

9.08    <u>Modifications</u>.

The Liens, lien priority, and other rights and remedies granted to the Lender pursuant to this Credit Agreement shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by any of the Loan Parties or by any other act or omission whatsoever.

9.09    Release; Termination.

(a)    Upon any sale, transfer or other disposition of any item of Collateral in accordance with the terms of the Exit Term Loan Documents, such Collateral shall be released from the security interest granted hereby, and in connection therewith, the Lender will, at the Borrower's expense, execute and deliver to the Borrower such documents as the Borrower shall reasonably request to evidence the release of such item of Collateral from the security interest granted hereby; provided, however, that (i) at the time of such request and such release no Default shall have occurred and be continuing, (ii) the proceeds of any such sale, transfer or other disposition required to be applied, or any payment to be made in connection therewith, in accordance with Section 2.02, shall, to the extent so required, be paid or made to, or in accordance with the instructions of, the Lender when and as required under Section 2.02, and (iii) in the case of Collateral sold or disposed of, the release of a Lien created hereby will not be effective until the receipt by the Lender of the Net Cash Proceeds arising from the sale or disposition of such Collateral.

(b)    Upon the payment in full in cash of the Obligations (other than contingent indemnification obligations which are not then due and payable, the pledge and security interest granted hereby shall terminate and all rights to the Collateral shall revert to the Borrower.  Upon any such termination, the Lender will, at the Borrower's expense, execute and deliver to the Borrower such documents as the Borrower shall reasonably request to evidence such termination.

ARTICLE X

GUARANTY

10.01    Guaranty.  Each Guarantor, severally, unconditionally and irrevocably guarantees (the undertaking by each Guarantor under this Article X being the "Guaranty") the punctual payment when due, whether at scheduled maturity or on any date of a required prepayment or by acceleration, demand or otherwise, of all of the Obligations of the Borrower now or hereafter existing under or in respect of the Exit Term Loan Documents (including, without limitation, any extensions, modifications, substitutions, amendments or renewals of any or all of the foregoing Obligations), whether direct or indirect, absolute or contingent, and whether for principal, interest, premium, fees, indemnification payments, contract causes of action, costs, expenses or otherwise (such Obligations being the "Guaranteed Obligations"), and agrees to pay any and all expenses (including, without limitation, reasonable fees and expenses of counsel) incurred by the Lender solely in enforcing any rights under this Guaranty or any other Exit Term Loan Document.

10.02    Guaranty Absolute.  Each Guarantor guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Exit Term Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Lender with respect thereto.  This Guaranty is a guaranty of payment and not of collection.  The Obligations of each Guarantor under this Guaranty are independent of the

41

Guaranteed Obligations or any other Obligations of any Loan Party under the Exit Term Loan Documents, and a separate action or actions may be brought and prosecuted against such Guarantor to enforce this Guaranty, irrespective of whether any action is brought against any other Loan Party or whether any other Loan Party is joined in any such action or actions. The liability of each Guarantor under this Guaranty shall be absolute, unconditional and irrevocable irrespective of, and such Guarantor hereby irrevocably waives any defenses it may now or hereafter have in any way relating to, any and all of the following:

(a)    any lack of validity or enforceability of any Exit Term Loan Document or any other agreement or instrument relating thereto;

(b)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations or any other Obligations of any Loan Party under the Exit Term Loan Documents, or any other amendment or waiver of or any consent to departure from any Exit Term Loan Document, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Loan Party or any of its Subsidiaries or otherwise;

(c)    any taking, exchange, release or nonperfection of any Collateral, or any taking, release or amendment or waiver of or consent to departure from this Guaranty or any other guaranty, for all or any of the Guaranteed Obligations;

(d)    any manner of application of Collateral, or proceeds thereof, to all or any of the Guaranteed Obligations, or any manner of sale or other disposition of any Collateral for all or any of the Guaranteed Obligations or any other Obligations of any Loan Party under the Exit Term Loan Documents, or any other property and assets of any other Loan Party or any of its Subsidiaries;

(e)    any change, restructuring or termination of the legal structure or existence of any other Loan Party or any of its Subsidiaries;

(f)    any failure of the Lender to disclose to any Loan Party any information relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Loan Party now or hereafter known to the Lender, as the case may be (such Guarantor waiving any duty on the part of the Lender to disclose such information);

(g)    the failure of any other Person to execute this Credit Agreement or any other guarantee or agreement of the release or reduction of the liability of any of the other Loan Parties or any other guarantor or surety with respect to the Guaranteed Obligations; or (h) any other circumstance (including, without limitation, any statute of limitations or any existence of or reliance on any representation by the Lender) that might otherwise constitute a defense available to, or a discharge of, such Guarantor, any other Loan Party or any other guarantor or surety.

This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by the Lender or by any other Person upon the insolvency, bankruptcy or reorganization of any other Loan Party or otherwise, all as though such payment had not been made.

10.03    Waivers and Acknowledgments.

(a)    Each Guarantor hereby unconditionally and irrevocably waives promptness, diligence, notice of acceptance, presentment, demand for performance, notice of nonperformance, default, acceleration, protest or dishonor and any other notice with respect to any of the Guaranteed Obligations and this Guaranty, and any requirement that the Lender protect, secure, perfect or insure any Lien or any property or assets subject thereto or exhaust any right or take any action against any other Loan Party or any other Person or any Collateral.  Each Guarantor waives any right to require the Lender to sue the Borrower, any other Guarantor, any other guarantor, or any other Person obligated for all or any part of the Guaranteed Obligations (each, an "Obligated Party"), or otherwise to enforce its payment against any Collateral securing all or any part of the Guaranteed Obligations.

(b)    Each Guarantor hereby unconditionally waives any right to revoke this Guaranty, and acknowledges that this Guaranty is continuing in nature and applies to all Guaranteed obligations, whether existing now or in the future.  Each Guarantor further agrees that the Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal.

(c)    Each Guarantor hereby unconditionally and irrevocably waives (i) any defense arising by reason of any claim or defense based upon an election of remedies by the Lender which in any manner impairs, reduces, releases or otherwise adversely affects the subrogation, reimbursement, exoneration, contribution or indemnification rights of such Guarantor or other rights to proceed against any of the other Loan Parties, any other guarantor or any other Person or any Collateral, and (ii) any defense based on any right of setoff or counterclaim against or in respect of the Obligations of such Guarantor hereunder.

(d)    Each Guarantor hereby unconditionally and irrevocably waives any duty on the part of Lender to disclose to such Guarantor any matter, fact or thing relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Loan Party or any of its Subsidiaries now or hereafter known by Lender.  The obligations of each Guarantor hereunder are not subject to any defense or setoff, counterclaim, recoupment, or termination whatsoever by reason of the invalidity, illegality, or unenforceability of any of the Guaranteed Obligations or otherwise, or any provision of applicable law or regulation purporting to prohibit payment by any Obligated Party, of the Guaranteed Obligations or any part thereof.

(e)    Each Guarantor acknowledges that it will receive substantial direct and indirect benefits from the financing arrangements contemplated by the Exit Term Loan Documents and that the waivers set forth in Section 10.02 and this Section 10.03 are knowingly made in contemplation of such benefits.

10.04    Subrogation.  Each Guarantor hereby unconditionally and irrevocably agrees not to exercise any rights that it may now have or may hereafter acquire against any other Loan Party or any other insider guarantor that arise from the existence, payment, performance or enforcement of its Obligations under this Guaranty or under any other Exit Term Loan Document, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or

43

indemnification and any right to participate in any claim or remedy of the Lender against such other Loan Party or any other insider guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from such other Loan Party or any other insider guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right, until such time as all of the Guaranteed Obligations shall have been paid in full in cash (other than contingent indemnification obligations not then due and payable), terminated or been cancelled and the Commitments shall have expired or terminated.  If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the latest of (a) the payment in full in cash of all of the Guaranteed Obligations (other than contingent indemnification obligations not then due and payable) and all other amounts payable under this Guaranty, and (b) the Maturity Date, such amount shall be received and held in trust for the benefit of the Lender (in the same form as so received) and shall forthwith be paid to the Lender (without any necessary endorsement or assignment) to be credited and applied to the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms of the Exit Term Loan Documents, or to be held as Collateral for any Guaranteed Obligations thereafter arising.  If (i) any Guarantor shall pay to the Lender all or any part of the Guaranteed Obligations, (ii) all of the Guaranteed Obligations shall have been paid in full in cash (other than contingent indemnification obligations not then due and payable), and (iii) the Maturity Date shall have occurred, the Lender will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from the payment made by such Guarantor pursuant to this Guaranty.

10.05    <u>Subordination</u>.  Each Guarantor agrees that any and all present and future debts and obligations of the Borrower or any other Guarantor to such Guarantor hereby are subordinated to the claims of the Lender and hereby are assigned by such Guarantor to the Lender as security for the payment and performance of such Guarantor's Guaranteed Obligations.

10.06    <u>Continuing Guarantee; Assignments</u>.  This Guaranty is a continuing guaranty and each Guarantor agrees that the Guaranteed Obligations of such Guarantor under this Guaranty shall be primary obligations of such Guarantor, shall not be subject to any counterclaim, set-off, abatement, deferment or defense based upon any claim that such Guarantor may have against the Lender, the Borrower, any other Guarantor or any other Person and shall (a) remain in full force and effect until the latest of (i) the payment in full in cash of all of the Guaranteed Obligations (other than contingent indemnification obligations not then due and payable), and (ii) the Maturity Date, (b) be binding upon each Guarantor and its successors and assigns and (c) inure to the benefit of, and be enforceable by, the Lender and its successors, transferees and assigns.  Without limiting the generality of clause (c) of the immediately preceding sentence, the Lender may assign or otherwise transfer all or any portion of its rights and obligations under this Credit Agreement to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to the Lender under this Article X.

10.07    <u>No Reliance</u>.  Each Guarantor has, independently and without reliance upon the Lender, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Guaranty and each other Exit Term Loan Document

44

to which it is or is to be a party, and such Guarantor has established adequate means of obtaining from each other Loan Party on a continuing basis information pertaining to, and is now and on a continuing basis will be completely familiar with, the business, condition (financial or otherwise), operations, performance, properties and prospects of such other Loan Party.

ARTICLE XI

MISCELLANEOUS

11.01    <u>Amendments, Etc</u>.  No amendment or waiver of any provision of this Credit Agreement or any other Exit Term Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Lender and the Borrower or the applicable Loan Party, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

11.02    <u>Notices and Other Communications; Facsimile Copie</u>s.

(a)    <u>General</u>.  Unless otherwise expressly provided in Section 2.02 or otherwise, all notices and other communications provided for hereunder or any other Exit Term Loan Document shall be in writing (including by facsimile transmission or electronic mail).  All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or (subject to subsection (c) below) electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable address, facsimile number, electronic mail address or telephone number specified for such Person on the signature page hereto or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties.

(b)    <u>Effectiveness of Facsimile Documents and Signatures</u>.  Exit Term Loan Documents may be transmitted and/or signed by facsimile or electronically delivered PDF copies thereof.  The effectiveness of any such documents and signatures shall, subject to applicable Law, have the same force and effect as manually signed originals and shall be binding on all Loan Parties, and the Lender.  The Lender may also require that any such documents and signatures be confirmed by a manually-signed original thereof; provided, however, that the failure to request or deliver the same shall not limit the effectiveness of any facsimile or electronically delivered PDF document or signature.

(c)    <u>Limited Use of Electronic Mail</u>.  Electronic mail and Internet and intranet websites may be used only to distribute routine communications, such as financial statements and other information as provided in Section 6.02, and to distribute Exit Term Loan Documents for execution by the parties thereto, and may not be used for any other purpose as effective notice under this Credit Agreement.

(d)    <u>Reliance by Lender</u>.  The Lender shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Borrower or any Guarantor even if (i) such party notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify the Lender from all losses,

45

costs, expenses and liabilities resulting from the reliance by the Lender on each notice purportedly given by or on behalf of the Borrower or any Guarantor.

11.03   No Waiver; Cumulative Remedies.  No failure by the Lender to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or any other Exit Term Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each other Exit Term Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

11.04   Attorney Costs, Expenses and Taxes.  The Borrower agrees (a) to pay or reimburse the Lender for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the development, preparation, negotiation and execution of this Credit Agreement and the other Exit Term Loan Documents and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transaction contemplated hereby or thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, including all Attorney Costs (including, without limitation, local counsel), and (b) to pay or reimburse the Lender for all documented out-of-pocket costs and expenses reasonably incurred in connection with the enforcement of any rights or remedies under this Credit Agreement or the other Exit Term Loan Documents (including all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law), including all Attorney Costs.  The foregoing costs and expenses shall include all search, filing and recording fees and taxes related thereto, and other out-of-pocket expenses incurred by the Lender.  The agreements in this Section 11.04 shall survive the termination of the Commitment and payment of all other Obligations.  If any Loan Party fails to pay when due any costs, expenses or other amounts payable by it hereunder or under any Exit Term Loan Document, including, without limitation, Attorney Costs and indemnities, such amount may be paid on behalf of such Loan Party by the Lender, in its sole discretion, and the sum of such payment by the Lender shall be deemed capitalized for all purposes as additional principal of the Term Loan as of the date so paid.

11.05   Indemnification by the Loan Parties.  Each Loan Party shall defend (with counsel satisfactory to Lender), protect, indemnify and hold harmless Lender, each affiliate or subsidiary of Lender, and each of their respective shareholders, members, officers, directors, managers, employees, attorneys, advisors and agents (collectively, the "Indemnitees") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature (including, without limitation, the disbursements and the Attorney Costs in connection with any investigative, administrative or judicial proceeding, whether or not the Indemnified Party shall be designated a party thereto), which may be imposed on, incurred by, or asserted against, any Indemnified Party (whether direct, indirect or consequential and whether based on any federal, state or local laws or regulations, including, without limitation, securities laws and regulations, environmental laws and commercial laws and regulations, under common law or in equity, or based on contract or otherwise) in any manner relating to or arising out of the business operations of Borrower, this Credit Agreement or any other of the Exit Term Loan Documents, or any act, event or transaction related or attendant thereto, the making or issuance and the management of the Term Loan or the use or intended use of

46

the proceeds of the Term Loan; except to the extent that direct damages (as opposed to special) indirect, consequential or punitive damages (including, without limitation, any loss of products, business or anticipated savings) are determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from the willful misconduct or gross negligence of such Indemnified Party. To the extent that the undertaking to indemnify set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, Borrower shall satisfy such undertaking to the maximum extent permitted by applicable Laws.  Any liability, obligation, loss, damage, penalty, cost or expense covered by this indemnity shall be paid to each Indemnified Party on demand, and, failing prompt payment, shall, together with interest thereon at the highest rate then applicable to Loans hereunder from the date incurred by each Indemnified Party until paid by Loan Parties, be added to the Obligations of Borrower and be secured by the Collateral.  The provisions of this Section 11.05 shall survive the satisfaction and payment of the Obligations.

11.06    <u>Payments Set Aside</u>.  To the extent that any payment by or on behalf of the Borrower is made to the Lender, or the Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred.

11.07    <u>Prior Agreements, Etc</u>.  This Credit Agreement supersedes all previous agreements and commitments made by Lender and Borrower and Guarantors with respect to the Term Loan, the Term Loan Re-Advances, and all other subjects of this Agreement, including, without limitation, any oral or written proposals or commitments made or issued by Lender.

11.08    <u>Successors and Assigns.</u>

(a)    The provisions of this Credit Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Lender.  Nothing in this Credit Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, to the extent expressly contemplated hereby, the Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Credit Agreement.

(b)    The Lender may, without the consent of the Borrower,  sell participations to one or more Persons (a "<u>Participant</u>") in all or a portion of the Lender's rights and obligations under this Credit Agreement (including all or a portion of its Commitment and the Term Loan owing to it); <u>provided</u> that (A) the Lender's obligations under this Credit Agreement shall remain unchanged, (B) the Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower shall continue to deal solely and directly with the Lender in connection with the Lender's rights and obligations under this Credit Agreement.  Any agreement or instrument pursuant to which the Lender sells such a participation shall provide that the Lender

shall retain the sole right to enforce this Credit Agreement and to approve any amendment, modification or waiver of any provision of this Credit Agreement; provided that such agreement or instrument may provide that the Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that affects such Participant.

(c)    The Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Credit Agreement to secure obligations of the Lender; provided that no such pledge or assignment of a security interest shall release the Lender from any of its obligations hereunder or substitute any such pledgee or assignee for the Lender as a party hereto.

11.09    Counterparts.  This Credit Agreement and each other Exit Term Loan Document may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.   Delivery by telecopier or electronically of an executed counterpart or PDF copy of a signature page to this Credit Agreement and each other Exit Term Loan Document shall be effective as delivery of an original executed counterpart of this Credit Agreement and such other Exit Term Loan Document.

11.10    Integration.  This Credit Agreement and the other Exit Term Loan Documents comprise the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersede all prior agreements, written or oral, on such subject matter.  In the event of any conflict between the provisions of this Credit Agreement and those of any other Exit Term Loan Document, the provisions of this Credit Agreement shall control; provided that the inclusion of supplemental rights or remedies in favor of the Lender in any other Exit Term Loan Document shall not be deemed a conflict with this Credit Agreement.  Each Exit Term Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

11.11    Survival of Representations and Warranties.  All representations and warranties made hereunder and in any other Exit Term Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Lender, regardless of any investigation made by the Lender or on its behalf and notwithstanding that the Lender may have had notice or knowledge of any Default at the time of any Term Loan Re-Advance, and shall continue in full force and effect as long as the Term Loan shall remain unpaid or unsatisfied.

11.12    Severability.  If any provision of this Credit Agreement or the other Exit Term Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Credit Agreement and the other Exit Term Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

11.13    Governing Law.

(a)     THIS CREDIT AGREEMENT AND EACH OTHER EXIT TERM LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF INDIANA AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

(b)     EACH PARTY TO THIS CREDIT AGREEMENT HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS CREDIT AGREEMENT OR ANY OF THE OTHER EXIT TERM LOAN DOCUMENTS, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE JURISDICTION OF THE BANKRUPTCY COURT.  EACH OF THE BORROWER AND THE LENDER IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF ANY EXIT TERM LOAN DOCUMENT OR OTHER DOCUMENT RELATED THERETO.  THE BORROWER AND THE LENDER WAIVES PERSONAL SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER PROCESS, WHICH MAY BE MADE BY ANY OTHER MEANS PERMITTED BY APPLICABLE LAW.

11.14   Waiver of Right to Trial by Jury.   EACH PARTY TO THIS CREDIT AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER ANY EXIT TERM LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY EXIT TERM LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS CREDIT AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

11.15   Binding Effect.   This Credit Agreement shall become effective when it shall have been executed by the Borrower and the Lender and thereafter shall be binding upon and inure to the benefit of the Borrower, and the Lender and their respective successors and assigns, except that the Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of the Lender.

11.16   Amendment and Restatement of DIP Credit Agreements.   This Credit Agreement amends, and as amended, restates each of the DIP Credit Agreements in their entirety, respectively.

[*Signatures of the Lender and Loan Parties are on following pages*]

IN WITNESS WHEREOF, the parties hereto have caused this Credit Agreement to be duly executed as of the date first above written.

LENDER:

LIP LENDERS, LLC

By: _____
Name: Robert L. Lauth, Jr.
Title:   Manager
Address:        401 Pennsylvania Parkway
                     Indianapolis, IN 46280
Facsimile:      (317) 848-6511
Attention:       Robert Lauth, Jr., Manager

BORROWER:

LIP INVESTMENT, LLC

By: _____
Name: Gregory C. Gurnik
Title:   Manager
Address:        c/o Lauth Group, Inc.
                     401 Pennsylvania Parkway
                     Indianapolis, IN 46280
Facsimile:      (317) 848-6511
Jurisdiction of Organization:  Delaware


GUARANTORS:

LIP DEVELOPMENT, LLC

By: _____
Name: Gregory C. Gurnik
Title:   President
Address:        c/o Lauth Group, Inc.
                     401 Pennsylvania Parkway
                     Indianapolis, IN 46280
Facsimile:      (317) 848-6511
Jurisdiction of Organization:  Delaware

LAUTH INVESTMENT PROPERTIES, LLC

By: _____
Name: Gregory C. Gurnik
Title:  President
Address:       c/o Lauth Group, Inc.
               401 Pennsylvania Parkway
               Indianapolis, IN 46280
Facsimile:     (317) 848-6511
Jurisdiction of Organization:  Indiana

## EXHIBIT A

FORM OF AMENDED AND RESTATED REPLACEMENT TERM NOTE

$24,500,000.00

_____ ___, 2011

FOR VALUE RECEIVED, LIP INVESTMENT, LLC, a Delaware limited liability company (the "Borrower") promises to pay to the order of LIP LENDERS, LLC, an Indiana limited liability company ("Payee") (i) the principal amount of TWENTY-FOUR MILLION FIVE HUNDRED THOUSAND AND NO/100ths DOLLARS ($24,500,000.00), or such lesser amount thereof as may be advanced to Borrower by Payee pursuant to the Credit Agreement (as defined below).

Borrower also promises to pay interest on the unpaid principal amount hereof, from the date hereof until paid in full, at the rates and at the times that shall be determined in accordance with the provisions of that certain Secured Credit and Security Agreement dated as of the date hereof, as the same may be amended, supplemented, restated, amended and restated, or otherwise modified from time to time (the "Credit Agreement"), by and among Borrower, as borrower, LIP Development, LLC and Lauth Investment Properties, LLC, as guarantors, and Payee, as lender. Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Credit Agreement.

Except as provided below, Borrower shall make principal payment on this Term Note, together with all accrued and unpaid interest and fees in the manner set forth in Section 2.03(a) of the Credit Agreement.

This Term Note is issued pursuant to and entitled to the benefits of the Credit Agreement, to which reference is hereby made for a more complete statement of the terms and conditions under which the Term Loan evidenced hereby were made and are to be repaid.

All payments of principal and interest of this Term Note and any fees hereunder shall be made in lawful money of the United States of America in same day funds at the office of the Payee at 11595 North Meridian Street, Suite 250, Carmel, IN 46032, or at such other place as shall be designated in writing for such purpose in accordance with the terms of the Credit Agreement.

Whenever any payment on this Term Note shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest on this Term Note.

This Term Note is subject to mandatory prepayment as provided in Section 2.02(b) of the Credit Agreement and to prepayment at the option of the Borrower as provided in Section 2.02(a) of the Credit Agreement.

**THIS TERM NOTE AND THE RIGHTS AND OBLIGATIONS OF BORROWER AND PAYEE HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS**

**OF THE STATE OF INDIANA WITHOUT REGARD TO CONFLICTS-OF-LAWS PRINCIPLES.**

Upon the occurrence and during the continuation of an Event of Default, the unpaid balance of the principal amount of this Term Note, together with all accrued and unpaid interest thereon, may become, or may be declared to be, due and payable in the manner, upon the conditions, and with the effect provided in the Credit Agreement.

The terms of this Term Note are subject to amendment only in the manner provided in the Credit Agreement.

This Term Note is guaranteed pursuant to the provisions of the Credit Agreement and is also secured by the other Collateral Documents, as more fully set forth in the Credit Agreement.

No reference herein to the Credit Agreement and no provision of this Term Note or the Credit Agreement shall alter or impair the obligations of Borrower, which are absolute and unconditional, to pay the principal of and interest on this Term Note at the place, at the respective times, and in the currency herein prescribed.

Borrower promises to pay all costs and expenses, including reasonable attorneys' fees, all as provided in Section 11.04 of the Credit Agreement, incurred in the collection and enforcement of this Term Note.  Borrower and any endorsers of this Term Note hereby consent to renewals and extensions of time at or after the maturity hereof, without notice, and hereby waive diligence, presentment, protest, demand and notice of every kind and, to the full extent permitted by law, the right to plead any statute of limitations as a defense to any demand hereunder.

Borrower hereby waives presentment for payment, protest and demand and notice of protest, demand, dishonor and nonpayment of this Term Note, and expressly agrees that this Term Note, or any payment hereunder, may be extended from time to time before, at or after maturity, without in any way affecting the liability of the Borrower hereunder or any guarantor hereof.

Time for the performance of the Borrower's obligations under this Term Note is of the essence.

*Replacement Note.* This Term Note amends, restates, replaces and supersedes in all respects that (i) certain Term Note, in the principal amount of Seventeen Million Dollars ($17,000,000), executed and delivered by Borrower to Lender as of December 31, 2010, under the First DIP Facility and (ii) certain Term Note, in the principal amount of Eight Million Dollars ($8,000,000), executed and delivered by Borrower to Lender as of November 10, 2010, under the Second DIP Facility.

2

IN WITNESS WHEREOF, Borrower has caused this Term Note to be duly executed and delivered by its officer thereunto duly authorized as of the date and at the place first written above.

BORROWER:

LIP INVESTMENT, LLC

By: _____

Name: _____

Title: _____

## **EXHIBIT B**

FORM OF COMPLIANCE CERTIFICATE

COMPLIANCE CERTIFICATE

Date: _____, _____.

This Compliance Certificate (the "Compliance Certificate") is given by _____(the "Loan Party"), pursuant to section 6.02(a) of that certain Secured Debtor-In-Possession Credit and Security Agreement dated as of _____ ___, 2011, among LIP INVESTMENT, LLC, as borrower, LIP DEVELOPMENT, LLC and LAUTH INVESTMENT PROPERTIES, LLC, as guarantors, and LIP LENDERS, LLC, as lender (the "Lender") (as amended, supplemented, modified or restated from time to time, the "Credit Agreement").  Capitalized terms used herein without definition shall have the meanings set forth in the Credit Agreement.

The officer executing this certificate is the Responsible Officer of the Loan Party and as such is duly authorized to execute and deliver this certificate on behalf of the Loan Party and not in any individual capacity.  By executing this certificate, the Loan Party hereby certifies to the Lender that:

(a)    the financial statements delivered with this Compliance Certificate in accordance with subsection 6.02(a) of the Credit Agreement fairly present in all material respects the revenues and expenditures of the Loan Party as of the dates of such financial statements; and

(c)    no Default or Event of Default has occurred or is presently continuing.

IN WITNESS WHEREOF, the Loan Party has caused this Compliance Certificate to be executed by its _____ this ____ day of _____, 20__

_____

By:    _____
Name:  _____
Title:   _____

# LIST OF SCHEDULES

## SCHEDULES TO BE PROVIDED BY THE BORROWER

Schedule 5.03 – Required Approvals

Schedule 5.03 – Litigation

Schedule 5.08 – Liens on Collateral

Schedule 5.11 – Taxes (exceptions to representation)

Schedule 5.12(a) – Subsidiaries

Schedule 5.12 – Investments

Schedule 7.08—Identification of Asset Management Agreement

Schedule 9.01 – Pledged Equity